# EXHIBIT A

1  John E. Schmidtlein, SBN 163520
   WILLIAMS & CONNOLLY LLP
2  725 Twelfth Street, N.W.
   Washington, DC 20005
3  Telephone:  (202) 434-5000
   Facsimile:  (202) 434-5029
4  Email:  jschmidtlein@wc.com

5  *Attorney for Defendants*

6

7

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11            **OAKLAND DIVISION**

12

13  SWEEPSTAKES TODAY, LLC, Individually    )  Case No. 20-cv-08984-HSG
    and on Behalf of All Others Similarly Situated,  )
14                                          )
15                    Plaintiffs,           )  **DEFENDANTS' RESPONSE IN**
                                            )  **OPPOSITION TO THE *STERLING***
16            v.                            )  ***INTERNATIONAL* PLAINTIFF'S**
                                            )  **ADMINISTRATIVE MOTION**
17  GOOGLE LLC, ALPHABET INC., and          )  **TO RELATE CASES**
    YOUTUBE, LLC,                           )
18                                          )
19                    Defendants.           )
                                            )  Hon. Haywood S. Gilliam, Jr.
20                                          )

21  _____

22

23

24

25

26

27

28
_____
DEFENDANTS' RESPONSE IN OPPOSITION TO THE *STERLING INTERNATIONAL* PLAINTIFF'S
ADMINISTRATIVE MOTION TO RELATE CASES
20-cv-08984-HSG

As explained below, the motion to relate before the Court is substantively identical to one that is already fully briefed, regarding *Genius Media, Inc. v. Alphabet Inc., et al.*, No. 20-cv-09092-BLF, and should be denied for the same reasons that motion should be denied. *See* ECF 19.

\* \* \*

Defendants Google LLC, Alphabet Inc., and YouTube, LLC ("Defendants") oppose Plaintiff's motion to relate *Sterling International Consulting Group. v. Google LLC*, No. 20-cv-09321-VC ("*Sterling International*"), now pending before another judge in this District, to the above-captioned matter, *Sweepstakes Today, LLC v. Google LLC, et al.*, No. 20-cv-08984-HSG ("*Sweepstakes Today*"). Plaintiff's motion to relate comes on the heels of an analogous motion to relate another case in this District, *Genius Media, Inc. v. Alphabet Inc., et al.*, No. 20-cv-09092-BLF ("*Genius Media*"), to the above-captioned matter. *See* No. 20-cv-08984-HSG, ECF 18. Defendants oppose this motion to relate for the same reason they opposed that one (*see* ECF 19): although *Sterling International* and *Sweepstakes Today* are related to one another, they both are also related to an earlier-filed case that has been pending in this District before Judge Beth Labson Freeman since May 2020, *In re Google Digital Advertising Antitrust Litigation*, No. 20-cv-03556-BLF ("*Digital Ads Litigation*").[1] Defendants therefore filed a motion to relate the *Sterling International* action to *Digital Ads Litigation*, which is now fully briefed and due to be decided by Judge Freeman by January 22, 2021, per Local Rule 3-12(f)(1).[2] *See* No. 20-cv-03556-BLF, ECF 61, 63. Because *Digital Ads Litigation*, and not *Sweepstakes Today*, is the lowest-numbered related case, *see* L.R. 3-12(b), Defendants respectfully submit that the Court should deny this motion to relate or, in the

---

[1] In yet another action filed in this Court against Defendants Google LLC and Alphabet Inc., *Astarita v. Google LLC, et al.*, No. 21-cv-00022-DMR ("*Astarita*"), also brought on behalf of a putative class of publishers and also concerning "Google's display advertising services," the plaintiff agreed that the case was related to the *Digital Ads Litigation*. No. 20-cv-03556-BLF, ECF 64.

[2] Defendants have also previously moved to relate to the *Digital Ads Litigation* the *Sweepstakes Today* and *Genius Media* cases. *See* No. 20-cv-03556-BLF, ECF 55, 57.

alternative, withhold ruling upon it until the pending relation motion in *Digital Ads Litigation* is resolved by Judge Freeman.

**ARGUMENT**

Cases are related "when (1) [t]he actions concern substantially the same parties, property, transaction or event; and (2) [i]t appears likely that there will be an unduly burdensome duplication of labor and expense or conflicting results if the cases are conducted before different judges." L.R. 3-12(a). The *Sterling International* plaintiff contends that both requirements are satisfied here because *Sterling International* and *Sweepstakes Today* concern common parties and facts, and because relating the matters would avoid the risk of undue expense and duplicative labor.

The *Sterling International* motion, like the *Genius Media* motion before it, gets the story only half-right. As Defendants explained in their motion to relate, *Digital Ads Litigation* also concerns the same parties and operative facts as *Sterling International*, such that it (like *Genius Media*) should be related back to *Digital Ads Litigation*. *See* No. 20-cv-03556-BLF, ECF 61. Indeed, it would be entirely inconsistent with Rule 3-12 for *Sterling International* and *Sweepstakes Today* to proceed separately from *Digital Ads Litigation*, given that the newer cases seek to proceed on behalf of display advertising publishers that are already included in the *Digital Ads Litigation* putative class. And because *Digital Ads Litigation* is "the lowest-numbered case," *Sterling International* and *Sweepstakes Today* should be related to it, not simply to each other. L.R. 3-12(b).

***Same Parties.*** Plaintiffs in all three cases bring class actions on behalf of online "publishers" that purportedly sold advertising space using "Google's display advertising services." *Digital Ads Litigation*, No. 20-cv-03556-BLF, ECF 52 ¶ 225 ("*Digital Ads Litigation* Amend. Compl.," Ex. A); *see Sweepstakes Today*, No. 20-cv-08984-HSG, ECF 1 ¶ 194 ("*Sweepstakes Today* Compl.," Ex. B) (seeking to represent persons and entities "who sold digital advertising space at any time during the period from December 15, 2016 through the present"); *Sterling International*, No. 20-cv-09321-VC, ECF 1 ¶ 172 ("*Sterling International* Compl.," Ex. C) (seeking to represent "[a]ll Publishers that sell digital display advertising inventory through a Google publisher ad server targeting consumers in the

- 2 -

United States").[3]  That the *Digital Ads Litigation* plaintiffs *also* include advertisers within their putative class does not change the fact that the *Sterling International* and *Sweepstakes Today* putative classes are subsumed within the class pleaded in *Digital Ads Litigation.  See Zakinov v. Ripple Labs, Inc.*, 2020 WL 2768966, at *2 (N.D. Cal. May 28, 2020) (actions "concern[ed] substantially the same parties" because "if the court were to certify [one] plaintiff's . . . class, [the other plaintiff] would be included among its membership").

**Common Facts.** Plaintiffs assert the same antitrust claims premised in substantial measure on the same alleged anticompetitive conduct.

All plaintiffs claim that Defendants have market power in an alleged market including publisher ad servers.  *Digital Ads Litigation* Amend. Compl. ¶ 186; *Sweepstakes Today* Compl. ¶¶ 7, 78; *Sterling International* Compl. ¶¶ 52, 57.  All plaintiffs also bring numerous, overlapping allegations regarding the means by which Defendants acquired and maintained their purported market power.  Specifically, all allege that Defendants: acquired rival ad-tech companies, most notably DoubleClick in 2007 (*Digital Ads Litigation* Amend. Compl. ¶¶ 62–68, *Sweepstakes Today* Compl. ¶¶ 11, 71, *Sterling International* Compl. ¶¶ 9, 69); broke promises to the Federal Trade Commission about the acquisition of DoubleClick (*Digital Ads Litigation* Amend. Compl. ¶ 68, *Sweepstakes Today* Compl. ¶ 71, *Sterling International* Compl. ¶¶ 70–71); impermissibly tied services or products, including by combining Defendants' publisher facing ad server and exchange into Google Ad Manager (*Digital Ads Litigation* Amend. Compl. ¶ 122, *Sweepstakes Today* Compl.

---

[3] Notably, the *Genius Media* and *Astarita* plaintiffs also bring class allegations on behalf of display advertising publishers.  *See Genius Media*, No. 20-cv-09092-BLF, ECF 1 ¶ 101 ("*Genius Media* Compl.," Ex. D) (seeking to represent "[a]ll persons that received revenue from Google for displaying advertisements using Google's Ad Exchange services" and that "received revenue from Google for displaying advertisements using Google's Ad Network services"); *Astarita*, No. 21-cv-00022-DMR, ECF 1 ¶ 211 ("*Astarita* Compl.," Ex. E) (seeking to represent "[a]ll persons and entities in the United States that . . . used Google's display advertising services to . . . place an ad from a third party on their own website (publishers)").

¶¶ 137–38, *Sterling International* Compl. ¶ 78); leveraged their purported monopoly in other markets, including an alleged market for search advertising (*Digital Ads Litigation* Amend. Compl. ¶ 134, *Sweepstakes Today* Compl. ¶¶ 163–65, *Sterling International* Compl. ¶ 124); interfered with competitors' header-bidding functions (*Digital Ads Litigation* Amend. Compl. ¶ 142, *Sweepstakes Today* Compl. ¶ 108, *Sterling International* Compl. ¶¶ 111–13); undermined competition through the introduction of Accelerated Mobile Pages technology (*Digital Ads Litigation* Amend. Compl. ¶ 144, *Sweepstakes Today* Compl. ¶ 109, *Sterling International* Compl. ¶ 128); phased third-party cookies out of their Chrome browser to force advertisers to use Defendants' services (*Digital Ads Litigation* Amend. Compl. ¶ 178, *Sweepstakes Today* Compl. ¶ 103, *Sterling International* Compl. ¶ 125); engaged in "self-preferencing" behavior on their exchanges (*Digital Ads Litigation* Amend. Compl. ¶ 142, *Sweepstakes Today* Compl. ¶ 108, *Sterling International* Compl. ¶ 66); imposed limitations on the sharing of their data and fees (*Digital Ads Litigation* Amend. Compl. ¶¶ 93, 112, *Sweepstakes Today* Compl. ¶¶ 135–36, *Sterling International* Compl. ¶¶ 12, 64); and charged supracompetitive prices to advertisers and paid subcompetitive prices to publishers (*Digital Ads Litigation* Amend. Compl. ¶ 214, *Sweepstakes Today* Compl. ¶ 8, *Sterling International* Compl. ¶ 84).[4]

---

[4] Further demonstrating that all of these actions should be assigned to the same judge, the *Astarita* plaintiff agrees that its case is related to *Digital Ads Litigation*, as it also raises **all** the above allegations of anticompetitive conduct. *See Astarita* Compl. ¶¶ 48–49 (acquired rivals); ¶ 55 (broke promises to FTC); ¶¶ 93, 106 (tied services and products); ¶ 1 (leveraged purported monopoly power in other markets); ¶ 129 (interfered with rivals' header bidding); ¶ 131 (introduced Accelerated Mobile Pages technology); ¶ 141 (phased out third-party cookies); ¶ 164 (engaged in "self-preferencing" behavior); ¶¶ 95, 134 (limited sharing of data and fees); ¶ 200 (charged supracompetitive prices). The *Genius Media* plaintiffs also level overlapping allegations of anticompetitive conduct. *See Genius Media* Compl. ¶ 41 (acquired rivals); ¶¶ 60–61 (tied services and products); ¶ 85 (leveraged purported monopoly power in other markets); ¶¶ 54–56 (interfered with rivals' header bidding); ¶ 93 (charged supracompetitive prices). *See also* ECF 19.

Based on this conduct, plaintiffs in all three cases bring monopolization claims under Section 2 of the Sherman Act, seeking injunctive relief and damages. *Digital Ads Litigation* Amend. Compl. ¶¶ 236–44, Prayer for Relief; *Sweepstakes Today* Compl. ¶¶ 202–07, Prayer for Relief; *Sterling International* Compl. ¶¶ 183–190, 206. The actions, then, "proffer[] materially identical allegations of misconduct . . . to support [their] theor[ies] of the case." *Zakinov*, 2020 WL 2768966, at *2; *see also JaM Cellars, Inc. v. Wine Grp. LLC*, 2020 WL 2322992, at *1 (N.D. Cal. May 11, 2020) (finding cases related in part because they "involve[d] . . . the same underlying legal claims").

***Labor, expense, potentially conflicting results.*** Given the overlap between the cases, dividing them between different judges would risk "unduly burdensome duplication of labor and expense or conflicting results," precisely what Rule 3-12(a) was designed to avoid. Discovery would necessarily overlap, imposing an undue burden of duplication on the parties if the actions were to proceed separately. Further, because the cases "are currently in a similar procedural posture," as discovery has not begun in any of them, "efficiency gains [would likely] be achieved" by treating all the matters as related. *Pepper v. Apple Inc.*, 2019 WL 4783951, at *2 (N.D. Cal. Aug. 22, 2019).

In addition, relating all the matters is appropriate to "avoid . . . conflicting results." *Zakinov*, 2020 WL 2768966, at *3. In *Digital Ads Litigation*, Rule 12 briefing is underway (ECF 41) and due to be completed by March (ECF 45), and the court already held an initial Case Management Conference in September (ECF 30, 32). Rule 3-12 exists so that any similar such motions in the *Sterling International* and *Sweepstakes Today* actions are addressed by one Court, to avoid potentially conflicting results. Likewise, were the actions to proceed past dispositive motions, given that plaintiffs all intend to seek injunctive relief on behalf of the same publishers, having the matters proceed before separate courts could lead to conflicting orders as to the same alleged conduct.

## CONCLUSION

For the foregoing reasons, Plaintiff's Administrative Motion should be denied. In the alternative, Defendants respectfully submit that the Court should refrain from ruling on the Motion until the earlier-filed motion to relate is decided in *Digital Ads Litigation*.

DATED:  January 11, 2021

**WILLIAMS & CONNOLLY LLP**

By: /s/ John E. Schmidtlein
John E. Schmidtlein, SBN 163520
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
Email:  jschmidtlein@wc.com

*Attorney for Defendants*

DEFENDANTS' RESPONSE IN OPPOSITION TO THE *STERLING INTERNATIONAL* PLAINTIFF'S
ADMINISTRATIVE MOTION TO RELATE CASES
20-cv-08984-HSG

1  John E. Schmidtlein, SBN 163520
2  WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, N.W.
3  Washington, DC 20005
   Telephone:  (202) 434-5000
4  Facsimile:  (202) 434-5029
   Email:  jschmidtlein@wc.com
5
6  *Attorney for Defendants*
7
8
9              **UNITED STATES DISTRICT COURT**
10
           **NORTHERN DISTRICT OF CALIFORNIA**
11
                   **OAKLAND DIVISION**
12
13  SWEEPSTAKES TODAY, LLC, Individually        )  Case No. 20-cv-08984-HSG
14  and on Behalf of All Others Similarly Situated,  )
                                                )
15                          Plaintiffs,         )  **[PROPOSED] ORDER ON THE *STERLING***
                                                )  ***INTERNATIONAL* PLAINTIFF'S**
16                  v.                           )  **ADMINISTRATIVE MOTION TO**
                                                )  **RELATE CASES**
17  GOOGLE LLC, ALPHABET INC., and             )
18  YOUTUBE, LLC,                               )
                                                )
19                          Defendants.         )  Hon. Haywood S. Gilliam, Jr.
                                                )
20
21  _____
22
23
24
25
26
27
28

**[PROPOSED] ORDER**

The Court, having considered the administrative motion of the plaintiff in *Sterling International Consulting Group. v. Google LLC*, No. 20-cv-09321-VC, to consider whether the action should be deemed related to *Sweepstakes Today, LLC v. Google LLC, et al.*, No. 20-cv-08984-HSG, hereby denies the administrative motion.

IT IS SO ORDERED.

Dated: January ___, 2021                    By: _____
                                                          Hon. Haywood S. Gilliam, Jr.
                                                          United States District Judge

Submitted by:

Williams & Connolly LLP

By:  /s/ John E. Schmidtlein
*Attorney for Defendants*

- 1 -

# EXHIBIT A

Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

Tina Wolfson (State Bar No. 174806)
Theodore W. Maya (State Bar No. 223242)
Rachel Johnson (State Bar No. 331351)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
rjohnson@ahdootwolfson.com

*Attorneys for Plaintiffs*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | Case No. 5:20-cv-03556-BLF<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Hon. Beth Labson Freeman |

Plaintiffs, on behalf of themselves and all others similarly situated, bring this first amended consolidated class action complaint for equitable relief and treble damages under the Sherman Antitrust Act, 15 U.S.C. § 2, and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*.

# I.    NATURE OF THE ACTION

1.    Over the past several years, Google leveraged its monopoly in online search and search advertising to acquire an illegal monopoly in brokering display advertising—the placement of advertisements on other companies' websites.  Google gained this market dominance in part by acquiring rivals in the online advertising space, conditioning access to its search-results data and YouTube video advertising platform upon the purchase of its separate display advertising services, and making its intermediation systems incompatible with those of its competitors.  Google's scheme to monopolize the market for brokering display advertising has vastly reduced competition in the purchase and placement of this advertising and resulted in economic harm to advertisers and publishers alike.

2.    Forty-nine state attorneys general are currently conducting antitrust investigations of Google's conduct in digital advertising markets, and the United States Department of Justice and eleven state attorneys general recently filed a civil antitrust action against Google for unlawfully maintaining monopolies in the markets for online search and search advertising.

3.    Because of its pervasive monopoly conduct, Google now controls the "ad tech stack" comprising the intermediary services between advertisers, which pay to place digital advertisements, and publishers paid to publish those ads on their websites.  Companies that wish to place or publish online advertisements have little choice but to pay Google for its advertising services, including instantaneous auctions, and Google's exclusion of competition in this intermediation market has enabled it to favor its own advertising platforms.  Google's extraction of monopoly rents through fees charged to both advertisers and publishers has resulted in higher prices paid by advertisers, higher consumer prices, and lower payments to publishers of online display advertisements.

4.    Like the other class members, Plaintiffs dealt directly with Google in its capacity as display advertising broker, having placed online display and search advertisements using Google's

services.  Plaintiffs, like the other class members, suffered economic losses as a result of Google's monopolization and seek appropriate equitable relief and damages through this action.

## II.  JURISDICTION AND VENUE

5.  This Court has original jurisdiction over Plaintiffs' federal antitrust claim under the Clayton Act, 15 U.S.C. § 15.  The Court also has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendants, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

6.  Venue is proper in this District under 28 U.S.C. § 1391.  Google's principal place of business is in this District, and it regularly conducts business here.  A substantial part of the events giving rise to Plaintiffs' causes of action occurred in or emanated from this District.

7.  Assignment to the San Jose Division is appropriate under Local Rule 3-2(c) because a substantial part of the conduct at issue in this case occurred in Santa Clara County.

## III.  PARTIES

### A.  Plaintiffs

#### 1.  Hanson Law Firm, PC

8.  Plaintiff Hanson Law Firm, PC is a law firm based in San Francisco, California.  During the class period, Hanson Law Firm paid Google directly to broker the placement of its display advertisements on third-party websites.

9.  Hanson Law Firm paid Google $487.78 between June 2016 and September 6, 2016 for these intermediation services.

10.  From June 1, 2016 to September 6, 2016, Hanson Law Firm's display advertising for its legal services appeared on 992 different websites a total of 689,876 different times.  These websites ranged from news organizations that included the *Los Angeles Times*, *Daily Beat*, and *Vanity Fair* to dating websites such as Match.com, as well as information sites like Wikihow.com.

11.  During the class period, Hanson Law Firm also paid Google for AdWords advertising connected to various searches performed using Google's internet search engine.

2

12. Hanson Law Firm placed display ads as well as search ads to expand the reach of its online advertising to include potential clients who may not have specifically searched the web for relevant topics or legal services, and to optimize its re-marketing to users who had already visited its website or clicked on its ad and to those who carried a similar "cookie" profile.

13. Hanson Law Firm sustained antitrust injury by paying supra-competitive prices to Google to broker the placement of its display advertisements on third-party websites. These anticompetitive overcharges directly and proximately resulted from Google's monopolization of the relevant market, defined in Part VI below.

### 2. Surefreight Global LLC d/b/a Prana Pets

14. Plaintiff Surefreight Global LLC d/b/a Prana Pets is an herbal remedy company based in Delray Beach, Florida and incorporated under Florida law. During the class period, Prana Pets paid Google directly to broker the placement of its display advertisements on third-party websites, including sites geared to dog owners.

15. Prana Pets paid Google $972.80 between August 2016 and July 2018, and $2,040.00 between February 2019 and December 2020, for these intermediation services.

16. During the class period, Prana Pets also paid Google for AdWords advertising connected to various searches performed using Google's internet search engine.

17. Prana Pets placed display ads as well as search ads to expand the reach of its online advertising to include consumers who may not have specifically searched the web for relevant products, and to optimize its re-marketing to users who had already visited its website or clicked on its ad and to those who carried a similar "cookie" profile. Prana Pets' display ads included branding and product-specific banner ads.

18. Prana Pets sustained antitrust injury by paying supra-competitive prices to Google to broker the placement of its display advertisements on third-party websites. These anticompetitive overcharges directly and proximately resulted from Google's monopolization of the relevant market.

### 3. Vitor Lindo

19. Plaintiff Vitor Lindo is a citizen and resident of Georgia and a photographer based in

3

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

Pembroke, Georgia. During the class period, Mr. Lindo paid Google directly to broker the placement of its display advertisements on third-party websites, including sites associated with wedding services.

20.     Mr. Lindo paid Google $21,971.45 between 2016 and 2019 for these intermediation services.

21.     During the class period, Mr. Lindo also paid Google for AdWords advertising connected to various searches performed using Google's internet search engine.

22.     Mr. Lindo placed display ads as well as search ads to expand the reach of his online advertising to include consumers who may not have specifically searched the web for topics or services relating to wedding photography, and to optimize re-marketing to users who had already visited his website or clicked on its ad and to those who carried a similar "cookie" profile.

23.     Mr. Lindo sustained antitrust injury by paying supra-competitive prices to Google to broker the placement of its display advertisements on third-party websites. These anticompetitive overcharges directly and proximately resulted from Google's monopolization of the relevant market.

**B.     Defendants**

24.     Defendant Google LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Mountain View, California. Google LLC is a technology company that provides internet-related services and products, including online advertising technologies and a search engine.

25.     Defendant Alphabet Inc. is a corporation organized under the laws of Delaware with its principal place of business in Mountain View, California. Google LLC is a wholly-owned subsidiary of Alphabet.

26.     Google LLC and Alphabet Inc. are collectively referred to herein as "Google."

**IV.     FACTUAL ALLEGATIONS**

**A.     Overview of Digital Advertising**

27.     Businesses have long relied on advertising to promote their products, generate brand awareness, and increase sales. Before the internet age, advertising campaigns were planned and managed by media buyers. If a media buyer needed to help a toy manufacturer reach parents of

children, she might place an ad in *Parents Magazine*, or in the family section of the local newspaper.

28. Digital advertising today works differently. The internet allows businesses to target potential customers with greater precision. Digital advertising is the promotion of products and services via the internet through search engines, websites, social media, and other platforms that can be accessed online. It is automated and data-driven, involving data scientists, mathematicians, and computer programmers who, behind the scenes, use advanced statistical tools to optimize advertising campaigns, micro-targeting users and constantly tweaking algorithms.

29. Digital advertising is now the fastest growing segment of the advertising business in the United States. More than half of all advertising money in the United States is now spent on digital advertising—approximately $129 billion in 2019.

30. The two overarching markets in digital advertising are search advertising and display advertising.

31. Search advertising is the placement of advertisements above or alongside the organic search results generated by a search engine, predominately Google Search. The advertisement targets those who are actually searching for a product or service; the advertisement appears when a consumer performs a search that has a connection to the product or service offered by company sponsoring the advertisement. The advertiser pays when the user clicks on the advertisement, based on a cost per click. For example, if a user searches for sandwich delivery, the search advertising results may look like this:



FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

32.     Search advertising is designed to reach customers who have already shown an interest in purchasing a product or service and may be close to making a purchasing decision. If, for example, a person finds herself locked out of her house and searches for nearby locksmiths on Google Search, search advertising will place ads for local locksmith services above the organic search results.

33.     Search advertising is limited, however, to prospective customers who affirmatively search for the advertiser's product or service or for something similar, or who input a related term.

34.     Display advertising, in contrast, is the advertising that appears next to content on websites. Unlike search advertising, which is generally limited to text, display advertising comes in many forms, including banners, images, and videos. For instance, an ad for Dove soap might appear as a banner or sidebar on the cooking website "myrecipes":



Or as side bar ads, like this:




35.     With display advertising, the internet user need not perform a specific search for the particular product or service. Instead, the key to effective display ads is placing them on websites likely to be viewed by the advertiser's target audience or by those most likely to purchase the advertised products or services. A running shoe company, for example, would prefer to have its advertisements appear on sporting goods websites rather than websites selling car parts. In that

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

scenario, even users who have not searched for running shoes will see the running shoe company's advertisement if they visit a website that publishes it.

36.  Suppliers of display advertising are website operators and are known as publishers (*e.g.*, providers of online news sites and other content creators). Publishers employ third-party tools to find advertisers willing to purchase advertising space available on their websites.

37.  In 2019, $69.9 billion was spent on digital display advertising in the United States; 85% of that display marketing was advertising, 90% of which was executed through "programmatic," or automated, real-time bidding. In 2020, spending on display media is expected to reach $81.3 billion, a 14% year-over-year increase.

38.  Display advertising accounts for approximately half of the digital advertising market, and many web publishers rely on display advertising for a major source of their revenue.

39.  As discussed in further detail below, search advertising and display advertising serve different purposes, and advertisers do not regard them as substitutes for each other. The Interactive Advertising Bureau—an advertising organization that develops industry standards and conducts research for the advertising industry—separates display and search for purposes of gathering and reporting annual revenues in these two advertising markets.

**B.  Google Dominates and Controls Digital Advertising Services Markets**

40.  Google is the dominant supplier in the search advertising market and has moved rapidly to control all stages of the display advertising market, as well. In 2019, Google's corporate parent Alphabet earned $135 billion, 84% of its total revenue, from search and display advertising.

41.  Google's revenue derived from display advertising comes from ads placed on Google's own properties (Google Maps, Gmail, etc.) and from acting as an intermediary in the sale of ad space on third-party websites to advertisers.

42.  One of Google's key sources of revenue derives from its activities as the broker between publishers and advertisers in programmatic display advertising. When an ad is viewed on a third-party publisher's site, such as the *New York Times* website, Google pays the publisher a share of the amount the advertiser paid to Google. The amount of revenue Google earns from display

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

advertising is dependent on the number of ads it sells, the price of those ads, and Google's percentage margin or "cut" of the deal, also known as the "take rate."

43.     The "take rate" is the difference between what an advertiser pays for an ad and what portion of that payment the publisher of the ad receives for placing the ad on its website.  Google's take rate as an intermediary is typically 54-61%.  When ads are presented on Google products, such as Google Search or YouTube, Google keeps the entire price of the ad.

44.     Google has a strong economic incentive to increase the number of ads placed on its proprietary sites, to charge advertisers higher prices, and to pay as little as possible to publishers displaying ads placed through Google on their websites.

### 1.     Google's Search Advertising Practices and Market Share

45.     As the owner of the dominant online search platform, Google is by far the largest supplier of digital search advertising in the United States.  Over the last ten years, Google's share of the digital search advertising supply has ranged between 89% and 93%.

46.     Google makes space on its search results pages available to advertisers through an auction process that occurs each time a user runs a search.  Google starts the auction by first finding all the ads with keywords matching the search.  It then excludes ads that are considered ineligible based on certain criteria, such as country restrictions.  Google then only displays ads with a sufficiently high "rank" based on a combination of factors, such as the advertiser's bid, the quality of the ad, user location, and the device the user is using.  Because the auction process is repeated for every search performed on Google Search, different auctions may lead to different advertisements being displayed.

47.     Although Google claims that it prices its search advertising through an auction, Google controls (and frequently raises) the price of its search advertising by setting a high reserve price.  Doing so enables Google to directly set the price of its search advertisements because an ad will not sell unless its price meets or exceeds the reserve price, which thus operates as a floor.  A majority of the winning bids for Google Search ads are at the reserve price.

### 2.     Google's Dominance in the Ad Tech Stack and Display Advertising

48.     Google is also a major supplier of programmatic display advertising and owns multiple

8

products that supply it.  Google captures well over 50% of the market across the ad tech stack—the set of intermediary exchanges and platforms that advertisers and publishers use to buy, sell, and place display ads ("intermediation" services).  Google runs the leading ad exchange, while also running buy-side and sell-side intermediary platforms trading on this exchange.

49.     YouTube, owned by Google, alone accounts for about 10% of the entire supply of display advertising.  Other major Google products, such as Google Maps and Google Play, also offer display advertisements.

50.     Approximately 86% of online display advertising space in the United States is bought and sold in real time on electronic trading venues, referred to in the industry as "advertising exchanges" or programmatic real-time bidding.  Google owns and operates the dominant ad exchanges.

51.     The role of the ad exchange is critical in display advertising.  Exchange transactions are the means by which website publishers monetize the attention they earn from web users and advertisers can maximize the impact of their ad spend.  A competitive and transparent ad exchange is therefore essential to parties on both sides of the ad stack.

52.     Relying on intermediaries like Google that route buy and sell orders from advertisers and publishers, the structure of the ad market resembles the structure of electronically traded financial markets.  Just as individual investors trade on financial exchanges through an intermediary brokerage firm, so must publishers and advertisers go through a computerized intermediary to trade on advertising exchanges.  But in display advertising, a single company, Google, simultaneously functions as the key intermediary through which buyers (advertisers) and suppliers (publishers) of display advertising trade, and as a leading publisher of advertisements in its own right.

53.     On the buy-side, advertisers use specialized software made either for small or large advertisers.  Smaller advertisers, such as a local dry cleaner, typically use Google Ads, a self-serve online buying tool.  Google Ads will bid on and buy ad space, including available inventory trading on Google's exchange, in an automated fashion on the dry cleaner's behalf.  But in this process, Google can ultimately be the advertiser's counterparty instead of its neutral agent.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

54. When an internet user clicks to visit a web page, in the milliseconds that it takes for that page to load, real-time auctions are occurring in the background to determine which ads will display on the web page *that particular user* will see. These auctions are run by supply-side platforms (SSPs), exchanges, and demand-side platforms (DSPs) in the ad tech stack.

55. On the supply side of the exchange, suppliers—online publishers—of display advertising employ publisher ad servers (PAS) to accept, store, and manage ads; choose where and when ads appear; and track the effectiveness of ad campaigns. Each specific ad placement is determined based on bids from advertisers and/or preexisting arrangements between publishers and advertisers. Publishers rely on supply-side platforms (SSPs) to run auctions, interface directly with their demand-side equivalents, and optimize available inventory.

56. The demand side is comprised of advertisers and media agencies running advertising campaigns for businesses. Advertisers and media agencies rely on advertiser ad servers (AAS) to store ads, deliver them to publishers, and record transactions. Advertisers and media agencies also employ demand-side platforms (DSPs) to purchase digital advertising by bidding in auctions and to manage their bids.

57. The DSP connects to an ad exchange, which combines inventory from ad networks and SSPs with third-party data from a data management platform or data broker. When an ad space on a publisher's site becomes available, the ad exchange holds an auction in which the DSP bids on the impression submitted by the ad network or SSP.

58. Together, the publisher ad servers (PAS), supply-side platforms (SSP), advertiser ad servers (AAS), and demand-side platforms (DSP) comprise what is known as the "ad tech stack." By connecting publishers and advertisers, an ad tech provider functions as an intermediary broker. The U.K.'s Competition and Markets Authority (CMA) depicted this market as follows:



10

59.     Until fairly recently, different firms provided the various services in the ad tech stack, and intermediaries did not own publishers or advertisers.  Google lagged behind the pace of innovation and was not a key player in the development of online ad exchanges.  Early players in virtual ad auctions recognized it was most efficient to interoperate with competitors and maintain a level playing field so that customers could mix and match products.  During Senate testimony on September 15, 2020, digital marketing expert Adam Heimlich compared transacting in those earlier auctions to "owning a stall in a vast open air market"—transparency was at a level where market participants could easily compare features, quality, and price with those of other participants within reach, and could use ad stack services provided by a variety of providers.  This is no longer the case.  After a series of acquisitions, Google now dominates and controls the ad stack as a whole.

60.     Before Google's entry, ad exchanges generally operated as disinterested brokers, similar to stock exchanges.  Google saw the market efficiency of these early exchanges as a threat to its primary business of selling ads.  It soon turned to a sustained mergers and acquisitions strategy to gain market dominance.  Google's acquisitions gave it access to and made it a major player at every level of the display advertising service industry, and have enabled Google to exclude competition through a variety of anticompetitive policies and activities.

61.     Since 2007, Google has made numerous key acquisitions in the interest of taking control of the entire ad tech stack.  Through these acquisitions, Google absorbed competing firms to avoid competing with them with the purpose and effect of building and consolidating its monopoly.

62.     In 2007, Google purchased the leading ad server, DoubleClick, which provided the basic technology for Google's current PAS.  In 2009, Google acquired AdMob, the largest ad server for the then-nascent mobile application market, which has since grown exponentially.  The technology from Invite Media, which Google acquired in 2010, was re-launched in 2012 as DoubleClick Bid Manager and eventually converted into Google's main DSP, Display & Video 360.  In 2011, Google purchased AdMeld, one of the largest SSPs in the display advertising industry, which it integrated into AdX, Google's existing exchange.  And in 2014, Google bought Adometry, an analytics and attribution provider it then integrated into Google Analytics.  Together, these acquisitions reveal a

business objective of occupying the entire ad stack and the connected analytics market through buying up the competition.

63.     When Google purchased DoubleClick, the Federal Trade Commission accepted Google's representations that it would not leverage its control of publishers' primary ad server to distort competition in the electronic ad-trading market.  Google promised to manage the conflicts of interest, including from enhanced access to user data, that would result from the acquisition.  Google's general counsel assured Congress that DoubleClick "data is owned by the customers, publishers and advertisers, and DoubleClick or Google cannot do anything with it."

64.     FTC Commissioner Pamela Jones Harbour dissented from the FTC's approval of the acquisition, warning in part that if Google and DoubleClick were permitted to merge without conditions, the new combination could merge Google and DoubleClick data to the detriment of consumer privacy and competition.  Commissioner Harbour stated that the merger could "profoundly alter the 21st century Internet-based economy—in ways we can imagine, and in ways we cannot."  She expressed concern about "the privacy interests of consumers" and wrote that she was "uncomfortable accepting the merging parties' nonbinding representations at face value."

65.     In approving Google's acquisition of DoubleClick, the FTC rejected prescient concerns about data and competition raised by Commissioner Harbour and public interest groups.  An April 14, 2007 news article in the *New York Times* noted that Google's DoubleClick division would have conflicts of interest with Google's exchange, but suggested publishers and advertisers might simply "jump ship" if Google leveraged the acquisition "to further its own ad network."

66.     When Google did leverage the DoubleClick acquisition to further its ad network, instead of turning to other ad tech providers, increasing numbers of publishers and advertisers concluded they had no choice but to rely on Google to broker display-ad placement.

67.     In 2009, Google restricted the ability of publishers and advertisers participating in its exchange to access their DoubleClick data, reserving an essential information advantage for its own trading divisions.

12

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

68.     In 2016, moreover, Google broke a key promise it made to the FTC to push through the DoubleClick acquisition: Google began merging DoubleClick web-browsing data with personal information collected through other Google services, combining information linked to a user's personal identity with their location on Google Maps, information from their Gmail records, and their Google search histories, along with user information obtained from other Google products.  With this step, Google eliminated the barrier between the data that Google gathered from cookies tracking users' online behavior and the personal information Google held from its users' accounts.  Its digital advertising monopolies enabled Google to make this momentous shift in data policy without risk of losing business to rivals more protective of consumer privacy.

69.     In approving Google's 2010 acquisition of AdMob, the leading mobile ad network at the time, the FTC acknowledged that "the combination of the two leading mobile advertising networks raised serious antitrust issues."  Yet the FTC deemed those concerns "overshadowed by recent developments in the market," in particular a move by Apple to "launch its own, competing mobile ad network."  The FTC approved Google's acquisition of AdMob based on the assumption that Apple would continue to build its presence in the mobile ad market.  But that assumption was incorrect— Apple's product failed to gain traction and in 2016 Apple abandoned its attempt to develop a competing mobile ad network.

70.     By 2015, Google's acquisitions had given it monopoly power in the display advertising services market, and the early exchanges that had initially outperformed Google were selling at a discount price or had folded.  The market shares of the DSPs that once led that market segment declined in parallel.

71.     Documents that Google produced to the House Subcommittee on Antitrust, Commercial, and Administrative Law show that Google acquired companies to absorb its competition and combine products along the ad stack instead of competing on the merits.  An internal Google presentation from July 2006 included a slide titled "Build a Self-Reinforcing Online Ads Ecosystem," which noted in part that acquiring DoubleClick or Atlas could create "self-reinforcing benefits" for Google's integrated ad business.  The slide asked, "[I]s there some framework we have to demonstrate

13

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

the synergies/inter-relationships from owning all these pieces?"

72.     In an internal email from 2010, discussing Google's potential development of a demand-side platform for advertising agencies (a "bidder"), the executive in charge of Google's display business wrote: "The primary benefits on having a bidder are eliminating the disintermediation risk and substantially increasing display spend with Google from agencies (through the combined use of DFA – bidder – AdX). . . . We are looking at options to accelerate this (potentially through M&A for example)."

73.     DFA refers to Google's ad server; AdX was Google's exchange.  The "disintermediation risk" that Google sought to eliminate resulted from the competitive, transparent conditions in the display advertising exchange market at the time, which diverted ad money away from Google.  Thus, Google's plan was to *combine* products to increase its revenue from "display spend" and lock in bidders to its new and consolidated intermediation services.

74.     Google's merge-to-monopolize strategy worked.  On the supply side, Google now holds at least 90% of the PAS submarket through multiple products such as Google Ad Manager and Google DoubleClick for Publishers.  Since taking the dominant position in the PAS submarket, Google began merging its supply-side intermediation products with its PAS offering.  The composite product "Google Ad Manager" combined Google's PAS with its associated ad exchange.  For the SSP and associated ad exchange submarket, Google holds a 50-60% share.  On the demand side, Google also controls a substantial majority of the DSP submarket.  Google has a 55% market share of the ad-exchange submarket, far more than the second-place company, AppNexus, which has a 11% share of that submarket.  And Google's DSP holds a 50% share of the DSP submarket, with AOL a distant second at 12%.  Google holds an 80-90% share of the AAS submarket as well.

75.     Because of Google's market dominance, publishers and advertisers have little choice but to use Google's intermediation services.  Nexstar Media Group, Inc., the nation's largest local news company, tested what would happen if it stopped using Google's technology to place ads on its websites.  Over just a few days, the company's video-ad sales plummeted.

---

14

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

76.     Google further consolidated its monopoly across the ad tech stack through a series of product mergers, whereby it bundled two distinct products together and rebranded the integrated entity as a single product.  Google blurred the distinction between its ad server and exchange by reclassifying its ad-serving revenues in its shareholder reports and by merging the two into a single new product that it named Google Ad Manager.  Google then merged its AAS with its DSP to create Display & Video 360.  Each of these mergers increased switching costs for advertisers—and barriers to entry for competitors—for services that already carried high switching costs.

**C.     Google Used Its Market Power to Acquire and Maintain a Monopoly for Display Advertising Services**

**1.     Google Leveraged Its Dominance in Search and Search Advertising and Its Control of User Data to Gain a Monopoly in Brokering Display Advertising**

77.     Google operates the default internet search platform in the United States.  More than 90% of all internet searches are conducted through Google Search.  Further, Google's web browser, Google Chrome, occupies about half of the U.S. browser market.

78.     Google has long monetized its monopoly in search by selling search advertising—digital ads responsive to user searches.  The data that Google has acquired from search and Google Chrome users allowed Google to leverage its monopoly in the digital search market into the related but separate market of display advertising.

79.     General online search services in the United States constitutes a distinct antitrust market.  Search services allow consumers to find responsive information on the internet by entering keyword queries into search engines such as Google.  These general search services are unique because they offer consumers access to an extremely large and diverse volume of information from many sources across the internet.

80.     There are no reasonable substitutes for general online search services.  Other search tools, platforms, and information sources are not reasonably interchangeable with general online search services because they do not provide access to a wide range of information from one search inquiry.  Few consumers would find alternative sources a suitable substitute for general search services.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

81.     Google has monopoly power in the United States general online search services market. Google dominates this market with an approximately 90% market share.  And nearly 95% of all search queries on mobile devices are performed using Google's search engine.

82.     There are significant barriers to entering the market for general online search services, including large capital investment, highly complex technology, access to effective distribution, and adequate scale.

83.     Google's anticompetitive conduct has effectively eliminated rivals' ability to compete in the general search services market.  Google used exclusionary agreements, tying arrangements, and payoffs to barricade its general search monopoly such that competitors are denied vital distribution, scale, and product recognition—preventing them from realistically challenging Google in this market. As one example, Google ensured that its search engine would be the preset default general search engine on hugely popular devices like Apple's iPhone and the devices running on Google's Android operating system.

84.     Online search advertising in the United States also constitutes a distinct antitrust market. Search advertising enables advertisers to target their ads in real time in response to search queries.

85.     Other forms of advertising are not reasonably interchangeable with online search advertising.  The capability of search advertising to respond to consumers' inquiries at the moment they are looking for information to make a potential purchase makes these ads highly valuable to advertisers and distinguishes them from other types of advertising that cannot be targeted in this way, whether online or offline.  Display advertising is no substitute for search advertising, including because display advertising is not responsive to a consumer's specific inquiry and is further removed from the point of purchase.  Few advertisers would find alternative sources a suitable substitute for search advertising.

86.     Google has monopoly power in the United States online search advertising market. Google holds more than a 70% share of that market.

87.     Barriers to entry in the search advertising market, among other factors, protect Google's monopoly in that market.  Most critically, search advertising requires a search engine with sufficient

16

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

scale to make the advertising profitable.  Hence the same entry barriers that fortify Google's general search services monopoly also protect Google's search advertising monopoly.

88.     Google's monopolies in search and search advertising—and the data they generate about individual users—give Google an enormous advantage over online advertisers and publishers owing to the sheer volume of information Google acquires about consumers through its integrated panoply of products and services.  This data include browsing histories from Google Search and Google's Chrome web browser, and location data from Google Maps, Waze, and Google's Android operating system embedded in hundreds of millions of smartphones.  As Google's former CEO Eric Schmidt boasted, "We know where you are.  We know where you've been. We can more or less know what you've been thinking about."

89.     Online advertising is more effective when it is targeted, displaying products or services a user is more likely to want.  Accordingly, user data—including gender, age, location, and browsing history—influence not just the types of ads a user will see, but also the prices advertisers are willing to pay.  "The exact same ad, on the same website, at the same time, could be worth vastly different amounts to two different buyers depending on how much they know about the consumer being targeted," explained Ari Paparo, a former Google executive who founded the advertising company Beeswax.  "User data is everything."

90.     The prices that any company is able to fetch for ads that it displays online depend on two crucial factors: the ability to identify *who* is loading the page or mobile application, and the ability to connect that user's identity with more information about them.

91.     The targeting of display ads begins the moment a user clicks to visit a web page.  Typically, the user's IP address and location, along with the URL of the web page, are swiped from the user's browser without their explicit knowledge.  This data then informs the instantaneous ad auctions that occur in the split second before the web page appears to the user.  The goal is to build and deploy as specific a portrait about the user as possible, primarily by linking their device with their identity.  Web cookies, tags, and "fingerprinting" of mobile devices are common tools for doing so.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

92. If a publisher or company that sells online ads can know what a user is viewing on *other* sites, the publisher can target the user based on that information when the user returns to the publisher's site. Because of its dominance, including in search, Google can track users' visits to at least 70% of the top one million sites on the internet. Google has tags (including as a third party) tracking user behavior on over 80% of popular websites.

93. Due to Google's monopoly in search and its unrivalled ability to gather, aggregate, and analyze user data, which it does not share, no potential competitor to Google can offer an advertising product that comes close to the individualized targeting that Google can offer. Without access to search data, potential rivals are effectively excluded from competing in digital advertising.

94. To illustrate Google's vast advantage over any other publisher in accessing and monetizing data, consider two hypothetical online publishers, CNBC and the *New York Times.* Suppose, for example, that a user named Mary visits CNBC's website in the mornings, where she reads about financial markets, and visits the *New York Times* in the evenings to read the book review section. CNBC knows that Mary follows financial markets and might monetize her view at a $30 CPM (cost per thousand impressions). The *Times* knows that Mary likes to read books and might only monetize her at a $10 CPM. If the *Times* can somehow find out that Mary is reading CNBC in the mornings, then when Mary visits the *Times* book review section in the evening, the *Times* can target her as someone who follows the markets and monetize her at $30, too.

95. Since the two are competitors in the supply side of the display advertising market, CNBC would not want to share with the *Times* what Mary reads on cnbc.com. If CNBC is selling ads to its audience of financial readers at a $30 CPM, and the *Times* can access CNBC's readers and their reading patterns, then the *Times* could undercut CNBC and sell ads targeted to CNBC financial readers for, say, $25 instead of $30.

96. Google uses its ability to track users across the web to extract such a large advantage in display advertising markets that rivals are effectively excluded. Google tracks users through its analytics and ad-serving products, which it combined and rebranded as the Google Marketing Platform. While publishers like CNBC and the *Times* would never share with each other user information that

18

gave each a competitive advantage, they have no choice but to share user tracking information with Google, which acts as both their ad broker and supply-side competitor.

97.     Google's exclusive access to its proprietary data from Chrome and Android further widens its substantial advantage over other publishers.  Google relies on this data, which is generally unavailable to competing bidders, when bidding on its own ad exchanges to win contracts to display ads.  Potential rivals for display advertising contracts cannot compete to win business without access to this data.

98.     Furthermore, while digital ads trade on several auction markets, Google ensures that its own display advertising inventory can only be purchased through its proprietary auctions.  Thus, the most effective, data-driven inventory stays within Google's control and potential competitors are excluded.

99.     Having consolidated key portions of the ad tech stack for display advertising, Google now readily brokers transactions on both sides of this market, and can steer advertisers to its *own* display supply platforms like YouTube.  As the U.K.'s CMA concluded in a report issued on July 1, 2020, "Google's strong position at each level of the intermediation value chain creates clear conflicts of interest, as it has the ability and incentive to exploit its position on both sides of a transaction to favour its own sources of supply and demand."

### 2.     Google Harms Purchasers and Sellers of Online Advertising by Coercing the Purchase of Display Advertising Through Tying Arrangements

100.     With about nine out of ten internet searches using Google's search engine, Google is the dominant source for search advertising.  As a result, companies seeking to promote their products or services online have little or no choice but to purchase search advertising space from Google.  Google has taken advantage of this dominance in the search advertising market to drive out competition in the separate market for display advertising services, tying its display advertising services to its search advertising services to extend its monopoly power.

101.     Because search advertising targets users who have already shown some interest in the product or service from their search, few online advertising campaigns bypass online search as a

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

platform for marketing. Search advertising accounts for at least part of the ad spend of nearly every advertiser engaged in online advertising.

102. When a Google Ads account is established for use in placing search advertisements, Google Ads is set as the default account for placing both search *and* display advertisements. Google also blocks advertisers from using third-party DSPs to purchase Google Search inventory, which is sold primarily through Google AdWords. And, to further disadvantage rivals, Google restricts access to data relating to web searches performed on Google Search.

103. When consumers run Google searches, Google collects and retains data related to the searches. For example, Google Ads (a DSP) relies on algorithms that match keywords selected by advertisers to user search terms to determine which search ads pop up after which searches.

104. DSPs and advertisers use this data to craft more effective advertising campaigns. Google, however, withholds this data from rival DSPs and advertisers using rival service providers. As a result, an advertiser running both search and display ads cannot track the performance of its search ads unless it relies only on Google to place its display ads.

105. The effect of this policy is that, to access the search data over which Google has monopoly control and which is vital to effective online advertising, an advertiser is coerced into using Google's products in the separate market for display advertising services.

106. Advertisers that open a Google Ads account are required to buy Google search advertising. Thus, Google Ads does not merely steer advertisers to Google search advertising but conditions their ability to bid for publisher display space upon their purchase and use of Google search advertising.

107. Google's restrictive practices coerce any advertiser whose marketing pairs online search advertising with online display advertising to rely only on Google's intermediation services to place its display advertisements.

108. Exacerbating this tying conduct, Google pressures many advertisers to use only one Google buy-side intermediary to purchase ad space. This pressure results from Google's decision to scramble user IDs across multiple bidding tools instead of assigning and disclosing a single user ID to a

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

particular advertiser.  Because Google obscures DoubleClick IDs for all parties other than Google, advertisers that use more than one buying tool at a time risk inadvertently bidding against themselves in exchange transactions, driving up the price they would pay.

109.    Google's Ads Data Hub (ADH) allows advertisers to view data from ad campaigns, including which users their search advertising campaigns reached, and to combine that data with internal or third-party data to set or adjust display advertising strategy.  Nevertheless, the ability to use Google's ADH data comes with a built-in restriction: the data can only be sent to another Google service and cannot otherwise be exported.

110.    In 2018, Google stopped allowing advertisers to access the encrypted user IDs from ad campaign reports.  Advertisers need this information to hire non-Google ad campaign measurement firms.  Advertisers that stay within Google's "walled garden" and use its ADH product can still access these IDs.

111.    Google's restrictive policies have made it virtually impossible for an online marketer to operate independently from the Google ad stack, particularly given Google's dominance in the DSP, ad server, site analytics, and other submarket segments.

112.    Likewise, on the supply side, Google restricts publishers' ability to access the bid data required to compare the performance of Google's exchange with rival exchanges.  And Google does not reveal to other market participants its own fees and commissions on transactions.  As discussed further below, this lack of transparency that Google has unilaterally imposed across the ad stack undermines the ability of both advertisers and publishers to make the informed decisions necessary to drive competition.

113.    Google similarly uses its dominance in the video-ad publishing market segment to coerce advertisers to use Google's display advertising services.

114.    Google-owned YouTube is Google's most valuable display property.  YouTube is by far the most visited website in the United States, drawing more than three times the traffic of Twitter and Facebook, respectively.  Nearly every business that advertises with online videos buys advertising space on YouTube, and about half of all video ads not appearing on Facebook and Amazon appear on

YouTube.

115.     Video has become increasingly important to online advertising campaigns because of its compelling nature and the exponential increase in user traffic that it generates.  In 2019, 81% of businesses used video as a marketing tool—up from 63% in 2018.  By 2022, online videos will account for more than 82% of all consumer internet traffic—15 times higher than the corresponding percentage in 2017.

116.     After Google purchased YouTube, it initially made YouTube's inventory of display advertising available to any advertising service provider.  But in 2015, Google took YouTube off the digital ad exchanges, restricting its ad inventory to being purchased *only through Google's* brokering channels and bidding tools.

117.     Consequently, advertisers can no longer purchase YouTube inventory using a third-party DSP.  If an advertiser wants to purchase any of the valuable advertising space on YouTube, it must use Google's advertising services and cannot use any of Google's rivals' advertising services.

118.     One erstwhile competitor described Google's requirement that Google services be used to place ads on YouTube as "the beginning of the end," noting that "Google used its monopoly on YouTube to put its hand on the scale" unfairly.  Sen. Amy Klobuchar (D-MN) observed that this change "of course had a crippling effect on Google's rivals" and "not only forces YouTube's ad inventory into Google DSP, it also had the effect of driving non-YouTube ad volume to Google and away from the rival DSPs."

119.     In 2018, Google also began restricting third-party ad servers from tracking viewing activity on YouTube, leaving Google-owned Display & Video 360 as the only product available to collect and analyze YouTube advertising data.  This action effectively tied YouTube to Google Ads and Display & Video 360, preventing advertisers from using competitors' products to serve *or* analyze ads on YouTube.

120.     Google's leveraging of its position in forums like YouTube in which it is the dominant ad publisher restrains competition with an enhanced effect because advertisers almost always use a single DSP for a given advertising campaign.  Advertisers use a single DSP for a campaign largely

22

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

because doing so allows them to manage frequency caps (limits on the number of times the same user is shown an ad) during the campaign and facilitates audience management and reporting. Thus, if an advertiser wished to advertise on YouTube, Google Search, *and* other publisher websites, the advertiser would bear significant costs and inefficiencies from using a different advertising service provider to broker distribution of the ad campaign into each forum.

121.    Even if an advertiser preferred to use multiple DSPs, Google does not permit it to use third-party DSPs to purchase Google Search inventory (sold primarily through Google AdWords) or Google's YouTube inventory. Because Google Search and YouTube, in addition to digital display, are essential to many online ad campaigns, Google is able to capitalize on its "must-have" inventory to tether advertisers to its DSP. And because advertisers typically use one DSP per ad campaign, a display advertiser that wants any of its ads to appear on Google Search or YouTube must use Google's DSP for the entire ad campaign. In short, Google enlisted its dominance in search and search advertising to pursue and secure a monopoly in display advertising.

122.    Google has also combined ad tech stack products that were once technically separate but interdependent, reinforcing that they were effectively tied within the relevant market all along. For instance, using Google's ad server, formerly called DoubleClick for Publishers, was for many years the only way to obtain full access to Google's AdX exchange. That access was critical for publishers because AdX connected to AdWords, and the ability to access AdWords greatly expanded publishers' access to advertisers because of Google's dominance in search. As the *Wall Street Journal* reported, "[f]or many years, Google's AdX was the only ad exchange that had access to" Google's AdWords platform and its many advertisers. Thus, for example, when News Corp considered switching from Google to a different company to facilitate its ad-serving business, it reportedly "felt it would jeopardize the 40% to 60% of advertising demand it gets from Google's ad marketplaces . . . ." According to the *Journal*, Google in 2018 merged DoubleClick for Publishers and AdX "into a single product called Google Ad Manager, making it plain to the industry that they are indeed linked . . . ."

123.    Advertisers have suffered harm by paying higher prices due to Google's display advertising monopoly. During the class period, increases in the prices paid by advertisers to place

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

online display ads have outpaced the rate of inflation as a result of Google's ability to charge supra-competitive prices free from any realistic competitive threat.

124. The investigation conducted by the House Subcommittee on Antitrust, Commercial, and Administrative Law revealed that many companies pay Google most of their online ad expenditures. For example, one major company paid well over half of its total ad spend to Google each year from 2016 to 2019, with the second top provider receiving less than 15%.

125. A 2018 study by eMarketer, which focused on programmatically purchased ads across the open internet, found that programmatic ad prices have risen meaningfully across all major display categories: desktop, mobile, mobile app, and video. In 2018, the average digital advertisement sold for 12% more than it did in 2016, an increase approximately five times the prevailing rate of inflation. These price increases resulted in substantial part from Google's consolidation of the intermediation services market and Google's price increases for those services, and were largely borne by advertisers who paid Google for those services to broker the placement of their display ads.

126. *Bloomberg* also reported that as of 2019, Google had increased the price of search ads by about 5% annually, a rate more than three times greater than the 1.6% inflation rate during the same time period.

127. Google's power in the relevant market enabled it to raise the prices of its brokering services to supra-competitive levels. The higher prices have increased Google's profits, but advertisers now receive less for each dollar they spend, with trading costs now accounting for half the cost of every trade on average.

128. A substantial portion of Google's trading fees are monopoly rents. Competitive market conditions would serve to reduce these fees.

129. Advertisers have seen progressively lower returns on their digital advertising investments as Google built and reinforced its monopoly in the relevant market. And publishers have lost ad revenue because Google's entrenched monopoly has enabled it to take a comparatively larger cut of advertisers' payments for the placement of ads.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

130.    The higher prices have greatly benefited Google.  Google has consistently reaped profits at margins greater than 20%—almost three times more than the average profit margin for an American business.  Financial analysts predict that Google is well positioned to maintain its dominance in digital advertising, noting that "Alphabet has established unusually deep competitive moats around its business."

131.    Google's reserve-price practices also have caused advertisers to pay higher prices.  In its online ad auctions, Google sets a reserve or floor price, which corresponds to a minimum bid that is needed to win a particular ad placement.  If none of the bids exceeds this reserve price, the winning bidder *must* pay the reserve price—a price that, by definition, is higher than the price that would have won the placement in an auction in which Google had not set a floor price.  In fact, the majority of winning bids by advertisers are at the reserve price.  The lack of competition from other ad auctions has allowed Google to impose these supra-competitive floor prices.  At the same time, Google denies advertisers access to data they would need to accurately measure the success of their advertising campaigns and negotiate for lower prices.

132.    Market participants such as advertisers and newspapers also lack visibility into the fees charged along the supply chain, which limits their ability to make optimal choices about how to buy or to sell advertising inventory.  A market participant observed in congressional testimony that "Google could make the process 'more transparent,' but given Google's financial stake in maintaining secrecy, 'there is no incentive to do so.'"

133.    The foreclosure of competition in digital advertising markets resulting from Google's monopoly has harmed the public at large.  When advertisers pay supra-competitive fees to brokers like Google for placing ads, they pass on a portion of those costs to their customers by marking up the prices of their goods and services.  And when publishers receive anticompetitive underpayments for running ads, they are often forced to cut costs, including through layoffs, and hence cannot produce content of the same quality or variety.  Finally, by eliminating competition, Google's display advertising monopoly also has reduced the incentive to innovate in these markets and thereby deprived the public of the benefit of improvements in advertising services and delivery.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

**D. Google Created and Has Maintained Its Monopoly in Display Advertising Services by Restricting the Ability of Rivals to Compete on Equal Footing**

134. Google has engaged in a host of anticompetitive practices, including the leveraging of its monopoly in search and search advertising and the multiple tying arrangements discussed above, to disadvantage its rivals and cement its dominance in the display advertising services market.

135. Another key monopolistic practice that Google employs is denying interoperability—that is, Google denies the ability of its own advertising service systems to interface with the systems of rival advertising service providers, where those systems once were compatible.

136. Google's set of anticompetitive acts described in this complaint, including its monopoly leveraging, tying, exploitation of user data, and foreclosure of technological compatibility, were part of a unified, long-term strategy to exclude competition in the relevant market. While each component of that strategy, by itself, may not have sufficed to allow Google to monopolize the relevant market, their combined effect was to roll back competition, giving Google untrammeled power across the ad tech stack connecting advertisers and publishers of display advertising.

137. Although Google has publicly claimed that publishers can "mix and match technology partners," that claim is false in several important respects. Google changed its practices to deny interoperability with its rivals to squelch competition that would otherwise occur within Google's SSP system. When accepting bids from advertising services, Google's SSP operates more efficiently with Google's own advertising service. Although Google's SSP can accept bids from non-Google advertising services, Google's SSP is inefficient by design at processing those bids, and they are therefore disadvantaged as compared to bids submitted by Google's own advertising service. As the U.K.'s CMA explained in its July 1, 2020 report, if a publisher "uses a non-Google ad server, AdX would not participate in a real-time auction with other SSPs, but would compete with an 'expected' price, which determines the order in which SSPs are sent an ad request" and "is inefficient for the publisher."

138. Google, in short, runs an auction that includes its own bids, which are prioritized by the auction system that Google designed in such a way that non-Google-based bids cannot effectively compete. Imagine if this were a live, in-person auction: Google would be the auctioneer as well as a

26

bidder; and it would have designed the process so that the other bidders could not hear the live bids, but instead would need to submit in advance bids based on guesses about what the other bids were going to be. Exacerbating these conflicts, Google is also a seller of a portion of the inventory up for bid.

139. Google also imposed new restrictions on publishers' ability to set differential price floors, preventing them from calibrating different pricing for different SSPs or DSPs. This change had its intended result of driving more brokering business to Google on the sell side because publishers could no longer set higher floor prices for Google than for other sources of demand.

140. Moreover, Google's asymmetric approach to sharing websites' DoubleClick user IDs has distorted competition among buying tools seeking to purchase ad space from Google's exchange—*i.e.*, the limited number of buying tools that still compete with Display & Video 360 and Google Ads. Google's exchange shares users' DoubleClick IDs with Google-owned buying tools. But, when sending bid requests to *non*-Google intermediaries, Google's exchange shares a different ID value that is obscured from view.

141. Google's scrambling of IDs in this manner has directly interfered with competition. An advertiser that uses Google's DoubleClick ad server now has a much harder time using a non-Google buying tool because the two tools operate on different user IDs.

142. Still another example of Google's exclusionary conduct involves technology called header bidding, a system designed by Google's competitors on the sell side to compete with Google's display advertising exchange. Google responded to header bidding not by accepting the free and open competition it otherwise would have fostered, but by preventing its systems from working with the javascript code that publishers usually placed on their websites to enable header bidding. The result of this lack of compatibility was that the publisher would first notify non-Google exchanges and the winning bid would be sent to Google as if it were a pre-existing contract price. Thus, instead of submitting a blind bid to the publisher for how much the publisher would be paid to place an ad on its website, Google would separately receive the bids submitted by *other* service providers and then submit its *own* bid, knowing the minimum price it would need to outbid its rivals. This rigging gave Google a significant advantage over its rival brokers because, unlike Google, they would need to

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

submit aggressive bids to ensure their bid was the most attractive—and even then Google could outbid them to win display advertising business.

143. Google's rivals lacked Google's market dominance and therefore could not make their systems incompatible with header bidding as Google did. Had they done so, a publisher simply would not have received bids from them. Even after Google permitted non-Google service providers to integrate with Google's "Open Bidding" system—its exclusionary response to header bidding— Google charged the winning bidder 5-10% of the winning bid, driving up the costs to Google's rivals of merely attempting to compete with Google. This structure also gives Google a systematic advantage in bidding to place ads because it does not charge itself these fees.

144. Similarly, when Google launched its Accelerated Mobile Pages, or "AMP," it made the pages incompatible with header bidding, coercing publishers to use Google's Open Bidding system. And to further repel competition created by header bidding, Google began conditioning premium treatment on Google Search (*i.e.*, being featured at the top of search results) upon publishers migrating to AMP and forgoing the use of header bidding.

145. As Mr. Heimlich, the digital marketing expert, described in his Senate testimony, "Google became the only display company not hobbled by the exclusions and restrictions it'd placed on everyone else. The power to interoperate among buy-side, sell-side and measurement software went from being a feature of the exchange ecosystem to a capability exclusive to Google." That exclusive capability fortified Google's power to exclude rivals and allowed it to further boost its share of the display advertising services market, unfettered by any meaningful competition.

**E.  Google Maintains Its Display Advertising Monopoly with Harmful Anticompetitive Conduct**

146. Google maintains a culture of secrecy around its advertising services, a culture made possible by its market power. When acting as an intermediary, Google conceals from publishers and advertisers the price actually paid to Google for an ad placement. Even so, the consensus among knowledgeable publishers and advertisers is that Google's "ad tech tax" is high, particularly in comparison to fees charged in non-programmatic ad markets.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

147.    Google is competing with other sellers of display advertising, yet because it is also acting as the broker for these sales, Google has unique information which it denies to the buyers and other sellers to protect its monopoly.  Google refuses to disclose even basic information, including the fees it charges for each transaction, to other participants in the ad tech stack, causing market-distorting inefficiencies that solidify its grip on display advertising.

148.    Google redacts its take rate from trading or auction records on both the buy-side and the sell-side.  Service providers in competitive markets, by contrast, generally must furnish their customers detailed accounts of the services they are providing to justify the prices they charge.  Studies have shown that about 15% of display advertising transaction costs are unaccounted for: these are Google's monopoly rents.

149.    In surveys conducted by Association of National Advertisers estimating take rates, participants reported it was impossible or very difficult to obtain transaction-level pricing data related to Google's brokering services.  This lack of transparency makes it harder for publishers to negotiate with advertisers, and for potential competitors to compete with Google.

150.    Google also removes time-stamp information on bids, which publishers previously had used to optimize their pricing.  Moreover, Google conceals information about the performance of the digital ads it brokers, such as how many impressions are shown to actual users, as opposed to bots.  Google's multiple failures of transparency reinforce its power in the display-ad market and prevent advertisers from knowing if they are wasting some of their spend.

151.    Google's lack of transparency is strong evidence of its monopoly power.  If Google were subjected to competition in the relevant market, it could not conceal from advertisers and publishers information that Google collects related to their transactions for the placement of display ads.  In a competitive market, Google would risk losing business to more transparent rivals, as both advertisers and publishers have an interest in learning, assessing, and modulating their advertising efforts in response to information related to those transactions.

152.    Google's lack of transparency is not limited to withholding of information.  When advertisers use the Google Ads tool to bid on ad space belonging to third-party publishers from

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

Google's exchange, Google does not disclose to them the price at which the ad space actually cleared. Google can thus arbitrage advertisers' bids across two Google-controlled marketplaces—a fact that may go unnoticed by small-business and other advertisers due to the sheer complexity of Google's terms, including in its various "Help" documents. Read as a whole, the terms appear to permit Google to process bids that advertisers submit via Google's buying tool for smaller advertisers (known as Google Ads) through two different Google marketplaces (auctions). In other words, Google Ads hosts a first auction, and then Google Ads acts as the "buyer" in Google's exchange, so that Google simultaneously acts on the buy-side and the sell-side. Google implicitly confirmed this practice to Australia's competition authority.

153. Google has claimed implausibly that the conflicts of interest now present in its digital advertising business should lead to market efficiencies rather than distortions, asserting that "the combination of Google's search business and its vertical ad tech integration should give it incentives to balance the interests of all ecosystem participants." But market data tell a different story. Google's public filings show that the differential in allocation of advertising revenues between Google and non-Google properties has consistently increased. In 2007, the share going to Google properties increased to 64%, in 2008 to 68%, eventually to 71% (2011), then 75% (2014), 77% (2015), 80% (2016), 81% (2017), and 82% (2018). This percentage increased again in 2019, with just 16% of the $134 billion that advertisers spent through Google going to the more than 2 million *non*-Google properties that sell their ad space through Google's exchange and buying tools. These widening percentages well demonstrate the market distortions now favoring Google, and they correspond to—and resulted from—Google's steady acquisition of monopoly power in the ad tech stack.

154. As discussed above, Google has ready access to enormous amounts of consumer data, yet it has also acted to prevent competitors from obtaining similar information. In January 2020, for instance, Google announced that it would "phase out" the third-party cookies in its Chrome browser that help advertisers target consumers based on demographics, past browsing history, and other information. As a result, competing exchanges and buying tools soon will no longer be able to use cookies to assign user IDs for the purpose of buying and selling ads. Without access to third-party

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

cookies, it will be much harder for advertisers and competing service providers to bid rationally on ads. Yet that is not so for Google, which will continue to have other sources for gleaning robust data on consumers.  Google Chrome has begun tracking users' web activity directly at the browser level, obviating Google's need to rely on cookies for identity information.

155.    In 2016, Google launched AMP for the stated purpose of loading web pages faster on mobile devices.  AMP is a framework that websites can use to create fast-loading mobile web pages. By limiting the types of programming codes that can be used on a page, AMP pages load faster than they otherwise would.  When a user clicks on an AMP link from Google Search, instead of being routed to the page on the third-party site's server, the user sees a cached version stored on Google's own servers via its Content Delivery Network.

156.    Google encourages publishers to use AMP web pages and lists them first in a search. But, because the pages are *Google* pages, publishers are unable to gather data about their own users as they normally would.  For example, in the below image, the left side shows a *Newsweek* article on its own server.  The right side shows the same article, but on a Google-hosted page the user would see after clicking on the AMP-loaded link via Google Search:



**Left:** Normal article; **Right:** AMP article loaded from Google Search

31

157.    Google's strategy to host more and more content on its own servers demonstrates that Google views content providers themselves as long-term competitors for the capture of ad dollars. More than half of the desktop searches on Google keep users on Google properties rather than prompting clicks to the rest of the web.  For mobile searches, 70% of Google searches keep users on Google properties. The percent of Google's revenue from advertising dollars spent on its own properties increased from 64% in 2007 to 85% in 2020.

158.    The report issued on October 6, 2020 by the House Subcommittee on Antitrust, Commercial, and Administrative Law notes that, "in the context of Google's placement of news on accelerated mobile pages (AMP) . . . publishers raised concerns that 'Google effectively gave news publishers little choice but to adopt it,' requiring the creation of parallel websites 'that are hosted, stored and served from Google's servers rather than their own.'"

159.    A recent study by the News Media Alliance found that in 2018, Google gained over $4 billion in revenue from crawling and scraping news content, and running associated display ads, without paying the publishers for that use.  Google was able to take these steps because of its monopoly power over display advertising.

160.    Considered as a whole, Google's activity in the ad tech stack reflects a long-term strategy to monopolize display advertising.  Through acquiring rivals, leveraging its monopoly in search, tying display advertising to search advertising, denying the interoperability of its products with others, exploiting conflicts of interest, and withholding information from other market participants, Google has effectively created a "walled garden" for display advertising.  Google sells its own display advertising inventory even as it brokers a large majority of all display advertising sales, inhibits potential rivals from competing by denying them information and equal footing in the intermediation process it controls, and has acquired any company that threatens its display advertising services monopoly.  Google profits illegally from its walled garden by plucking the fruit every step of the way.

### F.    Government Investigations and Actions Regarding Google's Monopolistic Activities

161.    In July 2019, the United States Department of Justice announced that it had opened an

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

investigation into whether Google is committing illegal monopolistic acts. The DOJ stated that its probe would focus on whether and how Google and other leading online platforms "have achieved market power and are engaging in practices that have reduced competition, stifled innovation, or otherwise harmed consumers."

162. DOJ's ensuing civil action—joined by eleven state attorneys general and filed on October 20, 2020 in the United States District Court for the District of Columbia—focuses on Google's monopoly conduct in the markets for online search, search advertising, and search text advertising. The complaint of these governmental enforcers alleges that Google acted unlawfully to preserve these monopolies after having "created continuous and self-reinforcing monopolies in multiple markets."

163. As a result of Google's monopoly conduct, the enforcers allege, consumers are "forced to accept Google's policies, privacy practices, and use of personal data; and new companies with innovative business models cannot emerge from Google's long shadow."

164. The governmental enforcers further note that Google's conduct and internal messaging demonstrate its executives' awareness that Google has used its monopoly power to restrain competition: "Google employees were instructed to avoid using terms such as 'bundle,' 'tie,' 'crush,' 'kill,' 'hurt,' or 'block' competition, and to avoid observing that Google has 'market power' in any market."

165. The governmental enforcers seek, among other relief, "structural relief as needed to cure any anticompetitive harm" and an injunction forbidding Google's anticompetitive practices: "Absent a court order, Google will continue executing its anticompetitive strategy, crippling the competitive process, reducing consumer choice, and stifling innovation."

166. The attorneys general of every state except Alabama are separately investigating Google for monopolization. In September 2019, the attorneys general of 48 states, and of the District of Columbia and Puerto Rico, led by Texas Attorney General Ken Paxton, disclosed that they had opened an investigation into whether Google is violating the antitrust laws. In announcing the investigation, Mr. Paxton referred to "evidence that Google's business practices may have undermined consumer choice, stifled innovation, violated users' privacy, and put Google in control of the flow and

dissemination of online information."

167.    On May 15, 2020, the *Wall Street Journal* reported—based on information from "people familiar with the matter"—that "[m]uch of the states' investigation has focused on Google's online advertising business.  The company owns the dominant tool at every link in the complex chain between online publishers and advertisers."

168.    The Texas Attorney General served Google with extensive civil investigative demands for documents and information on September 9, 2019 and on June 22, 2020.  These demands focus almost exclusively on Google's business decisions and conduct in the market for display advertising services, *i.e.*, the ad tech stack.

169.    On July 9, 2020, news media reported that the California Attorney General's Office had opened its own independent antitrust investigation of Google.

170.    On July 29, 2020, the House Subcommittee on Antitrust, Commercial, and Administrative Law of the House Judiciary Committee held hearings on the subject of "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google." Google CEO Sundar Pichai appeared for questioning by members of Congress, including regarding whether Google has abused its position as the default web gateway with its dominant search engine. The Subcommittee Chair, Rep. David N. Cicilline (D-RI), noted the "harmful economic effects" of the market dominance of Google and the other companies under scrutiny for monopoly conduct: "They discourage entrepreneurship, destroy jobs, hike costs, and degrade quality."

171.    On October 6, 2020, the House Subcommittee issued a report entitled "Investigation of Competition in Digital Markets."  The report finds that, "[w]ith a sizeable share in the ad exchange market, ad intermediary market, and as a leading supplier of ad space, Google simultaneously acts on behalf of publishers and advertisers, while also trading for itself—a set of conflicting interests that market participants say enable Google to favor itself and create significant information asymmetries from which Google benefits."

172.    The House report recognizes that Google's series of acquisitions in the relevant market "enabled it to gain a controlling position across an entire supply chain or ecosystem.  Google's

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

acquisitions of DoubleClick, AdMeld, and AdMob . . . let Google achieve a commanding position across the digital ad tech market."

173. On September 15, 2020, the Subcommittee on Antitrust, Competition Policy, and Consumer Rights of the Senate Judiciary Committee held a hearing on the subject of "Stacking the Tech: Has Google Harmed Competition in Online Advertising?" Questioning Google's witness, Sen. Josh Hawley (R-MO) took note of its "enormous advantage in this ad stack that you control every single layer of." Google controls "the entire ad stack from top to bottom," he further explained.

> And you're using your position in search and YouTube in order to give yourselves a dominant position in the ad stack, and not just on the demand side . . . but also on the supply side. . . . I think the concern is, is that you control YouTube and search, which are the dominant platforms; you control massive amounts of consumer data that you have harvested from your other consumer-facing platforms—Gmail, Google Maps, G-Suite, etcetera. You then use those advantages in the ad stack at every single layer, every layer of which you exercise dominance in.

Senator Hawley concluded: "This looks like monopoly upon monopoly, in a classic case of tying."

174. Senator Klobuchar added that "Google may be taking between 30 and 70 percent of every advertising dollar spent by advertisers using its services, depriving publishers of that revenue." She also stated that, "[w]ith the benefit of hindsight, it seems obvious that [Google's] acquisitions were undertaken by the company in order to add to its market share and without explanation . . . other than for Google to establish and maintain the monopoly power it currently has."

175. Sen. Richard Blumenthal (D-CT) stated that Google has committed "quite simply a stunning abuse of market power." Senator Blumenthal termed Google's position in regard to its digital advertising monopoly "indefensible," noting that

> in no other market does the same party represent the seller, the buyer, make the rules and conduct the auction. . . . Given that Google operates the exchange and it competes with publishers on that exchange, that is a classic risk of insider trading. If you compare it as Google has to the stock market, Google would have been prosecuted long ago for insider trading.

176. Google has already met with significant regulatory action in Europe. The European Commission fined Google $2.7 billion in 2017 for rigging search results to favor its own online

35

shopping portal and $1.7 billion in 2019 for dictating to other websites how they can display search results from Google's competitors.

177.   In December 2019, France's competition authority fined Google $166 million following a lengthy investigation into Google's online advertising practices.  France sanctioned Google for adopting "opaque and difficult to understand" rules for its ad platform and for applying them in an "unfair and random manner."  According to *TechCrunch*, the French governing body also found that "another element of Google ad rules could lead sites to favor a content policy aligned with its own ad-funded services—thereby pushing online publishers to adopt an economic model that deeds and benefits its own."  The French governing body summarized its bases for fining Google as follows:

> [T]he French Competition Authority considers that the Google Ads operating rules imposed by Google on advertisers are established and applied under non-objective, non-transparent and discriminatory conditions. The opacity and lack of objectivity of these rules make it very difficult for advertisers to apply them, while Google has all the discretion to modify its interpretation of the rules in a way that is difficult to predict, and decide accordingly whether the sites comply with them or not. This allows Google to apply them in a discriminatory or inconsistent manner. This leads to damage both for advertisers and for search engine users.

178.   On July 1, 2020, the U.K.'s Competition and Markets Authority released a 437-page report entitled "Online Platforms and Digital Advertising: Market Study Final Report."  The CMA found that Google has dominant market share positions at each level within the ad tech ecosystem, with particularly high shares of at least 80% in both the publisher ad server and advertising markets. The CMA further found that Google "has been able to leverage the market power from its owned-and-operated advertising inventory into the open display market and within the ad tech stack, making it harder for third-party intermediaries to compete," and that "greater competition and transparency would put downward pressure on" fees borne by advertisers and publishers.  Additionally, the CMA found that Google has deployed its dominant market positions by engaging in "self-preferencing behaviour," such as precluding publishers using Google Ad Manager from setting different floor prices for different buyers, a policy shift that substantially increased "Google demand's win rate."

179.   In response to Google's attempts to justify its lack of transparency and other practices

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

by invoking data privacy laws, the CMA observed that "Google itself" has proposed technologies "to allow targeted advertising without user profiling," and that Google has an obvious incentive to interpret data protection laws in a self-serving way to "entrench[] its own competitive advantage, including by denying third parties access to data that is necessary for targeting, attribution, verification and fee or price assessment" while preserving its own right to use that data within its "walled garden."

## V. INTERSTATE TRADE AND COMMERCE

180.     Google's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

181.     At all material times, Google participated in the marketing, promotion, distribution, and sale of publication and advertising services for display advertisements in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

182.     Google's conduct also had substantial intrastate effects in that, among other things, Google's publication and advertising services for display advertisements were sold in each state, including California.  At least thousands of individuals in each state, including California, were impacted by Google's anticompetitive conduct.  As alleged below, absent Google's unlawful conduct, Plaintiffs and class members within each state would have paid less or received more money for digital advertising services.

## VI. RELEVANT MARKET

183.     Google's anticompetitive conduct has restrained competition in the market for online display advertising services, encompassing the overall system or process that connects online display advertisers and publishers (including Google).  This market, colloquially known as the "ad tech stack" or "ad stack," comprises various segments and is the relevant market that Google monopolized for purposes of this action.

184.     The relevant geographic market is the United States.  Market participants recognize this in the ordinary course of business.  For example, Google offers display advertisers the ability to target and deliver ads based on the location of publishers or consumers in the United States.  Google also separately tracks display advertising revenue for the United States.

185.    Google is the dominant provider of online search and search advertising in the United States—over 90% of internet searches are performed on Google's search engine—and used its dominant position in those markets to restrain trade in the separate market for display advertising services.

186.    The display advertising services market comprises advertising services and platforms, and publishing services and platforms.  Google has monopolized each of the relevant submarkets of the overall market for display advertising services, including the subsidiary markets for publisher ad servers, supply-side platforms, demand-side platforms, and advertiser ad servers.  Google's conduct had the intent and effect of suppressing competition in the display advertising services market as well as in each of its component submarkets, and converting those submarkets into a single intermediation market under its control.

187.    Google controls well over 90% of the PAS submarket and more than half of the SSP and associated ad exchange submarket.  Likewise, on the demand side, Google controls 80-90% of the AAS submarket and at least 60% of the DSP submarket.

188.    Google has wielded its market power to integrate each submarket of the ad stack into a single set of bundled services, with the intent and effect of preventing and discouraging competitors (other display advertising services providers), publishers, and advertisers from relying on advertising service providers on a product-by-product basis.  Google's anticompetitive conduct has foreclosed competition, eliminating the ability of each segment of the display advertising services process, and the process as a whole, to function as a free and independent market.  As a result of Google's conduct detailed in this complaint, Google has succeeded in combining the various subcomponents of the intermediation market for display advertising into one market—and a large and continually increasing majority of advertisers and publishers recognize and submit to this economic reality by paying only Google for display advertising brokering services.

189.    Digital display advertising on the open web is a "market" under antitrust law even though advertisers may engage in other forms of digital advertising as well.  Online display advertising is at base a matching problem.  On one side are publishers who produce content, and earn

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

revenue by displaying ads to users. On the other side are advertisers who are interested in displaying ads to particular users (*e.g.*, based on demographics or market segments). The online user population is fragmented across hundreds of thousands of publishers, preventing advertisers from reaching desired customers without assistance from an intermediary. Likewise, given the vast number of advertisers interested in displaying their ads, most publishers would find it very difficult to maintain the corresponding business relationships.

190.    Display advertising brokering services have no reasonable substitute for purposes of marketing goods or services in today's economy. While it is theoretically possible for an advertiser to connect directly with a publisher to negotiate the placement of advertisements onto the publisher's supply of advertising space, for the vast majority of advertisers doing so is impractical and very rare. At least 90% of all online display advertising space in the United States is bought and sold on ad exchanges in the electronic real-time bidding market.

191.    Nearly all advertisers lack the resources and access to be able to negotiate directly with particular publishers to place their display advertisements, and even advertisers with the ability to do so prefer not to limit their placement of display advertisements to discrete websites. Publishers and advertisers thus generally rely on third-party display advertising services to facilitate the placement of online display advertisements.

192.    In the rare instances where select advertisers can purchase "directly from the publisher" they can do so via manual media buying, programmatic direct buying, or a private, invite-only marketplace (PMP). Manual media buying is antiquated and now seldomly if ever done. Programmatic direct and private auctions are the only current ways to purchase advertising directly from publishers. Programmatic direct buying is done under extremely limited circumstances of either specific invite from the publisher to participate in a private auction, or directly, without an auction, at ultra-premium prices most advertisers cannot afford. Ads sold through programmatic direct are typically tied to premium publishers (*e.g.*, *Forbes*) that reserve a limited percentage of their inventory for which they can demand a premium price from well-capitalized advertisers, which receive guaranteed ad space in return. Similarly with PMP, the participants are large enterprise advertisers and

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

marketers, and only a handful of large advertisers (*e.g.*, Nike, Barclays) are invited to bid on a publisher's inventory. PMP is typically offered by publishers with premium, expensive inventory, such as major media sites like *Forbes*, the *Wall Street Journal*, or the *New York Times*.

193.     For small- and medium-sized advertisers, it is essentially impossible to access such exclusive inventory directly—not only are they not invited by the publisher, but even if they were, they could not pay the high prices set by the publisher. Together, private invite-only auctions and direct purchase are so exclusive that they account for a very low percentage of the display advertising market, and they are no substitute for real-time bidding on the open web.

194.     In fact, Google often is involved in these limited invite-only and premium ad-buying processes where they occur. Google offers these options for transacting in Display & Video 360 (reserved for enterprise advertising customers), and DoubleClick Ad Exchange offers services to facilitate invite-only exchanges. As such, despite these processes' "private" label, Google's participation is frequently still required to complete the underlying transactions.

195.     Online display advertising is not substitutable with traditional forms of advertising, such a print, television, radio, or billboard advertisements. None of those platforms rely on individual targeting based on individual user data and profiles—the entire driver of programmatic or automated display advertising. Recent pricing and bid data from various exchanges illustrate the point. For example, a 2018 Google study reported that the prices for ad space trading on Google's exchange drop by half or more when advertisers cannot identify users associated with the ad space for sale. Relatedly, according to Index Exchange, the number of bids for ad space on Mozilla Firefox pages declined by 38% after that internet browser started blocking cookies. In short, unless they can know the identity of the users being targeted, advertisers often avoid ad auctions altogether.

196.     Regardless of whether certain traditional forms of advertising may be reasonably interchangeable for each other, digital advertising is not. Digital advertising is different in kind from traditional forms of advertising, including because it reaches targeted customers individually and because digital advertisements can be continuously updated and improved based on data showing how consumers are responding.

197.    With the broad category of digital advertising, display advertising is not reasonably interchangeable with search advertising.  These two forms of digital advertising perform different roles, serve different purposes in marketing campaigns, and are treated by advertisers and marketing firms as distinct.  Search is intent-based advertising that seeks to induce consumers who have already shown an interest in buying a product or service to make a purchase.  Display, in contrast, is suitable for raising awareness about a product, service, or brand and reaching new audiences that may not yet have shown an interest.  Because of this basic difference in how the two forms of advertising function in relation to potential customers, they are not reasonable substitutes for each other.

198.    During the class period, display advertising also performed a unique function in advertisers' re-marketing campaigns.  When a user visited a website selling goods or services, or clicked on a certain online advertisement, a "cookie" (or small file) capturing that user's action would be stored on their browser.  Then, as the user continued to browse the web, the cookie enabled the placement of display advertisements on other websites from the company whose website the user had visited or on whose advertisement the user had clicked.  Numerous class members, including Plaintiffs Prana Pets and Hanson Law Firm, relied on display advertising brokered by Google to carry out such re-marketing aiming to increase user "conversion" into paying clients or customers.  These campaigns also resulted in the placement of display advertisements to users who carried a similar "cookie" profile as users who visited the advertiser's website and/or clicked on its advertisement.  Search advertising cannot accomplish this re-marketing given that the purpose of this strategy is to target a discrete set of users with display advertising.

199.    The government enforcers note in their complaint that display advertising, in contrast to search advertising, does "not enable advertisers to target customers based on specific queries and are generally aimed at consumers who are further from the point of purchase."  The enforcers' complaint also quotes the statement of Google's Chief Economist that "[o]ne way to think about the difference between search and display/brand advertising is to say that 'search ads help satisfy demand' while 'brand advertising helps to create demand,'" and "[d]isplay and search advertising are complementary

tools, not competing ones." Thus, given that search and display advertising, by Google's own admission, do not compete for the same business, they occupy distinct antitrust markets.

200. Additionally, the market for display advertising services is separate and distinct from the market for advertisement inventory—*i.e.*, the spaces on websites that publishers make available for advertisers to purchase. At least thousands of companies act as publishers with display advertisement inventory, but in general, these companies do not offer the services that facilitate placement of advertisements into the supply of display advertising space. Only a few companies—Google chief among them—now provide display advertising services.

201. There are high barriers to entry for the display advertising market and its component submarkets. Entering any of these markets requires a substantial investment to develop and implement the technology necessary to compete. Consequently, "advertisers and publishers alike have few options when deciding how to buy and sell online ad space," concludes the 2020 House Subcommittee report on competition in digital markets.

202. Google's overall conduct, including leveraging its internet search platform dominance and denying interoperability in several respects, as described above, has made it exponentially more difficult for would-be market participants to effectively enter these markets and compete with Google. Google has used its market dominance to ensure that market entry by would-be competitors is infeasible. And Google's conduct, moreover, has made it impractical for existing market participants to compete—which has resulted in large numbers of companies exiting the relevant market.

203. Programmatic display advertising—the subject of this action—serves a different purpose and is not reasonably interchangeable with social-media display advertising. Google's automated display advertising services *connect* independent entities—advertisers and publishers. In other words, advertisers use display advertising services to access a *range* of publication options and thereby reach a broader group of users. Publishers, in turn, use display advertising services to access many potential advertisers. Google operates in an open-ended market in which it facilitates the transactions between these advertisers and publishers.

204. By contrast, companies like Facebook, Twitter, and Snapchat primarily host social

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

media content, while Amazon primarily operates an online market for goods. These web businesses are suppliers of their own ad inventory and have close-ended, in-house display advertising systems that they use to publish advertisements on their own sites. Those services are not available to other publishers, and advertisements that appear on these close-ended websites only reach visitors to *those* websites. To advertise across the open web—rather than, for example, on Facebook or Amazon specifically—an advertiser must engage with the ad tech stack that Google dominates.

205. As the House Subcommittee report explains:

> Within display advertising there are two separate "ad tech" markets . . . first-party and third-party. "First-party" platforms refer to companies such as Facebook, Twitter, and Snap which sell ad space on their own platforms directly to advertisers. . . . Third-party display ad tech platforms are run by intermediary vendors and facilitate the transaction between third-party advertisers, such as the local dry cleaner or a Fortune 500 company, and third-party publishers, such as *The Washington Post* or a blog.

206. The close-ended advertising services offered by Facebook, Amazon, Twitter, and Snapchat (among other web businesses) are not, therefore, reasonable substitutes for the open-ended system Google offers and do not compete for the same business. "Programmatic" CPM ads are thus distinguished from "social media" CPM ads among participants in the digital advertising industry.

## VII. ANTITRUST IMPACT

207. Google's conduct set forth herein had the purpose and effect of excluding competition in the relevant market. Absent Google's conduct, each segment of the display advertising market would have been significantly more competitive and class members would have financially benefited from that increased competition.

208. Google's monopoly conduct has caused ongoing and durable harm to competition in the display advertising market. Google's monopoly power has enabled it to raise its prices above the competitive level to advertisers and, in turn, pay lower than competitive prices to publishers. Google has extracted monopoly rents in the form of fees it does not fairly disclose to other market participants.

209. A competitive market would have benefited both the advertisers and the publishers that use display advertising services. Firms that provide display advertising services make money in a

variety of ways, including by retaining the difference between (1) what an advertiser pays the provider to place ads, and (2) the portion of that payment that the provider remits to a publisher for placing the ads on its website. In a competitive market, advertisers would have paid less to have their ads placed, and publishers would have received more for placing the ads on their websites.

210.    With Google stifling competition and extracting monopoly rents as the dominant intermediary, both advertisers and publishers lost money. The antitrust economist Fiona Scott Morton noted that,

> [i]f advertisers had more choices in the but-for world about where and through whom to place their ads, they would not continue to give their business to Google in the face of an overcharge. Google would have to choose between losing advertisers' business to rivals whose auctions were fair, or adopting an auction design that generated competitive (lower) prices for advertisers.

211.    In sum, the marked decrease in competition that has resulted from Google's conduct has caused economic injury to Plaintiffs and class members because advertisers have paid more than they otherwise would have paid, and publishers have been paid less than they otherwise would have been paid.

## VIII.  TOLLING OF THE STATUTE OF LIMITATIONS

### A.    The Statutes of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

212.    Plaintiffs and class members had no knowledge of Google's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

213.    As described herein, Plaintiffs and class members suffered antitrust injury in the form of economic losses as a result of Google's wrongful exercise of monopoly power in the relevant market. Other than dealing directly with Google when using its digital advertising services, Plaintiffs had no direct contact or interaction with Google and no means from which they could have discovered these injuries and the other bases for their causes of action set forth in this complaint.

214.    Throughout the class period, and continuing thereafter, there was no information in the

44

public domain sufficient to put Plaintiffs on notice that Google had wrongfully acquired a display advertising monopoly or was using its monopoly power to charge advertisers supra-competitive prices for display advertising and to pay sub-competitive prices to publishers of such advertising.

215. It was reasonable for Plaintiffs and class members not to suspect that Google was engaging in any unlawful and injurious anticompetitive behavior.

216. While certain of Google's anticompetitive acts occurred before the applicable limitations periods, not until recently, with the announcement of governmental investigations into Google's monopolization of the market for intermediation services in the online display advertising market, could Plaintiffs have discovered their antitrust injuries and causes of action set forth in this complaint. At the time it occurred, no reasonable class member had any basis to discern the anticompetitive nature of Google's conduct described in this complaint that occurred before the applicable limitations periods.

217. Plaintiffs allege a continuing course of unlawful conduct by Google, including conduct within the applicable limitations periods. That conduct has inflicted continuing and accumulating harm to Plaintiffs and class members within the applicable statutes of limitations.

218. For these reasons, the statutes of limitations applicable to Plaintiffs' and class members' claims have been tolled with respect to the claims asserted herein.

**B.    Google's Fraudulent Concealment Tolled the Statute of Limitations**

219. Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiffs' claims. Plaintiffs had no knowledge of Google's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place them on inquiry notice of their injuries or the other bases for their causes of action, during the class period and continuing thereafter. No information in the public domain or otherwise available to Plaintiffs during the class period suggested that Google had wrongfully acquired a digital advertising monopoly or was using its monopoly power to charge advertisers supra-competitive prices for display advertising and to pay sub-competitive prices to publishers of such advertising.

220. Google concealed its illicit and harmful conduct, both by failing to disclose its wrongful acquisition and maintenance of a digital advertising monopoly through exclusionary acts in the relevant

market, and by affirmatively denying that it was engaged in such conduct. Google has (repeatedly) publicly denied allegations by American and foreign regulators that it has abused its power in digital advertising markets. These affirmative statements, and Google's nondisclosure that it had acted to forestall competition, served to fraudulently conceal Google's unlawful monopoly in brokering online display advertising.

221. When the French Competition Authority fined Google $167 million in late 2019, Google publicly defended its advertising policies in a statement issued on December 20, 2019, as purportedly needed to "protect[ people] from exploitative and abusive ads." In fact, as discussed above, Google adopted those policies to protect its monopoly power by heading off competition. Similarly, in response to news reports in 2019 that federal and state officials had opened antitrust investigations into Google's advertising business, a Google vice-president for product management, Sissie Hsiao, released a public statement on September 11, 2019 asserting that "[c]ompetition is flourishing, and publishers and marketers have enormous choice" when that was false.

222. In addition to its affirmative fraud and nondisclosure, Google's anticompetitive conduct also was inherently self-concealing because revealing the true facts concerning Google's monopolistic behavior would have prompted governmental enforcement activity and/or class action litigation. Digital advertising is subject to antitrust regulation, so it was reasonable for Plaintiffs and class members not to suspect that digital advertising services were being sold in a noncompetitive market. A reasonable person under the circumstances would not have had occasion to suspect Google was brokering display advertising at supra-competitive prices (for advertisers) and sub-competitive prices (for publishers) at any time during the class period.

223. Because Google's antitrust violations were self-concealing and affirmatively concealed by Google, Plaintiffs and class members had no knowledge of Google's antitrust violations or of any facts or information that would have caused a reasonably diligent person to suspect Google of having wrongfully acquired and maintained monopoly power during the class period.

224. Therefore, by operation of Google's fraudulent concealment, the statutes of limitations applicable to Plaintiffs' and class members' claims were tolled throughout the class period.

---

46

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

## IX.    CLASS ACTION ALLEGATIONS

225.    Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as representatives of the following class:

> All persons and entities in the United States that, from January 1, 2016 to the present, used Google's display advertising services to (1) place an ad on a website operated by another entity (advertisers) or (2) place an ad from a third party on their own website (publishers).

Excluded from the proposed class are: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and court staff assigned to this case.

226.    The proposed class meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3).

227.    The members of the class are so numerous that joinder is impracticable.  The class includes at least hundreds of thousands of members that are widely dispersed throughout the country.

228.    Plaintiffs' claims are typical of the claims of all class members.  Plaintiffs' claims arise out of a common course of conduct that gives rise to the claims of all other class members.  Plaintiffs and all class members were and will continue to be damaged in the same manner by the same wrongful conduct, namely Google's unfair business practices and monopolization of the market for display advertising services.

229.    Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the class.

230.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with antitrust litigation.

231.    Numerous questions of law or fact common to the class arise from Google's course of conduct to exclude competition in the relevant market, including:

a.    Whether Google holds monopoly power in the relevant market;

b.    Whether Google unlawfully acquired and maintained monopoly power in the

47

relevant market;

        c.     Whether Google engaged in unfair business practices that reduced competition in the relevant market;

        d.     The form and content of injunctive relief to restore competition; and

        e.     The amount of damages owed the class as a result of Google's illegal activity.

232.    Questions of law and fact common to members of the class will predominate over any questions that may affect only individual class members because Google acted on grounds generally applicable to the class as a whole.  For the same reason, class certification for purposes of adjudicating Plaintiffs' claims for injunctive and declaratory relief is appropriate.

233.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy.  Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

234.    The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Google.

235.    Plaintiffs reserve the right to seek class certification with respect to common issues, including issues related to Google's duties or conduct.

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE SHERMAN ANTITRUST ACT
### 15 U.S.C. § 2

236.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

237.    The market for programmatic display advertising services in the United States is a relevant antitrust market, and Google has monopoly power in that market.

238.    Google wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the overall scheme and conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several

48

technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

239.   Google's actions were carried out willfully and with the specific intent to acquire and maintain monopoly power in the relevant market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

240.   Google's exclusionary conduct has foreclosed a substantial share of the market for programmatic display advertising services.

241.   As a direct and proximate cause of Google's conduct, Plaintiffs and members of the class have suffered antitrust injury in the form of economic losses.  Those losses constitute antitrust injury, as they are an injury of the type the antitrust laws were intended to prevent and that flows from what makes Google's monopolistic acts unlawful.  But for Google's unlawful exclusionary conduct, competition would have prevailed in the relevant market and Plaintiffs and class members would not have sustained these losses.  Google's conduct also deprived Plaintiffs and class members of improved quality and innovation in the relevant market.

242.   There is no legitimate pro-competitive justification for Google's anticompetitive conduct, and even if there were, less restrictive alternatives to achieve it would exist.

243.   Plaintiffs and members of the class are entitled to equitable relief as appropriate to halt Google's monopoly conduct and restore competition in the relevant market.  Members of the class are regular users of display advertising services and will continue to purchase such services and suffer further injury if Google's monopoly is not ended.  The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly.

244.   Plaintiffs and members of the class are entitled to damages, including treble damages, sustained as a result of Google's monopolistic acts and practices.

FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 5:20-cv-03556-BLF

## SECOND CAUSE OF ACTION
### VIOLATIONS OF THE UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)

245.    Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

246.    Google's conduct is unlawful in violation of the UCL because it violates the Sherman Antitrust Act, 15 U.S.C. § 2.

247.    Google has engaged in unfair business practices through the overall scheme and conduct alleged herein, which has restrained competition. Google's conduct is unfair, in violation of the UCL, because it violates California's clearly established public policy forbidding monopolistic acts. Google wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

248.    Google's practices also are unfair in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including from Google's supra-competitive prices that advertisers paid and Google's anticompetitive underpayments to publishers, that outweighs by a wide margin any possible utility from the practices.

249.    Google's unlawful and unfair business practices actually and proximately caused Plaintiffs and class members to lose money or property.

250.    Plaintiffs and class members lack an adequate remedy at law to redress certain conduct of Google that violates the unfair prong of the UCL. Through the practices described herein, Google suppressed competition in its incipiency, violated well-established antitrust policies, and significantly harmed and threatened competition in the relevant market.

251.    Accordingly, on behalf of the class, Plaintiffs seek injunctive relief, restitution, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper. The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater

innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the class defined herein, respectfully request that this Court:

A. Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given to the class, appoint Plaintiffs as named representatives of the class, and appoint the undersigned Plaintiffs' counsel as class counsel;

B. Enter judgment against Google and in favor of Plaintiffs and the class;

C. Enter injunctive relief to restore competition in the relevant market and its constituent submarkets;

D. Award damages, including treble damages, and/or restitution to the class in an amount to be determined at trial, plus interest in accordance with law;

E. Award Plaintiffs and the class their costs of suit, including reasonable attorneys' fees, as provided by law; and

F. Award such further and additional relief as is necessary to redress the harm caused by Google's unlawful conduct and as the Court may deem just and proper under the circumstances.

## XII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury on all matters so triable.

Dated: December 4, 2020

Respectfully submitted,

By:     /s/ *Dena C. Sharp*

Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)

51

Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

Tina Wolfson (State Bar No. 174806)
Theodore W. Maya (State Bar No. 223242)
Rachel Johnson (State Bar No. 331351)
**AHDOOT & WOLFSON, PC**
2600 West Olive Avenue, Suite 500
Burbank, CA 91505
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
tmaya@ahdootwolfson.com
rjohnson@ahdootwolfson.com

Scott L. Silver (*pro hac vice* forthcoming)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
Tel: (954) 755-4799
ssilver@silverlaw.com

*Attorneys for Plaintiffs*

# EXHIBIT B

ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIEL J. PFEFFERBAUM (248631)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dpfefferbaum@rgrdlaw.com
    – and –
DAVID W. MITCHELL (199706)
STEVEN M. JODLOWSKI (239074)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
sjodlowski@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SWEEPSTAKES TODAY, LLC, Individually and on Behalf of All Others Similarly Situated, ) | Case No. |
| Plaintiff, ) | CLASS ACTION |
| vs. ) | COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT AND THE CLAYTON ACT |
| GOOGLE LLC, ALPHABET INC. and YOUTUBE, LLC, ) | |
| Defendants. ) | DEMAND FOR JURY TRIAL |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ...................................................................................................1

II. THE PARTIES......................................................................................................7

III. JURISDICTION AND VENUE ............................................................................8

IV. FACTUAL BACKGROUND .................................................................................9

    A. Background of Online Advertising and Publishing...................................9

    B. Google's History: From Search Engine to Online Advertising Business.............11

V. GOOGLE BECOMES A MONOPOLY ................................................................13

    A. Google's Growth to Search Engine Market Dominance ........................13

    B. Google's Suite of Online Advertising Products and Services Consolidates Dominance Across Multiple Markets ........................14

        1. Double Click for Publishers and DoubleClick Ad Exchange...................15

        2. AdSense and Google Ads ............................................16

        3. YouTube ...........................................................17

        4. Android Operating System ..........................................18

        5. Google Chrome ...................................................19

        6. Other Google Products and Services ..............................19

    C. Key Acquisitions Expand Google's Ad Tech Capabilities....................19

    D. The Relevant Markets .............................................21

        1. Relevant Product Markets........................................21

        2. The Geographic Market .........................................27

VI. ANTITRUST LAWS..........................................................................................27

VII. PLAINTIFF SWEEPSTAKES TODAY'S ROLE IN THE DIGITAL ADVERTISING MARKET..........................................................28

VIII. GOOGLE WIELDS MONOPOLY POWER IN MULTIPLE MARKETS TO IMPEDE COMPETITION...................................................29

    A. Google's Anticompetitive Conduct and Manipulation of the Online Advertising Market ..............................................30

|     |     |     |                                                                                    | Page |
|-----|-----|-----|------------------------------------------------------------------------------------|------|
|     |     | 1.  | Designing Auctions to Weaken Competitive Sources and Advantage Itself ............. | 30   |
|     |     | 2.  | Manipulative and Technological Blocking, Exclusion and Downgrading ............... | 32   |
|     |     | 3.  | Denial of Interoperability and Purposeful Incompatibility ................... | 33   |
|     |     | 4.  | Cross-Subsidizing Various Functions of the Ad Tech Stack and Predatory Pricing ......... | 34   |
|     |     | 5.  | Unilateral Setting and Altering of Technological Standards ............ | 35   |
|     |     | 6.  | Using Google's Significant Data Advantage to Disadvantage Competitors ............. | 39   |
|     |     | 7.  | Illegal Tying and Bundling of Services ................ | 40   |
|     |     | 8.  | Google Affirmatively Interferes with Competitors Using Data Harvested from Its Monopolies ........ | 41   |
|     |     | 9.  | Preferential Treatment of Google Products and Services ........... | 42   |
|     |     | 10. | Exclusive Dealing and Anticompetitive Contracts ............. | 43   |
|     |     | 11. | Manipulation of the Patent Process ............. | 46   |
|     | B.  |     | Monopolistic Leveraging ............. | 47   |
| IX. |     |     | INTERSTATE TRADE AND COMMERCE ............. | 49   |
| X.  |     |     | ANTITRUST HARM ............. | 49   |
| XI. |     |     | PRIOR ANTITRUST ENFORCEMENT ACTIONS ............. | 52   |
| XII. |    |     | PLAINTIFF WAS INJURED AS A RESULT OF GOOGLE'S ANTICOMPETITIVE ACTIONS ............. | 52   |
| XIII. |   |     | CLASS ACTION ALLEGATIONS ............. | 54   |
| XIV. |    |     | CLAIMS ............. | 56   |
|     |     |     | PRAYER FOR RELIEF ............. | 62   |
|     |     |     | JURY DEMAND ............. | 63   |

Plaintiff Sweepstakes Today, LLC ("plaintiff" or "Sweepstakes Today"), individually, collectively, and on behalf of all persons and entities similarly situated, brings this class action under §2 of the Sherman Antitrust Act (the "Sherman Act") and §3 of the Clayton Act, 15 U.S.C. §14, for actual damages, treble damages, punitive damages, declaratory and injunctive relief, costs of suit, pre- and post-judgment interest, and other relief, and alleges as follows:

## I.    INTRODUCTION

1.    This is an action under, *inter alia*, the Sherman Act to restrain the anticompetitive conduct of defendants, to remedy the effects of defendants' past unlawful conduct, to protect free market competition from continued unlawful manipulation, and to remedy harm to digital publishers that make available and sell space on their website (or applications) to advertisers.  That harm is the direct result of Google's efforts to expand its occupation and control of the online advertising market to the detriment of publishers, with which it competes to sell ad space.  While it is most often thought of as a search engine, through aggressive expansion Google now owns at least 75 different consumer-facing products, many of which are used to serve digital ads.  It is, by all accounts, a significant competitor for the sale of digital ad space.  One product alone (YouTube) accounts for 20% of all display advertisements sold through the digital ad tech stack.  As discussed below, Google has illegally exploited the opportunities for competitive interference made possible by its control over the various firms that connect publishers and advertisers, to benefit its own properties and harm rival publishers.

2.    Plaintiff Sweepstakes Today is an online publisher and a direct competitor of Google. Since 2004, Sweepstakes Today has operated a website through which it has offered and sold space to digital advertisers on which they run ads so that visitors to its website can view the advertisers' offers.  For nearly a decade, Sweepstakes Today was a successful, profitable company, earning approximately $150,000 per year.

3.    All of that changed in 2012, however, as Google LLC, through both acquisitions and vertical integration, began consolidating the various markets that together constitute the online advertising market, driving out rivals, and became a direct horizontal competitor of publishers such as Sweepstakes Today.  Google, as a direct result of the illegal conduct described herein, has

1  economically harmed Sweepstakes Today, driving it to the brink of unprofitability and costing it

2  hundreds of thousands of dollars in annual revenue. If it is allowed to continue its practices, Google

3  will likely, as it already has with many other publishers now excluded from the market, put

4  Sweepstakes Today out of business and further cement its stranglehold over the digital advertising

5  market.

6        4.  At its core, Google, and its parent Alphabet Inc., are in the business of digital

7  advertising, services from which they derive the vast majority of their revenues. In 2019, Alphabet

8  reported a staggering $162 billion in revenues, out of which $135 billion resulted from Google

9  advertising revenues.[1] Users of the Google search engine do not pay a monetary fee; rather, Google

10  collects personal data from the users of its search engine and monetizes that data to drive online

11  advertising revenue. In essence, Alphabet and Google are brokers of Internet user data for online

12  advertising profits.

13        5.  For years, Google's goal has been to maximize profits in the online advertising

14  market by: (1) amassing and controlling Internet user data, creating user super-profiles;

15  (2) strategically acquiring companies that strengthen Google's ad tech capabilities, maximize user

16  and competitor data harvesting, or decrease competition; (3) controlling the devices and tools with

17  which users and competitors access the Internet; and (4) ultimately controlling which advertising

18  content is served to and consumed by Internet users.

19        6.  Google has achieved monopoly power in a number of overlapping markets, all with a

20  goal of dominating digital advertising. Google is the world's largest and most accessed search

21  engine, with an overwhelming market dominance – well over 90%. Google possesses monopoly

22  power in the market for general online search (hereinafter the "Internet Search Market") and

23  numerous interrelated and overlapping markets, including but not limited to the Search Advertising

24  Market, Online (or digital) Advertising Market, Publisher Ad Serving Market, and the Market for

25  Intermediating Ad Services. Google is also dominant in the Web Browser Market.

26  

27  [1]  *Investigation of Competition in Digital Markets, Majority Staff Report and*
*Recommendations*, H. R. Subcomm. on Antitrust, Com. & Admin. L. of the Comm. on the Judiciary

28  (2020) (hereinafter "House Antitrust Report") at 206.

7.      Google's breathtaking monopoly power has been amassed and maintained by engaging in strategic acquisitions and illegal anticompetitive practices for many years,[2] using its market dominance in several overlapping markets to drive online advertising dollars.  Specifically, Google has monopoly power in the following markets:

- Internet Search Market – 92% monopoly;[3]

- Online Advertising Market – over 50% monopoly;[4]

- Publisher Ad Serving Market – 90% monopoly;[5]

- Ad Exchange Market – 53% monopoly;[6]

- Advertising Ad Serving Market – 80-90% monopoly;[7]

- Web Browser Market – 66% monopoly;[8]

- Licensable Mobile Device Operating Systems – Android OS – 75% monopoly;[9] and

- Search Advertising Market – 80% monopoly.[10]

---

[2]      House Antitrust Report at 14.

[3]      *Search Engine Market Share Worldwide*, StatCounter Glob. Stats, https://gs.statcounter.com/search-engine-market-share (last visited Dec. 11, 2020).

[4]      House Antitrust Report at 206 ("Google is a prominent player in both search advertising and digital display advertising, and it captures over 50% of the market across the ad tech stack, or the set of intermediaries that advertisers and publishers must use to buy, sell, and place ads. Specifically, Google runs the leading ad exchange, while also running buy-side and sell-side intermediary platforms trade on the exchange.").

[5]      Patience Haggin & Kara Dapena, *Google's Ad Dominance Explained in Three Charts*, Wall St. J. (June 17, 2019), https://www.wsj.com/articles/why-googles-advertising-dominance-is-drawing-antitrust-scrutiny-11560763800.

[6]      *Ethical Advertisement Networks*, Wonder (Nov. 19, 2019), https://askwonder.com/research/market-size-ethical-advertisement-networks-f850yy5ld.

[7]      *Online platforms and digital advertising: Market study final report*, Competition & Mkts. Auth. (July 1, 2020) at 20.

[8]      *Browser Market Share Worldwide*, StatCounter Glob. Stats, https://gs.statcounter.com/browser-market-share (last visited Dec. 11, 2020).

[9]      Stacy Cowley, *The smartphone market's radical shakeup*, CNN Bus., Jan. 29, 2013, https://money.cnn.com/gallery/technology/mobile/2013/01/29/smartphone-market-share/index.html; *Mobile Operating System Market Share Worldwide*, StatCounter Glob. Stats., https://gs.statcounter.com/os-market-share/mobile/worldwide (citing 76.2% share) (last visited Dec. 14, 2020).

8. Google uses its dominance in these overlapping markets to wipe out competition, drive its online ad sales and charge supra-competitive prices. Google is the largest monopoly in United States history. These markets comprise a heavily intertwined ecosystem, and the products and services themselves are the means by which defendants' anticompetitive conduct is largely carried out. Because Google performs every function in the digital advertising chain that connects publishers and advertisers, it is nearly impossible for publishers to do business with advertisers except through Google. And when publishers have tried to do so, Google has promptly stamped out those efforts and prevented any real competition. Google is now in the unusual position of representing both buyers (advertisers) and sellers (publishers), while also being in control of the exchange (which sets the auction and pricing rules) through which they interact, giving Google the incentive and ability to bias ad auction rules and prices in its own favor, which it has done for many years. Using these pressure points, Google has affected the prices paid by advertisers and the amount ultimately received by the publishers, keeping a supra-competitive portion for itself.

9. Since gaining control, Google has deployed a number of anticompetitive measures to exclude and disadvantage its rivals in the publisher end of the intermediation chain – including Sweepstakes Today – in the supply of advertising inventory. Google is not only able to use its monopoly power to engage in traditional anticompetitive behavior, but it also physically and technologically blocks competitors from the market through its own products and services.

10. Indeed, through its ad server and related advertising intermediation products, as well as through its Chrome web browser, Google controls how publishers can participate in that online advertising market and connect with advertisers. And through its complete dominance of online search, it controls how, when, and even if users can access the countless websites on which these ads are shown and accessed. All the while, Google feeds its monopoly power by amassing more user data.

11. To maximize their advertising profits, to protect their valuable monopolies against competitive threats, and to extend their monopolies globally and across the entire digital advertising

---

[10] *Google's share of the search ad market is expected to grow*, Vox (Mar. 14, 2017), https://www.vox.com/2017/3/14/14890122/google-search-ad-market-share-growth.

chain, defendants have engaged in a series of inorganic strategic acquisitions, anticompetitive contracts and anticompetitive tactics designed to thwart competition on the merits. This conduct includes, but is not limited to:

- Strategic and inorganic acquisition of ad tech companies and online platforms to grow and maintain market power (*see, e.g.*, ¶¶68-76);

- Exclusionary disablement and disparagement of competitors' products and services to disadvantage, foreclose and punish its competitors (*see, e.g.*, ¶¶138, 150-158);

- Designing auction processes that cement its own market power and raise rivals' costs (*see, e.g.*, ¶¶101-110);

- Advantaging itself through arbitrage and cross-subsidization opportunities made possible because it operates at all levels of the advertising intermediation value chain (*see, e.g.*, ¶¶101-121);

- Exercising its control over the ad tech stack to weaken competitive sources of advertising supply for publishers (*see, e.g.*, ¶¶107-110);

- Leveraging its power in general search and search advertising, where it holds monopoly power, to coerce advertisers to use Google products to access the online advertising market (*see, e.g.*, ¶¶163-172);

- Tying or bundling, including technological tying, of Google products and services (*see, e.g.*, ¶¶137-140);

- Unilateral or surreptitious setting or altering technological standards by which products and services of competitors can be accessed and used (*see, e.g.*, ¶¶122-132);

- Manipulative and technological blocking, exclusion, or downgrading of competitors' products and services (*see, e.g.*, ¶¶111-112);

- Preferential treatment of its own products and services, including exempting YouTube but not competitors from Google-imposed technology and operating standards, and prioritization of its own products and services through manipulation of its algorithms (*see, e.g.*, ¶¶122-130);

- Obscuring and keeping secret key market information as to function, pricing and data so as to disadvantage competition and restrict competitive pricing (*see, e.g.*, ¶¶46, 49, 82, 116-117);

- Denial of interoperability and purposeful incompatibility to exclude entry by competitors or raise their costs and/or coerce them to use Google products and services (*see, e.g.*, ¶¶113-117);

- Gathering and using market intelligence about competitors through the Google and YouTube search engines and Google products and services to disadvantage competitors and interfere with competitors' businesses (*see, e.g.*, ¶¶133-136, 141-142);

- Engaging in predatory pricing and triangular predatory pricing by offering free services in some areas while extracting huge ad revenue margins elsewhere (*see, e.g.*, ¶¶118-121); and

- Manipulation and abuse of the patent process and attendant patents (*see, e.g.*, ¶¶159-162).

The above-referenced improper activities will be referred to herein collectively as the "Defendants' Anticompetitive Restraints."

12. There is significant interplay among these markets that makes Google's monopolistic power in these markets more insidious. In addition to the anticompetitive restraints listed above, defendants have illegally used and leveraged their monopoly power and market dominance both to maintain dominance in those markets already monopolized by Google, as well as to gain further dominance in related markets and further stamp out competition. Substantial barriers to entry further assist in consolidating Google's market power and online dominance.

13. Defendants' Anticompetitive Restraints are concerted attempts to maintain and extend defendants' monopolies, not by innovation or other competition on the merits, but rather by anticompetitive tactics that deter innovation, exclude competition, and rob customers of quality products and their right to choose among competing alternatives.

14. Defendants' illegal conduct has been setting off alarm bells worldwide for many years. In October 2020, following a year-long investigation, the U.S. Justice Department ("DOJ") filed a civil antitrust lawsuit to stop Google from unlawfully maintaining monopolies in the search and search advertising markets and to remedy the competitive harms.[11] The time has come to address these market abuses.

---

[11] Beyond the DOJ complaint, Google's monopolistic conduct has been the subject of numerous past and ongoing investigations and enforcement actions by regulatory bodies throughout the world. Google has been the subject of numerous investigations by the Federal Trade Commission ("FTC"). And Google has been charged with anticompetitive conduct by regulatory agencies in the European Union, France, South Korea, India, and Russia, resulting in billions of dollars of fines. The recently

## II.    THE PARTIES

15.    Plaintiff Sweepstakes Today, LLC is a limited liability corporation organized and existing under the laws of the State of Oklahoma, with its principal place of business located at 2914 South 122nd East Avenue, Tulsa, Oklahoma 74129.    Plaintiff operates a website, Sweepstakestoday.com, that provides online access to sweepstakes, contests, promotions, and drawings offered by large, well-known companies and corporations.  Plaintiff is an online publisher. On its sweepstakes website, it integrates and shows digital advertisements and generates revenue by displaying these ads, including ads selected, placed and served or filled through Google's advertising and publishing products and applications.

16.    Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California.  Google is the world leader in general Internet search conducted on all devices.  It also is the owner of the Android OS and several popular and exclusive mobile and tablet applications, including YouTube, Google Maps, and Gmail.

17.    In August 2015, Google announced its intention to create a new holding company, defendant Alphabet Inc.  The reorganization was completed on October 2, 2015.  Since then, Google has been a wholly-owned subsidiary of Alphabet, which has continued to be the umbrella company for the Internet interests of Google.  Once Alphabet was formed in 2017, Google changed from a corporation to a limited liability company (LLC).

18.    Defendant Alphabet Inc. is a Delaware corporation with its headquarters and principal place of business at the "Googleplex" in Mountain View, California.  Defendant Alphabet is one of the top ten largest companies in the United States with more than $162 billion in annual revenue. Alphabet, ranking 15th in the list of Fortune 500 companies, is traded on the NASDAQ under the symbol "GOOGL" and is included in the S&P 100 Index.

19.    Defendant YouTube, LLC ("YouTube") is a wholly-owned subsidiary of Google LLC and headquartered in San Bruno, California.  YouTube, Inc. was originally registered as a

---

released House Antitrust Report noted the same, stating that: "For years Google has been the subject of antitrust investigations and enforcement actions around the world."  House Antitrust Report at 176.

corporation in Delaware in October 2005 and was converted into YouTube, LLC a year later. According to YouTube's Terms of Service: "The entity providing the Service is Google LLC, a company operating under the laws of Delaware, located at 1600 Amphitheatre Parkway, Mountain View, CA 94043 (referred to as 'YouTube', 'we', 'us', or 'our'). References to YouTube's 'Affiliates' in these terms means the other companies within the Alphabet Inc. corporate group (now or in the future)."

20.     Collectively, defendants are operated and controlled as a single entity, with Sundar Pichai acting as the CEO. Not only did Google essentially create Alphabet as a holding company in 2015, but virtually all of Alphabet's revenues come from Google. YouTube, in turn, is a wholly owned subsidiary of Google and is controlled and operated as such. Alphabet filed its 10-K and 10-Q statements with the Securities and Exchange Commission, reporting consolidated revenues for all of the defendants. In fact, these statements expressly define Alphabet as "Alphabet Inc. and its subsidiaries." *See, e.g.*, Alphabet Inc., Quarterly Report (Form 10-Q) (July 30, 2020), at 2.

21.     As discussed below, Google provides publishing services through its stable of advertising products and applications, including, without limitation, Google Ads, the AdSense program, AdX, DoubleClick for Publishers or DFP, and Google Ad Manager. Plaintiff is a user, customer and/or consumer of these products and services and a participant in the Online Advertising Market set forth herein.

## III.     JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1337, §2 of the Sherman Act, 15 U.S.C. §2, *et seq*., and §§3, 4 and 16 of the Clayton Act, 15 U.S.C. §§14, 15 and 26, because plaintiff alleges violations of federal law.

23.     Venue is proper in this district under 15 U.S.C. §§15, 22 and 26 and under 28 U.S.C. §1391(b) and (c) because: (1) Google transacts business and is found within this district; and (2) a substantial portion of the events giving rise to the claims herein occurred within this district.

## IV.     FACTUAL BACKGROUND

### A.      Background of Online Advertising and Publishing

24.     The Internet reaches billions of people around the world and serves as a virtual marketplace for products, information, and ideas.  Given the number of online visitors, this is an attractive forum for advertisers.  Growing revenues derived from the sales of advertising space have driven the explosion of information available on the web since the first banner ad was displayed in 1993.

25.     Online or digital advertising consists of marketing advertisements, which are delivered through the Internet on both desktop and mobile devices.  Online advertising involves the use of the Internet as a medium to obtain website traffic and target and deliver marketing messages to the right users, customers, and consumers.  In most cases, the decision of which ad is served/shown to the user is made in real time, in response to the search term entered by the user (in the case of search advertising) or in response to information about likely characteristics of the person viewing the advertisement (in the case of display advertising) or the context of the page being viewed.

26.     The online advertising ecosystem consists of different types of advertising-technology platforms and intermediaries that all play a role in the creation and execution of an online advertising campaign.  Like other advertising media, online advertising often includes: (1) a publisher, who sells space on their website to advertisers and integrates advertisements into its online content; (2) an advertiser, who provides the advertisements to be shown; and (3) advertising agencies that help create and place the ads.  The goal of online advertising generally is to put an advertisement in front of the best possible audience for that ad.  A view of the ad by an Internet user is commonly referred to as an "impression."

27.     Many publishers rely on the sale of advertising space on the website(s) or application(s) they operate as their primary source of revenue.  This advertising space is filled with a type of digital advertising known as display advertising, which appears on a website or application that a user has chosen to view – such as USAToday.com or WSJ.com – and is often shown in a side

1  window or another dedicated space on the web page. Display ads account for roughly half of the

2  digital advertising market.

3      28.  Like search advertising, buying and selling display ads (including online video ads)

4  often involves real-time bidding. Online advertising campaigns are run through various pieces of

5  advertising technology or "ad tech."

6      29.  One main piece is an "ad tech stack," which refers to the series of companies and

7  technologies on the Internet that gets an advertiser's message in front of the right consumer at the

8  right time to maximize the chance for the advertisement to influence the consumer to take some

9  desired action. Today, the ad tech stack facilitates the automated selling and buying of digital ad

10  inventory on a large scale in real time.

11     30.  Below is a graphic representation of the various products and services that comprise

12  the ad tech stack:

13 

14

15

16     31.  Ad servers are used by publishers, advertisers, ad agencies, and ad networks to

17  manage and run online advertising campaigns. Ad servers make instantaneous decisions about what

18  ads to show on a website, and then place the ad onto that site. Additionally, ad servers collect and

19  report data (such as the number of impressions and clicks) for advertisers to gain insights from and

20  monitor the performance of their ads, including the efficacy of placing an ad with a particular

21  publisher. Ad servers are used to manage and display online advertising content to the right user on

22  a website. The ad server: (1) determines which ads to display on the publisher's website based on

23  collected user data and preferences across publishers; (2) serves the ad to the user; and (3) collects

24  and reports on additional data such as impressions and clicks, which is used to determine the cost to

25  the advertiser and the amount of money paid to the publisher.

26     32.  Additional technologies in the ad tech stack include supply-side platforms ("SSPs"),

27  which help publishers sell unused ad space (or inventory) and demand side-platforms ("DSPs"),

28  which are used by advertisers to buy ad impressions from ad exchanges for the cheapest price. The

ad formats can include: display, mobile, search, or video ads.  Display advertising, as well as online video advertising, use SSPs and DSPs.  Together, the publisher ad servers, SSPs, advertiser ad servers, and DSPs comprise the ad tech stack.

B.   **Google's History: From Search Engine to Online Advertising Business**

33.   Google runs the leading ad exchange, while also running the buy-side (advertisers) and sell-side (publishers) intermediary platforms that trade on the exchange.  Google is the dominant player in both search advertising and digital display advertising, and according to the October 2020 House Antitrust Report, it captures over 50% of the market across the ad tech stack, or the set of intermediaries that advertisers and publishers must use to buy, sell, and place ads.  The Publisher Ad Serving Market is particularly concentrated, with Google and its products having a 90% market share.  Most publishers can monetize their space only through Google-dominated ad tech stack.

34.   Google began as a general online search engine – a two-sided platform that enabled users to search the Internet for content.  While at first it simply indexed the content of web pages, Google's key innovation, the PageRank algorithm, helped define second-generation search technology by looking at links to and from other web pages as a way of determining relevance for users.

35.   Google operated at a loss for the first two years.  In 2000, Google began to monetize its search engine, and launched AdWords, an online advertising service that let businesses purchase keyword ads to appear on Google's search results page.  This offering evolved to become the heart of Google's business model.  Google turned its first profit in 2001.

36.   The multi-sided nature of Google's general search platform, which connects distinct but interdependent demands, offers Internet users a service purportedly "free of charge."  This consumer strategy (which Google employs with various products and services) attracts users, who are critical assets that allow Google to sell advertising space to companies that are interested in reaching those users.  In this way, Google connects users' demand for information, products, and services with advertisers' and publishers' demand for access to those users.  While Google's dominant business model suggests that users receive "free" access to services, the exchange in fact is for the commercial use of an individual's personal data, which is critical for attracting billions of

dollars in advertising revenue. Google then stores and monetizes this data through its proprietary algorithms.

37. Today Google is ubiquitous across the digital economy, serving as the infrastructure for core products and services online. It has grown and maintained its search engine dominance, such that "Googling" something is now synonymous with online search itself. The company is now also the largest provider of digital advertising, a leading web browser, a dominant mobile operating system, and a major provider of digital services such as mapping, email, cloud computing, voice assistant services, as well as dozens of other offerings.[12] Each of these services provides Google with a trove of user data, reinforcing its dominance across markets and driving greater monetization through online advertising.[13]

38. As Google's dominance and market power in Internet search grew and its product and service offerings diversified, Google captured user data and critical information about users, such as personally identifiable information, user impressions and preferences, location, browsing history, IP address, and insight into patterns, timing, trends, and demographics. At the same time, Google strategically acquired ad tech companies and competitors that provided the ad tech services Google needed to facilitate advertisers' placement of ads onto publishers' websites. This combination has enabled Google to build a data set for its ad tech services utilizing the user data from its search engine and other customer facing properties, such as Google Maps and Gmail, providing Google with an unparalleled ability to target ads to the right viewers.

39. Over time, Google's ad offerings have become considerably more sophisticated, resulting in tens of billions of dollars of annual revenue. These services now include, *inter alia*, search campaigns, display campaigns and online video campaigns, which can be implemented and viewed across multiple devices, and the buying and selling of which is facilitated through Google's suite of ad tech services. Moreover, Google's market power in search enables Google to harvest

---

[12]     House Antitrust Report at 174.

[13]     House Antitrust Report at 175.

data generated not only by Internet users, but also by competitors, publishers, advertisers and intermediaries, and further monetize and utilize the same.

40.     Today, Google's ad-based revenue model generates the vast majority of Google's revenues, yielding billions in revenue each year as reflected in the following chart:



For example, in the third quarter of 2019, defendants' advertising revenues hit a record $33.9 billion.

## V.     GOOGLE BECOMES A MONOPOLY

### A.     Google's Growth to Search Engine Market Dominance

41.     Google's flagship online service is its general search engine, Google Search, which is accessible either through Google's main website (www.google.com) or through localized websites. Search engines, such as Google, Yahoo, Baidu and Bing, utilize automated software applications (referred to as robots, bots or spiders) that travel along the Web and gather information used to create a searchable index of websites.

42.     Google Search is ubiquitous, existing for static devices (personal computers and laptops), for handheld and mobile devices (smartphones and tablets), and for other smart devices, such as Google Home or devices running Android TV or Android Auto operating systems. Additionally, Google also powers other search engines – including Ask, which is the sixth largest search engine in the world.

43.     When a user enters a keyword or a string of keywords (a "query") in Google Search, Google's general search results pages return different categories of search results, including: (1) generic search results; (2) specialized search results; and (3) online search advertisements.

44.     Generic search results typically appear on the left side of Google's general search results pages in the form of blue links with short excerpts ("snippets") in order of their rank. Generic search results can link to any page on the Internet, including web pages of specialized search services that compete with Google's own specialized search services.

45.     To rank generic search results in response to a query, Google uses algorithms, including an algorithm called PageRank. PageRank ostensibly measures the importance of a web page based on the interest in the page, as well as the number and quality of links to that page, the underlying assumption being that more important websites are likely to receive more links from other websites. Google applies a variety of adjustment mechanisms to the results of PageRank, which adjustments are determined by Google. Through PageRank and the adjustment mechanisms, Google determines and can manipulate the rank of a web page in the generic search results on Google's general search results pages.

46.     Google's clear dominance in online search also gives it significant control over the data generated by publishers and advertisers and allows Google to maintain its dominant position over digital advertising.[14] Through this generic search process, Google has attained long-recognized and substantial market power and monopoly status in both the Internet Search Market and the Online Advertising Market.

**B.      Google's Suite of Online Advertising Products and Services Consolidates Dominance Across Multiple Markets**

47.     For years, many different businesses offered the various complementary products and services that together accomplished the task of matching publishers with advertisers and arranging payment from the advertisers to the publishers who provide that space. This, however, is no longer the case.

---

[14]     House Antitrust Report at 196.

48.     Over time, Google expanded its offerings to include a suite of publishing and advertising products and services through which it controls the digital advertising intermediation chain.  These offerings were facilitated largely through Google's strategic acquisition of ad tech companies and competitors that provided the ad tech services Google needed to facilitate advertisers' placement of ads onto publishers' websites.  Virtually every part of the digital advertising chain is now controlled by a single company: Google.

49.     Once Google seized control over the market, it also shrouded the entire process of buying and selling ads in secrecy, as discussed further below.  As the House Antitrust Report recognized, "this process lacks transparency."[15]  Google intentionally withholds from publishers and advertisers key information about its services, such as how much their space sold for and how much Google keeps, making it difficult for publishers and advertisers to understand the value that Google's intermediation services provide.  Nor are publishers able to confirm that the auctions are conducted fairly.

### 1.     Double Click for Publishers and DoubleClick Ad Exchange

50.     Google's DoubleClick for Publishers, or DFP, is Google's ad server that enabled advertisers to upload advertiser/ad network creative advertisements and tags (HTML codes that call other ad networks and exchanges for ads).  When there is an opportunity (or an ad call), DFP selects which ad will be served based upon the accumulated data and preferences of the individual user.  Thus, through DFP, Google instantaneously controls the vast majority of how, when, where and which ads are served to users on the Internet.  A recent *Wall Street Journal* article lays out the inner workings of Google's multi-billion dollar advertising conglomerate.[16]

51.     DoubleClick Ad Exchange or AdX is Google's auction-based system for premium websites to be paired with premium advertisers.  Google AdX is more exclusive than Google Ad Manager and can only be accessed in two ways.  First, one could obtain a Google Ad Manager account and then get Google's approval to access the AdX account.  Alternatively, AdX can be accessed by

---

[15]     House Antitrust Report at 129-30.

[16]     Keach Hagey & Vivien Ngo, *How Google Edged Out Rivals and Built the World's Dominant Ad Machine: A Visual Guide*, Wall St. J., Nov. 7, 2019.

working with a Google Certified Publishing Partner, through which a publisher can obtain a subsidiary AdX account. In both cases, only large publishers approved by Google can use AdX.

### 2. AdSense and Google Ads

52.     AdSense enables publishers to reserve space for the placement of Google Ads on their own website (via text, video or images) and thereby monetize their own website content. AdSense is used to sell advertising space to Google.

53.     Google Ads (formerly AdWords) enables businesses and marketers to advertise on Google's network (search, display, etc.). Google Ads is used to buy advertising space from Google. Google Ads works by displaying a provider's ad when people search online for the products and services that provider offers. Google Ads is powered by an auction bidding market. Each time an ad is eligible to appear for a search, it goes through the ad auction. The auction determines whether the ad actually shows and in which ad position it will show on the page. To gain the top spot in Google advertisements, advertisers have to outbid each other. Higher bids move up the list, while low bids may not even be displayed at all.

54.     Cost per impression (or "CPI") is the cost or expense incurred for each potential customer who views the advertisement, while cost per thousand impressions (or "CPM") refers to the cost or expense incurred for every thousand potential customers who view the advertisement. CPI, along with pay-per-click ("PPC") and cost per order, are used to assess the cost-effectiveness and profitability of online advertising.

55.     How often an ad shows, its position on the page, and how much the ad costs are all purportedly driven by two factors: the advertiser's bid and the projected quality of the ads (via a subjective "Quality Score"). However, other factors determined by Google, including acceptable and bespoke minimum bids, are also accounted for in the determining the winning bid.

56.     Importantly, Google not only runs the auction, but also competes in it. While this process is held out by Google to be neutral and unbiased, Google alone controls the algorithms that generate Google Ads results, the Quality Score assigned to the search advertisements, and the minimum bids that a given advertiser can offer in the auction. As a result, the changing or selective application of Google's auction process and/or algorithms can effectively box out competition and

limit consumer choice on what may or may not be purchased, and from whom, based upon what advertisements "win" the auction.

57. The three most common Google Ads campaign types are:

- *Search campaigns* – usually in text form, these ads show on Google Search results pages when the user searches for a particular product or service;

- *Display campaigns* – usually in image form, these ads appear on websites or apps that consumers visit; and

- *Video campaigns* – these are digital advertisements, usually 6 or 15 second videos, that show right before or during substantive video content.

58. Google's video campaigns can run in a number of formats, including in-stream ads, video discovery ads, non-skippable in-stream ads, outstream ads, and bumper ads. Specifically, in-stream ads run before, during, or after other videos on YouTube or across the Google network sites, games or apps. These ads may also run on YouTube videos that are embedded on other sites.

### 3. YouTube

59. In October 2006, Google acquired YouTube, an online video-sharing company, for $1.65 billion. Launched by three former PayPal employees in 2005, YouTube is a video-sharing website that allows users to upload, view, rate, share, add to playlists, report, and comment on videos and subscribe to another user's content. YouTube became the fastest growing online video-sharing platform. Google acquired the company just over a year after its launch and it has now become the second largest search engine in the world – second only to Google Search.

60. Approximately 1.3 billion people use YouTube, and it has become the second most visited website in the world. YouTube gets over 30 million visitors per day, who watch an estimated 5 billion videos each day. Three hundred hours of video are uploaded to YouTube every minute.[17]

61. Like most other Alphabet properties, YouTube earns the bulk of its revenue through advertisements.[18] YouTube is estimated to generate between $16 billion and $25 billion in annual

---

[17] *37 Mind Blowing Youtube Facts, Figures and Statistics – 2020,* MerchDope (Feb. 26, 2020), https://merchdope.com/youtube-stats/.

[18] Andrew Beattie, *How YouTube Makes Money Off Videos (GOOG)*, Investopedia (May 27, 2020), https://www.investopedia.com/articles/personal-finance/053015/how-youtube-makes-money-videos.asp.

1    revenue, putting it in the top half of the Fortune 500.[19]  YouTube accounts for the second largest

2    revenue stream generated by Google next to its online advertising business.  Moreover, YouTube is

3    steadily becoming more valuable to Google due to the growing shift of consumer viewership from

4    television to online video.

### 4.  Android Operating System

62.  Google understood early on that the shift from desktop PCs to mobile Internet, which

started in the mid-2000s, would be a fundamental change for Google Search and would provide

access to emerging and third-world markets, where mobile devices are significantly more prevalent.

63.  In 2005, Google acquired Android, a developer of an open source mobile device

operating system, or "OS," for $50 million.  In 2015, the Android OS was installed on more than

80% of the world's smartphones.  Google has continued to develop Android and to acquire Android-

relevant patents since that time.

64.  Google's Android is now the most-used smartphone operating system in the world.

Today, over 75% of smart mobile devices worldwide run on the Android OS.[20]

65.  Because Android is a licensable smart mobile operating system, third-party

manufacturers of smart mobile devices can license and run Android on their devices.  As set forth

below in ¶¶170-173, Google's complete and total control of the Android OS has enabled Google to

engage in certain anticompetitive behavior to maintain and solidify its dominance across multiple

markets.[21]

---

[19]    Daisuke Wakabayashi, *YouTube Is a Big Business. Just How Big Is Anyone's Guess*., N.Y. Times (July 24, 2019), https://www.nytimes.com/2019/07/24/technology/youtube-financial-disclosure-google.html.

[20]    *Mobile Operating System Market Share Worldwide*, StatCounter Glob. Stats, https://gs.statcounter.com/os-market-share/mobile/worldwide (last visited Dec. 11, 2020)

[21]    Defendants' anticompetitive conduct in regard to Android OS has been the subject of numerous regulatory investigations in the United States and abroad.  Most recently, it has been included in the DOJ's October 20, 2020 complaint against Google for violations of the Sherman Act. Additionally, the FTC opened up investigations in 2011 and again in 2015.  In July 2018, the European Commission fined Google a record $5.1 billion in an Android antitrust case for, *inter alia*, illegally tying Google's search and browser apps; illegally making anticompetitive payments conditional on exclusive pre-installation of Google Search; and illegally obstructing the development and distribution of competing operating systems.  In an April 2017 settlement with Russia's Federal Antimonopoly Service, Google agreed to pay $7.8 million in fines and rewrite contracts with

### 5. **Google Chrome**

66.     In 2008, Google released its Chrome web browser ("Chrome" or "Chrome Browser"). A web browser is software that retrieves and displays pages from the Internet. When a user wants to access a certain web page, the web browser fetches information from the relevant server and displays it to the user. Browsers are used to navigate and spend time on websites and to search the web. Most activities online are made possible through a browser. Web browsers can be installed on almost any device connected to the Internet. Google Chrome includes synchronization with Google products and services and is designed to work with YouTube and Gmail. Google Chrome is used by over 50% of people in the United States and approximately 67% worldwide. Google's Android OS, discussed in §IV.B.4. above, requires pre-installation of the Chrome Browser under certain circumstances, including, *inter alia*, as a condition of accessing certain Google apps.

### 6. **Other Google Products and Services**

67.     Google also has additional product and service offerings designed to attract users and harvest their data. These services include but are not limited to Google Maps, Gmail, Google Drive, Google Photos, Google Play Store, Google Earth, Google Pay Send, Google Hang Outs, and Google Analytics.

### C. **Key Acquisitions Expand Google's Ad Tech Capabilities**

68.     Google has steadily and systematically grown through acquisition of corollary ad tech, web application and online video platform companies. Since its founding in 1998, Google has acquired more than 227 companies, spending over $27 billion for its top 10 acquisitions. Rather than growing organically, Google has grown through strategic acquisitions to yield products, manpower, and patent portfolios that directly and indirectly support and maintain its Internet search and other monopolies and feed its online advertising business revenue.

---

smartphone manufacturers under a settlement over Google's self-preference access to the Android operating system.

69.     In addition to the significant acquisitions of YouTube and Android described above, Google has made numerous key acquisitions to enable expansion of its online advertising market dominance and its ad tech capabilities.

70.     In April 2003, Google acquired Applied Semantics for $102 million.  This acquisition was instrumental in the creation of Google's AdSense product.

71.     In April 2007, Google announced its intention to acquire DoubleClick.  Following an investigation by the FTC prompted by antitrust concerns, Google acquired DoubleClick in March 2008 for $3.1 billion.[22]  The DoubleClick acquisition was instrumental in cementing Google's stronghold in the lucrative online advertising industry.  In addition to DoubleClick software, Google also acquired relationships with web publishers, advertisers and agencies, beating a host of other potential buyers like Microsoft to the acquisition.  Integrated into AdSense, DoubleClick has been enormously successful for Google, with almost 83% of Alphabet's $162 billion in revenues in 2019 coming from its advertising business.  Since the acquisition by Google, DoubleClick has further expanded with DFP and DoubleClick Ad Exchange.  When Google purchased DoubleClick, it told Congress and the FTC that it would not combine the data collected on Internet users via DoubleClick with the data collected throughout Google's ecosystem.  In 2016, however, Google reversed this commitment, and subsequently combined DoubleClick data with personal information collected through other Google services – effectively combining information from a user's personal identity with their location on Google Maps, information from Gmail, and their search history, along with information from numerous other Google products.[23]

72.     In 2010, Google acquired AdMob for $750 million and then began acquiring buyer services, including Invite Media for a reported $81 million.  The combination of deals gave Google unprecedented positioning in every facet of how ads end up on websites and smartphone apps around the world.

---

[22]     In 2013, following the appointment of former Google outside counsel Joshua Wright as President Obama's FTC Commissioner and despite a staff memo urging prosecution, the FTC issued two decisions effectively terminating the investigations into Google without any meaningful action against Google.

[23]     House Antitrust Report at 209-10.

73. In August 2011, Google acquired Motorola Mobility for $12.5 billion, a mobile device manufacturer. Google acquired Motorola's smartphone patent portfolio, with more than 20,000 patents on mobile phones and wireless technologies, for $12.5 billion. In the same year – prior to the Motorola acquisition – Google spent $4.9 million on the Mondu patent portfolio of Android-relevant technology. Moreover, Google bought 1,029 patents related to the Android OS from IBM. *See* MIT Technology Review, October 2011.[24]

74. In 2011, Google purchased Ad Meld, one of the largest SSPs, which it integrated into AdX, Google's existing exchange.

75. In January 2019, Google acquired some of Fossil's smartwatch technology for $40 million. On November 1, 2019, Fitbit announced an agreement to be acquired by Google for approximately $2.1 billion. This wearable technology enables significant harvesting of user data, already alarming regulatory agencies.[25]

76. With these and other acquisitions, Google has maintained its dominance in online search and search advertising, and gained dominance in related markets and market power as set forth below.

D. **The Relevant Markets**

77. Insofar as plaintiff is required to plead the relevant product and geographic market to establish the antitrust violations alleged here, plaintiff alleges the relevant markets at issue and has pled how defendants' conduct has harmed competitive processes in these markets. The contours of the relevant markets are set forth above. *See* §IV.

1. **Relevant Product Markets**

78. Google has a durable monopoly in each of the following markets:

---

[24] *Google Buys Motorola Mobility for $12.5 B, Says "Android Will Stay Open,"* TECHCRUNCH (Aug. 15, 2011), https://techcrunch.com/2011/08/15/breaking-google-buys-motorola-for-12-5-billion/ (reporting that Google purchased Motorola primarily to protect the Android ecosystem from patent litigation).

[25] On August 2020, European Union authorities announced an investigation into Google's $2.1 billion purchase of the fitness-tracking company, which raised alarms about the health data the Internet giant would be acquiring as part of the deal. Javier Espinoza, *EU signals deeper investigation of Google Fitbit deal*, Fin. Times (July 1, 2020), https://www.ft.com/content/aba45bc9-ffc8-411e-ac29-dbb3171f4886.

a. <u>The Internet Search Market</u> – Google overwhelmingly dominates the recognized market for general online search with control over 94% of the search engine market. Despite notable changes in the market – such as the switch from desktop to mobile – Google has maintained this dominance for more than a decade, a period during which its lead over its most significant competitors has only increased. The next largest competitor is Microsoft's Bing, with a market share of about 2.8%.

b. <u>Licensable Mobile Device Operating Systems</u>: Through Android OS, Google is dominant in the worldwide market for Licensable Mobile Device Operating Systems, with a market share of approximately 75%.[26]



**Global Mobile OS Market Share**
*February 2019*

■ Android ■ iOS ■ KaiOS ■ Unknown ■ Windows ■ Samsung

23.3%

1.0%
0.4%
0.3%
0.3%

74.2%

*Note: Values do not equal 100% due to rounding.*
*Source: Statcounter, 2019*

BUSINESS
INSIDER
INTELLIGENCE

c. <u>The Search Advertising Market</u>: Google has approximately 80% market share in the Search Advertising Market followed by Microsoft and Yahoo with 7.2% and 2.5%, respectively.[27]

---

[26] Stacey Cowley, *The smartphone market's radical shakeup*, CNN Bus., https://money.cnn.com/gallery/technology/mobile/2013/01/29/smartphone-market-share/index.html (Jan. 29, 2013); *Mobile Operating System Market Share Worldwide*, StatCounter Glob. Stats, https://gs.statcounter.com/os-market-share/mobile/worldwide (last visited Dec. 11, 2020) (citing 76.2% share).

d.   <u>Online Advertising Market</u>: As the House Antitrust Report recognized, Google dominates this market with more than a 50% market share.[28] Google's power in this market stems from three main sources: its inventory of search and display advertising (including video) and associated large base of advertisers; its data on users; and its strong position in intermediation, particularly as the largest publisher ad server, initially through the acquisition of DoubleClick and other intermediary businesses. Moreover, within the Online Advertising Market, there are at least four relevant and distinct sub-markets over which Google has control, as described below.

i.   <u>Publisher Ad Serving Market</u>: The market for publisher ad serving is highly concentrated, with Google Ad Manager accounting for 90% of the display ads.

ii.   <u>Ad Exchange Market</u>: Google has more than 50% market share in the market for intermediation services such as ad networks and ad exchanges.

iii.   <u>Advertiser Ad Serving Market</u>: The demand side of the ad tech chain – which includes tools used by advertisers to buy ad slots, track users, report revenue metrics, serve ads, and determine how to fill available inventory – is also highly concentrated, with Google accounting for up to 90% of ads served.

79.   Google has or is achieving monopoly power in the following market:

---

[27]   Tess Townsend, *Google's share of the search ad market is expected to grow*, Vox (Mar. 14, 2017), https://www.vox.com/2017/3/14/14890122/google-search-ad-market-share-growth.

[28]   House Antitrust Report at 206 ("Google is a prominent player in both search advertising and digital display advertising, and it captures over 50% of the market across the ad tech stack, or the set of intermediaries that advertisers and publishers must use to buy, sell, and place ads. Specifically, Google runs the leading ad exchange, while also running buy-side and sell-side intermediary platforms trade on the exchange.").

a.   <u>The Web Browser Market</u>: Google has effectively achieved monopoly power in the Web Browser Market, with an estimated market share of 66% and growing.



80.   The visual of Google's Internet Search Market share can be seen below:



81.     Internet search, search advertising and advertising technology have been recognized as distinct markets and Google's dominance in them has been established.[29]

82.     In addition to Google's market share set forth above, Google's market power in each of the above markets is demonstrated by the interoperability of the Google products within each of the markets; Google's unilateral ability to control how and on what terms market participants can interact with its products and services; Google's collection and weaponized usage of data from its products and services; Google's ability to both set pricing and maintain opacity in the fees its receives for its services; the self-reinforcing advantages of the data it collects for each of its services in garnering additional market share; the unique products and services at issue in this case, which can and have physically and technologically blocked competition on the merits; the minimal strength and capacity of competitors, especially given Google's control of the Internet ecosystem as a whole; the interplay of Google's monopolies with one another; Google's control of substantial relevant patents in the ad tech industry; and Google's infrastructure, which enables it to offer services for free to users of the market.

83.     Each of the above is a market for the purposes of antitrust law.  There are no reasonable substitutes for general Internet search; search advertising; Web Browsers; or licensable mobile operating device systems.  Nor is there a reasonable technological substitute for the digital advertising technology market, or each of the various sub-markets therein.  Each of these markets represents a different set of services performed at each level of the advertising stack and provides particularized functionality in delivering and tracking online advertisements, and these markets are therefore not substitutes for one another.

84.     Likewise, there is no reasonable substitute for online advertising services.  Online advertising is not substitutable with traditional forms of advertising, such a print, television, radio, or billboard advertisements.  Each of these forms of advertising reaches a distinct group of potential

---

[29]     *See* House Antitrust Report at 177, 180, 183, 196, 213; *see also, e.g.*, *Antitrust: Commission sends Statement of Objections to Google on Android operating system and applications – Factsheet*, Eur.  Comm'n  (Apr.  20,  2016),  https://ec.europa.eu/commission/presscorner/detail/ en/MEMO_16_1484;  F.T.C.,  *Statement  of  Federal  Trade  Commission  Concerning Google/DoubleClick*,  No.  071-0170,  at  5-6  (Dec.  20,  2007),  https://www.ftc.gov/ system/files/documents/public_statements/418081/071220googledc-commstmt.pdf.

1    customers, and advertisers and advertising agencies view each of these forms of advertising as
2    complementary rather than as potential replacements for each other. Online advertising also is
3    different in kind from traditional forms of advertising, because it is delivered differently and in a
4    manner that targets the specific individual end user. Additionally, online advertisements can be
5    continuously tracked, updated and improved based on data showing how consumers are responding.
6    Likewise, each of the component markets is not substitutable for the others as they serve a distinct
7    function and different audiences and are reachable by consumers in a different manner. Search
8    (which is pulled) is intent-based advertising that seeks to induce consumers who have already shown
9    an interest in buying a product or service to make a purchase. Display and video (which are pushed),
10   by contrast, are suitable for raising awareness about a product, service, or brand and reaching new
11   audiences that may not yet have shown an interest. Social media advertising is employed on a
12   closed, rather than open network and targeted at users of the social network itself. Moreover, as
13   described above, the publisher ad serving market, ad exchange, and advertiser ad serving markets
14   each represent a different service provided at a different level of the ad technology stack. For
15   example, on the supply side, a publisher ad server helps publishers track users, manage inventory
16   and make the final decision about how to fill available inventory; on the demand side, an advertising
17   ad server helps advertisers buy ad slots. Between these two sit intermediaries, which run the
18   auctions. These are separate functions, and thus are not substitutes for each other.

19        85.    These durable markets have significant barriers to entry, including, but not limited to,
20   network effects that make platforms more valuable as they gain more users; the advantages of big
21   data, which enable platforms and companies to use the treasure trove of data they collect from users
22   to improve the effectiveness of their products and services; and lock-in effects that cause users to
23   avoid switching platforms or companies so as not to lose their personal contacts, history of searches,
24   photos, apps, and other information. For general search, additional barriers to entry include
25   economies of scale in developing a web index; access to click-and-query data at scale; and Google's
26   extensive implementation of default positions. Also, for the Licensable Mobile Device Operating
27   System Market, there are high barriers to entry, in part due to specific network effects: the more
28   popular an OS is, the more developers write apps for that system – which in turn attracts more users.

Furthermore, significant resources are required to develop and distribute a successful licensable smart mobile operating system.

86.     Defendants' Anticompetitive Restraints have restrained competition on the merits in each of the above markets, including but not limited to the Online Advertising Market.  Google's conduct had the intent and effect of suppressing and/or foreclosing competition across markets and in particular in the Online Advertising Market as well as in the digital advertising technology market, in order to consolidate, maintain and gain dominance across markets.

## 2.     The Geographic Market

87.     The United States is the relevant geographic market for the markets defined above.

## VI.     ANTITRUST LAWS

88.     Congress passed the first antitrust law, the Sherman Act, in 1890 as a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." In 1914, Congress passed two additional antitrust laws:  the Federal Trade Commission Act, which created the FTC, and the Clayton Act.  With some revisions, these are the three core federal antitrust laws still in effect today.

89.     The Sherman Act is divided into two main sections: §1, which prohibits concerted activity of two or more entities that combine, contract, or conspire in restraint of trade; and §2, which addresses unilateral actions and prohibits monopolization or attempted monopolization in restraint of trade.  Specifically, §2 of the Sherman Act establishes three offenses, commonly termed "monopolization," "attempted monopolization," and "conspiracy to monopolize."[30]

90.     At its core, §2 makes it illegal to acquire or maintain monopoly power through improper means.  The long-standing requirement for monopolization is both: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.  To be found unlawful, monopoly power must be accompanied by an element of anticompetitive conduct, often described as "exclusionary" or "predatory" conduct.  This

---

[30]     *See, e.g.*, 1 Section of Antitrust Law, Am. Bar Ass'n, Antitrust Law Developments 225, 317 (6th ed. 2007).

includes both conduct used to acquire a monopoly unlawfully and conduct used to maintain a monopoly unlawfully.

91.     Section 2 also proscribes "attempt[s] to monopolize."  Establishing attempted monopolization requires proof (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.

92.     Section 3 of the Clayton Act, 15 U.S.C. §14, prohibits exclusionary practices, such as tying, exclusive dealing, and predatory pricing, that lessen competition.  The Clayton Act allows for monetary penalties that are three times as large as the harm caused by the illegal behavior.

## VII.    PLAINTIFF SWEEPSTAKES TODAY'S ROLE IN THE DIGITAL ADVERTISING MARKET

93.     Sweepstakes Today is a digital media publisher that provides services to online advertisers.  As a publisher, Sweepstakes Today facilitates the buying and selling of advertising space on its website (known as a publisher's inventory) either via an auction, or by selling space directly to an advertiser, where ads can be shown.  Sweepstakes Today manages the distribution and delivery of digital advertising content, by allowing brands to deliver advertisements to inform prospective customers of their goods and services.

94.     Google and Sweepstakes Today are competitors in the Online Advertising Market. Google provides services similar to those provided by Sweepstakes Today and has a significant market position as a supplier of space for digital ads.  In 2015, Google and Facebook, who hold a duopoly on the supply of display advertising, accounted for 75% of all new online ad spending. YouTube alone constitutes up to 10% of total display supply.  Through its stable of advertising products and services, Google supplies Sweepstakes Today with advertisements to populate its blank advertising space, which advertisements are served or filled by Google's ad server and are targeted to the individual user who is visiting Sweepstakes Today's website.  Like Google, online advertising sales are Sweepstakes Today's main revenue source.

95.     Between 2008 and 2012, Sweepstakes Today garnered digital advertising revenue of up to $150,000 annually.  By 2012, Sweepstakes Today had become the number one result in the

world for the Google search engine keyword "Sweepstakes," out of more than 100 million pages per day.

96. Sweepstakes Today is a user, customer and consumer of Google products and services and a participant in markets Google monopolizes. As a result of Google's market dominance, publishers such as Sweepstakes Today have no choice but to use some of Google's publishing and ad intermediation services, including DoubleClick, Ad Manager and AdSense. Sweepstakes Today also relies on both Google's Ad Server and Chrome Browser. To reach the majority of the market, Sweepstakes Today must use Google products to function as the delivery method for both display advertisements or creatives.

97. While the Google DoubleClick and Ad Manager programs deliver the advertisements displayed on Sweepstakes Today's websites, it is Google's algorithms that are responsible for the delivery pattern, frequency and pace of the ads appearing on Sweepstakes Today's digital properties. Google's software stores and manages what ads appear on Sweepstakes Today's sites.

98. 92% of consumers use Google's search engine; 80% of consumers use Google for search advertising; 75% of consumers use Google's Android OS to search the Internet and more than 66% of users worldwide view websites, online video and the associated video advertisements through Google Chrome. Google is the digital infrastructure, without which there is no market. Using the data advantage its gains through its search engine, Android OS, and Chrome Browser, as well as the rules it sets through its ad intermediation software, Google has made it virtually impossible for publishers and advertisers to do business with each other except through Google and its ad technology services.

## VIII. GOOGLE WIELDS MONOPOLY POWER IN MULTIPLE MARKETS TO IMPEDE COMPETITION

99. Google is a monopolist in the digital advertising, publisher and advertiser ad serving and ad exchange markets. Google aggressively uses its monopoly positions, and the money that flows from them, to continuously foreclose rivals and protect its monopolies.

100. As described below, Google has willfully maintained and extended its monopolies through a wide variety of anticompetitive conduct, including excluding and preventing entry by

competitors, raising its rivals' costs, and forcing publishers and advertisers to rely on Google's intermediation services to effectuate sales.

A.   **Google's Anticompetitive Conduct and Manipulation of the Online Advertising Market**

1.   **Designing Auctions to Weaken Competitive Sources and Advantage Itself**

101.   Google occupies the entire digital advertising chain linking publishers to advertisers and on numerous occasions has used its structural advantage for competitive interference.  In the publisher ad serving market, Google wields overwhelming power and has a share of up to 90% of the market.  Google's control over this stage of the ad tech stack is particularly important because it is the ad server that decides which advertisement wins the right to be displayed on a publisher's webpage.

102.   To compete in the Online Advertising Market, a company's services must be compatible with Google's ad products and services and Google's Chrome Browser.  Importantly, this enables Google to influence industry standards in its own favor and to set arbitrary and anticompetitive rules by which display content is enabled, viewable and audible in ways that preference Google, YouTube and Google's products and services.  In this way, Google has illegally abused its monopoly power through its algorithms, its arbitrary rules for advertisers and marketers, and certain technological changes.

103.   Google has made changes to its ad software to engage in self-preferencing, including, in particular, through a Last Look feature, which harms rival exchanges by suppressing competition on the merits, raises rivals' costs, reduces publishers' revenue and suppresses alternative auction processes.  Plaintiff Sweepstakes Today has been economically harmed by this practice.

104.   Traditionally, bidding for impressions was done sequentially in a "waterfall" auction – that is, a publisher passes its inventory from ad network to ad network in descending order of importance until all impressions are (hopefully) sold.  The ad networks are usually ranked according to the average historic yield they have produced for the publisher.  This means that an ad network

1    where premium inventory has been sold in the past (for a higher price) will then get first chance on

2    further impressions from the same publisher.

3         105.    In 2014, however, Google introduced a feature, called "Last Look," that changed the

4    way in which bids were accepted.  Last Look was a feature that allowed Google the opportunity to

5    bid on every impression and consequently always outbid other publishers.  The DoubleClick

6    AdExchange would wait for other exchanges to submit their bids before making its own, a dynamic

7    that left Google always in a position to outbid its rivals.  By having the "last look," Google's

8    exchange could simply bid $5.01 when the highest bid for a particular user from another exchange

9    was $5.  Google would effectively be first in line and would assess whether the impression was a

10   valuable user or instead a low-value impression.

11        106.    The next exchange in line was aware that it was bidding after Google and, because it

12   was operating at an informational disadvantage to assess the quality and value of the impression, it

13   would likely submit a bid at a much lower price (if it bid at all).  Over time, because the exchanges

14   bid at such low levels, it depressed the bids and payments to publishers, harming publishers.  It also

15   foreclosed competition in the ad tech market because non-Google providers did not get a chance to

16   bid on an impression offered through Google's Ad Manager until Google had passed on the

17   opportunity.  After intense criticism, and years of economic harm to publishers, Google eventually

18   relinquished the feature in 2019.

19        107.    As a potential work-around, publishers responded by developing "header bidding," an

20   advanced method of display ad buying which allows publishers to offer their inventory to multiple

21   ad exchanges simultaneously.  This gave every ad buyer an equal chance to bid on the same

22   inventory at the same time, leading to greater competition between bidders and more ad revenue for

23   publishers, fostering competition among ad exchanges and creating rivals to Google.  Following the

24   adoption of header bidding, publisher revenue increased significantly – cost per thousand

25   impressions increased by 25%-50%.

26        108.    In response to this competitive threat, Google took aim at header bidding, introducing

27   an alternative it called "Open Bidding," which was integrated into its ad tech stack.  Yet again,

28   Google's response was designed to suppress competition on the merits and favor itself over its

competitors. When ads are sold through Google's "Open Bidding," there was an additional charge imposed by Google, usually 5% of the SSP's bid – raising rivals' costs, lowering payments to publishers, and advantaging Google.

109. Another way in which Google sought to blunt this competitive threat and force "Open Bidding" adoption was through its design of Accelerated Mobile Pages ("AMP"). AMP, however, was technically designed to render websites built on the framework with header bidding incompatible with its applications, which created a *de facto* requirement for publishers to use AMP. Google also dropped the PageRank of sites that did not adopt AMP, maliciously rendering such sites nearly invisible to Google searches and starving publishers of the web traffic needed to create ad revenue and sustain their ad business. As a result, publishers could not utilize header bidding without being penalized for doing so (both financially and through the inability of users to see/reach their sites), which substantially removed the financial benefit of competition on the merits that header bidding had provided to publishers.

110. Google took additional steps to undermine header bidding and ensure that publishers using DoubleClick as their ad server increasingly relied on Google-controlled programmatic channels was the "minimum bid to win feature," which Google implemented in March 2019. The "minimum bid to win" feature allowed buyers using Google's software (as opposed to header bidding offered by its rivals) to receive extra information that allowed them to adjust their bidding strategy and potentially buy the same inventory at a cheaper price. The natural result was that buyers were driven to directly interact with and shift their budget to Google's Ad Manager rather than another exchange.

### 2. Manipulative and Technological Blocking, Exclusion and Downgrading

111. Google has engaged in manipulative and technological blocking, exclusion and downgrading of competitors' products. Google has used its Ad Server to control how ads end up on websites and smartphone apps, through the Android OS, and has manipulated this control to give preference to Google's own stable of products and services. Google has also used its Chrome Browser to force publishers and advertisers to comply with a host of arbitrary, unilaterally imposed

1    rules to – for example – allow their online videos to be enabled, viewable and audible on Google's

2    dominant Chrome Browser, while it has effectively prevented competitor advertisements from being

3    enabled.  The reverse network effect caused when Google products work while competitors'

4    products do not harms Sweepstakes Today and other publishers and competitors.

5        112.    Google likewise inhibits interoperability between Google ad platforms and non-

6    Google ad platforms, including as set forth above.

### 3.    Denial of Interoperability and Purposeful Incompatibility

8        113.    Google also engages in denying interoperability with competitors' products and

9    services and purposefully renders certain of its products and services incompatible, which has

10   excluded entry by competitors, raised their costs and costs to publishers, and coerced the use of

11   Google products and services by publishers, advertisers and competing platforms.  Between

12   September 2018 and August 2019, for example, the aggregated value of the impressions won by

13   Google Ads through AdX was several times that of impressions won through other third-party

14   exchanges.

15       114.    Google designed its exchange so that it operates more efficiently with requests from

16   Google's own ad server than it does from rival exchanges, which has suppressed competition on the

17   merits.  Google's server can receive requests from, and submit bids to, other ad servers, but the

18   Google server purposefully cannot easily put those requests into a real-time auction on equal footing

19   with the requests from Google's own server.  This lack of interoperability ensures that demand from

20   advertisers for third-party display inventory through Google Ads is overwhelmingly channeled

21   through Google's own exchange and disadvantages competing ad servers.

22       115.    Additionally, in January 2020, even though it may lose some capabilities on its end,

23   Google announced that it planned to phase out third-party cookies in Chrome, which has reinforced

24   Google's power and harmed rivals and forced even more advertisers toward Google.  In particular,

25   while Google phases out third-party cookies needed by other digital advertising companies to

26   effectively compete, Google can still rely on data collected throughout its digital ecosystem.

27       116.    The cookie identifies the unique user, which allows participants in the ad tech stack to

28   track consumers as they browse the web and cross the various functions involved in placing an ad.

Without the ability to identify a consumer and the ability to measure and track their action through third-party cookies, Google's rivals in the ad tech stack will not be able to bid efficiently – in effect, competing blindly with Google, who now has 20/20 vision. Retiring third-party cookies thus raises the costs of Google's rivals and diminishes their effectiveness. Google's dominance across markets and ability to capture user data in other ways means that Google will not be affected in the same way and will maintain the ability to target online advertising to individual users.

117. Through its control of the data, Google has thwarted publisher efforts to understand the source of advertising payments. For years, publishers could view the time stamps on advertising bid requests to match impression sales to bids and get a full view of their ad sales process, thereby allowing them to price their supply more accurately. Google recently removed time-stamp data on bid requests, which lessens the ability of publishers and advertisers to evaluate their performance against Google's.

### 4. Cross-Subsidizing Various Functions of the Ad Tech Stack and Predatory Pricing

118. Google's ubiquitous practice of offering various free services on one side of the advertising technology stack it controls enables it to extract higher prices from the other side and to drive out rivals. Google's market power allows it to raise prices on one end of the stack, while simultaneously lowering prices at the other end, which drives out rivals and makes entry into the market difficult. By way of example, Google has implemented an anticompetitive strategy directed at the publisher end of the advertising technology stack. After purchasing DoubleClick in 2008, Google lowered its prices to publishers by a factor of ten. This, in turn, made entry into the market far more difficult, as such pricing pressure made it nearly impossible to sustain publisher ad server services as a standalone business.

119. But this is not the only way in which Google has used its unique structural advantage to engage in competitive interference. Users' "free" Internet search is paid for in billions of dollars of advertising revenue. The "free" conversion of creatives into HTML5 meant Google could garner more advertisements through its own revenue generating ecosystem. Likewise, the "free" Android

OS puts Google and its products and services in the hands of a vast majority of mobile users world-wide.

120. While Google touts that AdSense is a "free" service, website owners pay for this "free" service by providing their own websites "real estate," *i.e.*, blank spaces on their websites that Google can then populate with paid for advertising; by enabling Google to trade on their names, goods and services; by driving web traffic to the Google platform; and by essentially providing digital client lists to Google for further data mining and monetization. Additionally, Google takes a piece of the profit paid by the advertiser to the website owner.

121. These free products and services are in essence predatory pricing and triangular predatory pricing. Only Google's dominance across markets enables these "free" offerings. Other market participants cannot compete.

### 5. Unilateral Setting and Altering of Technological Standards

122. By virtue of its dominance in the web browser market, Google can effectively set standards for the industry through changes to Chrome's functionality, creating *de facto* standards (as set forth above). Market participants must adhere to these standards or risk their technology no longer being compatible with most websites.[31]

123. Google also coerces users into using Google services by changing and/or altering algorithms to exempt Google-owned and Google-preferred platforms, products and services from the onerous and arbitrary rules that enable or disable online videos from being viewed and heard by users.

124. Another example of Google's technical manipulation of the market is its course of conduct pursued to monetize the transition from Adobe Flash advertising content to content based in HTML5. Flash is a digital software that was the standard for playing website video files for more than a decade, and publishers used Flash because it gave them significant control and flexibility over the user experience, including how and when videos played, whether a video would start automatically when the web page loaded, and whether the video would be accompanied by audio.

---

[31] House Antitrust Report at 229.

125.     Google's dominant Chrome Browser initially came with Flash pre-loaded, but beginning in or around 2014, Google began to roll out changes to Chrome designed to force advertisers to migrate to the Google advertising network and strip publishers of the control they had previously enjoyed. Google's conduct included using Chrome to significantly, technologically reduce the level of publisher control over ads that were supported by Adobe Flash, and later discontinuing use of Flash in Chrome entirely, unapologetically restricting advertiser and publisher options even further, despite the considerable concern at the time that HTML5 was not as versatile for users as Adobe Flash. Advertisers and publishers that had creatives supported by Adobe Flash were forced to either migrate to the Google advertising network to reach target users or to engage in this arduous conversion process. While the conversions were made or the creatives were being migrated to Google, publishers had to wait to monetize their websites, resulting in loss of substantial revenues. Alternatively, the publisher could suspend or sever prior relationships with advertisers and utilize Google's platform to fill their inventory with Google's HTML5-ready creatives, substantially adding to Google's own advertising revenue, further harming advertisers and publishers by reducing the market competition.

126.     In this way, Google syphoned off customers from publishers, who were economically harmed, while Google and YouTube plundered valuable video advertisements that had supported publishers' websites.

127.     Also, in June 2015, Google Chrome began to "intelligently pause" ads that were supported by Adobe Flash. Specifically, Chrome introduced features to automatically pause Flash content that was not "central to the webpage" while keeping central content playing without interruption. For example, the main video that a user wanted to watch was unaffected while animations on the side, such as video advertising, were paused. Google admitted knowing that the feature would stop video ads from playing, including "many Flash ads." At the time there was considerable concern that HTML5 was not as versatile for users as Adobe Flash. According to one commentator:

> The Flash-pause feature can be seen as yet another move by Google designed to increase digital dominance under the guise of a user benefit. Google wants to maintain web monetization dominance . . . .

*     *     *

In the past, Google dealt with threats to its dominance by forcing publishers into exclusive deals.  Now, Google found a more subtle means to the same end: developing features to "protect" users who don't understand how the web works.[32]





128.    Another way in which Google illegally leverages its monopoly power is through its control of the functionality of HTML5 and operability of competitors' products, through, *inter alia*, the Chrome Browser.

129.    HTML5 is open source technology and, as such, Google has used its monopoly powers to not only set the rules for how HTML5 will function, but to be the self-declared enforcer of how HTML5 operates.  When HTML5 is used to present video content, Google, through Chrome, has significantly more control over how, when, and what videos are played.  For example, Google controls whether a video will autostart and whether a video will play with the sound on or off.

---

[32]    *See* Vincent Meyer, *Google's New Flash Pause Tool — Are Video Ads Crippled?*, LinkedIn (June 18, 2015), https://www.linkedin.com/pulse/googles-new-flash-pause-tool-video-ads-crippled-vincent-meyer/.

Google also controls the allowable size of the video player to enable compatibility and interoperability with Chrome Browser and controls functionality such that Google allows autoplay when it serves Google and shuts down competitors' video players.

130. Moreover, certain Google-owned or preferred sites such as YouTube are white-listed, and thus algorithmically exempt from the restrictive Chrome Browser settings. Thus, Google and YouTube ads can run automatically and uninterrupted. This favorable treatment by Google and YouTube cannot be overstated – as the very purpose of advertising is to be seen and to be heard by the end user. And, advertisers and brands will necessarily pay to go where they are sure to been seen and heard by prospective customers.[33]

131. Effectively, through Google's products and services, including their Ad Server and Chrome Browser, Google can manipulate how, when and where ads are placed; how, where and whether they are seen; how, where and whether they are heard; and how efficiently and effectively they are delivered. Moreover, as stated, these restrictive rules are altered and/or not in place for the video advertisements that run in front of Google's own YouTube videos. Advertisers, tracking the efficacy of their ad spend, can tell where their video advertisements are seen and which publishers' website to place ads on and which to forego.

132. Additionally, Google has a monopoly in the Publishing and Advertising Ad Serving Markets with a near 90% market share. In order to use Google's AdX service, advertisers and publishers are forced to use Google's Ad Server, Double Click for Publishers, which is programmed to control how, when, where and to whom paid-for advertisements are served.[34] Coupled with its

---

[33] In the House Antitrust Report, it was noted that certain anticompetitive activities by Google could have a "'network effect in reverse.'" *Id*. at 190. That is, reduction in traffic led to fewer consumers, which led to fewer listings, and less revenue, reduced investment and further decline. *Id*. In video advertising, a network effect in reverse means if it doesn't work customers stop using it.

[34] Smaller, competing ad servers have noted: "'The ubiquity of Google's ad server provides virtually total control over which ads are shown and monetized for the majority of the Internet. This control of the ad server is strategically critical to Google.'" Paresh Dave & Sheila Dang, *Explainer: Advertising execs point to five ways Google stifles business*, Reuters (Sept. 26, 2019), https://www.reuters.com/article/us-tech-antitrust-google-explainer/explainer-advertising-execs-point-to-five-ways-google-stifles-business-idUSKBN1WB2Q1.

unparalleled user data, this unfairly advantages Google over Sweepstakes Today and other publishers and competitors.

### 6. Using Google's Significant Data Advantage to Disadvantage Competitors

133. As described above, Google has monopoly power over advertising and browser data and it has used this power to disadvantage its competitors and limit competition in the online advertising market. Google offers an entire family of products that gather valuable information about its users. In the digital advertising space, Google builds on this unmatched set of data through its data collection of consumer activities across the entire ad tech stack. A 2016 study found that Google had a tracking presence on 75% of the top one million sites – three times its nearest competitor (Facebook). More recent studies estimate a reach closer to 95%. While Google has access to a tremendous amount of online user data, it is generally difficult and costly for advertisers to assemble information on consumers from their own first-party data and other third-party data providers, and even then the data is not nearly as valuable as the data held by Google. Simply put, no competitor can even begin to match Google's ability to track consumers across the Internet and to create consumer profiles.

134. Google's extensive first-party data is a source of substantial advantage over smaller platforms and publishers, creating a barrier to entry for potential rivals across the entire ad tech stack and allowing the company to maximize the effectiveness of its ad targeting and attribution. Google does not provide access to this data on open data exchanges and restricts the use of this data to its own advertising tools. As a result, publishers are incentivized to use Google's advertising services, to maximize the effectiveness (and therefore, the value) of the digital space made available to advertisers. In doing so, however, publishers enable Google to obtain even more data, which only perpetuates Google's monopoly power and ability to deliver high performing ads. Google's data advantage becomes more difficult to overcome over time.

135. On top of that, Google also limits data sharing with third-party analytics and measurement tools, which hurts independent data providers, gives an advantage to Google's publisher and ad tech services, and suppresses competition.

136. To further insulate itself from competition, Google also does not clearly reveal the fees it charges along the digital advertising technology chain. Without this information, potential rivals along the chain cannot determine the most profitable service to enter, where they could provide a better price than Google. Nor can publishers negotiate directly with advertisers in a way that might put competitive pressure on Google.

### 7. Illegal Tying and Bundling of Services

137. Google has engaged in illegal tying or bundling, including technological tying, of Google products and services, in a way that reduces its customers' willingness and ability to switch to rival products. Specifically, Google has bundled and illegally tied the use of Google's DoubleClick Ad Server with the real-time bids from Google's AdX marketplace.

138. Google and YouTube have also illegally tied the purchase of ads on YouTube, the world's largest video streaming website, with Google's own ad buying tools – including Google Ads, AdSense, AdX and now Google Ad Manager – which harms competitors by making rival tools for placing ads in video streams less attractive to advertisers who can only access smaller audiences. In this way, Google has leveraged control over YouTube to further foreclose competition by excluding competitors from having access to YouTube.[35]

139. Google has further consolidated its market power through a series of product mergers, whereby Google bundled two distinct products together and rebranded the bundled products as a single integrated product. Specifically, in June 2018, Google underwent a major "rebranding" of its ad platform. Google has now tied its DFP Ad Server with AdX under a single tool, Google Ad Manager, as follows:

---

[35]     House Antitrust Report at 211.

**Google Rebranding Their Advertising Platform.**

Google AdWords
will become
Google Ads

DoubleClick and the Google
Analytics 360 Suite
will become
Google Marketing Platform

DoubleClick for Publishers
and DoubleClick Ad Exchange
are becoming
Google Ad Manager





140.    This rebranding is essentially the express tying of services to further Google products and services.  By integrating and "rebranding" them into the Google Ad Manger, Google illegally and blatantly ties its stable of advertising services together and compels and coerces the use of Google services, forcing publishers and advertisers to use both products in order to have access to the other.

### 8.    Google Affirmatively Interferes with Competitors Using Data Harvested from Its Monopolies

141.    Google offers an entire family of products.  Google has touted that: "Our tools and platforms make it easy for advertisers and publishers of all sizes to choose whom they want to work with in this open, interconnected ad system."  In reality, Google collects market intelligence on its competitors and engages in anticompetitive conduct by directly interfering with its competitors' businesses.

142.    By using market intelligence from its monopolies on competitors and competing online advertising platforms, Google both directly and surreptitiously interferes with competitors' businesses and contracts and garners additional market share for Google.  Google's "near-perfect market intelligence" has been recognized as enabling Google to covertly set up programs to more closely track its potential and actual competitors.[36]

---

[36]    House Antitrust Report at 15.

**9. Preferential Treatment of Google Products and Services**

143. Beyond the actions described above, Google has taken several other anticompetitive measures designed to prioritize its own advertising services and afford its own products and services favorable treatment and deprive publishers of advertising revenue.

144. Attribution is the process by which advertisers track consumers' exposure to their advertising across different websites and devices and link that exposure to specific actions taken by the consumer – for example, clicking through to the advertiser's website and purchasing a product. When a consumer sees multiple ads before taking action, however, Google sets the default attribution in its ad tech software to assign attribution to its own products (usually, search ads). By doing this, the default attribution deceptively gives Google – rather the publisher and advertiser responsible for the display ad – credit for delivering the customer. Not surprisingly, this default setting increases Google's profits while lowering payments to publishers for online ads, syphoning off profits from publishers in favor of Google.

145. Google has also usuriously increased the cost of rival online video platforms' use of Google's goods and services, unilaterally terminating contracts with rival online advertising platforms and/or expressly or constructively refusing to deal and/or do business with competitors. Additionally, Google has contractually restricted small businesses from advertising on competing search platforms.

146. Additionally, Google has taken part of the content of competing publisher sites and misappropriated such content by placing it in Google's own search results. When competitors have objected, Google threatens to remove them entirely from Google's search results.[37] Google's practice of misappropriating third-party content to bootstrap its own rival search services and to keep users on Google's own webpage has been cited by the House Judiciary Committee as further evidence of its monopoly power and an example of how Google has abused that power and harmed competition.[38]

---

[37] House Antitrust Report at 185-87.

[38] House Antitrust Report at 187.

147.    Moreover, Google is the default search provider on 87% of desktop browsers and the vast majority of mobile devices.  Specifically, Google has used its search dominance to promote the use of its Chrome Browser on laptops, personal computers, and workstations, which sets Google Search as its default.

148.    Google also pays Apple and others an undisclosed amount, estimated in Apple's case to be $12 billion per year, to secure the search default across iOS devices.  This self-preference favors Google because users tend to stick with the default presented.  Moreover, Google takes steps to hamper and dissuade even those users that do attempt to switch search engines on Chrome. Combined, Google's conduct significantly impedes other search providers from reaching users at scale – and further expands and entrenches Google's dominance.[39]

149.    In July, *The Wall Street Journal* reported that Google gives preferential treatment to defendant YouTube.  Tests conducted by *The Wall Street Journal* found that searching Google for videos delivered YouTube in results much more prominently than competing video providers, even when competitor videos had more engagement.  Reflecting interviews with those familiar with the matter, the piece stated that Google engineers: "[M]ade changes that effectively preference YouTube over other video sources . . . .  Google executives in recent years made decisions to prioritize YouTube on the first page of search results, in part to drive traffic to YouTube rather than to competitors, and also to give YouTube more leverage in business deals with content providers seeking traffic for their videos."[40]

### 10.    Exclusive Dealing and Anticompetitive Contracts

150.    Google engages in exclusive dealing and anticompetitive contracts that restrict competition.  With respect to Google ad offerings, Google insists on exclusivity by: (1) requiring the website owners that use AdSense not to allow search ads from Google's competitors to appear on the website; (2) requiring premium placement of a minimum number of Google search ads; (3) requiring

---

[39]    House Antitrust Report at 178.

[40]    Sam Schechner, et al., *Searching for Video? Google Pushes YouTube Over Rivals*, Wall St. J. (July 14, 2020), https://www.wsj.com/articles/google-steers-users-to-youtube-over-rivals-11594745232.

the website owners to allow a minimum number of search ads from Google to be displayed on the most prominent space on their search results pages; (4) prohibiting competing search ads from being placed above or next to Google search ads; and (5) establishing a right to authorize competing ads by requiring the website owners to obtain Google's approval before making any changes to display competing search ads.

151.    Google Ads also imposes obligations that prevent sellers and advertisers from managing search advertising campaigns across Google's AdWords and non-Google advertising services.  These obligations include, but are not limited to, various restrictions in the AdWords API terms and conditions.

152.    While anticompetitive conduct by the defendants with respect to any single market in which Google wields monopoly power runs afoul of the antitrust laws, the totality of defendants' illegal and anticompetitive conduct across multiple, inter-related markets is more insidious.

153.    On October 20, 2020, the DOJ filed an action against Google in which it stated that:

> 4.    For years, Google has entered into exclusionary agreements, including tying agreements, and engaged in anticompetitive conduct to lock up distribution channels and block rivals.  Google pays billions of dollars each year to distributors – including popular-device manufacturers such as Apple, LG, Motorola, and Samsung; major U.S. wireless carriers such as AT&T, T-Mobile, and Verizon; and browser developers such as Mozilla, Opera, and UCWeb – to secure default status for its general search engine and, in many cases, to specifically prohibit Google's counterparties from dealing with Google's competitors.  Some of these agreements also require distributors to take a bundle of Google apps, including its search apps, and feature them on devices in prime positions where consumers are most likely to start their internet searches.

> 5.    Google's exclusionary agreements cover just under 60% of all general search queries.  Nearly half the remaining queries are funneled through Google owned-and-operated properties (*e.g.*, Google's browser, Chrome).  Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 80 percent of the general search queries in the United States.  Largely as a result of Google's exclusionary agreements and anticompetitive conduct, Google in recent years has accounted for nearly 90 percent of all general-search-engine queries in the United States, and almost 95 percent of queries on mobile devices.[41]

---

[41]    Complaint, ¶¶4-5, *United States v. Google LLC*, No. 1:20-cv-03010 (D.D.C. October 20, 2020).

154. Google's exclusionary agreements include, but are not limited to, the following: distribution agreements, anti-fragmentation agreements, mobile application distribution agreements, mobile incentive agreements, and revenue sharing agreements.

155. Google's distribution agreements come in three basic types, with the specific terms of each agreement depending upon the counterparty and the search access points at issue. First, Google requires Android device manufacturers that want to preinstall Google's proprietary apps to sign an anti-forking agreement; these agreements set strict limits on the manufacturers' ability to sell Android devices that do not comply with Google's technical and design standards.

156. Next, for Android device manufacturers that sign an anti-forking agreement, Google provides access to its vital proprietary apps and application program interfaces (APIs) for preinstallation, but only if the manufacturers contractually agree to: (1) take a bundle of other Google apps; (2) make certain apps undeletable; and (3) give Google the most valuable and important real estate on the default home screen.

157. Finally, Google provides a share of its search advertising revenue to Android device manufacturers, mobile phone carriers, competing browsers, and Apple; in exchange, Google becomes the preset default general search engine for the most important search access points on a computer or mobile device. As a practical matter, users rarely switch the preset default general search engine. In many cases, the agreements relating to mobile devices go even further, expressly prohibiting: (1) the preinstallation of any rival general search services; and (2) the setting of other defaults to rival general search engines. This means that Google is the only preset default search provider preinstalled on the device.

158. These agreements work exactly as Google designed them – to foreclose distribution to Google's search rivals, weakening them as competitive alternatives for consumers, publishers and advertisers by denying them scale. They also keep Google products and services in the hands of more consumers, which is a force multiplier of Google's monopoly power across markets garnering more online advertising profits to Google and enabling the other anticompetitive conduct set forth herein.

### 11.    Manipulation of the Patent Process

159.    As a technology company, the patent process is important to Google.  As set forth in ¶¶63, 67 and 73 above, over time Google acquired the patents of numerous companies, including ad tech companies and mobile device companies.  These patents have been used both to grow Google's monopolies (*e.g.*, as in the case of DoubleClick) and buried to keep companies from competing with Google (as in the case of the acquisition of Motorola and its attendant patents).

160.    A history of using its clout and market position to weaken the value of potentially competitive patents owned by others – and indeed prevent those patents from issuing in the first place – while steadily increasing and making use of its own massive portfolio has become a hallmark of Google.[42]  Without patent protection, the work and/or methods of potential start-ups, innovators and competitors can and has been used by Google.

161.    Additionally, in or around March 2015, Michelle Lee, the deputy general counsel at Google, left Google to become the Commissioner of the U.S. Patent and Trademark Office ("USPTO"), a position she held until June 2017.  Lee had significant influence on the policy and workings of the USPTO, such as instituting the procedures of the Patent Trial and Appeal Board and Inter Partes Review ("IPR"). IPRs themselves are designed to increase the likelihood that patents from smaller inventors will be invalidated.

162.    Google also avails itself of other procedures that work to its benefit.  For example, in 2014, Google was by far the largest recipient of patents that were expedited under the USPTO's Track One program, created by the American Invents Act, which allows companies to get their patent applications "fast-tracked" by paying extra fees, something that Google has no trouble doing.[43]

---

[42]    James Temple, *Google lawyer: Why the patent system is broken*, SFGate.com (Nov. 30, 2011), https://www.sfgate.com/business/article/Google-lawyer-Why-the-patent-system-is-broken-2324278.php; Michael Shore, *How Google and Big Tech Killed the U.S. Patent System*, IP Watchdog (Mar. 21, 2018), https://www.ipwatchdog.com/2018/03/21/how-google-and-big-tech-killed-the-u-s-patent-system/.

[43]    Catherine Ho, *Google has gotten more fast-track patents than any other company*, Wash. Post, Oct. 26, 2014, https://www.washingtonpost.com/business/capitalbusiness/google-has-gotten-more-fast-track-patents-than-any-other-company/2014/10/26/b39334b4-594f-11e4-b812-38518ae74c67_story.html.

B.    **Monopolistic Leveraging**

163.    Not only has it abused its monopoly power in the Online Advertising Market and related sub-markets, Google has leveraged its monopoly power in adjacent markets to suppress competition and harm publishers.

164.    Monopolistic leveraging is the use of monopoly power in one market to strengthen or gain a monopoly share in another market.  Leveraging may be achieved through many anticompetitive practices, including, but not limited to, contractual and/or technological tying, bundling, exclusive dealing, and predatory or below-cost pricing.  Monopolistic leveraging is often used to describe the way in which a monopolist in one market uses its power to monopolize or attempt to monopolize a second market.  In digital markets, the DOJ has noted that monopolistic leveraging and relationships between markets is as important as dynamics within the market, such as barriers to entry and market power.[44]

165.    Plaintiff alleges that monopoly leveraging by defendants includes, but is not limited to, the following:

a.    Google has leveraged its monopoly power in the Internet Search Market, the Licensable Mobile Device Operating System ("LMDOS") Market and the Search Advertising Market and its dominance in the Online Advertising Market to gain, and then maintain and exploit, its monopoly power in those markets; and

b.    Google has leveraged its monopoly power in the Ad Exchange and Advertising Serving markets and its dominance (and/or monopoly) in the

---

[44]    In a December 10, 2019 address to the National Association of Attorneys General, U.S. Attorney William Barr warned: "[I]n addition to understanding the dynamics within a market, like barriers to entry and market power, we also need to look at relationships between markets.  This is especially important because today's digital platforms frequently operate across multiple areas.  A dominant firm may seek to leverage its monopoly power in one market to gain an unfair advantage in another."  William Barr, U.S. Attorney General, U.S. Dep't of Just., Remarks at the National Association of Attorneys General 2019 Capital Forum (Dec. 10, 2019), https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-national-association-attorneys-general.

Web Browser Market in an attempt to gain monopoly power in the broader Online Advertising Market.

166. For example, Google leveraged its monopolies in online search, search advertising and LMDOS to require default installation and global dissemination of its Chrome Browser.

167. In turn, Chrome Browser now serves as a way for Google to control the entry points for its core markets: online search and online advertising, including online video advertising.[45] Moreover, both Chrome Browser and Google's Ad Server control the delivery, functioning and operability of online advertising, including online video advertising and competing online advertising technology.

168. The House Subcommittee on Antitrust, Commercial and Administrative Law ("House Antitrust Subcommittee") found that Google repeatedly leveraged its monopoly power to maintain and gain dominance across related markets.[46] Specifically, the House Antitrust Subcommittee found that:

> Google used its search engine dominance and control over the Android operating system to grow its share of the web browser market and favor its other lines of business. ***Reciprocally***, Chrome's dominance in the browser market gives it significant gatekeeper power over managing and monitoring users' browsing activity – power Google can wield to shape outcomes ***across markets*** for search, mobile operating systems, and digital advertising. These advantages across markets feed back into and reinforce one another, advantages that [competitors] lack.[47]

169. Google also leverages its monopoly in its Android OS to maintain its monopoly power and attempt to gain further monopoly power.

170. Google has obtained default placement of both its Google Search and Chrome Browser across the mobile and desktop ecosystem through both integration and contractual arrangements. Through its ownership and complete control of Android, Google has been able to

---

[45]     House Antitrust Report at 224.

[46]     House Antitrust Report at 15, 183-87, 193, 211, 215, 217, 246.

[47]     House Antitrust Report at 225 (emphasis added).

1  ensure that Google Search remains dominant even as mobile replaced desktop as the critical entry

2  point to the Internet.[48]

3       171.    Google has required that any smartphone manufacturer seeking to license Android

4  preinstall Google Search and Google Play Store, alongside a host of other apps selected by Google.

5  Google has also offered mobile device manufacturers revenue-share agreements, under which

6  smartphone manufacturers would receive a cut of the search advertising revenue that Google made

7  from the use of Google's apps on their devices, as well as a cut of Google Play Store revenues.  In

8  return, however, manufacturers had to not only carry Google's apps, but also ensure that Google

9  Search was the default **_and_** exclusive search app pre-installed on the manufacturers' devices.[49]

10  Moreover, Google has established Chrome as the default browser on the majority of Android

11  devices.  This further feeds Google's preestablished rules and parameters for enabled, viewable, and

12  audible online video advertisements and use of HTML5 and disadvantages Sweepstakes Today and

13  other competitors.

14       172.    The illegal ties, restrictive agreements, self-preference and promotion of Chrome and

15  Google Search through its Android OS, maintains and enhances Google's ability to provide

16  preferential placement of its own advertising products and services to the detriment of Sweepstakes

17  Today and other Google competitors.

18  **IX.    INTERSTATE TRADE AND COMMERCE**

19       173.    Google's conduct as alleged herein has had a substantial effect on interstate and

20  intrastate commerce.  At all material times, Google participated in the conduct set forth herein in a

21  continuous and uninterrupted flow of commerce across state and national lines and throughout the

22  United States.

23  **X.    ANTITRUST HARM**

24       174.    Defendants' conduct goes far beyond aggressive competition.   Defendants'

25  anticompetitive and predatory actions intend to, and in fact do, exclude rivals and harm the

---

26  [48]    House Antitrust Report at 181.

27  [49]    House Antitrust Report at 213 (referencing documents provided by Google, including the

28  March 2011 Mobile Application Distribution Agreement).

competitive process. The conduct is not competition on the merits or otherwise privileged. Worse yet, the conduct has been systematically planned and thoroughly executed over many years; it is willful.

175. Defendants' conduct harms consumers by depriving customers of valid competitive choice, degrading consumer privacy, degrading quality and variety of products and services offered to consumers, stifling innovation and ultimately raising the prices of goods and services in the marketplace.

176. Defendants' conduct harms competition in each of the relevant markets by artificially and unlawfully reducing and foreclosing competition, foreclosing competitors from meaningfully participating in purportedly neutral and unbiased competitive processes, including the ad auction and bidding processes, which are in fact skewed and rigged to favor Google and Google products and services, and surreptitiously altering algorithms and compatibilities with competing platforms.

177. Defendants' conduct adversely affects competition and innovation in each of the relevant markets, including by:

(a)     Impairing the incentive of Google's competitors and potential competitors to undertake research and development, because they know that Google will be able to limit the rewards from any resulting innovation;

(b)     Impairing the ability of Google's competitors and potential competitors to obtain financing for research and development;

(c)     Inhibiting Google's competitors that nevertheless succeed in developing promising innovations from effectively marketing their improved products to customers;

(d)     Reducing the incentive and ability of advertising platforms, web application developers, and other competitors to innovate and differentiate their products in ways that will appeal to customers; and

(e)     Reducing competition and the spur to innovation by Google and others that only competition can provide.

178. The purpose and effect of defendants' conduct has been, and if not restrained, will be:

(a)     To preclude competition on the merits between competing online advertising platforms, advertisers, publishers seeking advertising space and websites offering their "real estate" for ad placement;

(b)     To preclude competition on the merits between Google's search and browser apps and other apps;

(c)     To preclude potential competition between Google's Android OS and competing operating systems, other companies, and software apps whose use is facilitated by bundled Google products and services, which systems could otherwise choose to offer competing Internet and advertising platforms; and

(d)     To maintain and extend Google's numerous monopolies, including Internet Search, Search Advertising, and Online Advertising monopolies.

179.     In light of the synergistic effect that defendants have acquired from their antitrust activities in the Internet Search Market, the Search Advertising Market, the LMDOS Market, and the Ad Serving Market – all connected by an Internet platform that enables Google to gather and monetize massive consumer and competitor data for its targeted and location-specific advertising (which accounts for about 83% of Alphabet's total revenue) – Google's conduct has resulted in real harm to competition, consumers, and innovation in each of the relevant markets.

180.     In addition to economic harm in fact to customers and competitors, the exclusion of competitors from competition on the merits, and harm to consumers from thwarting competition on the merits, Google's conduct also increases costs in distribution of products and services in the relevant markets; abuses its gatekeeping function and increases cost of market access across markets; and causes reverse network effects that result when Google's products and services are prominent and properly functioning, while competitors' are downgraded and unlawfully shut down by Google.

181.     Google's systematic and predatory conduct across markets threatens to change the trajectory of digital and online competition permanently.  As has been recognized, "because it can be

so difficult for courts to restore competition once it has been lost, the true cost of exclusion to consumer welfare – and its benefit to dominant firms – are likely to be understated."[50]

## XI.  PRIOR ANTITRUST ENFORCEMENT ACTIONS

182.    As noted above, in October 2020, the DOJ filed a civil complaint against Google for monopolization in the markets for search advertising and general search text advertising.

183.    Google's actions have repeatedly drawn scrutiny from governmental authorities.  The FTC investigated Google's role in search and advertising markets, culminating in a staff recommendation to file a complaint against Google – although the FTC ultimately decided not to do so.  At various points over the last decade, Mississippi, Missouri, and Texas have each separately investigated Google for antitrust violations, and, in September 2019, attorneys general from 50 U.S. states and territories announced that they were opening a fresh antitrust inquiry into the search and advertising giant.  These ongoing U.S. investigations follow multiple antitrust inquiries worldwide, as well as antitrust-related penalties levied on Google by the European Commission, France, India, and Russia.[51]

## XII.  PLAINTIFF WAS INJURED AS A RESULT OF GOOGLE'S ANTICOMPETITIVE ACTIONS

184.    Over the past ten years, the online advertising market has seen tremendous year-over-year growth.  In 2016, Internet advertising revenues in the United States totaled $72.5 billion for the full year, which was an increase of 21.8% over 2015.  In 2017, online advertising revenues in the United States reached $88 billion, with a growth rate of 21.4% relative to 2016.  Between the first quarter of 2018 and the first quarter of 2019, advertising revenue growth was 17.2%.  The increase in revenue from this growth, however, has not been shared by publishers and, in fact, many have seen a decrease in revenue.

185.    Google has abused its monopolist position to harm publishers in many ways, including by using anticompetitive measures to steer more valuable advertising content to its own

---

[50]    Andrew I. Gavil, *Exclusionary Distribution Strategies by Dominant Firms: Striking a Better Balance*, 72 Antitrust L.J. 3, 33 (2004).

[51]    House Antitrust Report at 176.

1   properties and away from competing publishers, and when publishers are able to secure ad

2   placements, Google has been able to depress bids and payments to publishers for placing ads on their

3   websites below what those publishers would receive in a competitive market, thereby increasing its

4   profits at the expense of publishers.

5          186.   Google has a strong incentive to disadvantage publishers in the supply of advertising

6   space so that it can capture the entire ad spend for itself.  One way that Google has harmed

7   publishers is by implementing technological changes that send users to content based on pages

8   hosted by Google and away from competing publishers.  In so doing, Google is able to capture all of

9   the ad dollars that would otherwise go to publishers.

10         187.   In steering these ad dollars to its own properties, Google is also consolidating its grip

11  over the advertising market and eroding competition for the supply of advertising by denying

12  publishers access to valuable data about these users.  Without the ability to access this data,

13  publishers are unable to target users and maximize the value of their supply.  Advertisers are, in turn,

14  less willing to pay premium prices to publishers, who are now providing lower quality services.

15         188.   For advertisements that Google is unable to steer into its own properties, it has been

16  able to use its monopoly power to depress payments to publishers so that Google can capture more

17  of the advertising fee than it would in a competitive market.

18         189.   As discussed above, advertisers work with demand side (advertising) platforms to buy

19  publishers' ad inventory through supply side (publisher) platforms.  When digital advertising is sold

20  and purchased, various service intermediaries involved in the sale and purchase of the advertising

21  inventory (such as Google) collect revenue by charging a fee that is levied on the initial advertiser's

22  expenditure.  In some cases, these fees are levied as a percentage deduction or commission from the

23  overall expenditure, whereas in other cases they are levied as a specific charge.

24         190.   In the digital advertising market, service providers such as Google collect revenue by

25  charging a fee as a percent of transacted dollars.  These fees, which are collected before they reach a

26  publisher, are often called the "ad tech tax" or "take rate."

27         191.   The higher the take rate, the less a publisher collects from the fee paid by the

28  advertiser.  For instance, if 20% of the advertising fee goes to providers in the ad tech chain,

1   publishers receive the remaining 80% of the total ad expenditure. Many publishers rely on their

2   portion of the advertising fee as the primary source of revenue for their business model. Publishers

3   who receive less than competitive rates invest less in their business, thereby degrading the quality of

4   the content they are able to provide on their websites and applications (which, in turn, hurts

5   advertisers and consumers).

6         192. Estimates by numerous industry sources have found that the "take rate" for display

7   advertising is inflated in comparison to "take rates" in non-programmatic markets. In a 2018 study,

8   the Association of National Advertisers found 35%-55% of ad spending in digital advertising goes to

9   ad tech players, meaning that publishers were only capturing 40%-60% of overall ad expenditures.

10        193. In December 2019, the Competition and Markets Authority, a governmental

11   department in the United Kingdom that is responsible for strengthening business competition and

12   preventing and reducing anticompetitive activities, reached a similar conclusion after a six-month

13   inquiry into online platforms and digital advertising. Drawing on four different data sources, the

14   Competition and Markets Authority estimated Google's average "take rate" by its main advertiser

15   and publisher-facing intermediaries. It calculated an average ad server/SSA fee of 22% and a

16   weighted DSP fee of 18% – making the overall "take rate" for matching advertisers to publishers

17   40% of the total ad spend. These findings ultimately led it to conclude that "the fact that

18   intermediaries are able to take more than a third of the total amount paid by advertisers raises

19   legitimate concerns about whether the intermediation chain is operating efficiently." It added that

20   "competition [in the digital advertising space] would drive greater innovation and put downward

21   pressure on fees."

22   **XIII. CLASS ACTION ALLEGATIONS**

23        194. Plaintiff brings this action individually and as a class action under Rules 23(a), (b)(2),

24   and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of the

25   following class (the "Class"):

26        All persons and entities who sold digital advertising space at any time during the
        period from December 15, 2016 through the present (the "Class Period").

27

28

Excluded from the Class are defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States government.

195.    Members of the Class are so numerous that joinder is impracticable.  Further, the Class is readily identifiable from information and records in defendants' possession.

196.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by defendants as a result of defendants' wrongful conduct.

197.    Plaintiff will fairly and adequately protect and represent the interests of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

198.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation in the online advertising industry.

199.    Questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual Class members because defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in defendants' wrongful conduct.  Questions common to the members of the Class include:

(a)     whether defendants unlawfully acquired, maintained and extended their monopoly power in the relevant markets;

(b)     whether defendants engaged in unlawful tying;

(c)     whether defendants engaged in exclusive dealing;

(d)     whether defendants leveraged their monopoly power in related markets to harm plaintiff and members of the Class;

(e)     whether a relevant market needs to be defined in light of the existence of direct evidence of defendants' power to exclude competition;

(f)     if a relevant market needs to be defined, the definition of the relevant market for analyzing defendants' monopoly power, and whether defendants had monopoly power in the relevant market(s);

(g)     whether the activities of defendants as alleged herein have substantially affected interstate commerce;

(h)     whether the conduct engaged in by defendants has harmed and/or not benefitted consumers; and

(i)     whether, and to what extent, defendants' conduct caused antitrust injury, and if so, the appropriate measure of damages.

200.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

201.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XIV.   CLAIMS

### COUNT I

### Violation of Sherman Act §2
### (Monopolization)

202.    Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set forth below.

203.    As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant markets.

204.    Through Defendants' Anticompetitive Restraints described in ¶¶99-172 above, defendants have willfully maintained and extended, and unless restrained by the Court will continue to willfully maintain and extend, that power by anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct.  Defendants have acted with the intent illegally to maintain and extend their

1    monopoly power in each of the relevant markets, and their illegal conduct has enabled them to do so

2    in violation of §2 of the Sherman Act, 15 U.S.C. §2.

3        205.    There is no valid procompetitive business justification for defendants' anticompetitive

4    conduct, and to the extent defendants offer one, it is pre-textual and not cognizable.    Any

5    procompetitive benefits of defendants' conduct do not outweigh the anticompetitive harms.

6        206.    As a direct and proximate result of Defendants' Anticompetitive Restraints, plaintiff

7    and members of the Class have suffered injury to their business and property throughout the Class

8    Period.  The precise amount of damages plaintiff is entitled to recover as a result of the foregoing

9    injuries is substantial and will be fully ascertained at trial.

10       207.    In addition, defendants' monopolization of the relevant markets is an ongoing wrong

11   that causes incalculable and irreparable injury for which there is no adequate remedy at law.  Unless

12   defendants are enjoined by an appropriate order of this Court, the asserted harm will continue

13   unabated.

## COUNT II

### Violation of Sherman Act §2
### (Unlawful Tying)

17       208.    Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set

18   forth below.

19       209.    As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant

20   markets.

21       210.    As described in ¶¶137-140 above, defendants have engaged in illegal tying or

22   bundling, including technological tying, of Google products and services, including through

23   bundling and illegally tying the use of Google's DoubleClick Ad Server with the real-time bids from

24   Google's AdX marketplace.

25       211.    Defendants engaged in unlawful tying with the specific intent to monopolize the

26   Online Advertising Market in the United States, in violation of §2 of the Sherman Act, 15 U.S.C. §2.

27

28

212.    There is no valid procompetitive business justification for defendants' anticompetitive conduct, and to the extent defendants offer one, it is pre-textual and not cognizable.    Any procompetitive benefits of defendants' conduct do not outweigh the anticompetitive harms.

213.    The goal, purpose and/or effect of defendants' conduct was to maintain and extend defendants' monopoly power.

214.    As a direct and proximate result of Defendants' Anticompetitive Restraints, publishers and members of the Class have suffered injury to their business and property throughout the Class Period.  The precise amount of damages plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

215.    In addition, defendants' monopolization of the relevant markets is an ongoing wrong that causes incalculable and irreparable injury for which there is no adequate remedy at law.  Unless defendants are enjoined by an appropriate order of this Court, the asserted harm will continue unabated.

# COUNT III

### Violation of Sherman Act §2
### (Exclusive Dealing)

216.    Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set forth below.

217.    As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant markets.

218.    Defendants have willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with publishers, advertisers, original equipment manufacturers, and others, creating high barriers to entry and unreasonably excluding competition in the attendant markets as described in ¶¶150-158 above.

219.    Defendants engaged in unlawful exclusive dealing with the specific intent to monopolize the Online Advertising Market in the United States in violation of §2 of the Sherman Act, 15 U.S.C. §2.

220. This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose; thus Google's exclusive dealing arrangement agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Google.

221. This conduct has substantially foreclosed competition in the relevant markets.

222. These exclusionary agreements violate §2 of the Sherman Act, 15 U.S.C. §2, because these agreements constitute anticompetitive acts intended to maintain Google's monopoly.

223. As a direct and proximate result of Defendants' Anticompetitive Restraints, publishers and members of the Class have suffered injury to their business and property throughout the Class Period. The precise amount of damages plaintiff is entitled to recover as a result of the foregoing injuries is substantial and will be fully ascertained at trial.

## COUNT IV

### Violation of Sherman Act §2
### (Monopoly Leveraging)

224. Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set forth below.

225. Defendants have monopoly power in each the Internet Search Market, the Search Advertising Market, and the LMDOS Market, as set forth above in ¶¶77-86 above. Through the anticompetitive conduct described herein, defendants have leveraged each of these markets in an effort to gain monopoly power and further dominance in the Online Advertising Market. Defendants have done so willfully, and unless restrained by the Court, will continue to willfully leverage that power by further anticompetitive, illegal, deceptive, and unreasonably exclusionary conduct (Defendants' Anticompetitive Restraints) as described in ¶¶99-172 above. Defendants have acted with the intent illegally to maintain and gain monopoly power in each of these markets, and their illegal conduct has enabled them to do so in violation of §2 of the Sherman Act.

226. Defendants have used and leveraged their monopoly power and dominance in Google Search, the Internet Search Market, the Search Advertising Market, and the LMDOS Market to

1  anticompetitively and illegally disadvantage and harm plaintiff and other competitors in the Online

2  Advertising Market.

3     227. As a direct and proximate result of Defendants' Anticompetitive Restraints as set

4  forth in ¶¶99-172 above, plaintiff and members of the Class have suffered injury to their business

5  and property throughout the Class Period.

6     228. Defendants' illegal conduct has directly caused significant monetary damages to

7  plaintiff.  The precise amount of damages plaintiff is entitled to recover as a result of the foregoing

8  injuries is substantial and will be fully ascertained at trial.

9     229. In addition, defendants' monopolization of the relevant markets and monopoly

10  leveraging are ongoing wrongs that cause incalculable and irreparable injury for which there is no

11  adequate remedy at law.  Unless defendants are enjoined by an appropriate order of this Court, the

12  asserted harm will continue unabated.

13  **COUNT V**

14  **Violation of Sherman Act §2**

15  **(Attempted Monopolization)**

16     230. Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set

17  forth below.

18     231. As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant

19  markets.

20     232. Defendants have attempted to monopolize multiple markets, including the Online

21  Advertising Market, in violation of §2 of the Sherman Act, 15 U.S.C. §2.

22     233. Defendants are violating §2 of the Sherman Act by attempting to implement the

23  anticompetitive scheme, as described in ¶¶99-172 above.  There is a dangerous probability that

24  defendants will succeed in monopolizing the relevant product markets through their anticompetitive

25  scheme.

26     234. Defendants have the power to exclude competition in the Online Advertising Market

27  and have used that power, including by way of their unlawful practices in restraint of trade and

28  monopoly leveraging as described above, in an attempt to monopolize these relevant markets.

235. Defendants have the specific intent to achieve monopoly power in the Online Advertising Market and the other relevant antitrust markets.

236. There is no business necessity or other procompetitive justification for defendants' conduct.

237. Plaintiff has been injured, and will continue to be injured, in its business and property by way of defendants' conduct, including by depriving plaintiff and other publishers of revenue and advertising fees and shutting them out of meaningful and fair participation in the Online Advertising Market.

## COUNT VI

### Violation of Clayton Act §3
### (Exclusive Dealing and Tying)

238. Plaintiff incorporates and realleges all paragraphs in this complaint as though fully set forth below.

239. As detailed in ¶¶77-86 above, defendants have monopoly power in the relevant markets.

240. Defendants have willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with publishers, advertisers, original equipment manufacturers, and others, creating high barriers to entry and unreasonably excluding competition in the attendant markets as set forth above in ¶¶137-140 and 150-158.

241. These exclusive dealing agreements and tying of products as described above are unreasonably restrictive in terms of breadth, duration and market coverage.

242. This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose; thus Google's exclusive dealing arrangement agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Google.

243. This conduct has substantially foreclosed competition in the relevant markets.

244.    These exclusionary agreements violate §3 of the Clayton Act, 15 U.S.C. §14, because these agreements constitute anticompetitive acts intended to maintain defendants' monopolies, including in the Online Advertising Market.

245.    As a direct and proximate result of defendants' anticompetitive and monopolistic conduct, plaintiff and other members of the Class have been damaged in fact.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that the Court enter a final judgment against each defendant as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; that plaintiff be designated as a representative for the Class, and that plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate §2 of the Sherman Act, 15 U.S.C. §2, and §3 of the Clayton Act, 15 U.S.C. §14;

C.    That defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the conduct alleged herein, or from entering into any other contract or engaging in any other conduct having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect.

D.    An award of monetary damages, including treble damages, punitive damages, the costs of this action, and reasonable attorneys' fees pursuant to §§4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26;

E.    An award of pre-judgement and post-judgement interest at the highest legal rate from and after the date of service of this complaint to the extent provided by law; and

F.    An award of such other relief as may be appropriate and as the Court may deem proper.

1      **JURY DEMAND**

2          Plaintiff demands a trial by jury on all issues herein.

3      DATED:  December 15, 2020                    ROBBINS GELLER RUDMAN
                                                       & DOWD LLP
4                                                   DANIEL J. PFEFFERBAUM

5

6                                                        s/ Daniel J. Pfefferbaum
                                                      DANIEL J. PFEFFERBAUM
7
                                                    Post Montgomery Center
8                                                   One Montgomery Street, Suite 1800
                                                    San Francisco, CA  94104
9                                                   Telephone:  415/288-4545
                                                    415/288-4534 (fax)
10                                                  dpfefferbaum@rgrdlaw.com

11                                                  ROBBINS GELLER RUDMAN
                                                       & DOWD LLP
12                                                  DAVID W. MITCHELL
                                                    STEVEN M. JODLOWSKI
13                                                  655 West Broadway, Suite 1900
                                                    San Diego, CA  92101-8498
14                                                  Telephone:  619/231-1058
                                                    619/231-7423 (fax)
15                                                  davidm@rgrdlaw.com
                                                    sjodlowski@rgrdlaw.com
16
                                                    HERMAN JONES LLP
17                                                  JOHN C. HERMAN
                                                    3424 Peachtree Road, N.E., Suite 1650
18                                                  Atlanta, GA  30326
                                                    Telephone:  404/504-6555
19                                                  404/504-6501 (fax)
                                                    jherman@hermanjones.com
20
                                                    Attorneys for Plaintiff
21

22

23

24

25

26

27

28

# EXHIBIT C

Sophia M. Rios (305801)
**BERGER MONTAGUE PC**
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

Eric L. Cramer (*Pro Hac Vice to be filed*)
Michael C. Dell'Angelo (*Pro Hac Vice to be filed*)
Patrick F. Madden (*Pro Hac Vice to be filed*)
Michaela Wallin (*Pro Hac Vice to be filed*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
mwallin@bm.net

*Attorneys for Plaintiff and the Class*
*[Additional counsel listed on signature page]*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| STERLING INTERNATIONAL CONSULTING GROUP, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No.: 20-CV-9321<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## **Table of Contents**

I.      NATURE OF ACTION AND SUMMARY ................................................................1

II.     JURISDICTION AND VENUE ..........................................................................4

III.    PARTIES ...............................................................................................5

IV.    DIGITAL DISPLAY ADVERTISING ..............................................................5

       A.     How Digital Display Advertising Works ...........................................6

       B.     The Importance of Data in Digital Advertising ..................................8

V.      GOOGLE'S BUSINESS ...............................................................................9

VI.    GOOGLE'S MARKET POWER IN THE PUBLISHER AD SERVER MARKET....................10

       A.     The Relevant Market ..................................................................10

       B.     Google Dominates the Relevant Market ...........................................11

VII.   GOOGLE'S ANTICOMPETITIVE SCHEME ....................................................13

       A.     Google Engaged In A Series Of Acquisitions To Acquire A Foothold At Each Level Of The Ad Tech Stack. ...........................................................14

       B.     Google Used Its Dominant Position Throughout the Ad Tech Stack to Engage In Exclusionary Conduct .............................................................16

       C.     Google Manipulates Its Ad Auction Processes to Preference Its Own Tied Auctions.......17

             1.     The Waterfall System (Pre-2009) ............................................18

             2.     Dynamic Allocation (2009) ..................................................20

             3.     Enhanced Dynamic Allocation (2014) .....................................21

             4.     Header Bidding (2015) .......................................................21

             5.     Exchange Bidding (2018) ...................................................24

             6.     First-Price Unified Auction ..................................................24

       D.     Google Uses Its Monopoly Power In Other Markets To Impair Potential Competitors In The Publisher Ad Server Market. ............................................26

       E.     Google Made an Unlawful Agreement with Its Biggest Competitor to Suppress Competition...........................................................................27

VIII.   GOOGLE'S SCHEME FORECLOSED THE PUBLISHER AD SERVER MARKET...............30

IX.    GOOGLE'S SCHEME CAUSES ANTICOMPETITIVE EFFECTS ...........................31

ii

**CLASS ACTION COMPLAINT**

A.  Google's Scheme Suppresses Ad Revenues Publishers Receive for Their Ad Inventory Below Competitive Levels ............................................................. 31

B.  Google's Scheme Reduces Publishers' Content Output and Quality Along with Publishers' Revenue-Generating Abilities. ................................................. 32

C.  Google's Scheme Causes Anticompetitive Effects for Both Google's Advertiser Clients and Non-Google Advertisers. ..................................................... 33

X.   GOOGLE'S SCHEME CAUSES PUBLISHERS ANTITRUST INJURY ................................ 34

XI.  INTERSTATE COMMERCE ............................................................................ 35

XII. CLASS ALLEGATIONS ................................................................................ 35

XIII. CAUSES OF ACTION ................................................................................ 38

XIV. DEMAND FOR JUDGMENT .......................................................................... 41

XV.  JURY TRIAL DEMAND ............................................................................... 41

**CLASS ACTION COMPLAINT**

Sterling International Consulting Group ("Plaintiff") files this action on behalf of itself and as a class action on behalf of all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure, against Defendant Google LLC ("Google" or "Defendant"). Plaintiff seeks treble damages and injunctive relief for Defendant's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1, 2. Plaintiff complains and alleges as follows based on: (a) its personal knowledge; (b) the investigation of Plaintiff's counsel; and (c) information and belief.

## I.     NATURE OF ACTION AND SUMMARY

1.     This is a civil antitrust action under Sections 1 and 2 of the Sherman Act for treble damages and other relief arising out of Google's overarching anticompetitive scheme (the "Scheme") to capture a dominant share of the revenues associated with services required to place open-web display ads. Specifically, Google has obtained and maintained a monopoly in the market for providing publisher ad server services (the "Publisher Ad Server Market"), and has used that power to artificially inflate its prices charged to "Publishers."

2.     Plaintiff is a "Publisher": Plaintiff operates a website on which it sells space to advertisers to place digital display ads.

3.     To sell its ad space, Plaintiff directly purchases publisher ad server services from Google. Publisher ad servers identify ad space that gets created when users load Publishers' webpages, and then solicit and organize bids from various sources of advertiser demand to fill the space. Publisher ad server providers receive compensation in a form of a cut of the payments advertisers make for their ads to appear in Publishers' webpages.

4.     Plaintiff, like other purchasers of Google's publisher ad server services, depends on Google to solicit and organize bids from advertisers for its website's ad inventory.

5.     When users generate ad inventory on Publishers' sites by loading the page, this sets off a series of processes in what is known as the "Ad Tech Stack." The publisher ad server notifies demand sources (*e.g.*, "ad exchanges" or "ad networks" that run auctions between advertisers) of the existence of ad space. The demand sources provide bids from their participating advertisers to the publisher ad server. Once the ad server identifies the winning bid, it obtains the winning advertisement from the advertiser's

**CLASS ACTION COMPLAINT**

representatives in the Ad Tech Stack and places the ads. The entire process typically takes less than a second.

6. Google controls the dominant services at each level of the Ad Tech Stack. Most importantly, Google controls (1) the dominant publisher ad server products, (2) the dominant ad exchange and ad network, and (3) the dominant advertiser ad server.

7. Google thus controls which ad inventory a dominant share of advertisers will bid on, which advertisers can participate in the most significant auctions (Google's auctions), and how Publishers prioritize and compare different demand sources (*e.g.*, ad exchange auctions, ads sold directly by a Publisher to an advertiser, and other auction types) to identify the advertiser that ultimately "wins" the right to place an ad in a particular ad slot.

8. Through a series of anticompetitive acts beginning by at least 2007 and continuing through the present (together, the "Scheme"), Google has illegally acquired, enhanced, and maintained dominant positions in the Publisher Ad Server Market.

9. First, Google engaged in a series of acquisitions designed to give it a significant market presence at each level of the Ad Tech Stack. Most notably, Google acquired DoubleClick in 2007, a company with the then-highest market share in the Publisher Ad Server Market.

10. Second, Google engaged in exclusionary conduct designed to entrench its offerings at each level of the Ad Tech Stack and disadvantage actual and potential rivals. For example, in selling its services to advertisers, Google ties its ad targeting and attribution data services to its advertiser-facing ad tech services.[1] Because these data services are critical to advertisers, Google was able to amass a substantial pool of advertiser clients through the tying arrangement. Google then used its positions at other levels of the Ad Tech Stack to control Publishers' access to that pool of advertiser demand. Specifically, Google required its advertisers to bid in Google-controlled auctions (through Google's ad exchange and/or ad network). Google then controlled how Publishers could access bids from Google-

---

[1] As set forth herein, Google's data on users is unparalleled. Google gleans data from its consumer-facing offerings including, *inter alia*, its market-leading web browser (Chrome), its popular email service (Gmail), the Android operating system ("OS") in use on hundreds of millions of mobile devices, Google's search data, and Google's ad placement products.

2

**CLASS ACTION COMPLAINT**

controlled auctions, essentially requiring Publishers who wanted to receive bids from Google-controlled auctions to use a Google publisher ad server. This conduct coerces Publishers to use Google's publisher ad server products.

11.     Third, as more and more Publishers adopted Google's publisher ad server products, Google reinforced its control on the advertiser side of the Ad Tech Stack through similar conduct. In particular, Google gave its own demand sources (*e.g.*, bids from its ad exchange) privileged access to Google's Publisher-clients' ad space through its control over a dominant share of Publishers' ad servers. By disadvantaging bids from non-Google demand sources, advertisers who want to display ads on Google's Publisher-clients must use Google's advertiser-facing products. The resulting increase in the number of advertisers in Google's pool of clients then further increases Publishers' need to use Google ad servers, further entrenching Google's market dominance.

12.     Fourth, Google has taken a variety of measures to impair potential rivals' ability to collect user data and use such data to target advertisements. For example, Google has coerced Publishers to create content for mobile users in a format known as "accelerated mobile pages" or "AMP" by suppressing non-AMP content in Google Search results. Then, when Publishers offer content in AMP format, Google caches the AMP pages such that when a user attempts to navigate to the content from, *inter alia*, Google Search results or the Google News app, Google serves the content from Google's (and not the Publisher's) servers. As a result, Publishers (and any third-party tracker the Publishers engage) cannot obtain data from their users that could later be used to target advertisements. Similarly, Google has announced imminent changes to features of its popular Chrome web browser that will inhibit potential rivals from collecting data through third-party cookies and/or DNS data.[2]

13.     Fifth, according to the complaint filed by the Texas Attorney General (and other state attorneys general), Google made an unlawful agreement with its largest potential rival—Facebook, Inc. Through the agreement the two advertising behemoths agreed to cooperate rather than compete. Such conduct removed significant competitive pressure on Google.

---

[2] As discussed *infra*, third-party cookies and DNS data tracking are mechanisms that potential competitors can use to amass data that would allow advertisers to target their advertisements without relying on Google's data services.

**CLASS ACTION COMPLAINT**

14. The absence of competition in the Publisher Ad Server Market caused by Google's Scheme allows Google to charge Publishers supracompetitive prices for its publisher ad server services. Because Google's Scheme has effectively destroyed competition in the Publisher Ad Server Market, Publishers have no choice but to pay the supracompetitive prices—extracted as a percentage of their advertising revenue.

15. As alleged herein, Google's conduct has had substantial anticompetitive effects in the Publisher Ad Server Market and has harmed Plaintiff and members of the Class. Plaintiff and members of the proposed Class accordingly seek compensatory and injunctive relief for violations of the Sherman Act, 15 U.S.C. §§ 1, 2.

## II.    JURISDICTION AND VENUE

16. Plaintiff brings this action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

17. Plaintiff has been injured, and is likely to continue to be injured, as a direct result of Defendant's unlawful conduct alleged herein.

18. The United States District Court for the Northern District of California has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and Section 4 of the Clayton Act, 15 U.S.C. § 15(a)(2).

19. The United States District Court for the Northern District of California also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 exclusive of interests and costs, and Plaintiff and a significant proportion of the members of the proposed Class are citizens of a state different from Defendant.

20. Venue is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22. Google is headquartered in this District, its principal business operations are based in this District, and the Scheme was formulated and carried out in this District. Venue also is proper pursuant to 28 U.S.C. § 1391 for the same reasons.

21. Additionally, Plaintiff and members of the proposed Class have contracts with Google containing a forum selection clause. The forum selection clause requires all claims between the parties to be resolved "exclusively in the federal or state courts of Santa Clara County, California," which includes this District.

**CLASS ACTION COMPLAINT**

### III.    PARTIES

22.    Plaintiff Sterling International Consulting Group is a Delaware Corporation with its principal place of business in Statesville, NC. Plaintiff operates an ad-supported website that uses a Google publisher ad server to identify the creation of ad inventory, obtain bids from demand sources, and fill the ad space.

23.    Defendant Google is a Delaware corporation with its principal place of business in Mountain View, California.

### IV.    DIGITAL DISPLAY ADVERTISING

24.    Digital advertising has exploded in recent years. Worldwide digital advertising spending was estimated to be $194.6 billion in 2016 and rose to $325 billion in 2019.

25.    The United States accounts for a substantial proportion of those revenue figures. In 2019, for example, the United States accounted for approximately 40% of the global digital advertising revenues.

26.    Digital advertising takes several complementary forms. For example, advertisements can be targeted to consumers, *inter alia*, as text-based ads to appear with search engine query results ("search ads"), as display ads appearing in-line in Publishers' content such as blog posts or news articles ("display ads"), or as ads in social media feeds.

27.    Advertisers purchase one format or another to serve their different goals. For instance, advertisers may purchase search ads to reach consumers actively looking to make a purchase by searching for a particular product or company. By contrast, they may purchase display ads on a Publisher's site to increase brand awareness or to market a product to a user that put the product in his shopping cart but did not complete the purchase.

28.    While search ads are targeted principally based on the search terms the user inputs into the search engine, display ads are shown to each user who loads a webpage programmed to display advertising. Thus, data about the webpage user is critical to advertisers seeking to display their advertisement to such user.

**CLASS ACTION COMPLAINT**

29. Publishers, who operate websites and mobile applications, are necessarily restricted in the types of ad formats they can sell. A news website, for example, can generally sell display ads alongside its news articles but cannot generally sell search ads to monetize the same content.

### A. **How Digital Display Advertising Works**

30. Publishers sell their ad inventory to advertisers either directly through their marketing departments or indirectly through programmatic ad auctions run by their publisher ad server and/or ad exchanges and ad networks.

31. Generally, only large Publishers have the means and/or incentive to sell advertisements directly to advertisers (so-called "direct-sold" ads) due to the need for internal staffing and general advertiser demand for the Publishers' ad inventory.

32. Even those Publishers that sell ad space directly to advertisers cannot always predict how many ad spaces they have available for direct-sold ads because the number of ad spaces is dependent on the number of users who visit each Publisher's website (as well as other factors specific to the Publishers' deals with advertisers, *e.g.*, specific criteria for users who would be targeted with the ads). Thus, selling inventory through programmatic ad auctions permits Publishers to sell their remnant inventory that either does not qualify for their direct-sold deals or where the programmatic placement would fetch a higher price than the direct-sold ad deals. Additionally, some Publishers sell the entirety of their inventory indirectly through programmatic ad auctions.

33. Programmatic ad auctions are run in various forms by ad exchange, ad networks, and ad servers. Their purpose is to determine which advertiser can place its ad in a particular ad slot created when a user loads a Publisher's webpage.

34. Instead of advertisers placing an order for a fixed amount of impressions (*i.e.*, user views) from a Publisher as they would in direct-sold ads, each auction organizer (*i.e.*, the ad exchange, ad server, or ad network) auctions the ad slot between its participating advertisers in real time when the page is loaded. This process—in which a user loads a webpage, the auction organizer conducts the auction, and the ad gets placed—occurs automatically (usually taking a few hundred milliseconds).

35. The process involves several entities providing services in the "Ad Tech Stack." On one end of the Ad Tech Stack, the Publisher engages a publisher ad server. The ad server can conduct its own

**CLASS ACTION COMPLAINT**

auctions and/or it can solicit bids from ad exchanges and/or ad networks, each of which serve as middlemen between Publishers and advertisers.

36.    On the other end of the Ad Tech Stack, advertisers engage an advertiser ad server and a "demand side platform"[3] or "DSP." The advertiser ad server performs the function of storing the advertisers' ads, serving advertisers ads when the advertiser wins auctions, and tracks the advertiser' ad campaign results. The DSP manages advertisers' programmatic ad buying. The DSP essentially automates the process of bidding on advertisers' behalf in ad auctions.

37.    Thus, the Ad Tech Stack looks like this:



*Figure 1: The Ad Tech Stack*

38.    The Publisher- and advertiser-facing services in the Ad Tech Stack are not always fully interoperable, meaning that ad tech service providers control the extent to which other service providers' clients (Publishers or advertisers) can transact with each other.

39.    As one relevant example, Google has not allowed Publishers who are not customers of Google's ad tech services on the supply side[4] to access Google's auctions to obtain real-time bids from Google's pool of advertisers on the demand side.

40.    As a result of this interoperability issue, Publishers (and advertisers) consider the demand (supply) that their publisher ad server (advertiser ad server and/or DSP) can access. In other words, a key consideration for Publishers in selecting an ad server is what demand (and on what terms) the ad server can solicit bids from different demand sources; the more advertisers (who are expected to bid the most) who participate in the auctions the ad server can access the better. Conversely, if a publisher ad server

---

[3] Publishers may also engage a platform (called a "supply side platform" or "SSP") to work with ad exchanges. Google has collapsed many of these functions into single offerings. As a result, there is relatively little distinction between the function of a publisher ad server and a SSP today.

[4] Publishers are the "supply" side because they generate the "supply" of ad inventory. Advertisers are the "demand" side because they purchase the ability to place ads in Publishers' ad inventory.

**CLASS ACTION COMPLAINT**

cannot access significant demand pools, the publisher ad server cannot compete effectively in the market against Google's publisher ad server products.

### B. The Importance of Data in Digital Advertising

41. The digital economy more broadly relies heavily on collecting, mining, analyzing, and monetizing data. Personal information collected by companies in the digital economy has become a substantial intangible asset used to create value, not unlike copyrights, patents, and goodwill.

42. Traditionally, advertising has relied on targeting methods. For example, when an advertiser wanted to market nationwide, the advertiser might purchase advertising space in nationally distributed newspapers and magazines (*e.g.*, USA Today or Newsweek). As a result, newspapers, magazines, and television stations tracked and kept detailed reader/viewer data. Their marketing departments (and/or contractors) would then work with advertisers (and/or their agents and contractors) to provide information on the potential reach and targeting capability of advertising on the media.

43. Digital advertising is not different in its reliance on targeting. However, the availability of data on users enable digital advertisers to target advertising with far more precision.

44. Different forms of digital advertising use different types of data. For example, when an advertiser markets to users of a search engine, the advertiser is using the user's search terms to target advertising. When seeking to use display advertisements, whether on a social network platform or on a Publisher's site, an advertiser can target users better with more personalized data about the individual users. So, if an advertiser knows a particular person used the advertiser's website and placed merchandise in his or her shopping cart without purchasing the item, that advertiser may place significant value being able to market *that* merchandise to *that* person as the person visits other websites. As another example, a particular advertiser (whether a retailer, political campaign, or services provider, etc.) may know that people with particular characteristics (*e.g.*, with certain interests like sports, travel, etc., with certain incomes or wealth, or located in a particular place) would be receptive to their marketing. To such advertisers, data on who is receiving advertisements is a valuable and critical element to their advertising campaigns.

45. One company ran a trial in 2019 to compare the revenue Publishers in the United Kingdom received from advertising benefiting from personalized data with revenue received from

**CLASS ACTION COMPLAINT**

advertising that did not use personalized data. The results indicated that U.K. Publishers earned between 50% and 65% less revenue when they were unable to sell personalized advertising but competed with others who could.

46. In digital advertising, a key input is data on consumers who would be targeted by a given advertisement. The more targeted an ad, the more likely it is that users act upon it (*e.g.*, click on the ad's link), and therefore the higher the return on investment is. Thus, advertisers are willing to (and do) bid far more when they have significant data on a user than when they have little or no data.

47. It is precisely because consumer data is the key input that Google and Facebook have emerged as the dominant players in the broader digital advertising sphere. Through its data access, Google dominates search advertising and the ad tech services that place advertising on Publishers' websites. Google achieved its dominance in no small part because of its ability to collect particular types of user data. Google's control over consumer-facing products, *e.g.*, Search, Android OS, Gmail, Maps, YouTube, Chrome, and its ad tech services, provides Google with unmatched access to user data based on what websites users view, what they search for, what emails they receive, where they go and how often they go there, where they live, where they work, what videos they watch on YouTube, what apps they use on their phone, and more.

## V. GOOGLE'S BUSINESS

48. Google offers myriad "free" services to consumers, such as Google Search, Google Chrome, Google Maps, YouTube, and Android OS. While consumers do not compensate Google for those services with money, consumers do allow Google to collect data from them relating to those interactions. For example, Google's Android OS provides Google with location data, Google Search provides Google with data on what a particular user is looking for online, and YouTube provides Google with data on user interests.

49. Google uses the data gathered from consumers using these "free" services (as well as other Google business lines, including its advertising services) to target advertisements displayed on Publishers' webpages, making billions of dollars a year in the process.

50. Because of the data Google gleans from users of its "free" services, Google has a nearly unparalleled ability to target advertisements to users. As a result, one of Google's most significant

**CLASS ACTION COMPLAINT**

revenue streams comes from assisting Publishers in filling their ad inventory, a role Google complements with interrelated services throughout the Ad Tech Stack.

51.     Google's unparalleled access to user data has been a significant factor in Google's domination of the digital display ad ecosystem with its offerings at each level of the Ad Tech Stack. Google's offerings include services that work together to (1) identify advertising inventory when a user loads a Publisher's content, (2) collect bids from advertisers interested in serving an ad to particular Publishers, (3) determine the winning advertiser, and (4) serve the ad—all of which happens in milliseconds.

## VI.    GOOGLE'S MARKET POWER IN THE PUBLISHER AD SERVER MARKET

### A.    The Relevant Market

52.     The Relevant Market is the market for publisher ad server services (the "Publisher Ad Server Market" or the "Market").

53.     Publishers are purchasers of services in the Publisher Ad Server Market. Companies, like Google, who offer publisher ad server products are sellers of services in the Market.

54.     Publisher ad servers are inventory management systems that Publishers use to holistically manage their online display advertising inventory—the image-based graphical ads alongside web content. They provide features such as: (1) reservation-based sales technology to support a Publisher's direct sales efforts; (2) inventory forecasting technology to help a Publisher determine what inventory will be available to sell; (3) a user interface through which a Publisher's sales team can input directly sold campaign requirements; (4) co-management of direct and indirect sales channels; (5) report generation of ad inventory performance; (6) invoicing capabilities for a Publisher's direct campaigns; and (7) yield management technology.

55.     The relevant geographic market is the United States, or in the alternative, predominantly English-speaking countries of the United States, Canada, the United Kingdom, and Australia. Publishers seek out publisher ad server services based on the service provider's ability to connect the Publisher with advertisers that would seek to target the Publisher's users. Because Publishers sell advertising space to advertisers based on, *inter alia*, the location of the Publishers' users, the geographic market's scope is determined by the Publishers' targeted user geographies, here, the United States, or in the alternative,

**CLASS ACTION COMPLAINT**

predominantly English-speaking countries of the United States, Canada, the United Kingdom, and Australia. A publisher ad server that could not connect Publishers with a significant pool of advertisers seeking to target American (or alternatively, English-speaking) users could not generate auction returns that rivaled publisher ad servers that could deliver such advertiser demand.

**B. Google Dominates the Relevant Market**

56. However the geographic component is defined, Google has market power in the Publisher Ad Server Market.



*Figure 2: Google's Estimated Market Share at Each Level of the Ad Tech Stack*

57. Google has a dominant share of the Publisher Ad Server Market, likely exceeding 90% of the market. Indeed, the United Kingdom's Competition & Markets Authority ("CMA") (the U.K.'s antitrust authority) found that Google had between 90% and 100% of the Publisher Ad Server Market (as measured by the money advertisers paid to place ads within U.K. Publishers' content.[5] Google holds similar market shares in the Publisher Ad Server Market in each geographic market.

---

[5] *See* Online Platforms and Digital Advertising, Market Study Final Report (July 2020), *available at* https://assets.publishing.service.gov.uk/media/5fa557668fa8f5788db46efc/Final_report_Digital_ALT_TEXT.pdf.

**CLASS ACTION COMPLAINT**

58. Although the CMA's market share analysis shows comparatively lower (but still quite high) market shares at the ad exchange/ad network and DSP levels of the Ad Tech Stack, the CMA's method would tend to understate Google's power at those levels of the Ad Tech Stack. Specifically, the CMA's analysis looked at how much money advertisers spent and how much money Publishers received over a specific time period, and then determined how much of that overall revenue traveled through the Google properties throughout the Ad Tech Stack. The analysis included, *inter alia*, direct-sold ads (*i.e.*, ads sold directly by Publishers to advertisers) that would show up as part of Google's market shares at the ad server levels on either side of the Ad Tech Stack (because advertisers spent the money as recorded by their Google ad server, and Publishers received it and placed the ad through their Google ad server), but not at the auction or DSP level because the direct-sold ads did not use DSPs' automated bidding services or participate in auctions. As a result, these direct-sold sums would suppress Google's apparent share of revenues at the auction and DSP levels of the Ad Tech Stack (as reflected in Figure 2) even though no Google competitor would capture such revenue. In addition, as a general matter, advertisers and Publishers generally use only one ad server each, but advertisers may use multiple DSPs and both Publishers and advertisers may use multiple auction sources. Although that situation may reflect some competition at the DSP and auction levels of the Ad Tech Stack, such competition is muted by the fact that the Publishers and advertisers that use non-Google DSPs and auctions also tend to use Google's offerings as well.

59. Other than Google, the other sellers in the Publisher Ad Server Market are small and fragmented. Indeed, since 2012, Google's closest competitors have either exited the market entirely or have been relegated to negligible market shares.

60. Google's market position in the Publisher Ad Server Market is protected by high barriers to entry.

61. First, Publishers who might look to switch ad server products face high switching costs because these server products must be programmatically and technologically built into the Publishers' operations.

62. Second, any potential rival seeking to gain market share at Google's expense must be able to compete with Google in two key areas: (1) the ability to deliver comparable data targeting and

**CLASS ACTION COMPLAINT**

attribution services; and (2) a pool of advertiser demand that would participate in non-Google auctions and generate comparable revenue to Google's auctions.

63.     These two elements are interrelated due to Google's conduct. Google's consumer-facing businesses (including, *inter alia*, Search, Gmail, YouTube, and Chrome), as well as its ad tech products collect significant user data that Google makes available to its advertiser-clients for targeting purposes. Advertisers who switch away from Google lose access to Google's data targeting and attribution services, and no substitute service can match Google's data offerings. Because Google only allows Publishers who use Google's publisher ad servers to have full access Google's advertiser demand, other publisher ad server providers must supply access to comparable advertiser demand that can replace Google's advertiser demand for Publishers to switch. But, even if a potential rival publisher ad server provider could connect Publishers to a sufficiently large pool of advertiser demand, if those advertisers lacked data comparable to Google's offerings, the rival's pool of advertiser demand would tend to bid less—and thus not be a true substitute for—Google's advertisers. Thus, Google's pool of advertisers and data targeting and attribution services impose high barriers to entry.

64.     Third, Google provides limited pricing information to Publishers. Thus, even if there were competing publisher ad server products for Publishers to switch to, those products would have significant difficulty in demonstrating to Publishers that switching is worthwhile because Google makes direct price comparisons nearly impossible.

65.     These barriers inhibit entry and expansion by potential competitors in the Publisher Ad Server Market, evidencing Google's monopoly power in the Relevant Market.

**VII.    GOOGLE'S ANTICOMPETITIVE SCHEME**

66.     Google has engaged in a series of actions to acquire and maintain monopoly power in the Publisher Ad Server Market including: (1) anticompetitive acquisitions at each level of the ad tech stack, including in the Publisher Ad Server Market, (2) bundling and/or tying its advertiser-facing properties in the ad tech stack to its data services to collect and control advertiser demand, (3) requiring Publishers who seek access to Google's pool of advertiser demand to use Google's publisher ad server products, (4) self-preferencing and/or steering ad placements through Google's ad tech products, (5) using its market

**CLASS ACTION COMPLAINT**

power from other markets to impair actual or potential rivals from amassing data that could allow them to compete with Google, and (6) making an agreement with its biggest potential rival (Facebook, Inc.) to cooperate and not compete in the relevant market.

67.     Google used this Scheme to achieve market dominance in the Publisher Ad Server Market.

**A.   Google Engaged In A Series Of Acquisitions To Acquire A Foothold At Each Level Of The Ad Tech Stack.**

68.     Google commenced its Scheme to dominate the Ad Tech Stack with a series of acquisitions.

69.     The first and most significant such acquisition was Google's 2007 purchase of DoubleClick for $3.1 billion. Google purchased DoubleClick as a means of entering the markets for providing services within the Ad Tech Stack. DoubleClick provided publisher ad server services and operated the largest ad exchange. The DoubleClick products formed the basis of Google's ad tech offerings in ensuing years. As Google's submission to the United States House of Representative's Subcommittee on Antitrust, Commercial and Administrative Law acknowledged, prior to the DoubleClick acquisition, Google had "no meaningful presence" in the Ad Tech Stack. A July 2006 Google presentation suggested that, by acquiring DoubleClick, Google could obtain "self-reinforcing benefits" for Google's planned digital ad "ecosystem."

70.     The Federal Trade Commission ("FTC"), as well as various foreign competition authorities, reviewed the DoubleClick acquisition. Ultimately, the FTC approved the merger, concluding that display advertising markets were "relatively nascent, dynamic and highly fragmented," and the DoubleClick acquisition did not threaten competition in the markets because other big companies appeared "to be well positioned to compete vigorously against Google."[6] However, as the New York Times recently reported, at least one of the FTC commissioners who voted to approve the merger has

---

[6] *See* Statement of Federal Trade Commission Concerning Google/DoubleClick, *available at* https://www.ftc.gov/system/files/documents/public_statements/418081/071220googledc-commstmt.pdf.

**CLASS ACTION COMPLAINT**

since expressed his regrets. Specifically, William Kovacic told the New York Times, "If I knew in 2007 what I know now, I would have voted to challenge the DoubleClick acquisition."[7]

71.     Indeed, when Google purchased DoubleClick, it told Congress and the FTC that it would not combine the data collected on internet users via DoubleClick with the data collected throughout Google's ecosystem (*e.g.*, through Gmail, Search, etc.). But in 2016, Google reversed that commitment and combined its datasets.

72.     Google followed its DoubleClick acquisition with additional ad tech properties:

        a.      In November 2009, Google acquired AdMob, a company with technology for serving ads in mobile apps. Google now uses AdMob technology to offer publisher ad server services in mobile apps.

        b.      In June 2010, Google acquired Invite Media, which offered a media buying optimization technology for display advertisers. Google now uses this technology as part of its DSP offerings, including Display & Video 360.

        c.      In June 2011, Google acquired AdMeld, a supply-side platform that Google integrated into its auction platforms.

        d.      May 2014, Google acquired an analytics and attribution provider known as Adometry, which Google integrated into its Google Analytics offering to provide improved attribution services.[8]

73.     These acquisitions created and/or solidified Google's product offerings in the Ad Tech Stack.

---

[7] *See This Deal Helped Turn Google Into an Ad Powerhouse. Is That a Problem?*, The New York Times (Sept. 21, 2020), *available at* https://www.nytimes.com/2020/09/21/technology/google-doubleclick-antitrust-ads.html.

[8] In addition to these acquisitions, Google has made further acquisitions in the ad tech space relating to in-app and video advertisements: mDialog (June 2014); Directr (August 2014); Toro (February 2015); Famebit (October 2016).

**CLASS ACTION COMPLAINT**

**B.** **Google Used Its Dominant Position Throughout the Ad Tech Stack to Engage In Exclusionary Conduct**

74.     Google has engaged in multiple types of exclusionary conduct to obtain, maintain, and enhance its market power in the Publisher Ad Server Market.

75.     Google's substantial, detailed user profiles derived from its consumer-facing services (and further supplemented by its ad tech properties' data collection activities) is a must-have input for many advertisers. Other than perhaps Facebook, no other company can provide the data targeting abilities that Google can provide. As a result, Google could sell data targeting services to advertisers—and would have substantial market power in a market for such services if it did so. But instead of selling such services as a standalone product, Google ties its data targeting services to its advertiser-facing ad tech products (DSP and advertiser ad server offerings), requiring advertisers to purchase Google's ad tech services to receive its data targeting services.

76.     Specifically, Google ties together its ad targeting and attribution data services with its ad server and DSP services. In other words, Google only lets advertisers, who buy ad space through Google's buying platforms (Google Ads and Google Display & Video 360), use Google's data for ad targeting and attribution purposes (including several types of data that only Google can collect, *e.g.*, Google's first-party data from the use of Google services—Gmail, Google Maps, Chrome, and the Android OS—data Google gleans from Publishers' websites that use Google's ad tech products, and Google's Search data). Thus, Google ties together separate products to advertisers: data—a must-have input for advertisers, particularly smaller advertisers without access to their own proprietary data—with its advertiser ad server and DSP. Each of these products could be made available to advertisers separately, but Google refuses to do so.

77.     Because advertisers need significant scale to benefit from so-called "multi-homing" (meaning using more than one DSP and/or ad server), and because Google's ad targeting data is a key input, Google's tie of ad targeting data with advertiser-facing ad tech services effectively coerces advertisers to use Google's ad tech services to the exclusion of other ad tech service providers who cannot provide access to comparable data targeting services. The advertiser-facing tie effectively compels

16

**CLASS ACTION COMPLAINT**

a significant pool of advertisers to use Google's advertiser facing services (as set forth above, Google controls approximately 80–90% of advertiser ad server business).

78.     For Publishers, Google ties its ad server and auction offerings. Prior to June 2018, Google offered its ad server and access to auctions as nominally separate products. But in June 2018, Google formally tied these two products together, requiring Publishers to use its ad server products to access its auctions (and the advertiser demand the auctions represent). Both before and after Google officially tied its ad server to accessing Google's auctions, Google restricted auction access to Publishers that used Google's ad server. Specifically, although Google's auctions can receive requests from non-Google ad servers, Google has never permitted its auctions to participate in real-time bidding against other companies' auctions.[9] This means that Publishers must use a Google ad server to have full access to Google's auctions and the corresponding pool of Google's advertiser demand. Because Google's auctions are the only way to obtain bids from advertisers using Google's advertiser-facing services in the Ad Tech Stack (representing 80%–90% of the advertising spend in the overall market), Google's conduct coerces Publishers to use Google's ad server irrespective of whether Google's tie was formal (post-June 2018) or whether Google's conduct coerced Publishers to treat the services as tied together (to access one, a Publisher needed to access the other).

### C.  Google Manipulates Its Ad Auction Processes to Preference Its Own Tied Auctions

79.     To entrench its monopoly power further, Google manipulates the ad auction process.

80.     Google's publisher ad server controls the auction process for at least 90% of advertisers' digital display ad spending. In this role, Google determines how advertiser bids from competing ad tech services (*e.g.*, other ad exchanges or ad networks) will be compared to Google's advertiser-clients' bids through Google's auctions. From at least 2010 to the present, Google used this favored position to preference its own tied auctions, and to disadvantage competing products.

---

[9] Absent Google's refusal to deal, Google's auction winner would compete in auctions head-to-head with the auction winners of other companies' auctions.

**CLASS ACTION COMPLAINT**

81.     Google has exerted control over open-web digital display advertising by subtly changing the ways its auctions operate to maximize its own revenues to the disadvantage of both Publishers and advertisers.

82.     Google is able to take these steps because it occupies the dominant position as the representative for most sellers (Publishers) and most buyers (advertisers), and because of its role in designing and conducting the auctions for the sellers' inventory (by virtue of its dominant market share in providing PAS services).



*Figure 3: Evolution of Google Display Ad Auctions*

83.     During each time period set forth in Figure 3, Google found a way to preference its own auctions, disadvantage competitors' auctions, and/or ensure that its advertiser clients using its advertiser services in the Ad Tech Stack won the maximum number of impressions without maximizing the returns for Google's Publisher clients.

84.     Such conduct suppresses revenues to Publishers and impairs rivals throughout the Ad Tech Stack. While it might appear in theory that the conduct could advantage Google's advertiser clients (through lower prices to win auctions), as set forth herein, Google does not pass these savings through to advertisers and instead retains any such "savings" for itself.

**1. The Waterfall System (Pre-2009)**

85.     Prior to 2009, Google's display ad auctions allowed Publishers to prioritize their sources of demand for advertising (from deals sold directly by the Publishers and from auctions through one or more ad exchanges) within Google's publisher ad server using a "waterfall" sequence.

86.     Publishers could prioritize their demand sources based on how the Publishers valued the demand sources, with direct-sold deals (if any) typically having priority over auctioned ads. The typical

**CLASS ACTION COMPLAINT**

auctions used a "second-price" auctioning mechanism.[10] Publishers would typically rank auction sources based on estimated performance using historical yield data.

87.     When ad inventory became available (*i.e.*, when a user loaded the Publisher's page generating ad slots) and there was no direct deal ad eligible for placement, the Google publisher ad server selected the demand source in order of the Publisher's assigned rankings, with the highest-ranked source having the opportunity to conduct an auction and present a winning bid for the ad slot above a reserve price.

88.     If that first auction sold the ad above the reserve, the auctioning process stopped there. If the reserve price was not met, Google's publisher ad server would offer the next exchange in the waterfall the opportunity to bid at a lower reserve price, and the process repeated for additional demand sources, lowering the reserve price each time.

89.     Although this process helped Publishers reduce risk that ad inventory would not sell, it precluded ad exchange demand sources from bidding against each other in real time (which would maximize Publisher yield).

90.     The Waterfall System failed to maximize revenues to Publishers because it did not allow all interested advertisers to bid in real time, nor did it allow Publishers to rank demand sources in the Waterfall in accordance with the demand sources' actual bids (instead relying only on estimated bids based on historic auction results).

91.     This limitation reduced Publisher yields. For example, if the Publisher's estimated bids for its second (or third, or fourth, or fifth, etc.) demand source was inaccurate and those lower-ranked sources' advertisers would have valued the ad slots more (*i.e.*, bid higher amounts) than the first demand source, the Waterfall System did not allow those lower-ranked demand sources to bid on the ad slots.

---

[10] Until recently, second-price auctions have been the norm in programmatic advertising. In a second-price auction, the winner only pays $0.01 more than the second highest bid. If Advertiser A bids $2.00 for an impression and Advertiser B bids $1.75, the auction clearing winning bid will be $1.76. Second-price auctions incentivize advertisers to bid in accordance with the value they place on the impression because they know that they will only have to pay the amount needed to beat the next highest bidder irrespective of their bid amount. First-price auctions, on the other hand, create incentives for advertisers not to bid as high as they value the impression and instead focus on optimizing their bids to bid as low as possible but still win the auction.

**CLASS ACTION COMPLAINT**

92. As set forth in Figure 4, if the Waterfall System has two demand sources (ad exchanges) both running second-price auctions, the publisher ad server would collect the bid from the first demand source using a reserve price (say $5). The auction clearing price may then be $5.01 and, because the reserve price was satisfied, the first auction would place the ad. However, if the second demand source's auction clearing price would have been $6.01, the Publisher effectively loses $1 for the ad placement due to the Waterfall System because that second demand source never gets the opportunity to bid.



*Figure 4: Lost Opportunity Due to Waterfall*

93. Therefore, the Publisher cannot maximize its revenue for its ad slots because the advertisers that valued the slots the highest were not permitted to bid.

94. An additional issue created by the Waterfall System was slow-loading advertisements. The process of conducting successive auctions sometimes took long enough that users often left a page before the advertisement loads, creating issues with tracking ad performance and potentially causing the Publisher's content to load more slowly and diminishing user experience.

### 2. Dynamic Allocation (2009)

95. Beginning in or around 2009, Google's PAS used a system called "Dynamic Allocation" as a supplement to the Waterfall System.

**CLASS ACTION COMPLAINT**

96.     With Dynamic Allocation, Google's PAS gave Google's own ad exchange an advantage: Google used the Publisher's highest estimated bid from a demand source in the Waterfall System (which Publishers inputted into the PAS) as the reserve price for Google's ad exchange's auction. If Google's ad exchange could beat that highest estimated price, Google placed the ad from its auction winner and no other demand source was given the opportunity to bid.

97.     This gave Google's ad exchange a privileged position as the default first demand source in the Waterfall System.

98.     Dynamic Allocation did nothing to address the inefficiencies of the Waterfall System; rather, it capitalized on those inefficiencies by imposing Google as the default first demand source.

### 3.  Enhanced Dynamic Allocation (2014)

99.     In 2014, Google implemented "Enhanced Dynamic Allocation," pursuant to which Google's ad exchange used an adjusted price from the highest value direct deal the Publisher had arranged as the reserve price for its own auction.

100.    Enhanced Dynamic Allocation conferred an even greater advantage on Google's own ad exchange by allowing it to prioritize Google's ad exchange even ahead of Publishers' direct-sold deals in the Waterfall System.

101.    Meanwhile other ad exchanges would only get to bid if (1) Google's ad exchange failed to meet the reserve, *and* (2) there was no direct deal qualifying for the space, *and* (3) the PAS reached the other ad exchange in the Waterfall System.

102.    While this process created the potential to increase Publisher revenues in the short term (by selling higher-revenue programmatic ads over direct deals), overall, the likely effect was weakening Publishers' direct sales channels and driving advertisers to programmatic channels (which benefits Google over the Publishers' direct sales).

### 4.  Header Bidding (2015)

103.    To address the inefficiencies created by the Waterfall System and Google's Dynamic Allocation processes, Publishers and ad tech competitors began to develop and implement a process known as "header bidding."

**CLASS ACTION COMPLAINT**

104.     There are two types of header bidding, client-side and server-side, each of which uses different means to allow Publishers to conduct real time auctions between multiple demand sources (*e.g.*, auctions and ad networks).

105.     Client-side header bidding involves adding a piece of code to Publishers' websites which causes the user's browser to send ad requests to the Publishers' demand sources before the code initiates the Publisher's ad server system. The header bidding demand sources then submit their bids simultaneously.

106.     Several ad tech companies offer server-side header bidding pursuant to which demand sources bid in a real time auction on a remote server controlled by a third party.

107.     Although server-side header bidding is marginally faster than client-side header bidding, server-side header bidding results in lower Publisher revenues because it impairs advertisers' ability to match their data to the user to whom the ad will be served.

108.     Through either type of header bidding, Publishers' ad inventory sales process avoids the Waterfall System altogether.

109.      With the Waterfall system, once the publisher ad server identifies a demand source in the Waterfall that meets the floor price, the process is over. But header bidding involves all demand sources



*Figure 5*: Waterfall with $2.00 Floor Price                    *Figure 6:* Header bidding with $2.00 Floor Price

22

**CLASS ACTION COMPLAINT**

bidding simultaneously, and therefore allowing the highest bidder to prevail. *Compare* Figure 5 (Waterfall auction), *with* Figure 6 (Header bidding auction).

110. The advent of header bidding significantly increased revenues to Publishers, sometimes up to 70%.

111. Google undermines client-side header bidding by refusing to allow its ad exchange to participate in header bidding auctions.

112. Because Google controls so much of the advertiser demand, Google's refusal to participate thins header bidding auctions, causing them to generate lower clearing bids. Google then provides its ad exchange a "last look" advantage after header bidding processes are complete. Through this process, after the client-side header bidding process sends the winning bid to Google's PAS, Google offers the spot to its ad exchange to see whether Google's exchange can beat the price.

113. Google's "last look" does not achieve the same result as participating in the header bidding process. With the last look, Google's ad exchange must only beat the header bidding clearing price. But if a header bidding advertiser would pay more than its winning bid, simply affording Google the last look results in a lower sale price because Google's winning bidder and the header bidding winner did not have to determine which would bid the highest in an auction between them. For example, if the winning header bidding advertiser is willing to bid $3.00 but needs only $2.00 to clear the header bidding auction. Google's last look advantage would allow Google's advertiser to win the auction at $2.01 rather than needing $3.01 to beat the header bidding winner.[11] As a result, Google can optimize its advertiser bids to bid the lowest amount needed to beat the header bidding auction clearing price rather than competing directly with the header bidding auction participants.[12]

---

[11] Notably, Google's advertisers do not benefit from these lower prices because Google still charges its advertisers a higher price (*e.g.*, the value the advertiser ascribes to displaying an ad to a particular user/type of user) and keeps the difference between that price and the clearing bid price.

[12] Google also used its control over the initial AMP format to make AMP incompatible with client-side header bidding. More recently, Google has introduced an AMP solution that allows client-side header bidding, but it imposes strict limits on the number of demand sources allowed to participate in bidding and a time constraint on response times from demand sources. The News Corp. Submission argues that these constraints "shut out some exchanges." *Id.* at 26.

23

**CLASS ACTION COMPLAINT**

### 5. Exchange Bidding (2018)

114. In 2018, Google introduced "Exchange Bidding" (also known as "Open Bidding") on its publisher ad servers. Google introduced Exchange Bidding to prevent header bidding from invading Google's market dominance. Exchange Bidding is a unified auction between rival ad exchanges that is, in essence, a form of server-side header bidding. Each time inventory is for sale, with Exchange Bidding activated by the Publisher, the Google publisher ad server runs consecutive auctions as follows:[13]

- First, Google conducts a second-price auction within Google Ads (a Google DSP that provides advertiser-facing services to smaller advertisers) to select the highest bidder among Google Ads advertisers.

- Second, Google conducts a second-price auction within Google's primary ad exchange (AdX) where Google Ads would compete with other DSPs.

- Third, Google conducts the Exchange Bidding auction, a final first-price auction where AdX would compete against other exchanges.

115. In that final auction, however, if the winning bidder of the Exchange Bidding auction is a non-Google advertiser client (*e.g.*, the winning bidder uses a competing ad exchange), Google charges the winning bidder a surcharge equal to 5%–10% of the winning bid. Google does not change this fee to Google's advertiser clients. Thus, Google places a 5%–10% tax on competition from other ad exchanges, raising its rivals' costs (and forcing advertisers to pay more). Google does not pass through this tax to its Publisher clients.

### 6. First-Price Unified Auction

116. Over time, many ad exchanges moved away from second-price auctions to first-price auctions. By September 2019, Google completed its switch to a first-price unified auction.

117. When Google "unified" its auctions, it collapsed its second-price auctions within its ad exchange into its Exchange Bidding auction, meaning that Google ran one first-price auction rather than second-price auctions followed by a first-price Exchange Bidding auction.

---

[13] Exchange Bidding must be actively enabled in Google's publisher ad server.

**CLASS ACTION COMPLAINT**

118.     While in some ways, Google's unified auction switch should benefit Publishers (*e.g.*, by having Google's ad exchange compete in real-time with other demand sources), it appears that the switch was driven by Google's desire to implement unified pricing. Specifically, when Google unified its auction, it removed its Publishers' ability to set different reserve prices (or floor prices) for different demand sources. Google's move to unified pricing was driven by its observation that Publishers were setting higher floor prices for Google's ad exchange than for Publishers' other demand sources.

119.     From Publishers' perspective, the need for differential reserve prices is heightened with a first-price auction, making Google's switch from a second-price auction with differential reserve prices to a first-price auction with unified pricing particularly problematic. Although the switch to first-price auctions, in the short term, can increase the value of winning bids (because advertisers will pay the amount they bid rather than $0.01 more than the second highest bid as they would in a second-price auction), over the long term, revenues do not increase because of the practice of bid shading.

120.     Bid shading refers to the use of an algorithm created by DSPs that optimizes bidding in ad auctions. These algorithms use machine learning capabilities and input historical data such as site, ad size, exchange and competitive dynamics to enable advertisers to pay as little as possible without impacting their win rate.

121.     DSPs, including Google's DSP offerings, use bid shading algorithms in first-price auctions to try to approximate the results of a second-price auction. Because of the prevalence of these bid shading approaches, Publishers have seen relatively small increases in revenue from the switch to first-price auctions.

122.     Google's unified auction impairs Publishers' ability to counteract bid shading by imposing unified pricing. As one Publisher put it:

> When a seller faces asymmetric bidders in an auction, it is optimal to set a higher reserve price (price floor) for the stronger bidder. This incentivizes the stronger bidder to engage in less 'bid shading', which improves revenue for the auctioneer (in this case the publisher). Google's exclusionary conduct, including its informational advantages, imply that publishers have a strong incentive to set higher reserve prices for Google's ad exchange. This partially (but not fully) mitigates Google's artificial advantages. Following the rule change [prohibiting publishers from setting separate price floors], publishers must use the same price floor for all buyers and bidders. As a result, publishers cannot run optimal auctions that require Google DSPs to pay for artificial information advantages.

**CLASS ACTION COMPLAINT**

123.     Thus, these pricing rules not only impair Publishers' ability to counteract bid shading in general, but specifically protect Google's ability to engage in bid shading.

**D.  Google Uses Its Monopoly Power In Other Markets To Impair Potential Competitors In The Publisher Ad Server Market.**

124.     Google has used its dominance in other markets (notably search and internet browser markets) to impair potential competitors' ability to collect data that could be used to compete with Google's advertiser-facing offerings in the Ad Tech Stack, which could undermine Google's stranglehold on advertisers that Google uses to control the Publisher Ad Server Market. Notably, Google has taken at least three actions in recent years that have impaired actual or potential competitors' ability to collect data that could be used for advertising purposes.

125.     First, Google has recently taken steps to stop supporting third-party cookies in its Chrome Browser. Third-party cookies have been a key mechanism in digital advertising for years. Cookies are pieces of text that websites place on users' browsers when they visit the website. The text contains code that identifies the user to the website so that the website can pull information on the users' past interactions with the site (*e.g.*, prior pages viewed, items in the users' shopping carts, etc.). In addition to cookies the website places on a user's browser, third parties can place cookies on a user's browser in certain circumstances (*e.g.*, Facebook places cookies on users' browsers when the users visit sites that utilize Social Plugins). These third-party cookies allow the third parties to aggregate information about particular users across all websites that the user visits.

126.     Various companies use third-party cookies to collect data on users to offer advertisers increased targeting abilities. However, Google's exclusionary conducts has directly impaired these companies' ability to compete in providing ad targeting services.

127.     Second, Google recently released a new version of Chrome that introduced a new encryption feature that would prevent internet service providers ("ISPs") from collecting user browsing data. Through this action, Google prevents ISPs like Verizon, which has offered competing services in the Ad Tech Stack, from collecting data on users' browsing history that ISPs could use or sell to be used to compete with Google for advertiser clients.

26

**CLASS ACTION COMPLAINT**

128. Third, Google uses its dominance in Search to coerce Publishers to offer content in "accelerated mobile pages" ("AMP") format. Once the Publisher loads content in AMP format, Google creates a cached version on Google's servers. Each time a user then navigates to the Publisher's AMP content from Google properties (*e.g.*, Search or Google News), instead of directing the user to the Publisher's server, Google serves the AMP content from Google's AMP cache server. This practice prevents Publishers from collecting their own data on users (which could be used to facilitate the Publisher's advertising objectives, or combined and/or sold to other parties to aggregate into datasets that could be used to compete with Google).

129. Each of these practices may significantly impair potential competitors in the Publisher Ad Server Market by blocking several of the most common ways that companies collect data for purposes of targeting advertisements and providing attribution services. Yet, each of these practices would have limited, if any, effect on Google's ability to collect user data because Google does not rely on third-party cookies or scraping DNS data in amassing its user data for ad targeting purposes. Similarly, because Google collects first party data through its advertising intermediation services and because Google hosts the AMP cache, the AMP cache conduct only adversely affects Publishers and has no effect on Google.

130. By inducing advertisers to utilize Google's Ad Tech Stack to distribute their content, Google has made Publishers dependent upon Google for selling their display ad inventory.

131. Google also took actions to impair directly competitors' and Publishers' ability to generate their own datasets on users that Publishers could use to sell advertising through Google's competitors in the Publisher Ad Server Market.

132. Google's conduct in this regard has allowed it to continually increase its market share at the expense of other ad tech services providers and to the detriment of Publishers.

**E. Google Made an Unlawful Agreement with Its Biggest Competitor to Suppress Competition.**

133. In March of 2017, Facebook publicly announced it would support header bidding. By doing so, Facebook would enable web and mobile app Publishers and advertisers to bypass the fees associated with transacting through Google's ad server. When bidding into Google's ad server, ad

**CLASS ACTION COMPLAINT**

exchanges and ad networks had pay fees to Google. Because header bidding cost nothing, Facebook's announced approach would let Publishers and advertisers evade fees altogether.

134.    The wider industry also thought that Facebook was prepared to challenge Google's monopoly. Google and Facebook operate the largest ad networks for display and in-app mobile inventory in the United States (*i.e.*, Google Display Network, AdMob, and Facebook Audience Network). The same day as Facebook's March 2017 header bidding announcement, industry publication AdAge wrote that Facebook was poised to execute a "digital advertising coup against rival Google and its DoubleClick empire." A Business Insider headline the same day read, "Facebook Made an Unprecedented move to Partner With Ad Tech Companies – Including Amazon – to Take on Google."

135.    Even before Facebook's March 2017 announcement, Google was concerned about large entrants supporting header bidding. In an October 2016 internal presentation, a Google employee expressed concern about the potential for competition from Facebook and other large tech companies, saying "to stop these guys from doing HB [header bidding] we probably need to consider something more aggressive."

136.    Thus, when Facebook announced its support for header bidding, Google realized its fears that Facebook's support could crack Google's stranglehold on the Ad Tech Stack generally, and the Publisher Ad Server Market in particular. Indeed, Facebook has its own ad tech tools (the Audience Network) that Publishers could use, in theory, to replace the function of Google's ad server products, along with substantial user data and a significant pool of advertisers. As a result, Facebook represented a viable threat to Google's market share if it were to enter the Publisher Ad Server Market and support header bidding.

137.    Facebook's backing of the header bidding threat was a credible threat in part because it would allow advertisers to bid on Publishers' ad inventory without paying the 5%–10% tax Google levied on non-Google advertisers that won Google's Exchange Bidding auctions.

138.    Facebook's announcement sought to and did induce Google to negotiate a deal with Facebook. Within months of Facebook's header bidding announcement, Google and Facebook began formal negotiations to reach a deal not to compete head-to-head in display advertising.

**CLASS ACTION COMPLAINT**

139.    The companies' efforts to avoid competition were successful. The ultimate outcome of the negotiations was a September 2018 Google-Facebook agreement that resulted in Facebook significantly curtailing its header bidding initiatives. Facebook would instead bid through Google's advertising tools and in return, Google agreed to give Facebook a leg up in its auctions.

140.    The agreement was known internally at Google as "Jedi Blue," a code name for the deal that references "Star Wars." Facebook executive Sheryl Sandberg signed the deal with Google and described the deal to Facebook CEO Mark Zuckerberg, among other executives, as "a big deal strategically."

141.    Google and Facebook were aware that the Jedi Blue agreement could trigger antitrust investigations and liability. The word "antitrust" appears in the Jedi Blue contract no fewer than 20 times. As part of the agreement, Google and Facebook agreed to cooperate and assist one another if they ever faced an investigation into the agreement to work together in online advertising.

142.    Pursuant to the deal, Facebook committed to spending a minimum of $500 million annually in Google-run auctions, and Google agreed that Facebook would win a fixed percentage of those auctions. According to an internal Facebook document, Facebook believed the deal was "relatively cheap" as compared with direct competition.

143.    By providing Facebook with advantages, Google has further manipulated auctions. Google already manipulates Publishers' ad auctions by giving Google bidders information and speed advantages. In 2019, these advantages helped them to win the overwhelming majority of Publishers' ad auctions, hosted by Google. Now Google offered Facebook information advantages, speed advantages, and other prioritizations, to the detriment of other auction participants. Google publicly misrepresents that all bidders in Publishers' auctions compete on an equal footing. "All participants in the unified auction, including Authorized Buyers and third-party yield partners, compete equally for each impression on a net basis," Google says. This, of course, is false.

144.    Given the scope and extensive nature of cooperation between the two companies, Google and Facebook were highly aware that their agreement could trigger antitrust violations.

**CLASS ACTION COMPLAINT**

## VIII.   GOOGLE'S SCHEME FORECLOSED THE PUBLISHER AD SERVER MARKET

145.    Through the anticompetitive conduct described above, Google forecloses other Ad Tech Stack service providers from competing for advertisers and Publishers. Because of its acquisitions and subsequent advantages Google conferred on itself by tying its various distinct products together, Google amassed network effects throughout the Ad Tech Stack. These network effects are self-reinforcing: advertisers use Google ad services to access Google's data advantages, and Publishers use Google ad services to access the advertiser demand that Google uniquely amasses through its data offerings.

146.    Google then further reinforces its market position by impairing potential competing Ad Tech Service providers by using its market power in other markets (*e.g.*, the internet browser market and internet search services market) to prevent potential rivals from collecting rival datasets that could make the potential rivals viable alternatives to Google for advertisers (which could, in turn, loosen Google's hold on the Publishers in the Publisher Ad Server Market).

147.    For Facebook, the one ad tech services provider Google could not foreclose through its conduct due to Facebook's independent ability to amass user data and substantial book of advertiser clients, Google entered into an illicit market allocation and bid-rigging agreement. The agreement turned Facebook from a potential challenger to Google's market dominance into a structural support of such dominance.

148.    Finally, Google foreclosed what few service providers remained by steering auctions to Google's services and away from the other service providers, and taxing/raising such rivals' costs when the rivals managed to win auctions for Google's Publisher-clients' ad inventory notwithstanding the hurdles Google imposed. Because of this conduct, potential rivals lack the ability to generate scale sufficient to compete with Google.

149.    The foreclosure caused by Google's conduct in the Publisher Ad Server Market can be seen by the exit of competitors and limited entry over the past decade or so. Several large advertising technology firms offered publisher ad server solutions, including substantial competitive offerings from Yahoo!, AppNexus, and OpenX. Today, few publisher ad server competitors remain in the United States. Yahoo's publisher ad server was acquired in 2017 and shuttered in 2019. AppNexus's publisher ad server

30

**CLASS ACTION COMPLAINT**

was acquired by AT&T and rebranded to Xandr but faces an uncertain future as AT&T is reportedly considering selling the publisher ad server. OpenX shut down its ad server solution in 2019.

150.    Entry into the Publisher Ad Server Market has been remarkably weak over the past decade too. This lack of entry is a result of high switching costs for Publishers augmented by the artificial barriers arising from Google's anticompetitive conduct. As a result, Publishers have very limited alternatives to Google's publisher ad serving product, and rivals are unable to compete by improving quality or lowering price.

## IX.    GOOGLE'S SCHEME CAUSES ANTICOMPETITIVE EFFECTS

151.    Google's conduct with respect to the ad tech stack has had multiple anticompetitive effects.

### A.    Google's Scheme Suppresses Ad Revenues Publishers Receive for Their Ad Inventory Below Competitive Levels

152.    Google's Publisher-facing services work with its advertiser-facing services to manipulate the auctioning and ad placement processes in ways that favor Google and suppress the net advertising income Publishers receive. Google represents the interests of two sides of the Ad Tech Stack (advertisers and Publishers) that conflict; advertisers want to pay as little as possible, whereas Publishers want to maximize their revenues. Google, as the representative of both sides of the Ad Tech Stack, represents neither interest. Google instead prioritizes Google's services to maximize the revenue Google can retain from advertiser payments before transmitting the net payments to Publishers; in other words, Google seeks to maximize the spread between what advertisers pay and what Publishers receive in connection with each ad placement because Google retains that difference.

153.    In a competitive market, service providers in the Ad Tech Stack would compete for Publishers (and advertisers) based on (1) the cut the ad server/ad exchanges take from advertiser spending on Publishers' ad inventory, and (2) efficiency of auction mechanisms (*e.g.*, Publishers would seek out ad servers and auction providers that would represent the Publishers' interests, including maximizing Publishers' revenue from auctions as opposed to prioritizing the vendors' own services to

**CLASS ACTION COMPLAINT**

maximize the vendors' ability to capture commissions).[14] This competition would drive down the cost of services in the Ad Tech Stack and increase Publishers' ad revenues by more efficiently running auction processes (as well as improve the quality of Publisher-facing ad tech services, *e.g.*, by increasing analytic data on auctions, placements, and revenues).

154.    In short, Google retains at least 30% of what Google's advertisers pay to place ads on Google's Publishers' pages (and analyses of pre-2019 periods estimate that Google took around 50% of advertiser payments), and in a competitive market, Google would retain a lower share of what would likely be higher gross revenues.[15] Given that Google's returns on capital are around 40% for its digital advertising intermediation business, while Publishers have been starved of advertising revenues, the CMA has raised concerns that Google's "take" is supra-competitive and suppresses payments to Publishers.

**B.    Google's Scheme Reduces Publishers' Content Output and Quality Along with Publishers' Revenue-Generating Abilities.**

155.    As set forth above, Google's conduct has impaired Publishers' ability to monetize their content by reducing competition in the Publisher Ad Server Market and charging supracompetitive prices. But Publishers require more revenue to increase output and improve quality.

156.    Publishers invest significant resources in content creation. For example, Publishers who operate news sites pay journalists to research and report on stories, pay for production of visual media, and have editors, producers, fact-checkers, etc. to ensure content quality.

157.    By reducing Publishers' ability to monetize their content, Google necessarily reduces the quality of Publishers' content by reducing their ability to pay to create it.

---

[14] Vendors would also likely compete on non-price bases *e.g.*, speed of auction processes/ad placements, ability to control types of advertisements that may appear on the Publishers' content, and integration with the Publishers' systems and needs.

[15] Gross revenues would likely be higher absent Google's conduct for a variety of reasons including, without limitation, auction bids would be higher as participants combine into unified auctions without Google's self-preferencing and manipulations, and because Google's commission would decrease and Publishers would see higher net revenues, Publishers would expand output creating more ad impressions for sale, which leads to higher gross revenues as well.

32

158.    As News Corp. put in in their recent comments to the FTC:

High-quality news publishers are built on the notion that investing in a superior product yields benefits for all parties. But when publishers cannot effectively monetize their content, they cannot make the necessary investments to continue to produce high-quality content. Without such investment, journalists/content writers will be laid off, offices will be closed, and longer-term investigations and writing projects will be cut. The platforms and the publishers are thus locked in an existential (for publishers) battle over whether consumers will pay for news content—which would make them more likely to navigate directly to publishers' sites and apps—or whether content will be made available for free, and intermediated by the platforms. The stakes are amplified by the fact that the platforms also control the only alternative form of monetization, advertising. Given the disparate power between the two sides, the likeliest outcome will be the reinforcement of the platforms' dominance and the further degradation of publishers' ability to generate quality journalism.

*See Comments of News Corp to the Federal Trade Commission Re: Hearings on Competition and Consumer Protection in the 21st Century* at 13 (Aug. 20, 2018).

159.    Even for those Publishers that have sufficient revenue, reputation, and influence to maintain the quality and quantity of their content, receipt of *additional* revenues would allow for even better content and quality. It is almost certain that Google's conduct reduces output and quality from smaller and less well-established Publishers and prevents others from starting in the first place.

160.    Google does not balance these anticompetitive effects with corresponding procompetitive effects. Both Publishers (through reduced compensation) and consumers (through reduced content quality and reduced content quantity) experience these anticompetitive effects.

C.    **Google's Scheme Causes Anticompetitive Effects for Both Google's Advertiser Clients and Non-Google Advertisers.**

161.    In addition to suppressing Publisher revenues, limiting Publishers' output, and reducing content quality (which harms consumers), Google's Scheme increases prices advertisers pay.

162.    First, Google restricts the ability of its DSP customers to compete for the inventory of Publishers using non-Google ad servers. This restriction has the effect of penalizing advertisers using Google's ad tech services by not allowing them to bid on non-Google Publishers' ad inventory through Google's DSPs. Google, of course, does this as part of the Scheme to coerce Publishers to use Google's Publisher-facing products (*i.e.*, by denying Publishers access to Google's advertisers through competing Publisher-facing products, Google can coerce Publishers to use Google's products irrespective of the harms such policy imposes upon Google's advertisers). Further, some evidence indicates that at least

**CLASS ACTION COMPLAINT**

prior to 2019, Google caused its own advertiser clients to pay more than the auction-clearing price (allowing Google to retain the difference between the advertiser's payment that Google determines and the auction-clearing price), thus artificially raising prices to its advertisers.

163. Second, Google prevents advertisers that do not use Google's services from having an equal opportunity to bid on Google's Publisher-clients' advertising inventory. For example, prior to 2018, Google manipulated the auctioning process for its Publisher clients to allow its demand sources to outbid other ad exchanges' pools of advertisers without ever allowing those rival ad exchanges to bid. As a result, Google effectively excluded non-Google client advertisers from bidding for significant portions of Google's Publisher-clients' ad inventory.

164. In addition, since 2018, when Google began to allow non-Google advertisers to bid in "Open Bidding" auctions against Google's advertisers, Google has charged non-Google advertisers an additional fee of 5%–10% when those advertisers outbid Google's own auctions.

## X. GOOGLE'S SCHEME CAUSES PUBLISHERS ANTITRUST INJURY

165. As a direct and proximate result of Google's anticompetitive conduct, as alleged herein, Plaintiff and members of the Class suffered substantial losses to their business or property in that their revenues from selling non-search digital display advertising space were artificially suppressed during the Class Period. The full amount of such damages will be calculated after discovery and upon proof at trial.

166. Google used its Scheme to obtain, maintain, and enhance its monopoly power in the Publisher Ad Server Market.

167. Due to Google's ill-gotten market power, Plaintiff and the Class were forced to utilize Google's publisher ad server services, pursuant to which Plaintiff and the Class paid Google a supracompetitive cut of advertising revenues Publishers generated for user visits to their sites. Absent this anticompetitive conduct, however, Plaintiff and members of the Class would have received more revenues for advertising on their content.

168. Moreover, because of the reduced revenues Publishers can generate due to this Scheme, Publishers have been forced to reduce output, lay off content creators (*e.g.*, journalists), and many have gone out of business altogether.

**CLASS ACTION COMPLAINT**

169.     Thus, as a direct and proximate result of this anticompetitive Scheme, Google reaps more revenue (including, without limitation, a cut of ad revenues through the Google Ad Manager), suppresses Publishers' revenues, and forces Publishers to reduce the content they produce causing further reductions in revenues.

170.     The conduct comprising Google's anticompetitive Scheme is continuing and so are the damages suffered by members of the Class.

## XI.     INTERSTATE COMMERCE

171.     Google engages in interstate commerce and in activities substantially affecting interstate commerce including, without limitation, (1) providing consumer services, such as Search, Gmail, YouTube, and Android OS, to consumers throughout the United States and globally, (2) providing advertiser buying platforms, Google Ads and Google Display & Video 360, to advertisers targeting consumers throughout the United States and globally, and (3) providing Google Ad Manager, Google AdSense, and Google AdMob to Publishers based throughout the United States and globally. Publishers, both foreign and domestic, use Google's ad tech services to sell ad inventory targeted at users across the United States. Both foreign and domestic advertisers use Google to target advertisements to Publishers' users across the United States.

## XII.     CLASS ALLEGATIONS

172.     Plaintiff brings this class action is brought under Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure on behalf of the "Class," defined as follows:

> All Publishers that sell digital display advertising inventory through a Google publisher ad server targeting consumers in the United States between December 23, 2016 and the date the Court certifies the Class.

173.     Excluded from the Class are: (1) any Judge or Magistrate presiding over the class action and members of their families; (2) Defendant and its subsidiaries, parents, successors, predecessors, or any entity in which Defendant has a controlling interest; (3) persons who properly execute and file a timely request for exclusion from the class; and (4) the legal representatives, successors, or assigns of such excluded persons.

**CLASS ACTION COMPLAINT**

174.     The number of Publishers in the Class are so numerous that joinder of all members in one action is impracticable. The Class is reasonably estimated to include at least one hundred (if not thousands of) participants. While the precise number, names, and addresses of all members of the Class are unknown to Plaintiff at this time, such information is ascertainable in several ways, including, without limitation, from analysis of Defendant's records.

175.     The objective facts are the same for all members of the Class in that, *inter alia*, Google's conduct in monopolizing the Publisher Ad Server Market was the same, *e.g.*, Google's conduct outlined herein vis-à-vis Publishers and advertisers, its tying of separate products, its market allocation agreement with Facebook, and its conduct impairing other companies' and Publishers' ability to collect data to be used for targeting ads.

176.     Within each Claim for Relief asserted below, the same legal standards govern resolution of the same operative facts existing across all members of the Class's individual claims. If Defendant is liable to one member of the Class, Defendant is liable to all members of the Class.

177.     Because the claims of each member of the Class have a common origin and share a common basis in terms of Defendant's systematic misconduct, there are common questions of fact and law which exist and which are susceptible to common answers as to each Class member under Federal Rule of Civil Procedure 23(a)(2), and which predominate over any questions affecting only individual members under Federal Rule of Civil Procedure 23(b).

178.     Substantial questions of fact and law that are common to all members of the Class, and which are susceptible to common answers and which control this litigation and predominate over any individual issues, include, *inter alia*, the following:

      a.  whether the Publisher Ad Server Market is a relevant market in this case;

      b.  whether Google possesses monopoly power in the Publisher Ad Server Market;

      c.  whether, through the conduct alleged herein, Google willfully acquired, maintained, and/or enhanced its monopoly power in the Publisher Ad Server Market;

      d.  whether Google's conduct, as alleged herein, is anticompetitive;

      e.  whether Google's conduct, as alleged herein, had anticompetitive effects in the Relevant Market;

36

**CLASS ACTION COMPLAINT**

f.   whether Google entered into an agreement with Facebook not to compete in providing ad tech services to Publishers;

g.   whether Google entered into an agreement with Facebook for Facebook to win a fixed percentage of Google's auctions;

h.   whether Google's conduct caused Plaintiff and members of the Class antitrust injury;

i.   the appropriate measure of damages; and

j.   the propriety of declaratory and injunctive relief.

179.    Plaintiff's claims are typical of the claims of the Class, and arise from the same course of conduct undertaken by Google against the Class. There are no conflicts between the interests of the named Plaintiff and the interests of the members of the Class that Plaintiff seeks to represent. The relief Plaintiff seeks is typical of the relief sought for the members of the Class.

180.    Plaintiff will fairly and adequately represent and protect the interests of the Class because of the common injury and interests of the members of the Class and the uniform conduct of Google that is, and was, applicable to all members of the Class. Plaintiff has retained counsel competent and experienced in antitrust class action litigation that will adequately represent and protect the interests of the members of the Class.

181.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) not only because common questions of fact and law predominate, but also because a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Google, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. Class action status, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

182.    Plaintiff is not aware of any management difficulties which should preclude maintenance of this litigation as a class action. Plaintiff does not anticipate any difficulty in the management of this action as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on

**CLASS ACTION COMPLAINT**

motion of Plaintiff or on its own determination, utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide the class into subclasses.

**XIII.** **CAUSES OF ACTION**

**COUNT I: Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.**

**(Brought by the Class Against Google)**

183.    Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

184.    The relevant geographic market is defined to include the United States, or in the alternative, the principally English-speaking countries of the United States, Canada, the United Kingdom, and Australia.

185.    The relevant market is the Publisher Ad Server Market.

186.    Google possesses market power in the Publisher Ad Server Market, regardless of the scope of the geographic market. Google has obtained, enhanced, and maintained dominance in the Publisher Ad Server Market through the Scheme alleged herein to impair and foreclose competition in that market in several ways, including, without limitation, (a) acquiring businesses that gave Google substantial footholds at each level of the Ad Tech Stack, (b) using data amassed through its consumer services (*e.g.*, Search, Gmail, YouTube, Maps, Chrome, Android OS) to lock-in substantial advertiser demand (tying advertiser ad tech services to Google's data services), (c) using its control over such advertiser demand to require its advertisers to bid only in Google's own auctions, (d) tying its publisher ad server services to Google's ad auctions—thus requiring Publishers who want to access Google's advertiser demand to use Google's ad server services, (e) impairing actual and potential rivals' ability to amass datasets that would enable them to better compete with Google, and (f) making an agreement to cooperate instead if compete with its largest potential competitor.

187.    As a direct and proximate result of Google's continuing violation of Section 2 of the Sherman Act, Plaintiff and members of the Class have suffered injury and damages in the form of artificially suppressed advertising revenues in amounts to be proven at trial.

**CLASS ACTION COMPLAINT**

188.     Plaintiff, on behalf of itself and other members of the Class, seek money damages from Google for these violations. These damages represent the amount of Google's overcharges and additional advertising revenues Publishers in the Class would have received absent Google's anticompetitive Scheme alleged herein. Damages will be quantified on a class-wide basis. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

189.     Plaintiff, on behalf of itself and other members of the Class seek injunctive relief barring Google from engaging in the anticompetitive Scheme alleged herein. The violations set forth above, and the effects thereof, are continuing and will continue unless injunctive relief is granted.

190.     Plaintiff's and Class members' injuries are of the type the antitrust laws were designed to prevent, and flow directly from Google's unlawful conduct.

### COUNT II: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

### (Brought by the Class Against Google)

191.     Plaintiff hereby incorporates by reference the preceding paragraphs as if they were fully set forth herein.

192.     Google and Facebook, Inc. entered into and carried out an unlawful market allocation and bid-rigging agreement in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

193.     In 2017, Facebook announced its support for the auction process known as "header bidding" to signal to Google that Facebook intended to compete head-to-head with Google in the Publisher Ad Server Market.

194.     Combined with Facebook's significant pool of advertisers and unique dataset derived from its third-party cookies and Social Plugins (*e.g.*, the "Like" and "Share" buttons on Publishers pages) and Facebook's social network platform, Facebook's endorsement of header bidding (which Publishers prefer to Google's systems) represented a significant competitive threat to Google's market dominance.

195.     Following Facebook's announcement, Google and Facebook commenced negotiations into an agreement not to compete.

196.     In September 2018, Google and Facebook reached an agreement—which Google code-named "Jedi Blue."

**CLASS ACTION COMPLAINT**

197. Pursuant to the Jedi Blue agreement, Facebook would not come into the Publisher Ad Server Market supporting header bidding, and would use Google's ad tech tools.

198. Through Jedi Blue, Facebook committed to spending at least $500 million annually on Google's auctions and Google, in return, committed to ensuring that Facebook would win a fixed percentage of auctions.

199. Facebook's agreement not to compete with Google for Publishers' business and its agreement to spend $500 million annually reinforced Google's market dominance in the Publisher Ad Server Market. Absent the Jedi Blue agreement, Facebook would have competed for Publishers' ad server business which, in turn, would have created price competition in the market that does not otherwise exist. Further, absent the Jedi Blue agreement, Facebook's advertising dollars would have been available to other ad tech providers through competition. Instead, the Jedi Blue agreement ensured that Google would not have to compete with its most significant potential competitor and that it would control significant additional advertising demand that further cemented Google's market share in the Publisher Ad Server Market.

200. Further, because Google guaranteed that Facebook would win a fixed percentage of auctions, the Jedi Blue agreement was not only a market allocation agreement, but also constitutes bid-rigging. Indeed, assured of winning a fixed percentage of auctions, Facebook would not need to bid as high to win the auctions, thus suppressing auction revenues and preventing advertisers that should have won more auctions from doing so.

201. Google's illicit market allocation and bid-rigging agreement with Facebook caused Publishers' injury.

202. Indeed, by agreeing not to compete in the Publisher Ad Server Market, Google cemented its dominance in the market and charged Publishers supracompetitive prices for its ad server services.

203. Further, by guaranteeing that Facebook would a fixed percentage of auctions, Google's agreement with Facebook suppressed auction revenues Publishers received for their ad inventory.

204. Google entered into the agreement with the purpose and intent of restraining trade in the Publisher Ad Server Market. As one internal Google email put it, the endgame was to "collaborate when necessary to maintain the status quo…." of Google continuing to dominate the market.

**CLASS ACTION COMPLAINT**

205.     Facebook too sought to reap supracompetitive rewards without competition. Facebook's negotiating team sent an email to Facebook CEO Mark Zuckerberg saying that the company faced options: "invest hundreds more engineers" and spend billions of dollars to lock up inventory, exit the business, or do the deal with Google. Ultimately, Facebook and Google did the deal, ensuring that Google could charge Publishers supracompetitive prices and suppress the revenues Publishers could generate on their content to Google's advantage.

## XIV.   DEMAND FOR JUDGMENT

206.     WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully asks the Court for a judgment that:

      a.   Certifies the Class as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), and appoints Plaintiff and its attorneys as class representatives and class counsel, respectively;

      b.   Awards Plaintiff and each member of the Class treble the amount of damages actually sustained by reason of the antitrust violations alleged herein, plus the reasonable costs of this action including attorneys' fees;

      c.   Orders such equitable relief as is necessary to correct for the anticompetitive market effects caused by the unlawful conduct of Defendant;

      d.   Awards such other relief the Court deems reasonable and appropriate.

## XV.   JURY TRIAL DEMAND

207.     Plaintiff hereby requests a jury trial for all issues so triable.

CLASS ACTION COMPLAINT

Dated: December 23, 2020

Respectfully Submitted,

By: /s/ Sophia M. Rios
Sophia M. Rios (305801)
**BERGER MONTAGUE PC**
12544 High Bluff Drive, Suite 340
San Diego, CA 92130
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

Eric L. Cramer (*Pro Hac Vice to be filed*)
Michael C. Dell'Angelo (*Pro Hac Vice to be filed*)
Patrick F. Madden (*Pro Hac Vice to be filed*)
Michaela Wallin (*Pro Hac Vice to be filed*)
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604
ecramer@bm.net
mdellangelo@bm.net
pmadden@bm.net
mwallin@bm.net

Daniel J. Walker (*Pro Hac Vice* to be filed)
**BERGER MONTAGUE PC**
2001 Pennsylvania Ave., NW
Suite 300
Washington, DC 20006
Tel: (202) 559-9745
dwalker@bm.net

Michael K. Yarnoff (*Pro Hac Vice* to be filed)
**KEHOE LAW FIRM, P.C.**
Two Penn Center Plaza
1500 JFK Blvd., Suite 1020
Philadelphia, PA 19102
Tel: (215) 792-6676
myarnoff@kehoelawfirm.com

*Attorneys for Plaintiff and the Class*

# EXHIBIT D

GEORGE A. ZELCS*
  gzelcs@koreintillery.com
ROBERT E. LITAN*
  rlitan@koreintillery.com
RANDALL P. EWING*
  rewing@koreintillery.com
JONATHON D. BYRER*
  jbyrer@koreintillery.com
RYAN Z. CORTAZAR*
  rcortazar@koreintillery.com
KOREIN TILLERY LLC
205 North Michigan Ave., Suite 1950
Chicago, Illinois 60601
Tel.: (312) 641-9760 / Fax: (312) 641-9751

STEPHEN M. TILLERY*
  stillery@koreintillery.com
MICHAEL E. KLENOV (277028)
  mklenov@koreintillery.com
CAROL L. O'KEEFE*
  cokeefe@koreintillery.com
JAMIE BOYER*
  jboyer@koreintillery.com
KOREIN TILLERY LLC
505 North Seventh St., Suite 3600
St. Louis, Missouri 63101
Tel.: (314) 241-4844 / Fax: (314) 241-3525

DAVID BOIES*
  dboies@bsfllp.com
BOIES SCHILLER FLEXNER LLP
333 Main Street, Armonk, NY 10504
Tel.: (914) 749-8200 / Fax: (914) 749-8300

PHILIP C. KOROLOGOS*
  pkorologos@bsfllp.com
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: (212) 446-2300 / Fax: (212) 446-2350

ABBY L. DENNIS*
  adennis@bsfllp.com
JESSE PANUCCIO*
  jpanuccio@bsfllp.com
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, DC 20005
Tel.: (202) 895-7580 / Fax: (202) 237-6131

MARK C. MAO (236165)
  mmao@bsfllp.com
SEAN P. RODRIGUEZ (262437)
  srodriguez@bsfllp.com
BOIES SCHILLER FLEXNER LLP
44 Montgomery St., 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6820 / Fax: (415) 293-6899

SABRIA A. MCELROY*
  smcelroy@bsfllp.com
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel.: (954) 377 4216 / Fax: (954) 356-0022

*Pro Hac Vice application forthcoming*
*Attorneys for Plaintiffs Genius Media Group, Inc.,*
*The Nation Company, L.P., and The Progressive, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| GENIUS MEDIA GROUP, INC., THE NATION COMPANY, L.P., and THE PROGRESSIVE, INC., individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> ALPHABET INC., GOOGLE LLC, and YOUTUBE, LLC, <br><br> Defendants. | Case No.: 5:20-cv-09092 <br><br> **CLASS ACTION COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

PARTIES ............................................................................................................................... 3

JURISDICTION AND VENUE ........................................................................................... 5

FACTUAL ALLEGATIONS ............................................................................................... 5

I.      DIGITAL ADVERTISING ....................................................................................... 5

      A.      Search advertising ..................................................................................... 6

      B.      Display advertising.................................................................................... 6

II.      THE OPEN DISPLAY ADVERTISING MARKETPLACE ..................................... 7

      A.      The relevant participants in the open display advertising marketplace ......................... 7

      B.      How online display ads are selected and delivered ......................................... 8

      C.      Google dominates the open display programmatic advertising marketplace ................. 9

      D.      Google's significant power on both sides of the Ad Exchange and Ad Network markets is compounded by indirect network effects .................................................. 10

III.      Google's unlawful conduct ....................................................................................... 11

      A.      Google excluded rival Ad Exchanges by using the publisher Ad Server to grant its Ad Exchange a first-in-line privilege and a last look in the sequential bidding process ....................................................................................................... 11

      B.      Google uses "Open Bidding" to tax its competitors in a classic "raising rivals' costs" strategy ......................................................................................... 13

      C.      Google has combined its Ad Server and Ad Exchange products under Ad Manager, further excluding rivals and raising barriers to entry .................................. 16

      D.      Google excludes rival Ad Networks under the guise of policing malicious code ........ 17

      E.      Google uses its Ad Server to impose rate structures that raise rivals' costs ................. 18

IV.      THE RELEVANT MARKETS ................................................................................. 19

V.      ANTITRUST IMPACT ............................................................................................ 21

VI.      ANTITRUST INJURY ............................................................................................. 22

CLASS ACTION COMPLAINT

VII.     GOOGLE CANNOT JUSTIFY ITS ILLEGAL CONDUCT ................................................... 23

VIII.    CLASS ALLEGATIONS .................................................................................................... 24

IX.      CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS ................................................ 26

CLAIMS FOR RELIEF ............................................................................................................... 27

COUNT I ..................................................................................................................................... 27

COUNT II .................................................................................................................................... 27

COUNT III ................................................................................................................................... 28

REQUEST FOR RELIEF ............................................................................................................. 28

JURY TRIAL DEMAND ............................................................................................................. 29

CLASS ACTION COMPLAINT

Plaintiffs Genius Media Group, Inc., The Nation Company, L.P., and The Progressive, Inc., on behalf of themselves and all others similarly situated, bring this class action against Defendants Alphabet Inc. ("Alphabet"), Google LLC ("Google"), and YouTube, LLC ("YouTube") (collectively, "Defendants"), and allege, based on personal knowledge as to acts and events taking place in their presence, on the investigation of counsel, and on information and belief for all other allegations, as follows:

## **INTRODUCTION**

1.      This case is about the future of the online publishers who produce and publish the websites that have become the driving source of information throughout our society. These publishers, ranging from news organizations to bloggers, rely on online advertising revenue to fund their businesses. Their ability and incentive to create internet content is being threatened by Google—a titan of the internet—whose U.S. advertising-related revenues have exploded, approaching nearly $135 billion in 2019, while publisher revenues have plummeted.

2.      The unlawful anticompetitive conduct at the heart of this case occurs in the display advertising marketplace, where publishers sell advertising space through real-time auctions.  Through its campaign of anticompetitive conduct, Google has achieved and maintained a monopoly or near-monopoly in that marketplace by erecting a toll bridge between publishers and advertisers and charging an unlawfully high price for passage.  Specifically, Google's Ad Server—the software or code that publishers use to make critical decisions about advertising content—imposes anticompetitive rules and conduct that artificially warp the channels through which publishers sell their ad placement inventory.

3.      The Ad Server connects publishers to "Ad Exchanges," which are auction like platforms where advertisers bid to place advertisements on publishers' websites.  "Ad Networks" are platforms that match advertisers and publishers, but which provide fewer features and target relatively smaller publishers.

4.      Historically, Google's Ad Server conducted auctions for advertising space sequentially, accepting the first bid that exceeded publishers' minimum thresholds.  But Google rigged the auctions by programming its Ad Server to make bids placed through its Ad Exchange marketplace artificially more likely to succeed, giving those bids both first-in-line privilege and the "last look" in each auction, which

CLASS ACTION COMPLAINT

artificially and anticompetitively distorted the outcomes. As Google's Ad Server awarded more winning bids to Google's Ad Exchange, that drove more advertisers to place bids using Google's Exchange, which in turn gave publishers stronger incentives to use that Exchange. And so the cycle continued—the increased use by advertisers and publishers of the Google Ad Exchange continued to incentivize further use by each. And this entire cycle was initiated by Google's use of its dominant Ad Server to give its Ad Exchange an advantage through a set of auction rules that were designed to exclude rival Ad Exchanges and thus to maintain and expand Google's dominance in the Ad Exchange market.

5.      Attempting to preserve some level of competition, publishers and other market participants turned to "header bidding"—a process that enabled simultaneous bidding among competing Ad Exchanges—as a more competitive means of engaging in the sale and distribution of open display advertising.

6.      Google reacted with a series of actions that ensured Google would retain and expand its control over the marketplace. Google began imposing Ad Server rules that pushed publishers to Google's own auction system and impeded the ability of header bidding to compete on the merits or function as intended. Through its Ad Server, Google also started levying an explicit surcharge on the bids submitted by non-Google Ad Exchanges. The surcharge can run as much as 10 to 15 percent of a bid, and it takes the form of a deduction from non-Google Ad Exchange bids as they are entered into the bidding process so that Google's Ad Exchange can win auctions even when its advertiser is not the highest bidder.

7.      But surcharging isn't enough for Google. It has also imposed uniform bidding floors that artificially prevent publishers from maximizing their revenues through competition. Google imposed these floors by modifying its Ad Server product to preclude publishers from establishing differentiated minimum bid floors for Ad Exchanges. When publishers tried to aim at a more even playing field—by allowing advertisers to submit lower bids through rival Ad Exchanges to encourage viable alternative Ad Exchanges--Google programmed its Ad Server to prevent it. This no-discounting provision makes it impossible for publishers to encourage competing Ad Exchanges and thereby prevents publishers from pursuing revenue-maximizing strategies.

8.      Google has further tilted the Ad Exchange market in its favor by combining its Ad Server and Ad Exchange products as a single product: Google Ad Manager. This fusion of two distinct products

CLASS ACTION COMPLAINT

serving distinct roles in related markets also favors Google's Ad Exchange by creating vendor lock-in to a single, anticompetitive, Google-controlled marketplace, entrenching its monopoly power in the Ad Server market, and excluding rival Ad Exchanges.

9.      Google also directed its anticompetitive conduct against the small- and medium-sized publishers that use Ad Networks, which act as intermediaries helping match those smaller publishers with advertisers through auction like processes.  Google modified its Ad Server to exclude bids submitted through rivals' Ad Networks when they competed with Google, thereby driving more business to Google's Ad Network.

10.      Google's conduct is not competition on the merits, but instead deliberately crafted anticompetitive conduct designed to monopolize or to attempt to monopolize the Ad Exchange and Ad Network markets, while unlawfully maintaining Google's monopoly in Ad Servers.

11.      Plaintiffs thus bring this class action, alleging violations of Section 2 of the Sherman Act and of California's competition laws, to obtain relief for themselves and the Class, and to ensure that competition, not Google's anticompetitive rules and practices, governs the online display of advertising through the Ad Server, Ad Exchange, and Ad Network markets.  Left unrestrained, Google will monopolize these and the other markets related to the display advertising marketplace, allowing Google's toll on publishers (and advertisers) to continue unabated.  Once Google is able to achieve that control, there will be no end to Google's ability to charge publishers monopoly prices, and Google will have obtained power once thought unimaginable—the power to decide which publishers live and which die.

## PARTIES

12.      Plaintiff Genius Media Group, Inc. is a Delaware corporation with its principal place of business at 92 Third Street, Brooklyn, New York 11231.  Established in 2009, Genius is a digital media company offering services such as the development and maintenance of a vast repository of annotated music lyrics, some of which are artist-supplied and many of which are transcribed and refined by a community of over two million Genius contributors.  Genius has approximately 25 million advertising impressions per day and has earned tens of millions of dollars in annual advertising revenue over the last four years.  Genius Media has used Google's Ad Server and Ad Exchange products to sell advertising

space on its website during the class period, received reduced revenues as a result of Google's misconduct, and suffered economic damage and antitrust injury as a direct result.

13.    Plaintiff The Nation Company, L.P., is a limited liability corporation organized in the state of New York, and having its principal place of business at 520 8th Avenue, 21st Floor, New York, New York 10018.  The Nation used a Google Ad Server product and paid for and used a Google Ad Network product to sell advertising space on its website during the Class Period, received reduced revenues as a consequence of Google's misconduct, and suffered economic damage and antitrust injury as a direct result.

14.    Plaintiff The Progressive, Inc. is a non-profit organization organized in the state of Wisconsin, and having its principal place of business at 30 W. Mifflin Street, Suite 703, Madison, WI 53703.  The Progressive used a Google Ad Server product and paid for and used a Google Ad Network product to sell advertising space on its website during the Class Period, received reduced revenues as a consequence of Google's misconduct, and suffered economic damage and antitrust injury as a direct result.

15.    Defendant Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Defendant Google is a wholly owned and controlled subsidiary of XXVI Holding Inc., which is a subsidiary of Defendant Alphabet.  Since 2006, Google has wholly owned and controlled YouTube.  Google is the alter ego and agent of Defendants Alphabet and YouTube, and the companies regularly combine and comingle their operations.  For example, Google and YouTube share consumer data from their respective websites, google.com and youtube.com, in order to create new content and personalized advertisements on both sites.

16.    Defendant Alphabet Inc. is a Delaware corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.  Defendant Alphabet wholly owns and controls Defendants Google and YouTube.  Defendant Alphabet is the alter ego of Defendants Google and YouTube.  Google and YouTube direct all profit to, and report revenue through, Alphabet.

17.    Defendant YouTube, LLC, is a Delaware limited liability company with its principal place of business at 901 Cherry Avenue, San Bruno, California 94066.  YouTube is a wholly owned and controlled subsidiary of Defendant Google.  Defendant YouTube is the alter ego of Defendants Google and Alphabet.  Google and YouTube combine both products for purposes of Google's AdWords

advertising program, which allows an advertiser to determine that if a person searches for a specific term on Google's search engine (*e.g.*, "financial advisor"), the advertiser can direct that the next time that consumer watches a video on YouTube that person will see an advertisement for financial advisory services.  Google has recently begun testing integrating links to its search engine within YouTube's search results.

18.    All three Defendants are engaged in substantial interstate commerce.  Each Defendant deals with and earns revenue from publishers and advertisers throughout the United States.

## JURISDICTION AND VENUE

19.    This action arises under Sections 2 and 15 of the Sherman Act, 15 U.S.C. §§ 2, 15 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

20.    This Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 & 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

21.    This Court has personal jurisdiction over Defendants.  Google, Alphabet, and YouTube each maintain their headquarters in California.

22.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).  All Defendants reside, transact business, are found, and have agents in this District.

23.    Defendants' acts were within the flow of, were intended to have, and did, in fact, have a substantial effect on the interstate commerce of the United States.

## FACTUAL ALLEGATIONS

## I.    DIGITAL ADVERTISING

24.    The internet has revolutionized advertising and publishing.  Due to the explosion of online commerce, the ability to target specific online consumers and audiences, whether through display or search ads, has powered the growth of online advertising.  Online advertising is now the most rapidly growing segment of the advertising business in the United States, accounting for more than half of all advertising spending.  In 2019, U.S. advertisers spent over $130 billion on online advertising.

25.    Before the internet, companies wanting to advertise did so largely through print, the radio, and television.  Advertising then was sent to all consumers, regardless of their traits or interests.  As a

CLASS ACTION COMPLAINT

result, significant advertising dollars were wasted each year. The internet has changed all that, through two basic types of advertising—display ads and search ads—which are increasingly finely targeted to specific consumers who are more likely both to click on the ads and to ultimately buy the advertised products or services.

**A.    Search advertising**

26.    Search advertising comprises ads linked to a word or phrase (*e.g.*, "Goldendoodles" or "water sprinklers") that are triggered to display when a consumer types that word or phrase into a search engine.

27.    Advertisers value paid search ads because they are served to a consumer only after the consumer has made a query correlated with products or services related to the ad.  On Google's search engine platform, search ads typically appear at the top of the first page of results from a keyword search. Google hosts search advertising on other platforms as well—notably Google Play, Google Maps, and third party applications.

28.    Google has been dominant in the online search advertising market for roughly 17 years. Collectively, Google's products account for approximately 73% of the search advertising market.

**B.    Display advertising**

29.    Unlike search advertising, which is triggered when a consumer expresses an interest in the product through a search inquiry, display advertising is designed to induce that interest by displaying ads on webpages likely to be frequented by potential customers.  Since display ads are shown to specific consumers as they view a web page on their computer or mobile device, it is critical for the successful deployment of marketing spend for advertisers to have information about each prospect.  All else being equal, the more advertisers know about consumers' characteristics (*e.g.,* geography, age, gender, income) and preferences (*e.g.,* cars, food, clothes), the more advertisers will be willing to pay for ad space offered by publishers.  Detailed data on consumer demographics, characteristics, interests, and tastes enables advertisers to target their display ads to narrow, carefully chosen audiences who are most likely to purchase their product or service.

CLASS ACTION COMPLAINT

## II.   THE OPEN DISPLAY ADVERTISING MARKETPLACE

30.   Publishers who wish to sell display advertising space on their webpages and advertisers who wish to place display ads on those pages are matched together, in the blink of an eye, in what is known as the "open display advertising marketplace."

31.   The act of displaying an advertisement to a consumer on a webpage is known as an "impression." The value of an impression depends upon both the characteristics of the consumer who is viewing the ad and the value of the real estate where it is embedded—that is, the content of the publisher's webpage and the ad's location on that page. Thus, the value of a publisher's impression may be increased whenever an advertiser has additional information about the consumer. The publishers who can deliver the most desirable impressions in terms of both quality of the webpage and data on the consumer are able to charge more for the advertising space on their websites.

32.   Advertising space in the open display advertising marketplace may be sold on the basis of impressions, clicks, or actions. Cost per impression means that advertisers pay the publisher for the number of times their ads are displayed as different consumers load the relevant webpage. Cost per click means the advertiser pays the publisher each time a consumer clicks on their ad. Cost per action means the advertiser pays the publisher if an action, such as a product purchase or a registration for a service, results from a consumer's exposure to the advertising.

33.   Advertisers that want to display their ads and publishers wishing to provide space for the ads each have a familiar problem: finding each other. Advertisers need to determine which sites and consumers to target, and the prices they are willing to pay to access consumers with various characteristics. Publishers need to determine which ads they are willing to host on their site, and how much they want to charge. A number of products and services within the industry enable publishers and advertisers to accomplish these goals, most often through automation. The use of automated, algorithmic-driven computer software programs in the buying and selling of media is known as "programmatic" advertising. Approximately two-thirds of all online advertising dollars are spent via programmatic marketing.

### A.   The relevant participants in the open display advertising marketplace

34.   Publishers use software, called an Ad Server, to make their impressions available for sale. The Ad Server is a key component of the publisher's website—it affects the revenue, layout, and content

CLASS ACTION COMPLAINT

of the website.  The publisher's Ad Server identifies the consumer, collects and distributes to potential advertisers information about both the webpage and the consumer, requests bids from those advertisers, selects an advertisement to display to the consumer from the competing advertisers' bids it receives, and ultimately serves the winning advertisement, displaying it to the consumer as the webpage loads.

35.     Ad Exchanges are platforms where publisher Ad Servers offer their inventory of impressions for sale and advertisers place bids on the impressions they wish to purchase.  Ad Exchanges then match advertisers with publishers programmatically using virtually instantaneous auctions known as "real-time bidding."  Ad Exchanges commonly cater to larger publishers, requiring that publishers have a minimum threshold of page views per month in order to offer their impressions up for auction on the Exchange.

36.     Smaller publishers with fewer page views than the Ad Exchange thresholds may use an Ad Network to sell their inventory of impressions.  An Ad Network is an aggregator that collects ad inventory from publishers and sells it to advertisers.  Like Ad Exchanges, Ad Networks compete against one another on the basis of price for publisher inventory.

37.     When possible, the publisher's Ad Server will offer the same impression on multiple Ad Exchanges or Ad Networks in order to reach the broadest group of potential advertisers, thereby increasing publisher revenues.

**B.     How online display ads are selected and delivered**

38.     Ads are chosen and shown to consumers via a sequence of events, all completed in a second or less.  In order for an ad to be displayed to a consumer visiting a webpage, the publisher's Ad Server, the consumer's browser, or a combination of the two, reach out to Ad Exchanges to request bids on the ad placement from interested advertisers.  These requests often contain information about the content the consumer is accessing, the consumer who is intending to visit the publisher's website, and the size and prominence of the ad space available on the web page.  After the interested advertisers place their bids, each Ad Exchange selects a winning bid from among those bids to submit to the publisher Ad Server.

39.     At that point, the publisher's Ad Server will essentially run an auction involving the participating Ad Exchanges.  Once the auction is concluded and the winning advertiser is selected, the Ad

CLASS ACTION COMPLAINT

Server delivers a final ad request to the consumer's browser, which contains a link for the ad to be displayed as part of the publisher's web page as it loads on the consumer's computer or mobile device.

**C.**    **Google dominates the open display programmatic advertising marketplace**

40.    Google is the dominant competitor at each segment of the open display programmatic advertising marketplace.

41.    Google's dominance of the publisher Ad Server market began in 2007, when Google purchased DoubleClick for Publishers, which controlled over 50% of the market.  At the time of the acquisition, industry participants, including publishers, raised concerns that Google could use DoubleClick's market power in Ad Servers and its wealth of consumer tracking data to reduce competition throughout the online advertising marketplace.  The Federal Trade Commission, which conducted a competition assessment of the merger, observed the potential for future "unlawful tying or other anticompetitive conduct."  The FTC nevertheless permitted the merger to continue, over the dissent of a Commissioner who warned of the "troubling" likely effect that the merger would have on "the evolution of the entire online advertising market—especially in light of existing network effects, and the tremendous additional network effects the transaction will generate."  Another Commissioner, while concurring in the decision to close the investigation, noted "serious vertical competition issues raised by Google's proposed acquisition of DoubleClick."

42.    The warnings were validated, as Google has achieved monopoly power in Ad Servers, with an estimated market share of 70-90%.  Google has benefitted from its market power in Ad Servers to become the dominant display Ad Exchange, with a market share in the neighborhood of 50%.  The few rivals to Google's Ad Exchange—such as Rubicon and OpenX—have market shares in the teens or single digits, and Google's current market share outstrips the combined shares of the next six competitors.  Google's control over the Ad Server makes it a gatekeeper for publishers' revenues and puts Google in charge of publishers' critical advertising and content decisions.

43.    Google is also the dominant display Ad Network, through its AdSense network, with a market share of over 50%.

44.    Today, Google stands as the dominant provider of tools to publishers at all levels of the open display programmatic advertising marketplace, with market power at each stage of that marketplace.



**D.** **Google's significant power on both sides of the Ad Exchange and Ad Network markets is compounded by indirect network effects**

45. Ad Exchanges and Ad Networks are subject to indirect network effects. This means that as the number of consumers on one side of the platform increases, the platform becomes more valuable to consumers on the other side of the platform.

46. Thus, as the number of advertisers using Google's Ad Exchange has grown, giving rise to more potential bidders on impressions, more publishers are encouraged to use Google's Ad Exchange. Similarly, as the number of publishers offering impressions on Google's Ad Exchange has grown, increasing the inventory of impressions available on that Exchange, more advertisers are encouraged to

use Google's Ad Exchange. Each additional advertiser increases the value of Google's Ad Exchange to all publishers using it. Likewise, each additional publisher increases the value of Google's Ad Exchange to all advertisers using it. These same indirect network effects are present in the Ad Network market as well.

## III. Google's unlawful conduct

47. Google has dominant power in the open display programmatic advertising marketplace at the Ad Server level, which determines the winner of any competitive bidding process. Google has abused its monopoly power in Ad Servers, and its concomitant control over the bid selection process, to engage in a number of anticompetitive acts, including:

    a. excluding rival Ad Exchanges through the imposition of rules designed to ensure Google's Ad Exchange wins more bids, including the combined practices of first-in-line privilege and last look in the waterfall process;

    b. taxing rival Ad Exchanges through Google's Open Bidding process;

    c. excluding rivals and raising barriers to entry by combining two separate products that serve distinct functions, the Ad Server and Ad Exchange;

    d. excluding rival Ad Networks from competing for impressions; and

    e. using its Ad Server to impose rate structures that raise rival Ad Exchanges' costs through prohibiting publishers from offering better prices through other Exchanges.

### A. Google excluded rival Ad Exchanges by using the publisher Ad Server to grant its Ad Exchange a first-in-line privilege and a last look in the sequential bidding process

48. Historically, Ad Servers conducted auctions for ad impressions supplied by publishers through a sequential, or "waterfall," process. The Ad Server first checked whether the space was subject to a direct long-term contract between the publisher and advertiser. If not, the Ad Server routed the impression to a series of Ad Exchanges for auction. If the first auction produced a bid above the publisher's minimum floor price, the bid would be accepted. If, however, the first Ad Exchange failed to generate a bid above the publisher's reservation price, the Ad Server would pass the impression on to a second Ad Exchange, and so on, until a winning bid from an Ad Exchange cleared the publisher's minimum floor price level.

CLASS ACTION COMPLAINT

49.     This waterfall method excluded rival Ad Exchanges and deprived publishers of the opportunity to reach the entire universe of Ad Exchanges.  If an Ad Exchange with an early place in the waterfall sequence produced a bid above the publisher's minimum acceptable price, that early bid would win the impression—even if an Ad Exchange later in the waterfall sequence had elicited a substantially higher bid.  The publisher Ad Server determined the order in which publisher impressions were sent to the various Ad Exchanges, setting their sequential ranking in the waterfall.  This waterfall option approach disadvantaged publishers to Google's benefit, particularly as compared to what would occur in a simultaneous auction.



Under the Waterfall Auction model, the highest potential bid of $3.50 is never considered because an earlier (albeit lower) bid matches the floor set by the publisher.  The winning bid is $3.00.  In contrast, in the Simultaneous Auction, the highest bid of $3.50 wins the auction, garnering higher returns for the publisher.

50.     The publisher Ad Server determined the order in which publisher impressions were sent to the various Ad Exchanges, setting their sequential ranking in the waterfall.  Google's Ad Server sent the vast majority of publisher impressions to Google's Ad Exchange first.  From the perspective of advertisers, this meant that Google's Ad Exchange provided a significant advantage because the advertiser was assured that its bid would be accepted so long as it was above the publisher's minimum acceptable price.  This first-in-line privilege, granted by the Google Ad Server, effectively drove advertisers to use Google's Ad

12

Exchange because advertisers knew that if they submitted the same bid on Google's Ad Exchange and on a competing Exchange, the bid on Google's Ad Exchange was more likely to win due to Google Ad Exchange's priority in the waterfall. Thus, Google used its Ad Server monopoly power to expand its Ad Exchange dominance. In turn, Google's enhanced Ad Exchange dominance reinforced its Ad Server dominance through network effects and feedback loop dynamics.

51.     Google introduced "last look" to its Ad Server in 2014. Rather than running a real-time auction among a variety of Ad Exchanges or Ad Networks, Google's Ad Server assigned each provider an estimated bid generated from historical data. The Ad Server would then submit the highest estimated bid to the Google Ad Exchange, which could win the auction by bidding one cent higher. This reduced publisher revenue because Google's Ad Exchange only had to beat the estimated bids of other providers, even if those providers would have bid far higher had they been given the opportunity. Google's last look also tended to foreclose competition in the Ad Exchange market because Google's Ad Server did not allow rival Ad Exchanges to bid in real time on an impression until Google's Ad Exchange had already passed on the opportunity. Like the first-in-line privilege, this last look option increased the number of winning bids originating from Google's Ad Exchange, driving even more advertisers to use the Exchange, and further reinforcing Google's power in both Ad Servers and Ad Exchange through indirect network effects.

52.      In sum, Google's first-in-line privilege combined with its last look served to further exclude rival Ad Exchanges by causing advertisers to gravitate to Google's Ad Exchange, which was more likely to win the auctions rigged by its Ad Server. This exclusion harmed competition in the Ad Exchange market, to the detriment of Plaintiffs and other class members, who were compelled to accept lower prices for their ad space than they would have received without Google's anticompetitive conduct.

**B.      Google uses "Open Bidding" to tax its competitors in a classic "raising rivals' costs" strategy**

53.     Publishers recognized that the sequential bidding process of the waterfall method did not produce bids as high as those generated by simultaneous bidding among competing Ad Exchanges. Publishers responded to their predicament—Google's manipulation of the waterfall method to favor its own Ad Server and discriminate against rivals—by widely adopting "header bidding" in 2015. Header

bidding refers to a bidding process enabled by "header codes" that publishers were able to place on their websites, allowing them to notify multiple Ad Exchanges simultaneously of the availability of an impression.

54.     Header bidding enhanced competition between Ad Exchanges and led to substantial increases in winning prices for impressions, by as much as 25-50%. This increase in impression prices for publishers under header bidding is evidence of the harm publishers suffered by virtue of Google's use of its monopoly power in Ad Serving to reduce competition in the Ad Exchange market.

55.     But here, too, Google was unwilling to compete head-to-head with rival Ad Exchanges. Google used its Ad Server to interfere with the mechanism its header bidding competitors used to handle simultaneous bids, making its Ad Exchange bid available in Google's Ad Server only *after* the header bidding auction was complete. Google thus granted itself an anticompetitive advantage over its competitors—one not based on the merits and enabled solely by the gatekeeper role Google took for itself.



**Header Bidding took the form of a simultaneous auction, which required Exchanges to compete head to head, and eliminated Google's ability to win impressions with bids lower than those offered by competing Exchanges, as its first-in-line preference had enabled it to do.**

**Google refused to participate in header bidding, choosing instead to essentially reimplement its last look option in this context, bidding against the winner of the header bidding auction in the Ad Server.**

CLASS ACTION COMPLAINT

56.     In April 2018, Google launched its direct competitor with header bidding, a system conducted by its dominant Ad Server under the name "Exchange Bidding with Dynamic Allocation." Google later euphemistically re-named "Open Bidding."  Google used its Ad Server to effectively force Exchange Bidding on publishers by interfering with the JavaScript code that rival Ad Exchanges used to place advertisements through header bidding.

57.     Google also used its monopoly in Ad Servers to impose an explicit 5-15% surcharge or tax on any ads from a non-Google Ad Exchange.  Google also chose to structure and use this surcharge to maximize its anticompetitive impact: it is imposed as part of the bidding process, as opposed to after-the-fact, which has the effect of suppressing the amount that advertisers from competing Exchanges are shown to be bidding for an impression.  This structure has two consequences.  First, bids as input from Google's Ad Exchange can win auctions even if those bids are lower than those of the rival Ad Exchange absent the surcharge; in this way, the surcharge *both* drives more wins towards Google's Ad Exchange *and* suppresses the revenues publishers earn from winning bids.  Second, even when a rival Ad Exchange wins an auction in spite of the surcharge, the publisher will receive less money for that impression than it otherwise would have received absent the surcharge.  Had the Ad Server imposed the surcharge on winning bids from rival Ad Exchanges after-the-fact, Google would have had to pay more to win the ad, resulting in more money for publishers and more wins by competing Ad Exchanges.

58.     For example, assume the surcharge is 10% and minimum bid increments are $0.05.

- **Scenario 1: Surcharge is imposed as part of the bid in the auction:** If Ad Exchange A has a winning bid of $1.00, it is entered into the Ad Server Open Bidding auction as $0.90, and Google's Ad Exchange must bid at least $0.95 to win the auction. If Google's Ad Exchange wins, the publisher receives $0.95; if Ad Exchange A wins, the publisher receives $0.90.

- **Scenario 2: Surcharge is imposed after the auction:** If Ad Exchange A again has a winning bid of $1.00, Google's Ad Exchange must now bid at least $1.05 to win.  If Google wins, the publisher receives $1.05; if Ad Exchange A wins, the publisher receives $0.90.

15

CLASS ACTION COMPLAINT

59.     While publishers receive the same amount if a rival Ad Exchange wins under either scenario, publishers receive significantly lower amounts when Google wins if the surcharge is imposed as part of the bidding process.  Moreover, structuring the surcharge as part of the bid necessarily results in more winning bids by the Google Ad Exchange, and again adds to Google's power in the Ad Exchange market literally at publishers' expense.  Google's surcharge on rivals reduces competition in the Ad Exchange market, to the detriment of publishers.  Ironically, Google imposes this tax through business rules imposed by the Ad Server—the very software product that purports to serve the interests of Google's publisher clients.

## C.     Google has combined its Ad Server and Ad Exchange products under Ad Manager, further excluding rivals and raising barriers to entry

60.     Google further responded to competition from header bidding by locking critical Ad Exchange functionality into its Ad Server and ultimately marketing and selling both products under a single product name, Google Ad Manager.  Google's combination of the two products into one further funnels publishers into Google's Ad Exchange.  The market's network effects then create a feedback loop: those additional publishers make Google's Ad Exchange even more irresistible to advertisers, which in turn entices more publishers to install Google's Ad Server.  The more transactions that Google's Ad Server sends to its Ad Exchange, the more surcharges Google is able to impose on its Ad Exchange rivals, thereby continuing to build its share and dominance in the Ad Exchange market.  The bolting of these two products together as one substantially forecloses rival Ad Exchanges by subjecting them to ever more surcharging by Google.

61.     Moreover, in order to reach a significant portion of Google's large stable of advertisers, publishers have no realistic alternative but to place their impressions on the Google Ad Exchange.  In order to do so, publishers are now compelled to use the Google Ad Server under the Ad Manager umbrella. The new Ad Manager serves as the latest nail in the coffin for any competing Ad Server, or for any potential entrant into the Ad Server market, further maintaining Google's existing monopoly in Ad Servers.

62.     Having compelled the use of both the Ad Server and Ad Exchange by customers that want only one or the other, Google has maintained, strengthened, and expanded its dominance in *both* markets,

1   thereby further enabling much of Google's other anticompetitive conduct, such as surcharging rivals and

2   misusing the Ad Server to steal auction wins from its Ad Exchange competitors.

3         63.    Forcing Google's Ad Exchange customers to use Google's Ad Server, and vice versa,

4   raises additional barriers to entry in a two-sided market that already posed a monumentally high bar given

5   Google's massive stable of advertisers. Google's conduct has both the goal and effect of gaining control

6   over the entire range of products, squelching innovation, and locking publishers and advertisers into a

7   Google-controlled network—all of which allows Google to extract more revenue from publishers and

8   advertisers alike.

9         64.    Microsoft used similar anticompetitive strategies in the 1990s. For example, Microsoft

10  correctly recognized that the web browser could displace the operating system as the most important

11  computer interface. The web browser is an application that sits on top of a "stack" or layers of software,

12  with the operating system at its foundation. Microsoft used its Windows operating system monopoly to

13  force consumers to install, load, and use Internet Explorer instead of a rival web browser. By so doing,

14  Microsoft was both expanding its monopoly "upward" in the stack—from the operating system into web

15  browsers—and maintaining its operating system monopoly by making the web browser dependent on

16  Windows. Similarly, Google seeks to maintain and expand control throughout the entire advertising

17  technology stack (including the Ad Server and Ad Exchange/Ad Network markets) by forcing its Ad

18  Server and Ad Exchange or Ad Network products together. Google, like Microsoft before it, is thereby

19  squelching innovation and locking its users into a Google-controlled system from top to bottom.

20        65.    Google cannot avoid the consequences of its monopoly by arguing that its wrongful

21  conduct—forcing Ad Server customers to use Ad Exchange and vice-versa—has in fact resulted in making

22  Ad Manager a "single integrated product" rather than two distinct products tied together. The fact remains

23  that the Ad Server, which selects and serves ads, and the Ad Exchange, which holds auctions, perform

24  fundamentally different functions.

25      **D.**    **Google excludes rival Ad Networks under the guise of policing malicious code**

26        66.    Ad Networks act as intermediaries, helping to match advertisers with small and medium-

27  sized publishers whose page views are not high enough to allow them to offer their advertising inventory

28  directly on the more sophisticated Ad Exchange marketplaces. By offering its Ad Server product for free

to publishers that use its Ad Network and have fewer than 90 million monthly page views, Google has generated power in the Ad Network market with an estimated market share of at least 50%. Google's Ad Server allows publishers to solicit guaranteed prices from multiple Ad Networks for the same impressions, although a publisher may choose to use only Google's Ad Network.

67. Under the guise of controlling problematic code, Google's Ad Server excluded rival Ad Networks from competing for impressions, thereby driving more business to the Google Ad Network and diminishing publisher revenues. Google's Ad Server informed the publisher and the rival Ad Network that there was a problem with the rival Ad Network's code. The Ad Server removed the rival Ad Network's code, which effectively precluded the rival from competing for the publisher's impressions. The rival Ad Network was then forced to resubmit the same code to the publisher's Ad Server, which required extensive work and hours of labor by staff at both the rival Ad Network and the publisher, and jeopardized the rival Ad Network's business relationship with the affected publisher. Moreover, while this work was in process, the rival Ad Network was not permitted to compete for that publisher's impressions in the Google Ad Server.

68. This recurring practice, instituted by the Google Ad Server, injured rival Ad Networks by imposing unnecessary additional costs on publishers seeking to use the rival Ad Networks in conjunction with their Google Ad Server. Publishers were injured because the rivals impacted included Ad Networks that paid more for the same inventory than Google's Ad Network was willing to offer. Through its anticompetitive conduct, Google has used its monopoly power in Ad Servers to monopolize or attempt to monopolize the Ad Network market, and as with Ad Exchange, the impacts of these acts are exacerbated by indirect network effects.

**E.    Google uses its Ad Server to impose rate structures that raise rivals' costs**

69. Separate and in addition to the surcharge on rival Ad Exchanges discussed above, Google uses its Ad Server to raise its rivals' costs. Through Google Ad Manager, Google imposes a rate structure that lowers publishers' revenues if an advertisement is placed using a rival Ad Network or Ad Exchange under certain circumstances.

70. For instance, Google's Ad Server may impose an "Audience" fee that is as much as 100% higher when advertisements are placed through a non-Google Ad Network or Ad Exchange (*e.g.*, a 5-cent

fee for a certain number of Google-placed advertisements, but a 10-cent fee for the same number of competitor-placed advertisements). Google deploys other fee structures that achieve a similar economic effect by "including" a certain number of Google-placed advertisements at certain price tiers, while "excluding" non-Google-placed advertisements so that publishers incur additional fees when they do business with a competitor.

71. Google's course of conduct is designed to force publishers to deal exclusively with Google and punish those who do not. Google's conduct has the purpose and effect of making it uneconomical to use a rival Ad Exchange, thereby coercing publishers to exclusively use Google's Ad Server and Ad Exchange. Put differently, Google punishes customers who choose not to deal exclusively with Google.

72. Google's surcharges and discriminatory rate structures make it uneconomical for publishers to substitute a rival Ad Server, Ad Exchange, or Ad Network. Because Google's surcharges and rate structures cannot be supported by legitimate business justifications, they serve no purpose but to keep publishers locked in to Google's advertising products by penalizing customers who attempt to substitute a rival product.

73. Google's Ad Manager conduct serves the same end because, by compelling publishers who need access to Google's dominant Ad Exchange or Ad Network to use Google's Ad Server, Google punishes publishers who attempt to use rivals' products by increasing the cost of doing so.

74. Together, Google's conduct adds up to a scheme to force publishers to deal exclusively with Google and to prevent publishers from defecting.

## IV. THE RELEVANT MARKETS

75. Google has achieved market or monopoly power in each of the relevant product markets.

76. This case involves the markets for three products: Ad Servers, Ad Exchanges, and Ad Networks.

77. Publisher Ad Servers are the means and "decision engine" for determining which advertisements to display. They impose and administer the rules for offering advertising impressions for sale, and selecting which ad to display.

78. Ad Exchanges, by contrast, match two different categories of customers (advertisers and publishers). They provide a service like a clearinghouse or auction house, that is distinct from the Ad

CLASS ACTION COMPLAINT

Server product, which connects publishers to the Ad Exchanges and Ad Networks and makes decisions regarding ad placement and acceptance.

79.     Ad Networks are less sophisticated than Ad Exchanges and are a separate product market. Rather than providing all the targeting and bidding features of Ad Exchanges, Ad Network placements are made based on a pool of advertising inventory.  Ad Networks have existed much longer than Ad Exchanges, and are inadequate for sophisticated or large-scale publishers.

80.     All of the foregoing markets are part of what the industry calls "display advertising"—as opposed to video advertising or search advertising, which use different technologies and are not substitutable with the display advertising seen across the internet.

81.     Display advertising comprises two channels: owned-and-operated platforms and the open display advertising marketplace.  The owned-and-operated channel consists of social media platforms like Facebook and e-commerce giant Amazon, which are each vertically integrated in that they sell their own advertising inventory directly to advertisers through propriety, integrated interfaces referred to in the industry as "walled gardens".  Google, however, operates not just in such an isolated space but instead has created advertising tools and advertising exchange services for both third party publishers and advertisers in the open display advertising marketplace.  Owned-and-operated platforms and the open display advertising marketplace are not reasonable substitutes for each other and are not viewed as such by advertisers or publishers.

82.     There is one further distinction within the open display advertising marketplace: the market for ads that are negotiated directly between publishers and advertisers, and the open display programmatic advertising market, in which ads are placed automatically through Ad Exchanges and Ad Networks.  The two segments are not reasonable substitutes for each other and are not viewed as such by advertisers or publishers.  That is because both sides of the market initially try to arrange direct placements, which provide both security and maximum revenue.  Once these opportunities are exhausted, parties on both sides of the market turn to programmatic advertising, arranged by auctions on Ad Exchanges and Ad Networks, which collectively account for approximately two-thirds of all open display advertising.

83.     In the open display programmatic advertising marketplace, Google has monopoly power in the publisher Ad Server market, where it has a market share in the range of 70–90%; the Ad Exchange

market, where it controls approximately 50% of the market; and the Ad Network market, where it controls approximately 50% of the market.

84.     The relevant geographic market is the United States.

85.     Google also has monopolies in adjacent markets—such as the market for advertiser buying products.  Because many advertisers single-home, meaning they use only a single advertiser buying product to access the open display advertising marketplace, Google's advertiser buying products have become the sole access point to the market for a substantial portion of all advertisers.  Google also has a monopoly or substantial market power in search advertising, web browsers, and phone operating systems. Google's power in these adjacent markets bears on Google's market power in the relevant markets and their barriers to entry.  These adjacent markets allow Google to lock customers into, and keep them dependent on, its ecosystem, but they are not the markets in which the challenged conduct occurred.  For instance, Google has used its search and mobile dominance to strong-arm publishers into a scheme called "AMP", whereby Google takes publisher content and hosts it on Google's own systems—thus ensuring that consumers never leave Google's websites even when viewing the non-Google content.  This allows Google to independently collect and retain information concerning the publishers' consumers, allowing Google to benefit from and control advertising associated with content created by others.

## V.     ANTITRUST IMPACT

86.     Google's conduct has substantially impaired competition in the Ad Exchange and Ad Network markets, which Google has a dangerous probability of monopolizing by virtue of its intentional and unlawful conduct.

87.     Google's taxes on rivals have contributed to the consolidation of the Ad Exchange market fostering Google's maintenance and expansion of its power in that market.  When Google entered that market in 2009, it was highly competitive, and has previously been populated by at least eight vigorous competitors.

88.     Since then, in part as a direct result of Google's anticompetitive conduct, several Ad Exchanges have left the Ad Exchange business, including adBrite, Yahoo, and the ASDAQ exchange. Among the remaining major competitors, Rubicon has consistently lost money and been barely profitable. Rubicon has attempted to remain alive in the Ad Exchange business by sharply cutting its fees to

1  percentages in the low teens or lower, a strategy which the company itself admitted may not succeed.  The

2  financial condition of OpenX, another competing privately owned Ad Exchange, is not publicly reported

3  and therefore unknown, although it was reported to have laid off approximately 20 percent of its staff at

4  the end of 2018, and added more layoffs earlier this year.

5        89.      In the Ad Network market, Google's use of its Ad Server product to block the bids of

6  competing Ad Networks has driven more market share to Google's own Ad Network.  By

7  anticompetitively driving additional usage of its Ad Network, Google has unlawfully maintained its

8  monopoly or enhanced the probability of it gaining monopoly power in the Ad Network market by

9  impeding its rivals' ability to compete on the merits, including through the use of strategies raising rivals'

10  costs.

11        90.      Moreover, by anticompetitively driving additional usage of its Ad Exchange and Ad

12  Network, and bolting its Ad Exchange and Ad Publisher into a single product, Google has unlawfully

13  maintained its monopoly in Ad Servers, and unlawfully maintained its monopoly or enhanced the

14  probability of it gaining monopoly power in the Ad Exchange market, to the detriment of Plaintiffs and

15  class members.

16        91.      Google's challenged conduct is completely lacking in any procompetitive justification.

17  Moreover, the harm to competition—particularly by publishers but also by advertisers—in the Ad

18  Exchange, Ad Network, and Ad Server markets from Google's unlawful conduct more than offsets any

19  pro-competitive benefits or justifications Google may offer.

20  **VI.    ANTITRUST INJURY**

21        92.      Plaintiffs and class members have suffered antitrust injury as a direct result of Google's

22  unlawful conduct.

23        93.      By impairing competition among advertisers on rival Ad Exchanges, Google has

24  artificially suppressed prices for and revenues earned by publishers for their ad space.  In addition,

25  Google's unlawful conduct has enabled it to charge supra-competitive prices for its Ad Exchange and Ad

26  Network services, both to publishers and advertisers, and supra-competitive prices, either directly or

27  indirectly, to publishers for its Ad Server product.

28

CLASS ACTION COMPLAINT

94.     The Ad Exchange and Ad Network markets are platforms or two-sided markets that serve two types of customers (publishers and advertisers) by matching them to create a transaction.  As such, the fee level for purposes of antitrust harm, and as an indicator of monopoly or market power, may be calculated as the net or total cost of the transaction across both sides of the market—that is the sum of fees paid by publishers and fees paid by advertisers.  Google is able to extract monopoly rents.

95.     But this case is not just about the publishers and advertisers that make up the two sides of an Ad Exchange or Ad Network transaction.  The ultimate consumers—the readers and viewers of publishers' content—are also harmed by Google's misconduct.  Consumers are deprived of quality.  This includes quality of presentation and display (due to Google's conduct in the Ad Server market) and of the match between consumer and advertiser (due to Google's conduct in the Ad Exchange and Ad Network markets).

96.     Total damages from Google's unlawful conduct suffered by class members during the class period amount, at the very least, to hundreds of millions of dollars.

## VII.     GOOGLE CANNOT JUSTIFY ITS ILLEGAL CONDUCT

97.     Google cannot justify its restraints of trade and monopolizing conduct.

98.     Google cannot supportably claim efficiency justifications for its conduct because Google's conduct creates numerous inefficiencies.

99.     Nor is there any valid argument that monopoly is somehow desirable in the relevant markets.  Even in markets with network effects, antitrust law does not recognize a defense to anticompetitive conduct based on size.  Moreover, as confirmed by relevant empirical and economic literature, competition between platforms results in better quality, better matches, and lower net prices.  Competition on the merits—in both the Ad Exchange and Ad Network markets—will produce better outcomes for consumers than monopoly because competing Ad Exchanges and Ad Networks will be incentivized to lower their take rates, increasing revenue to publishers enabling them to generate additional, higher-quality content as well as allow new or existing publishers to more readily enter the online world.

100.     Nor can Google claim any of the abstract justifications often used when firms "vertically integrate."  Google's integration in fact reflects a strategy through which Google raises barriers to entry

and prevents new competitors or ways of doing business from breaking into the online advertising marketplace.

## VIII.  CLASS ALLEGATIONS

101.  Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following classes (the "Classes"):

- Class 1 – All persons that received revenue from Google for displaying advertisements using Google's Ad Exchange services from four years prior to the date of this Complaint's filing through the present (the Class Period).

- Class 2 – All persons that received revenue from Google for displaying advertisements using Google's Ad Network services from four years prior to the date of this Complaint's filing through the present (the Class Period).

Specifically excluded from the Classes are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, and any person acting on their behalf.

Also excluded from the Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

102.  The Classes are readily ascertainable and the records for them should exist, including, specifically, Defendants' own records and transaction data.

103.  Due to the nature of the trade and commerce involved, there are thousands of geographically dispersed members in the Classes, the exact number and their identities being known to Defendants.

104.  Plaintiffs' claims are typical of the claims of the members of the Classes.  Plaintiffs and members of the Classes sustained damages arising out of Defendants' common course of conduct in violation of the laws alleged herein.  The damages and injuries of each member of the Classes were directly caused by Defendants' wrongful conduct.

105.    There are questions of law and fact common to the members of the Classes, including, but not limited to, the following:

- whether Google has monopoly power in the Ad Server, Ad Exchange, and Ad Networks markets;

- whether Google has imposed implicit and explicit taxes on rival Ad Exchanges;

- whether the imposition of such taxes constitutes monopolization, monopoly maintenance, and/or attempt to monopolize the Ad Exchange market;

- whether Google's tie of its publisher Ad Server and Ad Exchange products furthers Google's monopolization, monopoly maintenance, and/or attempt to monopolize the Ad Exchange market;

- whether Google has blocked rival Ad Networks from competing for publisher inventory;

- whether Google's conduct with respect to rival Ad Networks constitutes monopolization, monopoly maintenance, and an attempt to monopolize the Ad Network market;

- whether Google's conduct has harmed Plaintiffs and class members by reducing their revenues from the sale of their ad inventory;

- whether Google's conduct has harmed Plaintiffs and class members by causing them to pay supra-competitive prices for Google's Ad Exchange, Ad Network, and Ad Server services;

- whether Google's conduct has harmed or at least not benefited advertisers; and

- the appropriate Class-wide measures of damages.

106.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Classes, and Plaintiffs have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Classes.

107.    Questions of law or fact that are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

108.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Classes would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying

adjudications of the questions of law and fact common to the Classes. A class action, on the other hand, would achieve substantial economies of time, effort, and expense and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the vast majority of Class members to seek redress for the violations of law alleged herein.

## IX.     CALIFORNIA LAW APPLIES TO THE ENTIRE CLASS

109.     California's substantive laws apply to every member of the Classes, regardless of where in the United States the Class member resides. Defendants' Terms of Service explicitly state that California law will govern all disputes arising out of or relating to the terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. By choosing California law for the resolution of disputes covered by its Terms of Service, Google concedes that it is appropriate for this Court to apply California law to the instant dispute.

110.     Further, California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Classes under the Due Process Clause, *see* U.S. CONST. amend. XIV, § 1, and the Full Faith and Credit Clause, *see* U.S. CONST. art. IV, § 1, of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, with the claims asserted by the Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair. Defendants' decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible. The application of California laws to the Classes is also appropriate under California's choice of law rules because California has significant contacts with the claims of Plaintiffs and the proposed Classes, and California has the greatest interest in applying its laws here.

CLASS ACTION COMPLAINT

## CLAIMS FOR RELIEF

## COUNT I

## Violation of § 2 of the Sherman Act, 15 U.S.C. § 2

## (Monopolization and Monopoly Maintenance)

111.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

112.     The relevant markets defined above are valid antitrust markets.

113.     Google has monopolized the Ad Server, Ad Network, and Ad Exchange markets.

114.     Google possesses monopoly power in the Ad Server, Ad Network, and Ad Exchange markets.  Google willfully seeks to maintain its monopoly power through anticompetitive conduct.

115.     There are no procompetitive benefits or justifications that offset the competitive harm of Google's unlawful conduct.

116.     As a result of Google's unlawful conduct, Plaintiffs have suffered, and continue to suffer, monetary harm in an amount to be proved at trial.

## COUNT II

## Violation of § 2 of the Sherman Act, 15 U.S.C. § 2

## (Attempted Monopolization)

117.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

118.     The relevant markets defined above are valid antitrust markets.

119.     To the extent that Google contends it does not have a monopoly in any of the Ad Network, Ad Exchange, or Ad Server markets, Plaintiffs assert in the alternative that Google has intentionally and unlawfully attempted to monopolize the Ad Network, Ad Exchange, and/or Ad Server markets through anticompetitive conduct, including, *inter alia*, its implicit and explicit taxes on rival Ad Exchanges and its blocking of bids from rival Ad Networks; its interference with and manipulation of auctions and header bidding; and by combining and effectively forcing users to use both its Ad Server, one the one hand, and its Ad Network and/or Ad Exchange, on the other.

CLASS ACTION COMPLAINT

120.     Google has acted with the specific intent to monopolize the Ad Network, Ad Exchange markets, and/or Ad Server markets.

121.     Google has a dangerous probability of monopolizing the Ad Network, Ad Exchange, and/or Ad Server markets, including by excluding competitors, undermining quality, squelching innovation, and raising the total price of services.

122.     There is no legitimate business justification for Google's conduct.

123.     As a result of Google's unlawful conduct, Plaintiffs have suffered, and continue to suffer, monetary harm in an amount to be proved at trial.

## COUNT III

### Violation of California's Unfair Competition Law

### (Cal. Bus. & Prof. Code § 17000 *et seq.*)

124.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

125.     Google's conduct constitutes deceptive, fraudulent, unlawful and/or unfair business acts and practices.

126.     Google's conduct threatens an incipient violation of the antitrust laws alleged herein, and it violates the policy and spirit of those laws because the effects of the conduct are comparable to or the same as a violation of the law, and it otherwise significantly threatens and harms competition.

127.     Additionally, Google's conduct on balance harms consumers and competition, offends established public policy, is substantially injurious to consumers, and is neither outweighed by countervailing benefits nor avoidable by consumers.

128.     Plaintiffs have been deprived of money or property as a result of Google's unfair business practices alleged herein through numerous mechanisms, including but not limited to Google's depriving publishers of advertising revenue by taking fees and charges from publisher.

## **REQUEST FOR RELIEF**

129.     WHEREFORE, Plaintiffs and the Class members request the Court to enter judgment in their favor against Defendants, awarding all such relief as the Court deems appropriate and just.

130.     Plaintiffs request the following relief:

A. That the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to Class members;

B. That the Court enter an order declaring that Defendants' actions, as alleged herein, violate the law;

C. That the Court award Plaintiffs and Class members damages, treble damages, punitive damages, and/or restitution in an amount to be determined at trial;

D. That the Court order Defendants to fully divest their publisher Ad Server line of business, and refrain from operating within the market for publisher Ad Server products;

E. That the Court permanently enjoin Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof from continuing, maintaining, or renewing the conduct alleged herein, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F. That the Court award Plaintiffs pre- and post-judgment interest;

G. That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses; and

H. That the Court award any and all such other relief as the Court may deem proper.

## JURY TRIAL DEMAND

131. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial of all issues so triable.

Dated: December 16, 2020          */s/ Mark C. Mao*

George A. Zelcs (*pro hac vice* forthcoming)
Robert E. Litan (*pro hac vice* forthcoming)
Randall P. Ewing (*pro hac vice* forthcoming)
Jonathon D. Byrer (*pro hac vice* forthcoming)
Ryan A. Cortazar (*pro hac vice* forthcoming)
KOREIN TILLERY LLC
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Tel.: (312) 641-9750 / Fax: (312) 641-9751

Stephen M. Tillery (*pro hac vice* forthcoming)

CLASS ACTION COMPLAINT

Michael E. Klenov (277028)
Carol L. O'Keefe (*pro hac vice* forthcoming)
Jamie Boyer (*pro hac vice* forthcoming)
KOREIN TILLERY LLC
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel.: (314) 241-4844 / Fax: (314) 241-3525

David Boies (*pro hac vice* forthcoming)
BOIES SCHILLER FLEXNER LLP
333 Main Street
Armonk, NY 10504
Tel.: (914) 749-8200 / Fax: (914) 749-8300

Philip C. Korologos
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, NY 10001
Tel.: (212) 446-2300 / Fax: (212) 446-2350

Abby L. Dennis
Jesse Panuccio
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Tel.: (202) 895-7580 / Fax: (202) 237-6131

Mark C. Mao (236165)
Sean P. Rodriguez (262437)
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Tel.: (415) 293-6820 / Fax: (415) 293-6899

Sabria A. McElroy (*pro hac vice* forthcoming)
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Tel.: (954) 377 4216 / Fax: (954) 356-0022

*Attorneys for Plaintiffs Genius Media Group, Inc.,
The Nation Company, L.P., and The Progressive,
Inc.*

# EXHIBIT E

Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

John D. Radice (*pro hac vice* forthcoming)
April Lambert (*pro hac vice* forthcoming)
**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
alambert@radicelawfirm.com

*Attorneys for Plaintiff*

[Additional Counsel Listed on Signature Page]

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| MARK J. ASTARITA, individually and behalf of all others similarly situated, <br><br>          Plaintiff, <br><br>      v. <br><br> GOOGLE LLC and ALPHABET INC., <br><br>        Defendants. | Case No. <br><br> **CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

---

CLASS ACTION COMPLAINT
CASE NO.

Plaintiff Mark J. Astarita, on behalf of himself and all others similarly situated, bring this first amended consolidated class action complaint for equitable relief and treble damages under the Sherman Antitrust Act, 15 U.S.C. § 2, and the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*.

## I. NATURE OF THE ACTION

1. Over the past several years, Google leveraged its monopoly in online search and search advertising to acquire an illegal monopoly in brokering display advertising—the placement of advertisements on other companies' websites. Google gained this market dominance in part by acquiring rivals in the online advertising space, conditioning access to its search-results data and YouTube video advertising platform upon the purchase of its separate display advertising services, and making its intermediation systems incompatible with those of its competitors. Google's scheme to monopolize the market for brokering display advertising has vastly reduced competition in the purchase and placement of this advertising and resulted in economic harm to advertisers and publishers alike.

2. Forty-nine state attorneys general are currently conducting antitrust investigations of Google's conduct in digital advertising markets. Ten states, led by Texas, filed a civil antitrust action against Google on December 16, 2020 based on the conduct and violations described in this complaint. The United States Department of Justice and eleven state attorneys general also filed a civil antitrust action against Google on October 20, 2020 for unlawfully maintaining monopolies in the markets for online search and search advertising.

3. Because of its pervasive monopoly conduct, Google now controls the "ad tech stack" comprising the intermediary services between advertisers, which pay to place digital advertisements, and publishers paid to publish those ads on their websites. Companies that wish to place or publish online advertisements have little choice but to pay Google for its advertising services, including instantaneous auctions, and Google's exclusion of competition in this intermediation market has enabled it to favor its own advertising platforms. Google's extraction of monopoly rents through fees charged to both advertisers and publishers has resulted in higher prices paid by advertisers, higher consumer prices, and lower payments to publishers of online display advertisements.

4. Like the other class members, Plaintiff dealt directly with Google in its capacity as

---

1

CLASS ACTION COMPLAINT
CASE NO.

display advertising broker, having published online display advertisements using Google's services, and having been paid by Google for running those ads. Plaintiff, like the other class members, suffered economic losses as a result of Google's monopolization and seeks appropriate equitable relief and damages through this action.

## II.     JURISDICTION AND VENUE

5.     This Court has original jurisdiction over Plaintiff's federal antitrust claim under the Clayton Act, 15 U.S.C. § 15.  The Court also has diversity jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from Defendants, there are more than 100 class members nationally, and the aggregate amount in controversy exceeds $5,000,000.

6.     Venue is proper in this District under 28 U.S.C. § 1391.  Google's principal place of business is in this District, and it regularly conducts business here.  A substantial part of the events giving rise to Plaintiff's causes of action occurred in or emanated from this District.

7.     Assignment to the San Jose Division is appropriate under Local Rule 3-2(c) because a substantial part of the conduct at issue in this case occurred in Santa Clara County.  In addition, this case arises out of the same operative facts as a related action pending in this division, *In re Google Digital Advertising Antitrust Litigation*, No. 5:20-cv-03556-BLF.

## III.    PARTIES

### A.     Plaintiff

8.     Plaintiff Mark J. Astarita is a citizen and resident of Florida and an attorney who owns and operates the website seclaw.com.

9.     During each year from 2016 to 2020, Google brokered the placements of display advertisements that appeared on this website, and Google directly paid Plaintiff for making this advertising space available.

10.     Plaintiff sustained antitrust injury by being paid sub-competitive prices by Google in exchange for making space on his website available to publish display advertisements that Google brokered.  These anticompetitive underpayments directly and proximately resulted from Google's

CLASS ACTION COMPLAINT
CASE NO.

monopolization of the relevant market, defined in Part VI below.

**B. Defendants**

11.     Defendant Google LLC is a limited liability company organized under the laws of Delaware with its principal place of business in Mountain View, California.  Google LLC is a technology company that provides internet-related services and products, including online advertising technologies and a search engine.

12.     Defendant Alphabet Inc. is a corporation organized under the laws of Delaware with its principal place of business in Mountain View, California.  Google LLC is a wholly-owned subsidiary of Alphabet.

13.     Google LLC and Alphabet Inc. are collectively referred to herein as "Google."

**IV.     FACTUAL ALLEGATIONS**

**A.     Overview of Digital Advertising**

14.     Businesses have long relied on advertising to promote their products, generate brand awareness, and increase sales.  Before the internet age, advertising campaigns were planned and managed by media buyers.  If a media buyer needed to help a toy manufacturer reach parents of children, she might place an ad in *Parents Magazine*, or in the family section of the local newspaper.

15.     Digital advertising today works differently.  The internet allows businesses to target potential customers with greater precision.  Digital advertising is the promotion of products and services via the internet through search engines, websites, social media, and other platforms that can be accessed online.  It is automated and data-driven, involving data scientists, mathematicians, and computer programmers who, behind the scenes, use advanced statistical tools to optimize advertising campaigns, micro-targeting users and constantly tweaking algorithms.

16.     Digital advertising is now the fastest growing segment of the advertising business in the United States.  More than half of all advertising money in the United States is now spent on digital advertising—approximately $129 billion in 2019.

17.     The two overarching markets in digital advertising are search advertising and display advertising.

CLASS ACTION COMPLAINT
CASE NO.

18.     Search advertising is the placement of advertisements above or alongside the organic search results generated by a search engine, predominately Google Search.  The advertisement targets those who are actually searching for a product or service; the advertisement appears when a consumer performs a search that has a connection to the product or service offered by company sponsoring the advertisement.  The advertiser pays when the user clicks on the advertisement, based on a cost per click.  For example, if a user searches for sandwich delivery, the search advertising results may look like this:

19.     Search advertising is designed to reach customers who have already shown an interest in



purchasing a product or service and may be close to making a purchasing decision.  If, for example, a person finds herself locked out of her house and searches for nearby locksmiths on Google Search, search advertising will place ads for local locksmith services above the organic search results.

20.     Search advertising is limited, however, to prospective customers who affirmatively search for the advertiser's product or service or for something similar, or who input a related term.

21.     Display advertising, in contrast, is the advertising that appears next to content on websites.  Unlike search advertising, which is generally limited to text, display advertising comes in many forms, including banners, images, and videos.  For instance, an ad for Dove soap might appear as a banner or sidebar on the cooking website "myrecipes":

CLASS ACTION COMPLAINT
CASE NO.



Or as side bar ads, like this:




22.    With display advertising, the internet user need not perform a specific search for the particular product or service.  Instead, the key to effective display ads is placing them on websites likely to be viewed by the advertiser's target audience or by those most likely to purchase the advertised products or services.  A running shoe company, for example, would prefer to have its advertisements appear on sporting goods websites rather than websites selling car parts.  In that scenario, even users who have not searched for running shoes will see the running shoe company's advertisement if they visit a website that publishes it.

23.    Suppliers of display advertising are website operators and are known as publishers (*e.g.*, providers of online news sites and other content creators).  Publishers employ third-party tools to find advertisers willing to purchase advertising space available on their websites.

24.    In 2019, $69.9 billion was spent on digital display advertising in the United States; 85% of that display marketing was advertising, 90% of which was executed through "programmatic," or automated, real-time bidding.  In 2020, spending on display media is expected to reach $81.3 billion, a 14% year-over-year increase.

25.    Display advertising accounts for approximately half of the digital advertising market,

5

and many web publishers rely on display advertising for a major source of their revenue.

26.     As discussed in further detail below, search advertising and display advertising serve different purposes, and advertisers do not regard them as substitutes for each other.  The Interactive Advertising Bureau—an advertising organization that develops industry standards and conducts research for the advertising industry—separates display and search for purposes of gathering and reporting annual revenues in these two advertising markets.

**B.     Google Dominates and Controls Digital Advertising Services Markets**

27.     Google is the dominant supplier in the search advertising market and has moved rapidly to control all stages of the display advertising market, as well.  In 2019, Google's corporate parent Alphabet earned $135 billion, 84% of its total revenue, from search and display advertising.

28.     Google's revenue derived from display advertising comes from ads placed on Google's own properties (Google Maps, Gmail, etc.) and from acting as an intermediary in the sale of ad space on third-party websites to advertisers.

29.     One of Google's key sources of revenue derives from its activities as the broker between publishers and advertisers in programmatic display advertising.  When an ad is viewed on a third-party publisher's site, such as the *New York Times* website, Google pays the publisher a share of the amount the advertiser paid to Google.  The amount of revenue Google earns from display advertising is dependent on the number of ads it sells, the price of those ads, and Google's percentage margin or "cut" of the deal, also known as the "take rate."

30.     The "take rate" is the difference between what an advertiser pays for an ad and what portion of that payment the publisher of the ad receives for placing the ad on its website.  Google's take rate as an intermediary is typically 54-61%.  When ads are presented on Google products, such as Google Search or YouTube, Google keeps the entire price of the ad.

31.     Google has a strong economic incentive to increase the number of ads placed on its proprietary sites, to charge advertisers higher prices, and to pay as little as possible to publishers displaying ads placed through Google on their websites.

CLASS ACTION COMPLAINT
CASE NO.

### 1. Google's Search Advertising Practices and Market Share

32.     As the owner of the dominant online search platform, Google is by far the largest supplier of digital search advertising in the United States.  Over the last ten years, Google's share of the digital search advertising supply has ranged between 89% and 93%.

33.     Google makes space on its search results pages available to advertisers through an auction process that occurs each time a user runs a search.  Google starts the auction by first finding all the ads with keywords matching the search.  It then excludes ads that are considered ineligible based on certain criteria, such as country restrictions.  Google then only displays ads with a sufficiently high "rank" based on a combination of factors, such as the advertiser's bid, the quality of the ad, user location, and the device the user is using.  Because the auction process is repeated for every search performed on Google Search, different auctions may lead to different advertisements being displayed.

34.     Although Google claims that it prices its search advertising through an auction, Google controls (and frequently raises) the price of its search advertising by setting a high reserve price.  Doing so enables Google to directly set the price of its search advertisements because an ad will not sell unless its price meets or exceeds the reserve price, which thus operates as a floor.  A majority of the winning bids for Google Search ads are at the reserve price.

### 2. Google's Dominance in the Ad Tech Stack and Display Advertising

35.     Google is also a major supplier of programmatic display advertising and owns multiple products that supply it.  Google captures well over 50% of the market across the ad tech stack—the set of intermediary exchanges and platforms that advertisers and publishers use to buy, sell, and place display ads ("intermediation" services).  Google runs the leading ad exchange, while also running buy-side and sell-side intermediary platforms trading on this exchange.

36.     YouTube, owned by Google, alone accounts for about 10% of the entire supply of display advertising.  Other major Google products, such as Google Maps and Google Play, also offer display advertisements.

CLASS ACTION COMPLAINT
CASE NO.

37.     Approximately 86% of online display advertising space in the United States is bought and sold in real time on electronic trading venues, referred to in the industry as "advertising exchanges" or programmatic real-time bidding.  Google owns and operates the dominant ad exchanges.

38.     The role of the ad exchange is critical in display advertising.  Exchange transactions are the means by which website publishers monetize the attention they earn from web users and advertisers can maximize the impact of their ad spend.  A competitive and transparent ad exchange is therefore essential to parties on both sides of the ad stack.

39.     Relying on intermediaries like Google that route buy and sell orders from advertisers and publishers, the structure of the ad market resembles the structure of electronically traded financial markets.  Just as individual investors trade on financial exchanges through an intermediary brokerage firm, so must publishers and advertisers go through a computerized intermediary to trade on advertising exchanges.  But in display advertising, a single company, Google, simultaneously functions as the key intermediary through which buyers (advertisers) and suppliers (publishers) of display advertising trade, and as a leading publisher of advertisements in its own right.

40.     On the buy-side, advertisers use specialized software made either for small or large advertisers.  Smaller advertisers, such as a local dry cleaner, typically use Google Ads, a self-serve online buying tool.  Google Ads will bid on and buy ad space, including available inventory trading on Google's exchange, in an automated fashion on the dry cleaner's behalf.  But in this process, Google can ultimately be the advertiser's counterparty instead of its neutral agent.

41.     When an internet user clicks to visit a web page, in the milliseconds that it takes for that page to load, real-time auctions are occurring in the background to determine which ads will display on the web page *that particular user* will see.  These auctions are run by supply-side platforms (SSPs), exchanges, and demand-side platforms (DSPs) in the ad tech stack.

42.     On the supply side of the exchange, suppliers—online publishers—of display advertising employ publisher ad servers (PAS) to accept, store, and manage ads; choose where and when ads appear; and track the effectiveness of ad campaigns.  Each specific ad placement is determined based on bids from advertisers and/or preexisting arrangements between publishers and advertisers.  Publishers

8

CLASS ACTION COMPLAINT
CASE NO.

rely on supply-side platforms (SSPs) to run auctions, interface directly with their demand-side equivalents, and optimize available inventory.

43.     The demand side is comprised of advertisers and media agencies running advertising campaigns for businesses.  Advertisers and media agencies rely on advertiser ad servers (AAS) to store ads, deliver them to publishers, and record transactions.  Advertisers and media agencies also employ demand-side platforms (DSPs) to purchase digital advertising by bidding in auctions and to manage their bids.

44.     The DSP connects to an ad exchange, which combines inventory from ad networks and SSPs with third-party data from a data management platform or data broker.  When an ad space on a publisher's site becomes available, the ad exchange holds an auction in which the DSP bids on the impression submitted by the ad network or SSP.

45.     Together, the publisher ad servers (PAS), supply-side platforms (SSP), advertiser ad servers (AAS), and demand-side platforms (DSP) comprise what is known as the "ad tech stack."  By connecting publishers and advertisers, an ad tech provider functions as an intermediary broker.  The U.K.'s Competition and Markets Authority (CMA) depicted this market as follows:



46.     Until fairly recently, different firms provided the various services in the ad tech stack, and intermediaries did not own publishers or advertisers.  Google lagged behind the pace of innovation and was not a key player in the development of online ad exchanges.  Early players in virtual ad auctions recognized it was most efficient to interoperate with competitors and maintain a level playing field so that customers could mix and match products.  During Senate testimony on September 15, 2020, digital marketing expert Adam Heimlich compared transacting in those earlier auctions to "owning a stall in a vast open air market"—transparency was at a level where market participants could

9

easily compare features, quality, and price with those of other participants within reach, and could use ad stack services provided by a variety of providers. This is no longer the case. After a series of acquisitions, Google now dominates and controls the ad stack as a whole.

47. Before Google's entry, ad exchanges generally operated as disinterested brokers, similar to stock exchanges. Google saw the market efficiency of these early exchanges as a threat to its primary business of selling ads. It soon turned to a sustained mergers and acquisitions strategy to gain market dominance. Google's acquisitions gave it access to and made it a major player at every level of the display advertising service industry, and have enabled Google to exclude competition through a variety of anticompetitive policies and activities.

48. Since 2007, Google has made numerous key acquisitions in the interest of taking control of the entire ad tech stack. Through these acquisitions, Google absorbed competing firms to avoid competing with them with the purpose and effect of building and consolidating its monopoly.

49. In 2007, Google purchased the leading ad server, DoubleClick, which provided the basic technology for Google's current PAS. In 2009, Google acquired AdMob, the largest ad server for the then-nascent mobile application market, which has since grown exponentially. The technology from Invite Media, which Google acquired in 2010, was re-launched in 2012 as DoubleClick Bid Manager and eventually converted into Google's main DSP, Display & Video 360. In 2011, Google purchased AdMeld, one of the largest SSPs in the display advertising industry, which it integrated into AdX, Google's existing exchange. And in 2014, Google bought Adometry, an analytics and attribution provider it then integrated into Google Analytics. Together, these acquisitions reveal a business objective of occupying the entire ad stack and the connected analytics market through buying up the competition.

50. When Google purchased DoubleClick, the Federal Trade Commission accepted Google's representations that it would not leverage its control of publishers' primary ad server to distort competition in the electronic ad-trading market. Google promised to manage the conflicts of interest, including from enhanced access to user data, that would result from the acquisition. Google's general

CLASS ACTION COMPLAINT
CASE NO.

counsel assured Congress that DoubleClick "data is owned by the customers, publishers and advertisers, and DoubleClick or Google cannot do anything with it."

51.    FTC Commissioner Pamela Jones Harbour dissented from the FTC's approval of the acquisition, warning in part that if Google and DoubleClick were permitted to merge without conditions, the new combination could merge Google and DoubleClick data to the detriment of consumer privacy and competition.  Commissioner Harbour stated that the merger could "profoundly alter the 21st century Internet-based economy—in ways we can imagine, and in ways we cannot."  She expressed concern about "the privacy interests of consumers" and wrote that she was "uncomfortable accepting the merging parties' nonbinding representations at face value."

52.    In approving Google's acquisition of DoubleClick, the FTC rejected prescient concerns about data and competition raised by Commissioner Harbour and public interest groups.  An April 14, 2007 news article in the *New York Times* noted that Google's DoubleClick division would have conflicts of interest with Google's exchange, but suggested publishers and advertisers might simply "jump ship" if Google leveraged the acquisition "to further its own ad network."

53.    When Google did leverage the DoubleClick acquisition to further its ad network, instead of turning to other ad tech providers, increasing numbers of publishers and advertisers concluded they had no choice but to rely on Google to broker display-ad placement.

54.    In 2009, Google restricted the ability of publishers and advertisers participating in its exchange to access their DoubleClick data, reserving an essential information advantage for its own trading divisions.

55.    In 2016, moreover, Google broke a key promise it made to the FTC to push through the DoubleClick acquisition: Google began merging DoubleClick web-browsing data with personal information collected through other Google services, combining information linked to a user's personal identity with their location on Google Maps, information from their Gmail records, and their Google search histories, along with user information obtained from other Google products.  With this step, Google eliminated the barrier between the data that Google gathered from cookies tracking users' online behavior and the personal information Google held from its users' accounts.  Its digital advertising

---

11

CLASS ACTION COMPLAINT
CASE NO.

monopolies enabled Google to make this momentous shift in data policy without risk of losing business to rivals more protective of consumer privacy.

56.     In approving Google's 2010 acquisition of AdMob, the leading mobile ad network at the time, the FTC acknowledged that "the combination of the two leading mobile advertising networks raised serious antitrust issues." Yet the FTC deemed those concerns "overshadowed by recent developments in the market," in particular a move by Apple to "launch its own, competing mobile ad network." The FTC approved Google's acquisition of AdMob based on the assumption that Apple would continue to build its presence in the mobile ad market. But that assumption was incorrect—Apple's product failed to gain traction and in 2016 Apple abandoned its attempt to develop a competing mobile ad network.

57.     By 2015, Google's acquisitions had given it monopoly power in the display advertising services market, and the early exchanges that had initially outperformed Google were selling at a discount price or had folded. The market shares of the DSPs that once led that market segment declined in parallel.

58.     Documents that Google produced to the House Subcommittee on Antitrust, Commercial, and Administrative Law show that Google acquired companies to absorb its competition and combine products along the ad stack instead of competing on the merits. An internal Google presentation from July 2006 included a slide titled "Build a Self-Reinforcing Online Ads Ecosystem," which noted in part that acquiring DoubleClick or Atlas could create "self-reinforcing benefits" for Google's integrated ad business. The slide asked, "[I]s there some framework we have to demonstrate the synergies/inter-relationships from owning all these pieces?"

59.     In an internal email from 2010, discussing Google's potential development of a demand-side platform for advertising agencies (a "bidder"), the executive in charge of Google's display business wrote: "The primary benefits on having a bidder are eliminating the disintermediation risk and substantially increasing display spend with Google from agencies (through the combined use of DFA – bidder – AdX). . . . We are looking at options to accelerate this (potentially through M&A for example)."

CLASS ACTION COMPLAINT
CASE NO.

60.     DFA refers to Google's ad server; AdX was Google's exchange. The "disintermediation risk" that Google sought to eliminate resulted from the competitive, transparent conditions in the display advertising exchange market at the time, which diverted ad money away from Google. Thus, Google's plan was to *combine* products to increase its revenue from "display spend" and lock in bidders to its new and consolidated intermediation services.

61.     Google's merge-to-monopolize strategy worked. On the supply side, Google now holds at least 90% of the PAS submarket through multiple products such as Google Ad Manager and Google DoubleClick for Publishers. Since taking the dominant position in the PAS submarket, Google began merging its supply-side intermediation products with its PAS offering. The composite product "Google Ad Manager" combined Google's PAS with its associated ad exchange. For the SSP and associated ad exchange submarket, Google holds a 50-60% share. On the demand side, Google also controls a substantial majority of the DSP submarket. Google has a 55% market share of the ad-exchange submarket, far more than the second-place company, AppNexus, which has a 11% share of that submarket. And Google's DSP holds a 50% share of the DSP submarket, with AOL a distant second at 12%. Google holds an 80-90% share of the AAS submarket as well.

62.     Because of Google's market dominance, publishers and advertisers have little choice but to use Google's intermediation services. Nexstar Media Group, Inc., the nation's largest local news company, tested what would happen if it stopped using Google's technology to place ads on its websites. Over just a few days, the company's video-ad sales plummeted.

63.     Google further consolidated its monopoly across the ad tech stack through a series of product mergers, whereby it bundled two distinct products together and rebranded the integrated entity as a single product. Google blurred the distinction between its ad server and exchange by reclassifying its ad-serving revenues in its shareholder reports and by merging the two into a single new product that it named Google Ad Manager. Google then merged its AAS with its DSP to create Display & Video 360. Each of these mergers increased switching costs for advertisers—and barriers to entry for competitors—for services that already carried high switching costs.

---

13

CLASS ACTION COMPLAINT
CASE NO.

C.    **Google Used Its Market Power to Acquire and Maintain a Monopoly for Display Advertising Services**

1.    **Google Leveraged Its Dominance in Search and Search Advertising and Its Control of User Data to Gain a Monopoly in Brokering Display Advertising**

64.    Google operates the default internet search platform in the United States.  More than 90% of all internet searches are conducted through Google Search.  Further, Google's web browser, Google Chrome, occupies about half of the U.S. browser market.

65.    Google has long monetized its monopoly in search by selling search advertising—digital ads responsive to user searches.  The data that Google has acquired from search and Google Chrome users allowed Google to leverage its monopoly in the digital search market into the related but separate market of display advertising.

66.    General online search services in the United States constitutes a distinct antitrust market.  Search services allow consumers to find responsive information on the internet by entering keyword queries into search engines such as Google.  These general search services are unique because they offer consumers access to an extremely large and diverse volume of information from many sources across the internet.

67.    There are no reasonable substitutes for general online search services.  Other search tools, platforms, and information sources are not reasonably interchangeable with general online search services because they do not provide access to a wide range of information from one search inquiry.  Few consumers would find alternative sources a suitable substitute for general search services.

68.    Google has monopoly power in the United States general online search services market.  Google dominates this market with an approximately 90% market share.  And nearly 95% of all search queries on mobile devices are performed using Google's search engine.

69.    There are significant barriers to entering the market for general online search services, including large capital investment, highly complex technology, access to effective distribution, and adequate scale.

70.    Google's anticompetitive conduct has effectively eliminated rivals' ability to compete in the general search services market.  Google used exclusionary agreements, tying arrangements, and

CLASS ACTION COMPLAINT
CASE NO.

payoffs to barricade its general search monopoly such that competitors are denied vital distribution, scale, and product recognition—preventing them from realistically challenging Google in this market. As one example, Google ensured that its search engine would be the preset default general search engine on hugely popular devices like Apple's iPhone and the devices running on Google's Android operating system.

71.     Online search advertising in the United States also constitutes a distinct antitrust market. Search advertising enables advertisers to target their ads in real time in response to search queries.

72.     Other forms of advertising are not reasonably interchangeable with online search advertising.  The capability of search advertising to respond to consumers' inquiries at the moment they are looking for information to make a potential purchase makes these ads highly valuable to advertisers and distinguishes them from other types of advertising that cannot be targeted in this way, whether online or offline.  Display advertising is no substitute for search advertising, including because display advertising is not responsive to a consumer's specific inquiry and is further removed from the point of purchase.  Few advertisers would find alternative sources a suitable substitute for search advertising.

73.     Google has monopoly power in the United States online search advertising market. Google holds more than a 70% share of that market.

74.     Barriers to entry in the search advertising market, among other factors, protect Google's monopoly in that market.  Most critically, search advertising requires a search engine with sufficient scale to make the advertising profitable.  Hence the same entry barriers that fortify Google's general search services monopoly also protect Google's search advertising monopoly.

75.     Google's monopolies in search and search advertising—and the data they generate about individual users—give Google an enormous advantage over online advertisers and publishers owing to the sheer volume of information Google acquires about consumers through its integrated panoply of products and services.  This data include browsing histories from Google Search and Google's Chrome web browser, and location data from Google Maps, Waze, and Google's Android operating system embedded in hundreds of millions of smartphones.  As Google's former CEO Eric Schmidt boasted,

CLASS ACTION COMPLAINT
CASE NO.

1  "We know where you are. We know where you've been. We can more or less know what you've been

2  thinking about."

3       76.    Online advertising is more effective when it is targeted, displaying products or services a

4  user is more likely to want. Accordingly, user data—including gender, age, location, and browsing

5  history—influence not just the types of ads a user will see, but also the prices advertisers are willing to

6  pay. "The exact same ad, on the same website, at the same time, could be worth vastly different

7  amounts to two different buyers depending on how much they know about the consumer being

8  targeted," explained Ari Paparo, a former Google executive who founded the advertising company

9  Beeswax. "User data is everything."

10      77.    The prices that any company is able to fetch for ads that it displays online depend on two

11  crucial factors: the ability to identify *who* is loading the page or mobile application, and the ability to

12  connect that user's identity with more information about them.

13      78.    The targeting of display ads begins the moment a user clicks to visit a web page.

14  Typically, the user's IP address and location, along with the URL of the web page, are swiped from the

15  user's browser without their explicit knowledge. This data then informs the instantaneous ad auctions

16  that occur in the split second before the web page appears to the user. The goal is to build and deploy as

17  specific a portrait about the user as possible, primarily by linking their device with their identity. Web

18  cookies, tags, and "fingerprinting" of mobile devices are common tools for doing so.

19      79.    If a publisher or company that sells online ads can know what a user is viewing

20  on *other* sites, the publisher can target the user based on that information when the user returns to the

21  publisher's site. Because of its dominance, including in search, Google can track users' visits to at least

22  70% of the top one million sites on the internet. Google has tags (including as a third party) tracking

23  user behavior on over 80% of popular websites.

24      80.    Due to Google's monopoly in search and its unrivalled ability to gather, aggregate, and

25  analyze user data, which it does not share, no potential competitor to Google can offer an advertising

26  product that comes close to the individualized targeting that Google can offer. Without access to search

27  data, potential rivals are effectively excluded from competing in digital advertising.

28

CLASS ACTION COMPLAINT
CASE NO.

81.     To illustrate Google's vast advantage over any other publisher in accessing and monetizing data, consider two hypothetical online publishers, CNBC and the *New York Times*.  Suppose, for example, that a user named Mary visits CNBC's website in the mornings, where she reads about financial markets, and visits the *New York Times* in the evenings to read the book review section.  CNBC knows that Mary follows financial markets and might monetize her view at a $30 CPM (cost per thousand impressions).  The *Times* knows that Mary likes to read books and might only monetize her at a $10 CPM.  If the *Times* can somehow find out that Mary is reading CNBC in the mornings, then when Mary visits the *Times* book review section in the evening, the *Times* can target her as someone who follows the markets and monetize her at $30, too.

82.     Since the two are competitors in the supply side of the display advertising market, CNBC would not want to share with the *Times* what Mary reads on cnbc.com.  If CNBC is selling ads to its audience of financial readers at a $30 CPM, and the *Times* can access CNBC's readers and their reading patterns, then the *Times* could undercut CNBC and sell ads targeted to CNBC financial readers for, say, $25 instead of $30.

83.     Google uses its ability to track users across the web to extract such a large advantage in display advertising markets that rivals are effectively excluded.  Google tracks users through its analytics and ad-serving products, which it combined and rebranded as the Google Marketing Platform.  While publishers like CNBC and the *Times* would never share with each other user information that gave each a competitive advantage, they have no choice but to share user tracking information with Google, which acts as both their ad broker and supply-side competitor.

84.     Google's exclusive access to its proprietary data from Chrome and Android further widens its substantial advantage over other publishers.  Google relies on this data, which is generally unavailable to competing bidders, when bidding on its own ad exchanges to win contracts to display ads.  Potential rivals for display advertising contracts cannot compete to win business without access to this data.

85.     Furthermore, while digital ads trade on several auction markets, Google ensures that its own display advertising inventory can only be purchased through its proprietary auctions.  Thus, the

17

CLASS ACTION COMPLAINT
CASE NO.

most effective, data-driven inventory stays within Google's control and potential competitors are excluded.

86.     Having consolidated key portions of the ad tech stack for display advertising, Google now readily brokers transactions on both sides of this market, and can steer advertisers to its *own* display supply platforms like YouTube.  As the U.K.'s CMA concluded in a report issued on July 1, 2020, "Google's strong position at each level of the intermediation value chain creates clear conflicts of interest, as it has the ability and incentive to exploit its position on both sides of a transaction to favour its own sources of supply and demand."

### 2.     Google Harms Purchasers and Sellers of Online Advertising by Coercing the Purchase of Display Advertising Through Tying Arrangements

87.     With about nine out of ten internet searches using Google's search engine, Google is the dominant source for search advertising.  As a result, companies seeking to promote their products or services online have little or no choice but to purchase search advertising space from Google.  Google has taken advantage of this dominance in the search advertising market to drive out competition in the separate market for display advertising services, tying its display advertising services to its search advertising services to extend its monopoly power.

88.     Because search advertising targets users who have already shown some interest in the product or service from their search, few online advertising campaigns bypass online search as a platform for marketing.  Search advertising accounts for at least part of the ad spend of nearly every advertiser engaged in online advertising.

89.     When a Google Ads account is established for use in placing search advertisements, Google Ads is set as the default account for placing both search *and* display advertisements.  Google also blocks advertisers from using third-party DSPs to purchase Google Search inventory, which is sold primarily through Google AdWords.  And, to further disadvantage rivals, Google restricts access to data relating to web searches performed on Google Search.

90.     When consumers run Google searches, Google collects and retains data related to the searches.  For example, Google Ads (a DSP) relies on algorithms that match keywords selected by

CLASS ACTION COMPLAINT
CASE NO.

advertisers to user search terms to determine which search ads pop up after which searches.

91.     DSPs and advertisers use this data to craft more effective advertising campaigns. Google, however, withholds this data from rival DSPs and advertisers using rival service providers.  As a result, an advertiser running both search and display ads cannot track the performance of its search ads unless it relies only on Google to place its display ads.

92.     The effect of this policy is that, to access the search data over which Google has monopoly control and which is vital to effective online advertising, an advertiser is coerced into using Google's products in the separate market for display advertising services.

93.     Advertisers that open a Google Ads account are required to buy Google search advertising.  Thus, Google Ads does not merely steer advertisers to Google search advertising but conditions their ability to bid for publisher display space upon their purchase and use of Google search advertising.

94.     Google's restrictive practices coerce any advertiser whose marketing pairs online search advertising with online display advertising to rely only on Google's intermediation services to place its display advertisements.

95.     Exacerbating this tying conduct, Google pressures many advertisers to use only one Google buy-side intermediary to purchase ad space.  This pressure results from Google's decision to scramble user IDs across multiple bidding tools instead of assigning and disclosing a single user ID to a particular advertiser.  Because Google obscures DoubleClick IDs for all parties other than Google, advertisers that use more than one buying tool at a time risk inadvertently bidding against themselves in exchange transactions, driving up the price they would pay.

96.     Google's Ads Data Hub (ADH) allows advertisers to view data from ad campaigns, including which users their search advertising campaigns reached, and to combine that data with internal or third-party data to set or adjust display advertising strategy.  Nevertheless, the ability to use Google's ADH data comes with a built-in restriction: the data can only be sent to another Google service and cannot otherwise be exported.

97.     In 2018, Google stopped allowing advertisers to access the encrypted user IDs from ad

campaign reports. Advertisers need this information to hire non-Google ad campaign measurement firms. Advertisers that stay within Google's "walled garden" and use its ADH product can still access these IDs.

98. Google's restrictive policies have made it virtually impossible for an online marketer to operate independently from the Google ad stack, particularly given Google's dominance in the DSP, ad server, site analytics, and other submarket segments.

99. Likewise, on the supply side, Google restricts publishers' ability to access the bid data required to compare the performance of Google's exchange with rival exchanges. And Google does not reveal to other market participants its own fees and commissions on transactions. As discussed further below, this lack of transparency that Google has unilaterally imposed across the ad stack undermines the ability of both advertisers and publishers to make the informed decisions necessary to drive competition.

100. Google similarly uses its dominance in the video-ad publishing market segment to coerce advertisers to use Google's display advertising services.

101. Google-owned YouTube is Google's most valuable display property. YouTube is by far the most visited website in the United States, drawing more than three times the traffic of Twitter and Facebook, respectively. Nearly every business that advertises with online videos buys advertising space on YouTube, and about half of all video ads not appearing on Facebook and Amazon appear on YouTube.

102. Video has become increasingly important to online advertising campaigns because of its compelling nature and the exponential increase in user traffic that it generates. In 2019, 81% of businesses used video as a marketing tool—up from 63% in 2018. By 2022, online videos will account for more than 82% of all consumer internet traffic—15 times higher than the corresponding percentage in 2017.

103. After Google purchased YouTube, it initially made YouTube's inventory of display advertising available to any advertising service provider. But in 2015, Google took YouTube off the digital ad exchanges, restricting its ad inventory to being purchased *only through Google's* brokering channels and bidding tools.

CLASS ACTION COMPLAINT
CASE NO.

104.    Consequently, advertisers can no longer purchase YouTube inventory using a third-party DSP.  If an advertiser wants to purchase any of the valuable advertising space on YouTube, it must use Google's advertising services and cannot use any of Google's rivals' advertising services.

105.    One erstwhile competitor described Google's requirement that Google services be used to place ads on YouTube as "the beginning of the end," noting that "Google used its monopoly on YouTube to put its hand on the scale" unfairly.  Sen. Amy Klobuchar (D-MN) observed that this change "of course had a crippling effect on Google's rivals" and "not only forces YouTube's ad inventory into Google DSP, it also had the effect of driving non-YouTube ad volume to Google and away from the rival DSPs."

106.    In 2018, Google also began restricting third-party ad servers from tracking viewing activity on YouTube, leaving Google-owned Display & Video 360 as the only product available to collect and analyze YouTube advertising data.  This action effectively tied YouTube to Google Ads and Display & Video 360, preventing advertisers from using competitors' products to serve *or* analyze ads on YouTube.

107.    Google's leveraging of its position in forums like YouTube in which it is the dominant ad publisher restrains competition with an enhanced effect because advertisers almost always use a single DSP for a given advertising campaign.  Advertisers use a single DSP for a campaign largely because doing so allows them to manage frequency caps (limits on the number of times the same user is shown an ad) during the campaign and facilitates audience management and reporting.  Thus, if an advertiser wished to advertise on YouTube, Google Search, *and* other publisher websites, the advertiser would bear significant costs and inefficiencies from using a different advertising service provider to broker distribution of the ad campaign into each forum.

108.    Even if an advertiser preferred to use multiple DSPs, Google does not permit it to use third-party DSPs to purchase Google Search inventory (sold primarily through Google AdWords) or Google's YouTube inventory.  Because Google Search and YouTube, in addition to digital display, are essential to many online ad campaigns, Google is able to capitalize on its "must-have" inventory to tether advertisers to its DSP.  And because advertisers typically use one DSP per ad campaign, a display

CLASS ACTION COMPLAINT
CASE NO.

advertiser that wants any of its ads to appear on Google Search or YouTube must use Google's DSP for the entire ad campaign. In short, Google enlisted its dominance in search and search advertising to pursue and secure a monopoly in display advertising.

109. Google has also combined ad tech stack products that were once technically separate but interdependent, reinforcing that they were effectively tied within the relevant market all along. For instance, using Google's ad server, formerly called DoubleClick for Publishers, was for many years the only way to obtain full access to Google's AdX exchange. That access was critical for publishers because AdX connected to AdWords, and the ability to access AdWords greatly expanded publishers' access to advertisers because of Google's dominance in search. As the *Wall Street Journal* reported, "[f]or many years, Google's AdX was the only ad exchange that had access to" Google's AdWords platform and its many advertisers. Thus, for example, when News Corp considered switching from Google to a different company to facilitate its ad-serving business, it reportedly "felt it would jeopardize the 40% to 60% of advertising demand it gets from Google's ad marketplaces . . . ." According to the *Journal*, Google in 2018 merged DoubleClick for Publishers and AdX "into a single product called Google Ad Manager, making it plain to the industry that they are indeed linked . . . ."

110. Advertisers have suffered harm by paying higher prices due to Google's display advertising monopoly. During the class period, increases in the prices paid by advertisers to place online display ads have outpaced the rate of inflation as a result of Google's ability to charge supra-competitive prices free from any realistic competitive threat.

111. The investigation conducted by the House Subcommittee on Antitrust, Commercial, and Administrative Law revealed that many companies pay Google most of their online ad expenditures. For example, one major company paid well over half of its total ad spend to Google each year from 2016 to 2019, with the second top provider receiving less than 15%.

112. A 2018 study by eMarketer, which focused on programmatically purchased ads across the open internet, found that programmatic ad prices have risen meaningfully across all major display categories: desktop, mobile, mobile app, and video. In 2018, the average digital advertisement sold for 12% more than it did in 2016, an increase approximately five times the prevailing rate of inflation.

CLASS ACTION COMPLAINT
CASE NO.

These price increases resulted in substantial part from Google's consolidation of the intermediation services market and Google's price increases for those services, and were largely borne by advertisers who paid Google for those services to broker the placement of their display ads.

113.    *Bloomberg* also reported that as of 2019, Google had increased the price of search ads by about 5% annually, a rate more than three times greater than the 1.6% inflation rate during the same time period.

114.    Google's power in the relevant market enabled it to raise the prices of its brokering services to supra-competitive levels.  The higher prices have increased Google's profits, but advertisers now receive less for each dollar they spend, with trading costs now accounting for half the cost of every trade on average.

115.    A substantial portion of Google's trading fees are monopoly rents.  Competitive market conditions would serve to reduce these fees.

116.    Advertisers have seen progressively lower returns on their digital advertising investments as Google built and reinforced its monopoly in the relevant market.  And publishers have lost ad revenue because Google's entrenched monopoly has enabled it to take a comparatively larger cut of advertisers' payments for the placement of ads.

117.    The higher prices have greatly benefited Google.  Google has consistently reaped profits at margins greater than 20%—almost three times more than the average profit margin for an American business.  Financial analysts predict that Google is well positioned to maintain its dominance in digital advertising, noting that "Alphabet has established unusually deep competitive moats around its business."

118.    Google's reserve-price practices also have caused advertisers to pay higher prices.  In its online ad auctions, Google sets a reserve or floor price, which corresponds to a minimum bid that is needed to win a particular ad placement.  If none of the bids exceeds this reserve price, the winning bidder *must* pay the reserve price—a price that, by definition, is higher than the price that would have won the placement in an auction in which Google had not set a floor price.  In fact, the majority of winning bids by advertisers are at the reserve price.  The lack of competition from other ad auctions has

CLASS ACTION COMPLAINT
CASE NO.

allowed Google to impose these supra-competitive floor prices. At the same time, Google denies advertisers access to data they would need to accurately measure the success of their advertising campaigns and negotiate for lower prices.

119.    Market participants such as advertisers and newspapers also lack visibility into the fees charged along the supply chain, which limits their ability to make optimal choices about how to buy or to sell advertising inventory. A market participant observed in congressional testimony that "Google could make the process 'more transparent,' but given Google's financial stake in maintaining secrecy, 'there is no incentive to do so.'"

120.    The foreclosure of competition in digital advertising markets resulting from Google's monopoly has harmed the public at large. When advertisers pay supra-competitive fees to brokers like Google for placing ads, they pass on a portion of those costs to their customers by marking up the prices of their goods and services. And when publishers receive anticompetitive underpayments for running ads, they are often forced to cut costs, including through layoffs, and hence cannot produce content of the same quality or variety. Finally, by eliminating competition, Google's display advertising monopoly also has reduced the incentive to innovate in these markets and thereby deprived the public of the benefit of improvements in advertising services and delivery.

**D.      Google Created and Has Maintained Its Monopoly in Display Advertising Services by Restricting the Ability of Rivals to Compete on Equal Footing**

121.    Google has engaged in a host of anticompetitive practices, including the leveraging of its monopoly in search and search advertising and the multiple tying arrangements discussed above, to disadvantage its rivals and cement its dominance in the display advertising services market.

122.    Another key monopolistic practice that Google employs is denying interoperability—that is, Google denies the ability of its own advertising service systems to interface with the systems of rival advertising service providers, where those systems once were compatible.

123.    Google's set of anticompetitive acts described in this complaint, including its monopoly leveraging, tying, exploitation of user data, and foreclosure of technological compatibility, were part of a unified, long-term strategy to exclude competition in the relevant market. While each component of that

CLASS ACTION COMPLAINT
CASE NO.

strategy, by itself, may not have sufficed to allow Google to monopolize the relevant market, their combined effect was to roll back competition, giving Google untrammeled power across the ad tech stack connecting advertisers and publishers of display advertising.

124. Although Google has publicly claimed that publishers can "mix and match technology partners," that claim is false in several important respects. Google changed its practices to deny interoperability with its rivals to squelch competition that would otherwise occur within Google's SSP system. When accepting bids from advertising services, Google's SSP operates more efficiently with Google's own advertising service. Although Google's SSP can accept bids from non-Google advertising services, Google's SSP is inefficient by design at processing those bids, and they are therefore disadvantaged as compared to bids submitted by Google's own advertising service. As the U.K.'s CMA explained in its July 1, 2020 report, if a publisher "uses a non-Google ad server, AdX would not participate in a real-time auction with other SSPs, but would compete with an 'expected' price, which determines the order in which SSPs are sent an ad request" and "is inefficient for the publisher."

125. Google, in short, runs an auction that includes its own bids, which are prioritized by the auction system that Google designed in such a way that non-Google-based bids cannot effectively compete. Imagine if this were a live, in-person auction: Google would be the auctioneer as well as a bidder; and it would have designed the process so that the other bidders could not hear the live bids, but instead would need to submit in advance bids based on guesses about what the other bids were going to be. Exacerbating these conflicts, Google is also a seller of a portion of the inventory up for bid.

126. Google also imposed new restrictions on publishers' ability to set differential price floors, preventing them from calibrating different pricing for different SSPs or DSPs. This change had its intended result of driving more brokering business to Google on the sell side because publishers could no longer set higher floor prices for Google than for other sources of demand.

127. Moreover, Google's asymmetric approach to sharing websites' DoubleClick user IDs has distorted competition among buying tools seeking to purchase ad space from Google's exchange—*i.e.*, the limited number of buying tools that still compete with Display & Video 360 and Google Ads.

Google's exchange shares users' DoubleClick IDs with Google-owned buying tools.  But, when sending bid requests to *non*-Google intermediaries, Google's exchange shares a different ID value that is obscured from view.

128.    Google's scrambling of IDs in this manner has directly interfered with competition.  An advertiser that uses Google's DoubleClick ad server now has a much harder time using a non-Google buying tool because the two tools operate on different user IDs.

129.    Still another example of Google's exclusionary conduct involves technology called header bidding, a system designed by Google's competitors on the sell side to compete with Google's display advertising exchange.  Google responded to header bidding not by accepting the free and open competition it otherwise would have fostered, but by preventing its systems from working with the javascript code that publishers usually placed on their websites to enable header bidding.  The result of this lack of compatibility was that the publisher would first notify non-Google exchanges and the winning bid would be sent to Google as if it were a pre-existing contract price.  Thus, instead of submitting a blind bid to the publisher for how much the publisher would be paid to place an ad on its website, Google would separately receive the bids submitted by *other* service providers and then submit its *own* bid, knowing the minimum price it would need to outbid its rivals.  This rigging gave Google a significant advantage over its rival brokers because, unlike Google, they would need to submit aggressive bids to ensure their bid was the most attractive—and even then Google could outbid them to win display advertising business.

130.    Google's rivals lacked Google's market dominance and therefore could not make their systems incompatible with header bidding as Google did.  Had they done so, a publisher simply would not have received bids from them.  Even after Google permitted non-Google service providers to integrate with Google's "Open Bidding" system—its exclusionary response to header bidding— Google charged the winning bidder 5-10% of the winning bid, driving up the costs to Google's rivals of merely attempting to compete with Google.  This structure also gives Google a systematic advantage in bidding to place ads because it does not charge itself these fees.

131.    Similarly, when Google launched its Accelerated Mobile Pages, or "AMP," it made the

CLASS ACTION COMPLAINT
CASE NO.

pages incompatible with header bidding, coercing publishers to use Google's Open Bidding system. And to further repel competition created by header bidding, Google began conditioning premium treatment on Google Search (*i.e.*, being featured at the top of search results) upon publishers migrating to AMP and forgoing the use of header bidding.

132.    As Mr. Heimlich, the digital marketing expert, described in his Senate testimony, "Google became the only display company not hobbled by the exclusions and restrictions it'd placed on everyone else.  The power to interoperate among buy-side, sell-side and measurement software went from being a feature of the exchange ecosystem to a capability exclusive to Google."  That exclusive capability fortified Google's power to exclude rivals and allowed it to further boost its share of the display advertising services market, unfettered by any meaningful competition.

## E.    Google Maintains Its Display Advertising Monopoly with Harmful Anticompetitive Conduct

133.    Google maintains a culture of secrecy around its advertising services, a culture made possible by its market power.  When acting as an intermediary, Google conceals from publishers and advertisers the price actually paid to Google for an ad placement.  Even so, the consensus among knowledgeable publishers and advertisers is that Google's "ad tech tax" is high, particularly in comparison to fees charged in non-programmatic ad markets.

134.    Google is competing with other sellers of display advertising, yet because it is also acting as the broker for these sales, Google has unique information which it denies to the buyers and other sellers to protect its monopoly.  Google refuses to disclose even basic information, including the fees it charges for each transaction, to other participants in the ad tech stack, causing market-distorting inefficiencies that solidify its grip on display advertising.

135.    Google redacts its take rate from trading or auction records on both the buy-side and the sell-side.  Service providers in competitive markets, by contrast, generally must furnish their customers detailed accounts of the services they are providing to justify the prices they charge.  Studies have shown that about 15% of display advertising transaction costs are unaccounted for: these are Google's monopoly rents.

136.    In surveys conducted by the Association of National Advertisers estimating take rates,

27

CLASS ACTION COMPLAINT
CASE NO.

participants reported it was impossible or very difficult to obtain transaction-level pricing data related to Google's brokering services. This lack of transparency makes it harder for publishers to negotiate with advertisers, and for potential competitors to compete with Google.

137. Google also removes time-stamp information on bids, which publishers previously had used to optimize their pricing. Moreover, Google conceals information about the performance of the digital ads it brokers, such as how many impressions are shown to actual users, as opposed to bots. Google's multiple failures of transparency reinforce its power in the display-ad market and prevent advertisers from knowing if they are wasting some of their spend.

138. Google's lack of transparency is strong evidence of its monopoly power. If Google were subjected to competition in the relevant market, it could not conceal from advertisers and publishers information that Google collects related to their transactions for the placement of display ads. In a competitive market, Google would risk losing business to more transparent rivals, as both advertisers and publishers have an interest in learning, assessing, and modulating their advertising efforts in response to information related to those transactions.

139. Google's lack of transparency is not limited to withholding of information. When advertisers use the Google Ads tool to bid on ad space belonging to third-party publishers from Google's exchange, Google does not disclose to them the price at which the ad space actually cleared. Google can thus arbitrage advertisers' bids across two Google-controlled marketplaces—a fact that may go unnoticed by small-business and other advertisers due to the sheer complexity of Google's terms, including in its various "Help" documents. Read as a whole, the terms appear to permit Google to process bids that advertisers submit via Google's buying tool for smaller advertisers (known as Google Ads) through two different Google marketplaces (auctions). In other words, Google Ads hosts a first auction, and then Google Ads acts as the "buyer" in Google's exchange, so that Google simultaneously acts on the buy-side and the sell-side. Google implicitly confirmed this practice to Australia's competition authority.

140. Google has claimed implausibly that the conflicts of interest now present in its digital advertising business should lead to market efficiencies rather than distortions, asserting that "the

28

CLASS ACTION COMPLAINT
CASE NO.

combination of Google's search business and its vertical ad tech integration should give it incentives to balance the interests of all ecosystem participants." But market data tell a different story. Google's public filings show that the differential in allocation of advertising revenues between Google and non-Google properties has consistently increased. In 2007, the share going to Google properties increased to 64%, in 2008 to 68%, eventually to 71% (2011), then 75% (2014), 77% (2015), 80% (2016), 81% (2017), and 82% (2018). This percentage increased again in 2019, with just 16% of the $134 billion that advertisers spent through Google going to the more than 2 million *non*-Google properties that sell their ad space through Google's exchange and buying tools. These widening percentages well demonstrate the market distortions now favoring Google, and they correspond to—and resulted from—Google's steady acquisition of monopoly power in the ad tech stack.

141. As discussed above, Google has ready access to enormous amounts of consumer data, yet it has also acted to prevent competitors from obtaining similar information. In January 2020, for instance, Google announced that it would "phase out" the third-party cookies in its Chrome browser that help advertisers target consumers based on demographics, past browsing history, and other information. As a result, competing exchanges and buying tools soon will no longer be able to use cookies to assign user IDs for the purpose of buying and selling ads. Without access to third-party cookies, it will be much harder for advertisers and competing service providers to bid rationally on ads. Yet that is not so for Google, which will continue to have other sources for gleaning robust data on consumers. Google Chrome has begun tracking users' web activity directly at the browser level, obviating Google's need to rely on cookies for identity information.

142. In 2016, Google launched AMP for the stated purpose of loading web pages faster on mobile devices. AMP is a framework that websites can use to create fast-loading mobile web pages. By limiting the types of programming codes that can be used on a page, AMP pages load faster than they otherwise would. When a user clicks on an AMP link from Google Search, instead of being routed to the page on the third-party site's server, the user sees a cached version stored on Google's own servers via its Content Delivery Network.

143. Google encourages publishers to use AMP web pages and lists them first in a search.

CLASS ACTION COMPLAINT
CASE NO.

But, because the pages are *Google* pages, publishers are unable to gather data about their own users as they normally would. For example, in the below image, the left side shows a *Newsweek* article on its own server. The right side shows the same article, but on a Google-hosted page the user would see after clicking on the AMP-loaded link via Google Search:



*Left*: Normal article; *Right*: AMP article loaded from Google Search

144. Google's strategy to host more and more content on its own servers demonstrates that Google views content providers themselves as long-term competitors for the capture of ad dollars. More than half of the desktop searches on Google keep users on Google properties rather than prompting clicks to the rest of the web. For mobile searches, 70% of Google searches keep users on Google properties. The percent of Google's revenue from advertising dollars spent on its own properties increased from 64% in 2007 to 85% in 2020.

145. The report issued on October 6, 2020 by the House Subcommittee on Antitrust, Commercial, and Administrative Law notes that, "in the context of Google's placement of news on accelerated mobile pages (AMP) . . . publishers raised concerns that 'Google effectively gave news publishers little choice but to adopt it,' requiring the creation of parallel websites 'that are hosted, stored and served from Google's servers rather than their own.'"

146.     A recent study by the News Media Alliance found that in 2018, Google gained over $4 billion in revenue from crawling and scraping news content, and running associated display ads, without paying the publishers for that use.  Google was able to take these steps because of its monopoly power over display advertising.

147.     Considered as a whole, Google's activity in the ad tech stack reflects a long-term strategy to monopolize display advertising.  Through acquiring rivals, leveraging its monopoly in search, tying display advertising to search advertising, denying the interoperability of its products with others, exploiting conflicts of interest, and withholding information from other market participants, Google has effectively created a "walled garden" for display advertising.  Google sells its own display advertising inventory even as it brokers a large majority of all display advertising sales, inhibits potential rivals from competing by denying them information and equal footing in the intermediation process it controls, and has acquired any company that threatens its display advertising services monopoly.  Google profits illegally from its walled garden by plucking the fruit every step of the way.

**F.     Government Investigations and Actions Regarding Google's Monopolistic Activities**

148.     In July 2019, the United States Department of Justice announced that it had opened an investigation into whether Google is committing illegal monopolistic acts.  The DOJ stated that its probe would focus on whether and how Google and other leading online platforms "have achieved market power and are engaging in practices that have reduced competition, stifled innovation, or otherwise harmed consumers."

149.     DOJ's ensuing civil action—joined by eleven state attorneys general and filed on October 20, 2020 in the United States District Court for the District of Columbia—focuses on Google's monopoly conduct in the markets for online search, search advertising, and search text advertising.  The complaint of these governmental enforcers alleges that Google acted unlawfully to preserve these monopolies after having "created continuous and self-reinforcing monopolies in multiple markets."

150.     As a result of Google's monopoly conduct, the enforcers allege, consumers are "forced to accept Google's policies, privacy practices, and use of personal data; and new companies with innovative business models cannot emerge from Google's long shadow."

CLASS ACTION COMPLAINT
CASE NO.

151.    The governmental enforcers further note that Google's conduct and internal messaging demonstrate its executives' awareness that Google has used its monopoly power to restrain competition: "Google employees were instructed to avoid using terms such as 'bundle,' 'tie,' 'crush,' 'kill,' 'hurt,' or 'block' competition, and to avoid observing that Google has 'market power' in any market."

152.    The governmental enforcers seek, among other relief, "structural relief as needed to cure any anticompetitive harm" and an injunction forbidding Google's anticompetitive practices: "Absent a court order, Google will continue executing its anticompetitive strategy, crippling the competitive process, reducing consumer choice, and stifling innovation."

153.    The attorneys general of every state except Alabama are separately investigating Google for monopolization.  In September 2019, the attorneys general of 48 states, and of the District of Columbia and Puerto Rico, led by Texas Attorney General Ken Paxton, disclosed that they had opened an investigation into whether Google is violating the antitrust laws.  In announcing the investigation, Mr. Paxton referred to "evidence that Google's business practices may have undermined consumer choice, stifled innovation, violated users' privacy, and put Google in control of the flow and dissemination of online information."

154.    On July 9, 2020, news media reported that the California Attorney General's Office had opened its own independent antitrust investigation of Google.

155.    On July 29, 2020, the House Subcommittee on Antitrust, Commercial, and Administrative Law of the House Judiciary Committee held hearings on the subject of "Online Platforms and Market Power: Examining the Dominance of Amazon, Apple, Facebook, and Google." Google CEO Sundar Pichai appeared for questioning by members of Congress, including regarding whether Google has abused its position as the default web gateway with its dominant search engine. The Subcommittee Chair, Rep. David N. Cicilline (D-RI), noted the "harmful economic effects" of the market dominance of Google and the other companies under scrutiny for monopoly conduct: "They discourage entrepreneurship, destroy jobs, hike costs, and degrade quality."

156.    On October 6, 2020, the House Subcommittee issued a report entitled "Investigation of Competition in Digital Markets."  The report finds that, "[w]ith a sizeable share in the ad exchange

CLASS ACTION COMPLAINT
CASE NO.

market, ad intermediary market, and as a leading supplier of ad space, Google simultaneously acts on behalf of publishers and advertisers, while also trading for itself—a set of conflicting interests that market participants say enable Google to favor itself and create significant information asymmetries from which Google benefits."

157.  The House report recognizes that Google's series of acquisitions in the relevant market "enabled it to gain a controlling position across an entire supply chain or ecosystem.  Google's acquisitions of DoubleClick, AdMeld, and AdMob . . . let Google achieve a commanding position across the digital ad tech market."

158.  On September 15, 2020, the Subcommittee on Antitrust, Competition Policy, and Consumer Rights of the Senate Judiciary Committee held a hearing on the subject of "Stacking the Tech: Has Google Harmed Competition in Online Advertising?"  Questioning Google's witness, Sen. Josh Hawley (R-MO) took note of its "enormous advantage in this ad stack that you control every single layer of."  Google controls "the entire ad stack from top to bottom," he further explained.

> And you're using your position in search and YouTube in order to give yourselves a dominant position in the ad stack, and not just on the demand side . . . but also on the supply side. . . . I think the concern is, is that you control YouTube and search, which are the dominant platforms; you control massive amounts of consumer data that you have harvested from your other consumer-facing platforms—Gmail, Google Maps, G-Suite, etcetera. You then use those advantages in the ad stack at every single layer, every layer of which you exercise dominance in.

Senator Hawley concluded: "This looks like monopoly upon monopoly, in a classic case of tying."

159.  Senator Klobuchar added that "Google may be taking between 30 and 70 percent of every advertising dollar spent by advertisers using its services, depriving publishers of that revenue."  She also stated that, "[w]ith the benefit of hindsight, it seems obvious that [Google's] acquisitions were undertaken by the company in order to add to its market share and without explanation . . . other than for Google to establish and maintain the monopoly power it currently has."

160.  Sen. Richard Blumenthal (D-CT) stated that Google has committed "quite simply a stunning abuse of market power."  Senator Blumenthal termed Google's position in regard to its digital advertising monopoly "indefensible," noting that

33

in no other market does the same party represent the seller, the buyer, make the rules and conduct the auction. . . . Given that Google operates the exchange and it competes with publishers on that exchange, that is a classic risk of insider trading. If you compare it as Google has to the stock market, Google would have been prosecuted long ago for insider trading.

161. On December 16, 2020, the State of Texas, joined by nine other states, filed a civil antitrust action against Google for the conduct alleged herein. *See Texas, et al. v. Google LLC*, No. 4:20-cv-00957-SDJ (E.D. Tex. filed Dec. 16, 2020). Like Plaintiff in this action, the state plaintiffs in the *State of Texas* action claim that Google illegally acquired and maintained a monopoly in online display advertising services, alleging "Google uses its powerful position on every side of the online display markets to unlawfully exclude competition." And like Plaintiffs here, the state plaintiffs assert causes of action against Google for violations of Section 2 of the Sherman Act, as well as the antitrust and unfair competition laws of their respective states, seeking a range of civil remedies and penalties to restore competition.

162. Google has already met with significant regulatory action in Europe. The European Commission fined Google $2.7 billion in 2017 for rigging search results to favor its own online shopping portal and $1.7 billion in 2019 for dictating to other websites how they can display search results from Google's competitors.

163. In December 2019, France's competition authority fined Google $166 million following a lengthy investigation into Google's online advertising practices. France sanctioned Google for adopting "opaque and difficult to understand" rules for its ad platform and for applying them in an "unfair and random manner." According to *TechCrunch*, the French governing body also found that "another element of Google ad rules could lead sites to favor a content policy aligned with its own ad-funded services—thereby pushing online publishers to adopt an economic model that deeds and benefits its own." The French governing body summarized its bases for fining Google as follows:

> [T]he French Competition Authority considers that the Google Ads operating rules imposed by Google on advertisers are established and applied under non-objective, non-transparent and discriminatory conditions. The opacity and lack of objectivity of these rules make it very difficult for advertisers to apply them, while Google has all the discretion to modify its interpretation of the rules in a way that is difficult to predict, and decide accordingly whether the sites comply

34

with them or not. This allows Google to apply them in a discriminatory or inconsistent manner. This leads to damage both for advertisers and for search engine users.

164. On July 1, 2020, the U.K.'s Competition and Markets Authority released a 437-page report entitled "Online Platforms and Digital Advertising: Market Study Final Report." The CMA found that Google has dominant market share positions at each level within the ad tech ecosystem, with particularly high shares of at least 80% in both the publisher ad server and advertising markets. The CMA further found that Google "has been able to leverage the market power from its owned-and-operated advertising inventory into the open display market and within the ad tech stack, making it harder for third-party intermediaries to compete," and that "greater competition and transparency would put downward pressure on" fees borne by advertisers and publishers. Additionally, the CMA found that Google has deployed its dominant market positions by engaging in "self-preferencing behaviour," such as precluding publishers using Google Ad Manager from setting different floor prices for different buyers, a policy shift that substantially increased "Google demand's win rate."

165. In response to Google's attempts to justify its lack of transparency and other practices by invoking data privacy laws, the CMA observed that "Google itself" has proposed technologies "to allow targeted advertising without user profiling," and that Google has an obvious incentive to interpret data protection laws in a self-serving way to "entrench[] its own competitive advantage, including by denying third parties access to data that is necessary for targeting, attribution, verification and fee or price assessment" while preserving its own right to use that data within its "walled garden."

## V.  INTERSTATE TRADE AND COMMERCE

166. Google's conduct as alleged herein has had a substantial effect on interstate and intrastate commerce.

167. At all material times, Google participated in the marketing, promotion, distribution, and sale of publication and advertising services for display advertisements in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States.

168. Google's conduct also had substantial intrastate effects in that, among other things, Google's publication and advertising services for display advertisements were sold in each state,

CLASS ACTION COMPLAINT
CASE NO.

including California.  At least thousands of individuals in each state, including California, were impacted by Google's anticompetitive conduct.  As alleged below, absent Google's unlawful conduct, Plaintiff and class members within each state would have paid less or received more money for digital advertising services.

## VI.  RELEVANT MARKET

169.     Google's anticompetitive conduct has restrained competition in the market for online display advertising services, encompassing the overall system or process that connects online display advertisers and publishers (including Google).  This market, colloquially known as the "ad tech stack" or "ad stack," comprises various segments and is the relevant market that Google monopolized for purposes of this action.

170.     The relevant geographic market is the United States.  Market participants recognize this in the ordinary course of business.  For example, Google offers display advertisers the ability to target and deliver ads based on the location of publishers or consumers in the United States.  Google also separately tracks display advertising revenue for the United States.

171.     Google is the dominant provider of online search and search advertising in the United States—over 90% of internet searches are performed on Google's search engine—and used its dominant position in those markets to restrain trade in the separate market for display advertising services.

172.     The display advertising services market comprises advertising services and platforms, and publishing services and platforms.  Google has monopolized each of the relevant submarkets of the overall market for display advertising services, including the subsidiary markets for publisher ad servers, supply-side platforms, demand-side platforms, and advertiser ad servers.  Google's conduct had the intent and effect of suppressing competition in the display advertising services market as well as in each of its component submarkets, and converting those submarkets into a single intermediation market under its control.

173.     Google controls well over 90% of the PAS submarket and more than half of the SSP and associated ad exchange submarket.  Likewise, on the demand side, Google controls 80-90% of the AAS

submarket and at least 60% of the DSP submarket.

174. Google has wielded its market power to integrate each submarket of the ad stack into a single set of bundled services, with the intent and effect of preventing and discouraging competitors (other display advertising services providers), publishers, and advertisers from relying on advertising service providers on a product-by-product basis. Google's anticompetitive conduct has foreclosed competition, eliminating the ability of each segment of the display advertising services process, and the process as a whole, to function as a free and independent market. As a result of Google's conduct detailed in this complaint, Google has succeeded in combining the various subcomponents of the intermediation market for display advertising into one market—and a large and continually increasing majority of advertisers and publishers recognize and submit to this economic reality by paying only Google for display advertising brokering services.

175. Digital display advertising on the open web is a "market" under antitrust law even though advertisers may engage in other forms of digital advertising as well. Online display advertising is at base a matching problem. On one side are publishers who produce content, and earn revenue by displaying ads to users. On the other side are advertisers who are interested in displaying ads to particular users (*e.g.*, based on demographics or market segments). The online user population is fragmented across hundreds of thousands of publishers, preventing advertisers from reaching desired customers without assistance from an intermediary. Likewise, given the vast number of advertisers interested in displaying their ads, most publishers would find it very difficult to maintain the corresponding business relationships.

176. Display advertising brokering services have no reasonable substitute for purposes of marketing goods or services in today's economy. While it is theoretically possible for an advertiser to connect directly with a publisher to negotiate the placement of advertisements onto the publisher's supply of advertising space, for the vast majority of advertisers doing so is impractical and very rare. At least 90% of all online display advertising space in the United States is bought and sold on ad exchanges in the electronic real-time bidding market.

177. Nearly all advertisers lack the resources and access to be able to negotiate directly with

CLASS ACTION COMPLAINT
CASE NO.

particular publishers to place their display advertisements, and even advertisers with the ability to do so prefer not to limit their placement of display advertisements to discrete websites. Publishers and advertisers thus generally rely on third-party display advertising services to facilitate the placement of online display advertisements.

178. In the rare instances where select advertisers can purchase "directly from the publisher" they can do so via manual media buying, programmatic direct buying, or a private, invite-only marketplace (PMP). Manual media buying is antiquated and now seldomly if ever done. Programmatic direct and private auctions are the only current ways to purchase advertising directly from publishers. Programmatic direct buying is done under extremely limited circumstances of either specific invite from the publisher to participate in a private auction, or directly, without an auction, at ultra-premium prices most advertisers cannot afford. Ads sold through programmatic direct are typically tied to premium publishers (*e.g.*, *Forbes*) that reserve a limited percentage of their inventory for which they can demand a premium price from well-capitalized advertisers, which receive guaranteed ad space in return. Similarly with PMP, the participants are large enterprise advertisers and marketers, and only a handful of large advertisers (*e.g.*, Nike, Barclays) are invited to bid on a publisher's inventory. PMP is typically offered by publishers with premium, expensive inventory, such as major media sites like *Forbes*, the *Wall Street Journal*, or the *New York Times*.

179. For small- and medium-sized advertisers, it is essentially impossible to access such exclusive inventory directly—not only are they not invited by the publisher, but even if they were, they could not pay the high prices set by the publisher. Together, private invite-only auctions and direct purchase are so exclusive that they account for a very low percentage of the display advertising market, and they are no substitute for real-time bidding on the open web.

180. In fact, Google often is involved in these limited invite-only and premium ad-buying processes where they occur. Google offers these options for transacting in Display & Video 360 (reserved for enterprise advertising customers), and DoubleClick Ad Exchange offers services to facilitate invite-only exchanges. As such, despite these processes' "private" label, Google's participation is frequently still required to complete the underlying transactions.

CLASS ACTION COMPLAINT
CASE NO.

181.    Online display advertising is not substitutable with traditional forms of advertising, such as print, television, radio, or billboard advertisements.  None of those platforms rely on individual targeting based on individual user data and profiles—the entire driver of programmatic or automated display advertising.  Recent pricing and bid data from various exchanges illustrate the point.  For example, a 2018 Google study reported that the prices for ad space trading on Google's exchange drop by half or more when advertisers cannot identify users associated with the ad space for sale.  Relatedly, according to Index Exchange, the number of bids for ad space on Mozilla Firefox pages declined by 38% after that internet browser started blocking cookies.  In short, unless they can know the identity of the users being targeted, advertisers often avoid ad auctions altogether.

182.    Regardless of whether certain traditional forms of advertising may be reasonably interchangeable for each other, digital advertising is not.  Digital advertising is different in kind from traditional forms of advertising, including because it reaches targeted customers individually and because digital advertisements can be continuously updated and improved based on data showing how consumers are responding.

183.    With the broad category of digital advertising, display advertising is not reasonably interchangeable with search advertising.  These two forms of digital advertising perform different roles, serve different purposes in marketing campaigns, and are treated by advertisers and marketing firms as distinct.  Search is intent-based advertising that seeks to induce consumers who have already shown an interest in buying a product or service to make a purchase.  Display, in contrast, is suitable for raising awareness about a product, service, or brand and reaching new audiences that may not yet have shown an interest.  Because of this basic difference in how the two forms of advertising function in relation to potential customers, they are not reasonable substitutes for each other.

184.    During the class period, display advertising also performed a unique function in advertisers' re-marketing campaigns.  When a user visited a website selling goods or services, or clicked on a certain online advertisement, a "cookie" (or small file) capturing that user's action would be stored on their browser.  Then, as the user continued to browse the web, the cookie enabled the placement of display advertisements on other websites from the company whose website the user had

CLASS ACTION COMPLAINT
CASE NO.

visited or on whose advertisement the user had clicked. Numerous class members relied on display advertising brokered by Google to carry out such re-marketing aiming to increase user "conversion" into paying clients or customers. These campaigns also resulted in the placement of display advertisements to users who carried a similar "cookie" profile as users who visited the advertiser's website and/or clicked on its advertisement. Search advertising cannot accomplish this re-marketing given that the purpose of this strategy is to target a discrete set of users with display advertising.

185. The government enforcers note in their complaint that display advertising, in contrast to search advertising, does "not enable advertisers to target customers based on specific queries and are generally aimed at consumers who are further from the point of purchase." The enforcers' complaint also quotes the statement of Google's Chief Economist that "[o]ne way to think about the difference between search and display/brand advertising is to say that 'search ads help satisfy demand' while 'brand advertising helps to create demand,'" and "[d]isplay and search advertising are complementary tools, not competing ones." Thus, given that search and display advertising, by Google's own admission, do not compete for the same business, they occupy distinct antitrust markets.

186. Additionally, the market for display advertising services is separate and distinct from the market for advertisement inventory—*i.e.*, the spaces on websites that publishers make available for advertisers to purchase. At least thousands of companies act as publishers with display advertisement inventory, but in general, these companies do not offer the services that facilitate placement of advertisements into the supply of display advertising space. Only a few companies—Google chief among them—now provide display advertising services.

187. There are high barriers to entry for the display advertising market and its component submarkets. Entering any of these markets requires a substantial investment to develop and implement the technology necessary to compete. Consequently, "advertisers and publishers alike have few options when deciding how to buy and sell online ad space," concludes the 2020 House Subcommittee report on competition in digital markets.

188. Google's overall conduct, including leveraging its internet search platform dominance and denying interoperability in several respects, as described above, has made it exponentially more

CLASS ACTION COMPLAINT
CASE NO.

difficult for would-be market participants to effectively enter these markets and compete with Google. Google has used its market dominance to ensure that market entry by would-be competitors is infeasible. And Google's conduct, moreover, has made it impractical for existing market participants to compete—which has resulted in large numbers of companies exiting the relevant market.

189.    Programmatic display advertising—the subject of this action—serves a different purpose and is not reasonably interchangeable with social-media display advertising. Google's automated display advertising services *connect* independent entities—advertisers and publishers. In other words, advertisers use display advertising services to access a *range* of publication options and thereby reach a broader group of users. Publishers, in turn, use display advertising services to access many potential advertisers. Google operates in an open-ended market in which it facilitates the transactions between these advertisers and publishers.

190.    By contrast, companies like Facebook, Twitter, and Snapchat primarily host social media content, while Amazon primarily operates an online market for goods. These web businesses are suppliers of their own ad inventory and have close-ended, in-house display advertising systems that they use to publish advertisements on their own sites. Those services are not available to other publishers, and advertisements that appear on these close-ended websites only reach visitors to *those* websites. To advertise across the open web—rather than, for example, on Facebook or Amazon specifically—an advertiser must engage with the ad tech stack that Google dominates.

191.    As the House Subcommittee report explains:

> Within display advertising there are two separate "ad tech" markets . . . first-party and third-party. "First-party" platforms refer to companies such as Facebook, Twitter, and Snap which sell ad space on their own platforms directly to advertisers. . . . Third-party display ad tech platforms are run by intermediary vendors and facilitate the transaction between third-party advertisers, such as the local dry cleaner or a Fortune 500 company, and third-party publishers, such as *The Washington Post* or a blog.

192.    The close-ended advertising services offered by Facebook, Amazon, Twitter, and Snapchat (among other web businesses) are not, therefore, reasonable substitutes for the open-ended system Google offers and do not compete for the same business. "Programmatic" CPM ads are thus

41

distinguished from "social media" CPM ads among participants in the digital advertising industry.

## VII.  ANTITRUST IMPACT

193.  Google's conduct set forth herein had the purpose and effect of excluding competition in the relevant market.  Absent Google's conduct, each segment of the display advertising market would have been significantly more competitive and class members would have financially benefited from that increased competition.

194.  Google's monopoly conduct has caused ongoing and durable harm to competition in the display advertising market.  Google's monopoly power has enabled it to raise its prices above the competitive level to advertisers and, in turn, pay lower than competitive prices to publishers.  Google has extracted monopoly rents in the form of fees it does not fairly disclose to other market participants.

195.  A competitive market would have benefited both the advertisers and the publishers that use display advertising services.  Firms that provide display advertising services make money in a variety of ways, including by retaining the difference between (1) what an advertiser pays the provider to place ads, and (2) the portion of that payment that the provider remits to a publisher for placing the ads on its website.  In a competitive market, advertisers would have paid less to have their ads placed, and publishers would have received more for placing the ads on their websites.

196.  With Google stifling competition and extracting monopoly rents as the dominant intermediary, both advertisers and publishers lost money.  The antitrust economist Fiona Scott Morton noted that,

> [i]f advertisers had more choices in the but-for world about where and through whom to place their ads, they would not continue to give their business to Google in the face of an overcharge. Google would have to choose between losing advertisers' business to rivals whose auctions were fair, or adopting an auction design that generated competitive (lower) prices for advertisers.

197.  In sum, the marked decrease in competition that has resulted from Google's conduct has caused economic injury to Plaintiff and class members because publishers have been paid less than they otherwise would have been paid, and advertisers have paid more than they otherwise would have paid.

CLASS ACTION COMPLAINT
CASE NO.

## VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   The Statutes of Limitations Did Not Begin to Run Because Plaintiff Did Not and Could Not Discover His Claims

198.   Plaintiff and class members had no knowledge of Google's anticompetitive conduct, or of facts sufficient to place them on inquiry notice of the claims asserted herein, during the class period and continuing thereafter.

199.   As described herein, Plaintiff and class members suffered antitrust injury in the form of economic losses as a result of Google's wrongful exercise of monopoly power in the relevant market. Other than dealing directly with Google when using its digital advertising services, Plaintiff had no direct contact or interaction with Google and no means from which Plaintiff could have discovered these injuries and the other bases for his causes of action set forth in this complaint.

200.   Throughout the class period, and continuing thereafter, there was no information in the public domain sufficient to put Plaintiff on notice that Google had wrongfully acquired a display advertising monopoly or was using its monopoly power to pay sub-competitive prices to publishers of such advertising and to charge advertisers supra-competitive prices for display advertising.

201.   It was reasonable for Plaintiff and class members not to suspect that Google was engaging in any unlawful and injurious anticompetitive behavior.

202.   While certain of Google's anticompetitive acts occurred before the applicable limitations periods, not until recently, with the announcement of governmental investigations into Google's monopolization of the market for intermediation services in the online display advertising market, could Plaintiff have discovered his antitrust injuries and causes of action set forth in this complaint.  At the time it occurred, no reasonable class member had any basis to discern the anticompetitive nature of Google's conduct described in this complaint that occurred before the applicable limitations periods.

203.   Plaintiff alleges a continuing course of unlawful conduct by Google, including conduct within the applicable limitations periods.  That conduct has inflicted continuing and accumulating harm to Plaintiff and class members within the applicable statutes of limitations.

204.   For these reasons, the statutes of limitations applicable to Plaintiff's and class members'

CLASS ACTION COMPLAINT
CASE NO.

claims have been tolled with respect to the claims asserted herein.

**B.** **Google's Fraudulent Concealment Tolled the Statute of Limitations**

205.     Additionally or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitations on Plaintiff's claims.  Plaintiff had no knowledge of Google's wrongful acquisition and maintenance of monopoly power in the relevant market, or of facts sufficient to place Plaintiff on inquiry notice of his injuries or the other bases for his causes of action, during the class period and continuing thereafter.  No information in the public domain or otherwise available to Plaintiff during the class period suggested that Google had wrongfully acquired a digital advertising monopoly or was using its monopoly power to pay sub-competitive prices to publishers of such advertising and to charge advertisers supra-competitive prices for display advertising.

206.     Google concealed its illicit and harmful conduct, both by failing to disclose its wrongful acquisition and maintenance of a digital advertising monopoly through exclusionary acts in the relevant market, and by affirmatively denying that it was engaged in such conduct.  Google has (repeatedly) publicly denied allegations by American and foreign regulators that it has abused its power in digital advertising markets.  These affirmative statements, and Google's nondisclosure that it had acted to forestall competition, served to fraudulently conceal Google's unlawful monopoly in brokering online display advertising.

207.     When the French Competition Authority fined Google $167 million in late 2019, Google publicly defended its advertising policies in a statement issued on December 20, 2019, as purportedly needed to "protect[ people] from exploitative and abusive ads."  In fact, as discussed above, Google adopted those policies to protect its monopoly power by heading off competition.  Similarly, in response to news reports in 2019 that federal and state officials had opened antitrust investigations into Google's advertising business, a Google vice-president for product management, Sissie Hsiao, released a public statement on September 11, 2019 asserting that "[c]ompetition is flourishing, and publishers and marketers have enormous choice" when that was false.

208.     In addition to its affirmative fraud and nondisclosure, Google's anticompetitive conduct also was inherently self-concealing because revealing the true facts concerning Google's monopolistic

behavior would have prompted governmental enforcement activity and/or class action litigation. Digital advertising is subject to antitrust regulation, so it was reasonable for Plaintiff and class members not to suspect that digital advertising services were being sold in a noncompetitive market. A reasonable person under the circumstances would not have had occasion to suspect Google was brokering display advertising at supra-competitive prices (for advertisers) and sub-competitive prices (for publishers) at any time during the class period.

209. Because Google's antitrust violations were self-concealing and affirmatively concealed by Google, Plaintiff and class members had no knowledge of Google's antitrust violations or of any facts or information that would have caused a reasonably diligent person to suspect Google of having wrongfully acquired and maintained monopoly power during the class period.

210. Therefore, by operation of Google's fraudulent concealment, the statutes of limitations applicable to Plaintiff's and class members' claims were tolled throughout the class period.

## IX. CLASS ACTION ALLEGATIONS

211. Plaintiff brings this action on behalf of himself and, under Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3) and/or (c)(4), as the representative of the following class:

> All persons and entities in the United States that, from January 1, 2016 to the present, used Google's display advertising services to (1) place an ad on a website operated by another entity (advertisers) or (2) place an ad from a third party on their own website (publishers).

Excluded from the proposed class are: Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and their immediate family members and court staff assigned to this case.

212. The proposed class meets the requirements of Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3).

213. The members of the class are so numerous that joinder is impracticable. The class includes at least hundreds of thousands of members that are widely dispersed throughout the country.

214. Plaintiff's claims are typical of the claims of all class members. Plaintiff's claims arise

out of a common course of conduct that gives rise to the claims of all other class members.  Plaintiff and all class members were and will continue to be damaged in the same manner by the same wrongful conduct, namely Google's unfair business practices and monopolization of the market for display advertising services.

215.    Plaintiff will fairly and adequately protect and represent the interests of the class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the class.

216.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation and have particular expertise with antitrust litigation.

217.    Numerous questions of law or fact common to the class arise from Google's course of conduct to exclude competition in the relevant market, including:

    a.    Whether Google holds monopoly power in the relevant market;

    b.    Whether Google unlawfully acquired and maintained monopoly power in the relevant market;

    c.    Whether Google engaged in unfair business practices that reduced competition in the relevant market;

    d.    The form and content of injunctive relief to restore competition; and

    e.    The amount of damages owed the class as a result of Google's illegal activity.

218.    Questions of law and fact common to members of the class will predominate over any questions that may affect only individual class members because Google acted on grounds generally applicable to the class as a whole.  For the same reason, class certification for purposes of adjudicating Plaintiff's claims for injunctive and declaratory relief is appropriate.

219.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy.  Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation.  There will be no material difficulty in the management of this action as a class action.

220.    The prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Google.

CLASS ACTION COMPLAINT
CASE NO.

221.     Plaintiff reserves the right to seek class certification with respect to common issues, including issues related to Google's duties or conduct.

## X.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE SHERMAN ANTITRUST ACT
### 15 U.S.C. § 2

222.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

223.     The market for programmatic display advertising services in the United States is a relevant antitrust market, and Google has monopoly power in that market.

224.     Google wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the overall scheme and conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

225.     Google's actions were carried out willfully and with the specific intent to acquire and maintain monopoly power in the relevant market through anticompetitive conduct and not through a superior product, business acumen, or a historic accident.

226.     Google's exclusionary conduct has foreclosed a substantial share of the market for programmatic display advertising services.

227.     As a direct and proximate cause of Google's conduct, Plaintiff and members of the class have suffered antitrust injury in the form of economic losses.  Those losses constitute antitrust injury, as they are an injury of the type the antitrust laws were intended to prevent and that flows from what makes Google's monopolistic acts unlawful.  But for Google's unlawful exclusionary conduct, competition would have prevailed in the relevant market and Plaintiff and class members would not have sustained these losses.  Google's conduct also deprived Plaintiff and class members of improved quality and innovation in the relevant market.

228.     There is no legitimate pro-competitive justification for Google's anticompetitive conduct,

CLASS ACTION COMPLAINT
CASE NO.

and even if there were, less restrictive alternatives to achieve it would exist.

229. Plaintiff and members of the class are entitled to equitable relief as appropriate to halt Google's monopoly conduct and restore competition in the relevant market. Members of the class are regular users of display advertising services and will continue to purchase such services and suffer further injury if Google's monopoly is not ended. The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly.

230. Plaintiff and members of the class are entitled to damages, including treble damages, sustained as a result of Google's monopolistic acts and practices.

### SECOND CAUSE OF ACTION
**VIOLATIONS OF THE UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200 *et seq.* (UCL)**

231. Plaintiff incorporates the allegations set forth above as if fully set forth herein.

232. Google's conduct is unlawful in violation of the UCL because it violates the Sherman Antitrust Act, 15 U.S.C. § 2.

233. Google has engaged in unfair business practices through the overall scheme and conduct alleged herein, which has restrained competition. Google's conduct is unfair, in violation of the UCL, because it violates California's clearly established public policy forbidding monopolistic acts. Google wrongfully acquired and unlawfully maintained monopoly power in the relevant market through the conduct alleged herein, including by leveraging its monopoly power in the online search and other markets to coerce the purchase and use of its display advertising services (an unlawful tying arrangement), acquiring rivals, denying interoperability on several technological fronts, restricting competing firms' access to information, and rigging auctions that it controlled to its own advantage.

234. Google's practices also are unfair in violation of the UCL because they offend public policy; are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious; and caused substantial harm, including from Google's supra-competitive prices that advertisers paid and Google's anticompetitive underpayments to publishers, that outweighs by a wide margin any possible utility from the practices.

CLASS ACTION COMPLAINT
CASE NO.

235.    Google's unlawful and unfair business practices actually and proximately caused Plaintiff and class members to lose money or property.

236.    Plaintiff and class members lack an adequate remedy at law to redress certain conduct of Google that violates the unfair prong of the UCL.  Through the practices described herein, Google suppressed competition in its incipiency, violated well-established antitrust policies, and significantly harmed and threatened competition in the relevant market.

237.    Accordingly, on behalf of the class, Plaintiff seeks injunctive relief, restitution, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.  The primary purpose of such injunctive relief will be to benefit the public from the lower prices and greater innovation that will prevail in competitive digital advertising markets in the absence of Google's monopoly.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the class defined herein, respectfully request that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), direct that reasonable notice of this action be given to the class, appoint Plaintiff as the named representative of the class, and appoint the undersigned Plaintiff's counsel as class counsel;

B.    Enter judgment against Google and in favor of Plaintiff and the class;

C.    Enter injunctive relief to restore competition in the relevant market and its constituent submarkets;

D.    Award damages, including treble damages, and/or restitution to the class in an amount to be determined at trial, plus interest in accordance with law;

E.    Award Plaintiff and the class their costs of suit, including reasonable attorneys' fees, as provided by law; and

F.     Award such further and additional relief as is necessary to redress the harm caused by Google's unlawful conduct and as the Court may deem just and proper under the circumstances.

## XII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Dated: January 4, 2021             Respectfully submitted,

By:    /s/ *Dena C. Sharp*   

Dena C. Sharp (State Bar No. 245869)
Jordan Elias (State Bar No. 228731)
Adam E. Polk (State Bar No. 273000)
Scott M. Grzenczyk (State Bar No. 279309)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
dsharp@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
scottg@girardsharp.com

John D. Radice (*pro hac vice* forthcoming)
April Lambert (*pro hac vice* forthcoming)
**RADICE LAW FIRM, PC**
475 Wall Street
Princeton, NJ 08540
Tel: (646) 245-8502
Fax: (609) 385-0745
jradice@radicelawfirm.com
alambert@radicelawfirm.com

Scott L. Silver (*pro hac vice* forthcoming)
**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, FL 33065
Tel: (954) 755-4799

50

CLASS ACTION COMPLAINT
CASE NO.

ssilver@silverlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT
CASE NO.

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

MARK J. ASTARITA

**(b)** County of Residence of First Listed Plaintiff   Palm Beach County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Girard Sharp LLP
601 California St., Ste. 1400, San Francisco, CA 94108 Tel: (415) 981-4800

## DEFENDANTS

GOOGLE LLC and ALPHABET INC.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                           *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | **LABOR** | 820 Copyrights | ☒ 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 710 Fair Labor Standards Act | 830 Patent | 430 Banks and Banking |
| | 340 Marine | **PERSONAL PROPERTY** | 720 Labor/Management Relations | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | 370 Other Fraud | 740 Railway Labor Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 371 Truth in Lending | 751 Family and Medical Leave Act | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| of Veteran's Benefits | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | 446 Amer. w/Disabilities–Other | **OTHER** | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 448 Education | 540 Mandamus & Other | | | |
| 245 Tort Product Liability | | 550 Civil Rights | | | 950 Constitutionality of State Statutes |
| 290 All Other Real Property | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court |
| ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened |
| ☐ 5 Transferred from Another District (specify) | ☐ 6 Multidistrict Litigation–Transfer |
| ☐ 8 Multidistrict Litigation–Direct File | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 2
Brief description of cause:
Violation of Sherman Act, 15 U.S.C. § 2 and California law

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE Beth Labson Freeman

DOCKET NUMBER 5:20-cv-03556

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
**(Place an "X" in One Box Only)**    ☐ SAN FRANCISCO/OAKLAND    ☒ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

**DATE** 01/04/2021    **SIGNATURE OF ATTORNEY OF RECORD**    /s/ Dena C. Sharp